IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| PAUL REINHART, INC., | § | Case No. 08-35283-HDH-11 |
| | § | |
| Debtor. | § | |

**JOINT DISCLOSURE STATEMENT PURSUANT TO 11 U.S.C. § 1125
IN SUPPORT OF DEBTOR'S AND OFFICIAL UNSECURED CREDITORS'
COMMITTEE'S FIRST AMENDED JOINT PLAN OF LIQUIDATION UNDER
CHAPTER 11 OF THE UNITED STATES BANKRUPTCY CODE**

<div style="border:2px solid black; background:green;">

**NOTICE**

**THE BANKRUPTCY COURT HAS NOT YET APPROVED THIS
DISCLOSURE STATEMENT PURSUANT TO 11 U.S.C. § 1125.
THEREFORE, IT IS NOT TO BE RELIED UPON OR USED IN
CONNECTION WITH THE SOLICITATION OF VOTES FOR
OR AGAINST ANY CHAPTER 11 PLAN FILED IN THE
BANKRUPTCY CASE.**

</div>

E. Lee Morris
Deborah M. Perry
**MUNSCH HARDT KOPF & HARR, P.C.**
3800 Lincoln Plaza
500 N. Akard Street
Dallas, Texas 75201-6659
Telephone: (214) 855-7500
Facsimile: (214) 855-7584

**Attorneys for Paul Reinhart, Inc.,
Debtor and Debtor-in-Possession**

Michael R. Rochelle
Sean J. McCaffity
**ROCHELLE McCULLOUGH LLP**
325 N. St. Paul, Suite 4500
Dallas, Texas 75201
Telephone: (214) 953-0182
Facsimile: (214) 953-0185

**Attorneys for Official Unsecured
Creditors' Committee**

Dated: August 17, 2009

# TABLE OF CONTENTS

INTRODUCTORY DISCLOSURES .................................................................................................. v

I.      INTRODUCTION ..................................................................................................... 1

II.     PLAN OVERVIEW ................................................................................................... 2

III.    VOTING PROCEDURES AND REQUIREMENTS ........................................... 6
        A.    Ballots and Voting Deadline.................................................................. 6
        B.    Creditors Solicited to Vote ................................................................... 6
        C.    Definition of Impairment ...................................................................... 7
        D.    Classes Impaired Under the Plan .......................................................... 7
        E.    Vote Required for Class Acceptance ..................................................... 8

IV.     CONFIRMATION OF THE PLAN ....................................................................... 8
        A.    Confirmation Hearing ........................................................................... 8
        B.    Requirements for Confirmation of the Plan.......................................... 9
        C.    Cramdown............................................................................................. 11

V.      HISTORICAL AND BACKGROUND INFORMATION .............................. 12
        A.    Organizational Information.................................................................. 12
        B.    The Debtor's Business and Operations................................................ 12
        C.    Events Leading to Chapter 11 Filing .................................................. 13
        D.    Management of the Debtor ................................................................... 15
        E.    Description of Assets of the Debtor ..................................................... 15
        F.    Bank Agent's and Lenders' Assertions............................................... 16

VI.     SIGNIFICANT EVENTS DURING THE BANKRUPTCY CASE................. 17
        A.    Debtor's Employment of Professionals ............................................... 17
              1.    Bankruptcy Counsel.................................................................. 17
              2.    Financial and Restructuring Advisor ........................................ 17
              3.    Ordinary Course Mexican Counsel........................................... 17
        B.    Committee's Employment of Professionals......................................... 18
              1.    Bankruptcy Counsel.................................................................. 18
              2.    Special Litigation Counsel........................................................ 18
        C.    Cash Management System and Maintenance of Accounts .................... 19
        D.    Financing of Operations and Administration of the Estate.................... 19
              1.    PRAI-Texas Gratuitous Contribution ....................................... 19
              2.    Authorization to Use Cash Collateral ....................................... 19
        E.    Authorization to Pay Warehouse Charges and Certain Critical Vendor Claims ...... 21
        F.    Adequate Assurance of Utility Payments ............................................ 21
        G.    Employee Stabilization ....................................................................... 21
              1.    Authorization to Pay Pre-Petition Wages and Related Amounts;
                    Continuation of Standard Employee Benefits............................ 21
              2.    Authorization to Maintain Severance Plan ................................ 22
              3.    Approval of Officer Incentive Program ..................................... 22
        H.    Executory Contracts and Unexpired Leases ........................................ 22
              1.    Rejection of Unperformed Cotton Purchase Contracts............... 22
              2.    Assumption of Headquarters Lease, As Modified ..................... 22

|   |   | 3. | Rejection of Miscellaneous Equipment Leases | 23 |
|---|---|---|---|---|
|   | I. | | Disposition of Disputed Cotton Bales | 23 |
|   | J. | | Automatic Stay Matters | 23 |
|   |   | 1. | Supplemental Stay Order | 23 |
|   |   | 2. | CoMark's Motion for Relief from the Automatic Stay | 23 |
|   | K. | | Tax Matters | 24 |
|   |   | 1. | Payment of Allocated Share of Tax Return Preparation Expenses | 24 |
|   |   | 2. | California Franchise Tax Board's Request for Payment of Alleged Taxes | 24 |
|   | L. | | Authorization for Committee to Pursue Estate-Based Claims | 24 |
|   | M. | | Extension of Plan Exclusivity Periods | 24 |
|   | N. | | Adversary Proceedings | 25 |
|   |   | 1. | East Lawsuit (Adversary No. 08-3438) | 25 |
|   |   | 2. | CoMark Lawsuit (Adversary No. 08-3491) | 27 |
|   | O. | | Sales of Assets of the Estate | 28 |
|   |   | 1. | Investment in The Seam and ICE | 28 |
|   |   | 2. | Unnecessary Furniture | 28 |
|   | P. | | Compromises of Disputes | 28 |
|   |   | 1. | Signia Settlement | 28 |
|   |   | 2. | PPGC-PGC Settlement | 28 |
|   |   | 3. | Receivables Restructuring Protocol | 29 |

| VII. | **PRAG SETTLEMENT** | | 29 |
|---|---|---|---|
|   | A. | Introduction | 29 |
|   | B. | Nature of Claims Subject to Resolution | 29 |
|   | C. | Terms of the PRAG Settlement | 31 |
|   | D. | Legal Standard for Approval of Settlements | 33 |
|   | E. | Committee's Analysis of PRAG Settlement Under Legal Standard | 35 |
|   | F. | Bank Agent's and Lenders' Assertions | 36 |

| VIII. | **EQUITABLE SUBORDINATION OF CLAIMS OF LENDERS** | | 37 |
|---|---|---|---|
|   | A. | Introduction | 37 |
|   | B. | Standards for Equitable Subordination | 38 |
|   | C. | Committee's Application of Standards to Lenders' Claims | 39 |
|   | D. | Bank Agent's and Lenders' Assertions | 41 |

| IX. | **SUMMARY OF THE CLAIMS, CLASSIFICATION AND TREATMENT UNDER THE PLAN** | | | 43 |
|---|---|---|---|---|
|   | A. | | Introduction | 43 |
|   | B. | | Classification of Claims and Equity Interests | 43 |
|   | C. | | Treatment of Unclassified Claims Under the Plan | 44 |
|   |   | 1. | Treatment of Allowed Administrative Claims | 44 |
|   |   | 2. | Treatment of Allowed Priority Tax Claims | 45 |
|   | D. | | Treatment of Classified Claims and Equity Interests Under the Plan | 45 |
|   |   | 1. | Treatment of Secured Claims of Lenders (Class 1) | 45 |
|   |   | 2. | Treatment of Allowed Secured Claims of Non-Lender Claimants (Class 2) | 47 |
|   |   | 3. | Treatment of Allowed Priority Non-Tax Claims (Class 3) | 48 |
|   |   | 4. | Treatment of Allowed General Unsecured Claims (Class 4) | 48 |
|   |   | 5. | Treatment of Allowed Unsecured Lender Claims (Class 5) | 50 |
|   |   | 6. | Treatment of Allowed Subordinated Claims (Class 6) | 50 |

       7.     Treatment of Equity Interests (Class 7) ....................................... 51

E.    Distributions Only on Account of Allowed Claims ................................. 51

**X.    MEANS FOR IMPLEMENTATION OF THE PLAN** ............................... 51

A.    Creation, Funding and Administration of Creditor Trust ..................... 51

B.    Wind-Up and Termination of Debtor ...................................................... 54

C.    Approval and Consummation of PRAG Settlement ............................... 54

D.    Cancellation of Notes and Instruments; Release of Liens ..................... 54

E.    Preservation of Causes of Action ............................................................ 54

F.    Termination of Pension Plan ................................................................... 55

**XI.    LEGAL PROCEEDINGS AFFECTING THE DEBTOR AND ESTATE** ................... 56

A.    Litigation Pending as of the Petition Date ............................................. 56

B.    Post-Petition Litigation ........................................................................... 57

C.    Potential Litigation ................................................................................. 57

       1.     Claims Against the Lenders .......................................................... 58

       2.     Avoidance Causes of Action ......................................................... 58

       3.     Subordination Causes of Action ................................................... 58

       4.     Collection Causes of Action .......................................................... 58

       5.     Bank Agent's and Lenders' Assertions......................................... 59

       6.     Notice of Preservation of Causes of Action.................................. 59

**XII.    OTHER SIGNIFICANT PLAN PROVISIONS** .................................................. 60

A.    Treatment of Executory Contracts and Unexpired Leases....................... 60

B.    Distributions Under the Plan ................................................................... 60

       1.     Distributions Made to Holders as of Distribution Record Date.................. 60

       2.     Interim and Final Distributions of Net Available Funds............................. 60

       3.     Conditions to Distributions, Warranty of Entitlement, and Withholding .... 61

       4.     Setoffs ........................................................................................... 61

       5.     Establishment of Reserves Under the Plan .................................. 61

       6.     Undeliverable and Unclaimed Distributions................................. 62

       7.     Disputed Distributions .................................................................. 62

       8.     De Minimis Distributions ............................................................. 63

C.    Means for Resolving Disputed Claims .................................................... 63

D.    Conditions to Confirmation and Effectiveness of the Plan..................... 63

E.    Effects of Confirmation of the Plan; Injunction and Exculpation........... 65

       1.     Binding Effect of Plan ................................................................... 65

       2.     Vesting of Assets ........................................................................... 65

       3.     Injunction Against Interference with Plan .................................... 65

       4.     Exculpation ................................................................................... 65

F.    Modification of the Plan ......................................................................... 65

G.    Retention of Jurisdiction ......................................................................... 66

**XIII.    COMPARISON OF PLAN TO ALTERNATIVES** ............................................. 66

A.    Chapter 7 Liquidation ............................................................................. 66

B.    Alternative Plans ..................................................................................... 67

C.    Dismissal.................................................................................................. 67

**XIV.    MATERIAL UNCERTAINTIES AND RISKS** .................................................. 67

**XV.    CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN** ................ 68
    A.      Introduction ........................................................................................... 68
    B.      Federal Income Tax Consequences to the Debtor ................................... 69
    C.      Federal Income Tax Consequences Associated with Creation of Creditor Trust ..... 69
    D.      Additional Federal Income Tax Consequences to Creditors ................... 70
    E.      Tax Withholding .................................................................................... 70
    F.      Disclaimers ............................................................................................ 70

**XVI.    CONCLUSION** ......................................................................................... 71

## EXHIBITS

**Exhibit A**:    Debtor's and Official Unsecured Creditors' Committee's First Amended
                    Joint Plan of Liquidation Under Chapter 11 of the United States Bankruptcy Code

**Exhibit B**:    Unaudited Balance Sheet of the Debtor as of July 31, 2009

**Exhibit C**:    Notice of Designation of Trustee

**Exhibit D**:    Notice of Designation of Members of Creditor Trust Oversight Committee

## INTRODUCTORY DISCLOSURES

THIS DISCLOSURE STATEMENT, WHICH HAS BEEN JOINTLY FILED BY PAUL REINHART, INC. (THE "<u>DEBTOR</u>") AND THE OFFICIAL UNSECURED CREDITORS' COMMITTEE (THE "<u>COMMITTEE</u>," AND TOGETHER WITH THE DEBTOR THE "<u>PLAN PROPONENTS</u>"), CONTAINS A SUMMARY OF MATERIAL PROVISIONS OF THE DEBTOR'S AND OFFICIAL UNSECURED CREDITORS' COMMITTEE'S FIRST AMENDED JOINT PLAN OF LIQUIDATION UNDER CHAPTER 11 OF THE UNITED STATES BANKRUPTCY CODE (THE "<u>PLAN</u>"), INCLUDING PROVISIONS RELATING TO THE PLAN'S TREATMENT OF CLAIMS AGAINST AND EQUITY INTERESTS IN THE DEBTOR, THE SUBORDINATION OF LENDER CLAIMS UNDER THE PLAN, THE TERMS OF THE PRAG SETTLEMENT, AND THE MEANS OF IMPLEMENTATION OF THE PLAN. THE DISCLOSURE STATEMENT ALSO SUMMARIZES CERTAIN FINANCIAL INFORMATION CONCERNING THE DEBTOR AND THE CLAIMS ASSERTED AGAINST THE DEBTOR IN ITS BANKRUPTCY CASE. WHILE THE PLAN PROPONENTS BELIEVE THAT THE DISCLOSURE STATEMENT CONTAINS ADEQUATE INFORMATION WITH RESPECT TO THE DOCUMENTS AND INFORMATION SUMMARIZED, CREDITORS AND EQUITY INTEREST HOLDERS SHOULD REVIEW THE ENTIRE PLAN AND EACH OF THE DOCUMENTS REFERENCED HEREIN, AND SHOULD SEEK THE ADVICE OF THEIR OWN COUNSEL AND OTHER ADVISORS BEFORE CASTING THEIR BALLOTS ON THE PLAN.

EXCEPT FOR THE INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT AND THE EXHIBITS ATTACHED HERETO, NO REPRESENTATIONS CONCERNING THE DEBTOR, THE DEBTOR'S ASSETS AND LIABILITIES, THE PAST OR FUTURE OPERATIONS OF THE DEBTOR, THE PLAN AND ITS TERMS, OR ALTERNATIVES TO THE PLAN ARE AUTHORIZED, NOR ARE ANY SUCH REPRESENTATIONS TO BE RELIED UPON IN ARRIVING AT A DECISION WITH RESPECT TO THE PLAN. ANY INFORMATION WITH RESPECT TO SUCH TOPIC AREAS THAT IS PROVIDED TO SECURE ACCEPTANCE OR REJECTION OF THE PLAN AND THAT IS NOT CONTAINED IN THIS DISCLOSURE STATEMENT AND THE EXHIBITS ATTACHED HERETO IS UNAUTHORIZED AND SHOULD BE REPORTED IMMEDIATELY TO THE PLAN PROPONENTS' RESPECTIVE COUNSEL.

STATEMENTS AND FINANCIAL INFORMATION CONCERNING THE DEBTOR HEREIN, INCLUDING, WITHOUT LIMITATION, HISTORICAL INFORMATION, INFORMATION REGARDING THE DEBTOR'S ASSETS AND LIABILITIES, AND INFORMATION REGARDING CLAIMS AND EQUITY INTEREST ASSERTED OR OTHERWISE EVIDENCED IN THE BANKRUPTCY CASE, HAVE BEEN DERIVED FROM NUMEROUS SOURCES INCLUDING, WITHOUT LIMITATION, THE DEBTOR'S BOOKS AND RECORDS, THE DEBTOR'S SCHEDULES, AND COURT RECORDS. WHILE THE COMMITTEE PARTICIPATED IN THE PREPARATION OF THE DISCLOSURE STATEMENT, HISTORICAL AND FINANCIAL INFORMATION REGARDING THE DEBTOR WAS PREPARED BY THE DEBTOR, AND THE COMMITTEE IS NOT REPONSIBLE FOR THE ACCURACY OR COMPLETENESS OF SUCH HISTORICAL AND FINANCIAL INFORMATION. AND WHILE THE DEBTOR REASONABLY BELIEVES THAT THE HISTORICAL AND FINANCIAL INFORMATION SET FORTH HEREIN IS ACCURATE, COMPLETE AND RELIABLE, THE DEBTOR AND ITS PROFESSIONALS HAVE NOT TAKEN ANY INDEPENDENT ACTION TO VERIFY THE ACCURACY, COMPLETENESS OR RELIABILITY OF SUCH HISTORICAL INFORMATION AND THERE HAS BEEN NO INDEPENDENT AUDIT OF THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT. THEREFORE, NEITHER THE PLAN PROPONENTS NOR

THEIR RESPECTIVE PROFESSIONALS WARRANT OR REPRESENT THAT THE INFORMATION CONTAINED HEREIN IS COMPLETE, ACCURATE AND RELIABLE. HOWEVER, THE PLAN PROPONENTS HAVE REVIEWED THE INFORMATION SET FORTH HEREIN AND, BASED UPON THE SOURCES OF INFORMATION AVAILABLE TO THEM, GENERALLY BELIEVE SUCH INFORMATION TO BE COMPLETE.

UNLESS INDICATED OTHERWISE, THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE AS OF AUGUST 7, 2009, AND NEITHER DELIVERY OF THIS DISCLOSURE STATEMENT NOR ANY EXCHANGE OF RIGHTS MADE IN CONNECTION WITH THE PLAN SHALL, UNDER ANY CIRCUMSTANCES, CREATE AN IMPLICATION THAT THERE HAS BEEN NO CHANGE IN THE INFORMATION SET FORTH HEREIN SINCE THE DATE THE DISCLOSURE STATEMENT AND THE MATERIALS RELIED UPON IN THE PREPARATION OF THE DISCLOSURE STATEMENT WERE COMPILED.

THIS DISCLOSURE STATEMENT MAY NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN TO DETERMINE WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN. THIS DISCLOSURE STATEMENT CONTAINS PROJECTED FINANCIAL INFORMATION REGARDING THE DEBTOR, RECOVERIES UNDER THE PLAN, AND CERTAIN OTHER FORWARD-LOOKING STATEMENTS, ALL OF WHICH ARE BASED UPON VARIOUS ASSUMPTIONS AND ESTIMATES AS OF AUGUST 7, 2009 OR SUCH OTHER TIME AS IS SPECIFIED. SUCH INFORMATION WILL NOT BE UPDATED TO REFLECT EVENTS OCCURRING AFTER SAID DATE(S), AND SUCH INFORMATION IS SUBJECT TO INHERENT UNCERTAINTIES AND TO A WIDE VARIETY OF SIGNIFICANT BUSINESS, ECONOMIC AND COMPETITIVE RISKS. CONSEQUENTLY, ACTUAL EVENTS, CIRCUMSTANCES, EFFECTS AND RESULTS MAY VARY SIGNIFICANTLY FROM THOSE INCLUDED IN OR CONTEMPLATED BY SUCH PROJECTED FINANCIAL INFORMATION AND SUCH OTHER FORWARD-LOOKING STATEMENTS.

THE APPROVAL OF THIS DISCLOSURE STATEMENT BY THE BANKRUPTCY COURT DOES NOT CONSTITUTE AN ENDORSEMENT BY THE BANKRUPTCY COURT OF THE PLAN OR A GUARANTY OF THE ACCURACY AND COMPLETENESS OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT.

ANY INFORMATION PROVIDED IN THE DISCLOSURE STATEMENT BY THE BANK AGENT AND/OR LENDERS SHOULD NOT BE RELIED UPON UNLESS SUCH INFORMATION HAS BEEN INDEPENDENTLY VERIFIED. NOTHING CONTAINED IN THIS DISCLOSURE STATEMENT SHALL HAVE ANY PRECLUSIVE EFFECT AGAINST THE BANK AGENT OR LENDERS (WHETHER BY WAIVER, ADMISSION, ESTOPPEL OR OTHERWISE) IN ANY CAUSE OR PROCEEDING WHICH MAY EXIST OR OCCUR IN THE FUTURE. THIS DISCLOSURE STATEMENT SHALL NOT BE CONSTRUED OR DEEMED TO CONSTITUTE AN ACCEPTANCE OF FACT OR AN ADMISSION BY THE BANK AGENT OR LENDERS IN REGARDS TO ANY OF THE STATEMENTS CONTAINED OR MADE HEREIN, AND ALL RIGHTS AND REMEDIES OF THE BANK AGENT AND LENDERS ARE EXPRESSLY RESERVED IN THIS REGARD.

NOTHING CONTAINED IN THIS DISCLOSURE STATEMENT, EXPRESS OR IMPLIED, IS INTENDED TO GIVE RISE TO ANY COMMITMENT OR OBLIGATION OF THE DEBTOR, THE COMMITTEE, OR ANY OTHER PARTY, NOR SHALL IT BE CONSTRUED AS CONFERRING UPON ANY PERSON ANY RIGHTS, BENEFITS OR REMEDIES OF ANY NATURE WHATSOEVER. THE DISCLOSURE STATEMENT IS INFORMATIONAL ONLY.

**ADDITIONALLY, CREDITORS AND EQUITY INTEREST HOLDERS SHOULD NOT CONSTRUE THE CONTENTS OF THIS DISCLOSURE STATEMENT AS PROVIDING ANY LEGAL, BUSINESS, FINANCIAL OR TAX ADVICE. EACH CREDITOR AND EQUITY INTEREST HOLDER SHOULD CONSULT WITH ITS OWN LEGAL, BUSINESS, FINANCIAL AND TAX ADVISORS AS TO ANY MATTER CONCERNING THE PLAN, THE EFFECTS OF IMPLEMENTATION OF THE PLAN, AND THE VOTING PROCEDURES APPLICABLE TO THE PLAN.**

**JOINT DISCLOSURE STATEMENT PURSUANT TO 11 U.S.C. § 1125 IN SUPPORT
OF DEBTOR'S AND OFFICIAL UNSECURED CREDITORS' COMMITTEE'S
FIRST AMENDED JOINT PLAN OF LIQUIDATION UNDER CHAPTER 11
OF THE UNITED STATES BANKRUPTCY CODE**

# I.
## INTRODUCTION

On October 15, 2008, Paul Reinhart, Inc. (the "Debtor")[1] filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code, thereby initiating Case No. 08-35283-HDH-11 (the "Bankruptcy Case") with the United States Bankruptcy Court for the Northern District of Texas (the "Bankruptcy Court").  Since the inception of the Bankruptcy Case, the Debtor has been operating and managing its business and properties as a debtor in possession.  On October 28, 2008, the Official Unsecured Creditors' Committee (the "Committee"), comprised of nine (9) members, was appointed in the Bankruptcy Case to represent the common interests of all unsecured creditors.

On August 17, 2009, the Debtor and the Committee (together, the "Plan Proponents") filed the Debtor's and Official Unsecured Creditors' Committee's First Amended Joint Plan of Liquidation Under Chapter 11 of the United States Bankruptcy Code (the "Plan").  The Plan proposes, among other things, the means by which all Claims against and Equity Interests in the Debtor will be finally resolved and treated for distribution purposes, consistent with the provisions and priorities mandated by the Bankruptcy Code.  Approval and consummation of the Plan will enable the Bankruptcy Case to be concluded and closed.

The Plan Proponents hereby submit this Joint Disclosure Statement Pursuant to 11 U.S.C. § 1125 in Support of Debtor's and Official Unsecured Creditors' Committee's First Amended Joint Plan of Liquidation Under Chapter 11 of the United States Bankruptcy Code (the "Disclosure Statement") in connection with the solicitation of votes on the Plan.  On _____, 2009, after notice and a hearing, the Bankruptcy Court, The Honorable Harlin D. Hale presiding, signed an order approving the Disclosure Statement as containing information of a kind and in sufficient detail, to enable Creditors and Equity Interest holders whose votes on the Plan are being solicited to make an informed judgment on whether to accept or reject the Plan.  The Bankruptcy Court's approval of the Disclosure Statement does not constitute the Court's approval or disapproval of the Plan.

The Disclosure Statement, which includes the Plan as **Exhibit A**, is being mailed to each holder of a Claim against and each holder of an Equity Interest in the Debtor.  However, the Plan Proponents are only seeking votes on the Plan from Creditors and Equity Interest holders who are entitled to vote.  With respect to voting on the Plan, pursuant to the Bankruptcy Code only those Creditors holding Claims, and those Equity Interest holders holding Equity Interests, within impaired Classes under the Plan are entitled to vote.

The Plan Proponents believe that they have promulgated the Plan consistent with the provisions of the Bankruptcy Code.  The Plan Proponents believe that the Plan provides affected Creditors and Equity Interest holders distribution rights on account of their Claims and Equity Interests which are at least equal to, if not greater than, what they would obtain if the Bankruptcy Case were converted to a Chapter 7 liquidation and assets of the Debtor were liquidated within the parameters of Chapter 7 of the Bankruptcy Code.  The Plan Proponents believe that the Plan is fair and equitable to all Classes of Claims and Equity Interests under the Plan.

---

[1] Capitalized terms used herein, if not separately defined, have the meanings assigned to them in the Plan, or if not defined in the Plan, then in the Bankruptcy Code or Bankruptcy Rules.

The Bank Agent and Lenders assert that the Plan Proponents have not promulgated the Plan consistent with the provisions of the Bankruptcy Code. The Bank Agent and Lenders assert, among other things, that the Plan was not proposed in good faith; that the Plan is not fair and equitable to the Bank Agent and Lenders because the Bank Agent and Lenders have not engaged in any wrongful conduct and the Plan attempts to equitably subordinate the Claims of the Lenders for exercising their contractual rights agreed to by the Debtor in the Sixth Amendment to Agreement, Priority Credit Facility and Forbearance Agreement (the "Forbearance Agreement"); and the PRAG Settlement is not fair and equitable and in the best interests of the estate.[2]

This Disclosure Statement is not intended to replace careful review and analysis of the Plan. Rather, it is submitted as an aid and supplement in your review of the Plan, and attempts to explain the terms and implications of the Plan. Every effort has been made to fully explain the various aspects of the Plan as it may affect Creditors and Equity Interest holders. All Persons receiving this Disclosure Statement are urged to review all of the exhibits to this Disclosure Statement, in addition to reviewing the text of this Disclosure Statement. If you have any questions, you may contact the Debtor's counsel and/or the Committee's counsel, and every effort will be made to assist you.

Creditors and Equity Interest holders should read this Disclosure Statement in its entirety prior to voting on the Plan. No solicitation of votes on the Plan may be made except pursuant to this Disclosure Statement and Section 1125 of the Bankruptcy Code. No other party has been authorized to utilize any information concerning the Debtor, its operations, and its assets and liabilities, other than the information contained in this Disclosure Statement, to solicit votes on the Plan. Creditors and Equity Interest holders should not rely on any information relating to the Debtor, its operations, or its assets and liabilities, other than the information contained in this Disclosure Statement and the exhibits attached hereto.

## II.
## PLAN OVERVIEW

The Plan is designed to accomplish five primary objectives: (a) the liquidation of all remaining assets of the Debtor's Estate; (b) the consummation of a settlement between the Debtor and certain of its affiliates, on the one hand, and the Committee and East Plaintiffs, on the other hand, referred to herein as the PRAG Settlement;[3] (c) the subordination of Claims asserted against the Debtor by the Lenders; (d) the orderly determination of Disputed Claims in the Bankruptcy Case; and (e) the making of distributions to holders of Allowed Claims consistent with the priorities mandated by the Bankruptcy Code. The Plan specifies the means for accomplishing each of these objectives, and pertinent provisions of the Plan in relation thereto are described in detail in this Disclosure Statement.

---

[2] Disclaimer by Bank Agent and Lenders: Any information provided in the Disclosure Statement by the Bank Agent and/or Lenders should not be relied upon unless such information has been independently verified. Nothing contained in this Disclosure Statement shall have any preclusive effect against the Bank Agent or Lenders (whether by waiver, admission, estoppel or otherwise) in any cause or proceeding which may exist or occur in the future. This Disclosure Statement shall not be construed or deemed to constitute an acceptance of fact or an admission by the Bank Agent or Lenders in regards to any of the statements contained or made herein, and all rights and remedies of the Bank Agent and Lenders are expressly reserved in this regard.

[3] The East Plaintiffs are comprised of the East Cotton Company Inc., Michael D. East, and certain cotton growers and gin companies who originally filed suit against the Debtor, the Debtor's parent corporation Paul Reinhart America, Inc., and the Debtor's pre-petition lenders under Adversary No. 08-3438 in the Bankruptcy Court. The East Plaintiffs subsequently non-suited the Debtor and Paul Reinhart America, Inc. in connection with the filing of the Plan, and the Committee was granted standing by the Bankruptcy Court to pursue certain causes of action of the Estate against the pre-petition lenders. See section VI(N)(1) below for more information regarding the East Lawsuit.

Focusing on distributions to be made to Creditors and Equity Interest holders under the Plan, the Plan divides Claims against and Equity Interests in the Debtor into separate Classes of Claims[4] and Equity Interests, and then sets out the treatment to be provided to each such Class under the Plan. Sections 1122 and 1123 of the Bankruptcy Code require such classification, with each Class to contain Claims or Equity Interests that are substantially similar to one another. The Plan Proponents have classified Claims against the Debtor into six (6) Classes for purposes of voting on and distributions under the Plan. There is a single Class of Equity Interests for purposes of voting on and distributions under the Plan. The various Classes of Claims and Equity Interests and the treatment provided under the Plan to each such Class are discussed in greater detail in later sections of the Disclosure Statement.

The following table sets out the Debtor's estimate of the number of Claims and Equity Interests per Class, an estimate of the total liquidated amount of Claims and Equity Interests falling within each Class (as asserted or scheduled), and summary of the treatment afforded to each Class under the Plan. The information set forth within the table is qualified in its entirety by the more detailed information regarding the Plan set forth in this Disclosure Statement, the exhibits hereto (including the Plan itself), and the additional disclosures which follow the table.

| SUMMARY OF TREATMENT OF CLASSES UNDER THE PLAN | | |
|---|---|---|
| **Class** | **Estimated Amounts of Claims and Equity Interests per Class** | **Treatment Under Plan** |
| Unclassified – Allowed Administrative Claims | Est. No. of Claimants: 7<br>Est. Amt. of Claims: $2,011,950<br>Est. Allowable Claims: *See* description of Plan treatment for Allowed Administrative Claims | Paid in full within 15 days of the later of the Effective Date or the date on which Allowed.<br>**Est. recovery: 100%** |
| Unclassified – Allowed Priority Tax Claims | Est. No. of Claimants: 9<br>Est. Amt. of Claims: $16,891<br>Est. Allowable Claims: $16,074 | Paid in full within 15 days of the later of the Effective Date or the date on which Allowed.<br>**Est. recovery: 100%** |
| 1 – Secured Claims of Lenders | Est. No. of Claimants: 2<br>Est. Amt. of Claims: $157,633,023<br>Est. Allowable Claims: *See* description of Plan treatment for Class 1 | Plan provides for the subordination of such Claims and the transfer of Liens to the estate.<br><br>*If subordinated*: each holder of an Allowed Subordinated Secured Claim will receive a Pro Rata Share of Net Available Funds in the Creditor Trust (along with holders of Allowed Unsecured Lender Claims and Allowed Subordinated Claims) after Allowed Claims in Class 4 have been fully satisfied per the Plan.<br>**Est. recovery: 0%**<br><br>*If not subordinated*: within 15 days of the later of the Effective Date or the date on which Allowed, either (at the option of the Trustee of the Creditor Trust) (i) paid in full or (ii) the Trustee will transfer the Collateral securing the particular Allowed Secured Claim to the Bank Agent for disposition in accordance with the Intercreditor Agreement and any applicable Orders of the Bankruptcy Court.[5]<br>**Est. recovery: 100%** |

---

[4] There are two exceptions to the classification of Claims. Because Administrative Claims and Priority Tax Claims are subject to mandatory treatment under the Bankruptcy Code, they are not subject to classification.

[5] The Bank Agent and Lenders assert that the Plan requires as a condition of confirmation that the Lenders' Claims be equitably subordinated.

| SUMMARY OF TREATMENT OF CLASSES UNDER THE PLAN | | |
| --- | --- | --- |
| **Class** | **Estimated Amounts of Claims and Equity Interests per Class** | **Treatment Under Plan** |
| 2 – Allowed Secured Claims of Non-Lender Claimants | Est. No. of Claimants: 1<br>Est. Amt. of Claims: $26,307<br>Est. Allowable Claims: $0 | Within 15 days of the later of the Effective Date or the date on which Allowed, the Allowed Claim will be satisfied in one of the following ways (at the option of the Trustee of the Creditor Trust): (i) paid in full; (ii) if not in default, assumed by the Creditor Trust without impairment to the holder's legal, equitable and contractual rights; (iii) if in default, reinstated, subject to cure and compensation for pecuniary loss, and assumed by the Creditor Trust without impairment to the holder's legal, equitable and contractual rights.<br>**Est. recovery: 100%** |
| 3 – Allowed Priority Non-Tax Claims | Est. No. of Claimants: 35<br>Est. Amt. of Claims: $42,411<br>Est. Allowable Claims: $0 | Paid in full within 15 days of the later of the Effective Date or the date on which Allowed.<br>**Est. recovery: 100%** |
| 4 – Allowed General Unsecured Claims | Est. No. of Claimants: 487<br>Est. Amt. of Claims: $146,284,223<br>Est. Allowable Claims: *See description of Plan treatment for Class 4* | Each holder of an Allowed General Unsecured Claim will receive a Pro Rata Share of Net Available Funds in the Creditor Trust after satisfaction of (or reserve for) Allowed Administrative Claims, Allowed Priority Tax Claims, and Allowed Claims in Classes 2 and 3.<br><br>*If Secured Claims of Lenders subordinated:*<br>**Est. recovery: 10-15%[6]**<br><br>*If Secured Claims of Lenders not subordinated:*<br>**Est. recovery: 0%** |
| 5 – Allowed Unsecured Lender Claims | Est. No. of Claimants: 1<br>Est. Amt. of Claims: unknown<br>Est. Allowable Claims: *See description of Plan treatment for Class 5* | Plan provides for the subordination of such Claims. Each holder of an Allowed Unsecured Lender Claim will receive a Pro Rata Share of Net Available Funds in the Creditor Trust (along with holders of Allowed Subordinated Secured Claims and Allowed Subordinated Claims) after Allowed Claims in Class 4 have been fully satisfied per the Plan.<br>**Est. recovery: 0%** |
| 6 – Allowed Subordinated Claims | Est. No. of Claimants: 0<br>Est. Amt. of Claims: n/a<br>Est. Allowable Claims: n/a | Each holder of an Allowed Subordinated Claim will receive a Pro Rata Share of Net Available Funds in the Creditor Trust (along with holders of Allowed Subordinated Secured Claims and Allowed Unsecured Lender Claims) after Allowed Claims in Class 4 have been fully satisfied per the Plan.<br>**Est. recovery: 0%** |
| 7 – Equity Interests | Est. No. of Equity Interest holders: 1<br>Est. No. of Equity Interests: 5,000,000<br>Est. Allowable Equity Interests: 5,000,000 | Cancelled, extinguished and otherwise rendered null, void and of no further force or effect<br>**Est. recovery: 0%** |

## Factors and Assumptions Applied in Arriving at Estimates

The estimated numbers and amounts of Claims per Class in the foregoing table have been derived from the Debtor's Schedules and proofs of claim filed by Creditors in the Bankruptcy Case, as reconciled with the Debtor's books and records and certain other records obtained by the Debtor in relation thereto. With respect to Claims asserted in the Bankruptcy Case, at least 460 proofs of claim have been filed asserting Claims in the aggregate amount of approximately $306,000,000.[7] In addition to the proofs of claim filed in the Bankruptcy Case, the Debtor's Schedules in the Bankruptcy Case list Claims which the Debtor believed to be validly existing against it as

---

[6] The Bank Agent and Lenders assert that the Plan's estimated recovery for Class 4 is completely reliant on the equitable subordination of the Lenders' Claims and approval and consummation of the PRAG Settlement, and that if the Lenders' Claims are not equitably subordinated and the PRAG Settlement is not approved, then Class 4 Creditors will not receive any such recovery under the Plan.

[7] Certain proofs of claim have been asserted, in whole or in part, in an unliquidated amount. The estimate set forth above only includes the liquidated amount of such Claims.

of the Petition Date. For those Claimants listed on the Schedules who have also filed proofs of claim in the Bankruptcy Case, applicable Bankruptcy Rules provide that the proofs of claim have superseded any amounts reflected in the Schedules. To the extent Claims scheduled by the Debtor have not been superseded by proofs of claim, the estimates in the foregoing table take into account Claims scheduled by the Debtor in a liquidated, non-contingent and undisputed amount. The total amount of such scheduled and asserted Claims in the Bankruptcy Case, as of the date hereof, is approximately $309,000,000 (excluding duplicate proofs of claim, proofs of claim that have been amended, and unliquidated Claims). The following additional information is provided in relation to the estimated numbers and amounts of Administrative Claims and Priority Tax Claims:

- Allowed Administrative Claims. The estimated number of Administration Claims in the table above for Unclassified-Allowed Administrative Claims (7 total) contemplates the assertion of Administrative Claims by four (4) of the court-approved estate professionals in the Bankruptcy Case. However, the estimated amount of Administrative Claims does not include an estimate of the amount of fees and expenses that such professionals are likely to incur through the projected Effective Date of the Plan for which they may seek allowance and payment. Such estimate is discussed below in connection with the description of the Plan treatment provided for Allowed Administrative Claims.

- Allowed Priority Tax Claims. Certain Claims asserted by taxing authorities have been filed as Secured Claims and, only in the alternative, as Priority Tax Claims. Notwithstanding the assertion of such Claims as Secured Claims in the first instance, such Claims have been classified under the Plan for all purposes as Priority Tax Claims. Accordingly, such Claims have been reflected in the table above as Priority Tax Claims and not as Secured Claims.

With respect to the estimated amount of Allowed Claims per Class, the estimates reflected in the table above (or alternatively in the Class descriptions below) constitute the Debtor's best estimate of allowable Claims on a per Class basis as of the projected Effective Date. For Claims asserted by proofs of claim, the amounts reflected take into account the anticipated disallowance of such Claims to the extent they are disputed or the Debtor has been unable to otherwise reconcile them to the Debtor's Schedules, books and records, or otherwise. Any Claim which is a Disputed Claim may be disallowed or reduced in amount if an objection has been, or is timely hereafter, filed and sustained by the Bankruptcy Court. Because the resolution of Disputed Claims involves many factual and legal issues which may or may not be resolved as anticipated by the Debtor, no assurance can be given that the anticipated amount of allowable Claims in each Class will be achieved, and the foregoing estimates shall not be deemed as an admission on the part of the Plan Proponents to the validity of any Claim. Similarly, the projected recovery levels reflected in the table above are estimates only, there is no guaranty that such levels of recovery will be achieved, and such estimates shall not constitute an admission on the part of the Plan Proponents to the validity of any Disputed Claims. Except as otherwise provided in the Plan, all objections and other defenses to Disputed Claims are preserved under the Plan. The following additional information is provided in relation to the estimated allowable Claims and projected recoveries per Class:

- Class 1. The Bank Agent, on behalf of itself and the Debtor's pre-petition lenders, has asserted a Claim in the approximate amount of $147,848,221. During the course of the case and pursuant to the cash collateral order entered in the case, however, the Debtor's pre-petition lenders have periodically received certain payments. As of July 31, 2009, the estimated total outstanding principal owing to the pre-petition lenders was approximately $49.76 million. With respect to projected recoveries to Class 1, the Plan provides for the equitable subordination of Secured Claims of the Lenders. If, and to the extent, such equitable subordination is ordered by the Bankruptcy Court, then such Claims, to the extent Allowed, are referred to as Allowed Subordinated Secured Claims. Otherwise, such Claims, to the extent Allowed, are referred to as Allowed Secured Claims of the Lenders. Therefore, for purposes of the above table, Class 1 is bifurcated to reflect the projections as to both Allowed Subordinated Secured Claims and Allowed Secured Claims of the Lenders.

- Class 4. The ultimate recovery to Class 4 will depend upon whether the Bankruptcy Court orders Claims of the Lenders to be equitably subordinated to Claims within Class 4, whether the Bankruptcy Court approves the PRAG Settlement, and whether the Trustee of the Creditor Trust is

successful in prosecuting Causes of Action and obtaining recoveries thereon. In the case of prosecuting Causes of Action, because it is difficult to realistically assess the likelihood of success in litigation and the level of recovery to be obtained on account of such litigation, the recovery projected for Class 4 in the table above does not incorporate any projected levels of recoveries that may be obtained on account of the prosecution of Causes of Action.

<div align="center">

**III.**
**VOTING PROCEDURES AND REQUIREMENTS**

</div>

**A.  Ballots and Voting Deadline**

Each Creditor holding a Claim which entitles the Creditor to vote on the Plan has been provided a Ballot along with this Disclosure Statement. If a Creditor holds Claims in more than one Class entitled to vote under the Plan, such Creditor has been provided a separate Ballot for each such Class. The Ballot is to be used by the Creditor to accept or reject the Plan.

To ensure that a Ballot is deemed timely and considered by the Balloting Agent, a Creditor must (a) carefully review the Ballot and the instructions set forth thereon, (b) provide all of the information requested on the Ballot, (c) sign the Ballot, and (d) return the completed and signed Ballot to the Balloting Agent by the Voting Deadline.

By order of the Bankruptcy Court, the Voting Deadline is 5:00 p.m. (prevailing Central Time), on _____, 2009. Therefore in order for a Ballot to be counted for voting purposes, the completed and signed Ballot must be received at the address specified below by no later than such Voting Deadline:

<div align="center">

**DEADLINE**: Must Be **Received** By 5:00 p.m. (prevailing Central Time),
on _____, 2009

**Addressed To**:
Grant Thornton LLP
Attn: John D. Bittner
1717 Main Street, Suite 1500
Dallas, Texas 75201
Fax: (214) 561-2370

</div>

**B.  Creditors Solicited to Vote**

Each Creditor holding a Claim in a Class which is impaired under the Plan is being solicited to vote on the Plan. As to any Claim for which a proof of claim was filed and as to which an objection has been lodged, however, if such objection is still pending as of the Voting Deadline, the Creditor's vote associated with such Claim will not be counted to the extent of the objection to the Claim, unless and to the extent the Bankruptcy Court temporarily allows the Claim upon motion by such Creditor in an amount which the Bankruptcy Court deems proper for the purpose of voting on the Plan. Such motion must be heard and determined by the Bankruptcy Court prior to the date and time established by the Bankruptcy Court for determination of confirmation of the Plan. In addition, a Creditor's vote may be disregarded if the Bankruptcy Court determines that the Creditor's acceptance or rejection of the Plan was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.

## C.    Definition of Impairment

Pursuant to Section 1124 of the Bankruptcy Code, except to the extent that the holder of a particular claim or equity interest within a class agrees to less favorable treatment of the holder's claim or equity interest, a class of claims or equity interests is impaired under a plan unless, with respect to each claim or equity interest of such class, the plan does at least one of the following two (2) things:

1.    The plan leaves unaltered the legal, equitable, and contractual rights to which such claim or equity interest entitles the holder of such claim or equity interest; or

2.    Notwithstanding any contractual provision or applicable law that entitles the holder of such claim or equity interest to demand or receive accelerated payment of such claim or equity interest after the occurrence of a default, the plan:

   (a)    cures any such default that occurred before or after the commencement of the case under the Bankruptcy Code, other than a default of a kind specified in Section 365(b)(2) of the Bankruptcy Code or of a kind that Section 365(b)(2) expressly does not require to be cured;

   (b)    reinstates the maturity of such claim or equity interest as such maturity existed before such default;

   (c)    compensates the holder of such claim or equity interest for any damages incurred as a result of any reasonable reliance by such holder on such contractual provision or such applicable law;

   (d)    if such claim or such equity interest arises from any failure to perform a nonmonetary obligation, other than a default arising from failure to operate a nonresidential real property lease subject to Section 365(b)(1)(A) of the Bankruptcy Code, compensates the holder of such claim or equity interest (other then the debtor or an insider) for any actual pecuniary loss incurred by such holder as a result of such failure; and

   (e)    does not otherwise alter the legal, equitable, or contractual rights to which such claim or equity interest entitles the holder of such claim or equity interest.

## D.    Classes Impaired Under the Plan

Classes 1, 4, 5 and 6 of the Plan are impaired Classes of Claims under the Plan; therefore, holders of Claims within such Classes are being solicited to vote on the Plan. The remaining Classes of Claims (Classes 2 and 3) are unimpaired under the Plan; therefore, such Classes are deemed to have accepted the Plan pursuant to Section 1126(f) of the Bankruptcy Code and Creditors holding Claims within such Classes are not being solicited to vote on the Plan.

Class 7 of the Plan, the sole Class of Equity Interests under the Plan, is also impaired. Because the Plan does not provide for the holders of Equity Interests in Class 7 to receive or retain any property under the Plan, however, Class 7 is deemed to have rejected the Plan pursuant to Section 1126(g) of the Bankruptcy Code and holders of Equity Interests within such Class are not being solicited to vote on the Plan.

With respect to the foregoing, the Plan Proponents specifically reserve the right to determine and contest, if necessary, (a) the impaired or unimpaired status of a Class under the Plan; and (b) whether any Ballots cast by Creditors holding Claims within such a Class should be counted for purposes of confirmation of the Plan.

**E.      Vote Required for Class Acceptance**

Pursuant to Section 1126(c) of the Bankruptcy Code, a Class of Claims under the Plan shall be deemed to have accepted the Plan if the Plan is accepted by Creditors holding at least two-thirds (2/3) in amount and more than one-half (1/2) in number of the Claims within such Class who are entitled to vote and who actually vote using a properly completed and signed Ballot which is returned to the Balloting Agent by no later than the Voting Deadline.

Pursuant to Section 1126(e) of the Bankruptcy Code, on request of a party in interest in the Bankruptcy Case, and after notice and a hearing, the Bankruptcy Court may designate the vote of any Creditor whose acceptance or rejection of the Plan was not in good faith, or was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.

# IV.
# CONFIRMATION OF THE PLAN

**A.      Confirmation Hearing**

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a hearing on confirmation of the Plan (the "Confirmation Hearing").  Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to confirmation of the Plan.

By order of the Bankruptcy Court entered on _____, 2009, the Confirmation Hearing has been scheduled for February ___, 2010, at _____ ___.m., in the United States Bankruptcy Court, Courtroom of The Honorable Harlin D. Hale, 1100 Commerce Street, 14th Floor, Dallas, Texas 75242. Any objection to confirmation must be made in writing, and such written objection must be filed with the Bankruptcy Court and served on the following parties by no later than _____, 2009:

Debtor:
Paul Reinhart, Inc.
Attn: R. Dale Grounds
2280 Campbell Creek Blvd., Suite 350
Richardson, Texas 75082
Facsimile: (972) 301-3283

Counsel for the Debtor:
Munsch Hardt Kopf & Harr, P.C.
Attn: E. Lee Morris
500 N. Akard Street, Suite 3800
Dallas, Texas 75201-6659
Facsimile: (214) 855-7584

Committee:
Official Unsecured Creditors' Committee
Attn: Michael D. East, Chairman
35 Alta Vista Cove
Marion, Arkansas 72364
Facsimile: (870) 739-3054

Counsel for Committee:
Rochelle McCullough LLP
Attn: Michael R. Rochelle
325 N. St. Paul, Suite 4500
Dallas, Texas 75201
Facsimile: (214) 953-0185

United States Trustee:
Office of United States Trustee
Attn: George F. McElreath
1100 Commerce Street, Room 976
Dallas, Texas 75242
Facsimile: (214) 767-8971

**UNLESS AN OBJECTION TO CONFIRMATION IS TIMELY FILED AND SERVED, IT WILL NOT BE CONSIDERED BY THE BANKRUPTCY COURT**.

**B.     Requirements for Confirmation of the Plan**

At the Confirmation Hearing, the Bankruptcy Court will determine whether the confirmation requirements of Section 1129(a) of the Bankruptcy Code have been satisfied. Only in the event that all of these requirements have been satisfied, and that all other conditions to confirmation set forth in the Plan have been met, will the Bankruptcy Court enter an order confirming the Plan under Section 1129(a). The requirements of Section 1129(a) applicable to corporate debtors are as follows:

1.     The plan complies with the applicable provisions of the Bankruptcy Code.

2.     The proponent of the plan complies with the applicable provisions of the Bankruptcy Code.

3.     The plan has been proposed in good faith and not by any means forbidden by law.

4.     Any payment made or to be made by the proponent, by the debtor, or by a person issuing securities or acquiring property under the plan, for services or for costs and expenses in or in connection with the case, or in connection with the plan and incident to the case, has been approved by, or is subject to the approval of, the court as reasonable.

5.     The proponent of the plan has disclosed:

(a) the identity and affiliations of any individual proposed to serve, after confirmation of the plan, as a director, officer, or voting trustee of the debtor, an affiliate of the debtor participating in a joint plan with the debtor, or a successor to the debtor under the plan, and the appointment to, or continuance in, such office of such individual, is consistent with the interests of creditors and equity interest holders and with public policy; and

(b) the identity of any insider that will be employed or retained by the reorganized debtor, and the nature of any compensation for such insider.

6.     Any governmental regulatory commission with jurisdiction, after confirmation of the plan, over the rates of the debtor has approved any rate change provided for in the plan, or such rate change is expressly conditioned on such approval.

7.     With respect to each impaired class of claims or equity interests:

(a) each holder of a claim or equity interest of such class has accepted the plan or will receive or retain under the plan on account of such claim or equity interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under Chapter 7 of the Bankruptcy Code on such date; or

(b) if Section 1111(b)(2) of the Bankruptcy Code applies to the claims of such class, each holder of a claim of such class will receive or retain under the plan on account of such claim property of a value, as of the effective date of the plan, that is not less than the value of such holder's interest in the estate's interest in the property that secures such claims.

8.     With respect to each class of claims or equity interests, such class has accepted the plan or such class is not impaired under the plan.

9.     Except to the extent that the holder of a particular claim has agreed to a different treatment of such claim, the plan provides that:

(a) with respect to a claim of a kind specified in Section 507(a)(2) or 507(a)(3) of the Bankruptcy Code, on the effective date of the plan, the holder of such claim will receive on account of such claim cash equal to the allowed amount of such claim;

(b) with respect to a class of claims of a kind specified in Section 507(a)(1), 507(a)(4), 507(a)(5), 507(a)(6), or 507(a)(7) of the Bankruptcy Code, each holder of a claim of such class will receive (i) if such class has accepted the plan, deferred cash payments of a value, as of the effective date of the plan, equal to the allowed amount of such claim, or (ii) if such class has not accepted the plan, cash on the effective date of the plan equal to the allowed amount of such claim;

(c) with respect to a claim of a kind specified in Section 507(a)(8) of the Bankruptcy Code, the holder of such claim will receive on account of such claim regular installment payments in cash (i) of a total value, as of the effective date of the plan, equal to the allowed amount of such claim, (ii) over a period ending not later than 5 years after the date of the order for relief under Section 301, 302, or 303 of the Bankruptcy Code, and (iii) in a manner not less favorable than the most favored nonpriority unsecured claim provided for by the plan (other than cash payments made to a class of creditors under Section 1122(b) of the Bankruptcy Code); and

(d) with respect to a secured claim which would otherwise meet the description of an unsecured claim of a governmental unit under Section 507(a)(8) of the Bankruptcy Code, but for the secured status of that claim, the holder of that claim will receive on account of that claim, cash payments, in the same manner and over the same period, as prescribed in paragraph 9(c) above.

10. If a class of claims is impaired under the plan, at least one class of claims that is impaired under the plan has accepted the plan, determined without including any acceptance of the plan by any insider.

11. Confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan.

12. All fees payable under Section 1930 of Title 28, as determined by the court at the hearing on confirmation of the plan, have been paid or the plan provides for the payment of all such fees on the effective date of the plan.

13. The plan provides for the continuation after its effective date of payment of all retiree benefits, as that term is defined in Section 1114 of the Bankruptcy Code, at the level established pursuant to subsection (e)(1)(B) or (g) of Section 1114 of the Bankruptcy Code, at any time prior to confirmation of the plan, for the duration of the period the debtor has obligated itself to provide such benefits.

14. All transfers of property of the plan shall be made in accordance with any applicable provisions of nonbankruptcy law that govern the transfer of property by a corporation or trust that is not a moneyed, business, or commercial corporation or trust.

If a sufficient number of Creditors and amounts of Claims in impaired Classes under the Plan vote to accept the Plan, the Plan Proponents believe that the Plan will satisfy all of the applicable statutory requirements of Section 1129(a) of the Bankruptcy Code with the exception of the requirement set out in paragraph 8 above on account of the deemed rejection of the Plan by Class 7 (Equity Interests). As discussed below, however, the Plan Proponents nevertheless believe that the Plan may be confirmed under the "cramdown" provisions of Section 1129(b) of the Bankruptcy Code.

**C.      Cramdown**

Pursuant to Section 1129(b) of the Bankruptcy Code, the Bankruptcy Court may confirm the Plan at the request of the Plan Proponents if: (a) all of the requirements of Section 1129(a) of the Bankruptcy Code, with the exception of Section 1129(a)(8) (set out in paragraph 8 above), are met with respect to the Plan; (b) at least one Class of Claims that is impaired under the Plan has accepted the Plan (excluding the votes of insiders); and (c) with respect to each impaired Class that has not accepted the Plan, the Plan does not "discriminate unfairly" and is "fair and equitable."

A plan does not "discriminate unfairly" within the meaning of the Bankruptcy Code if the classification of claims under the plan complies with the Bankruptcy Code and no particular class will receive more than it is legally entitled to receive for its claims or equity interests.

"Fair and equitable," on the other hand, has a different meaning for classes of secured claims, classes of unsecured claims, and classes of equity interests, as described below:

With respect to a class of secured claims that rejects the plan, to be "fair and equitable" the plan must, among other things, provide:

(a) that the holders of such claims retain the liens securing such claims, whether the property subject to such liens is retained by the debtor or transferred to another entity, to the extent of the allowed amount of such claims, and that each holder of a claim of such class receive on account of such claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property;

(b) for the realization of such holders of the indubitable equivalent of such claims; or

(c) for the sale, subject to Section 363(k) of the Bankruptcy Code, of any property that is subject to the liens securing such claims, free and clear of such liens, with such liens to attach to the proceeds of such sale, and the treatment of such liens on proceeds under (a) or (b) above.

With respect to a class of unsecured claims that rejects the plan, to be "fair and equitable" the plan must, among other things, provide:

(a) that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or

(b) that the holder of any claim or equity interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or equity interest any property.

With respect to a class of equity interests that rejects the plan, to be "fair and equitable" the plan must, among other things, provide:

(a) that each holder of an equity interest of such class receive or retain on account of such equity interest property of a value, as of the effective date of the plan, equal to the greatest of the allowed amount of any fixed liquidation preference to which such holder is entitled, any fixed redemption price to which such holder is entitled, or the value of such equity interest; or

(b) that the holder of any equity interest that is junior to the equity interests of such class will not receive or retain under the plan on account of such junior equity interest any property.

In the event that at least one impaired Class of Claims under the Plan accepts the Plan, the Plan Proponents request the Bankruptcy Court to confirm the Plan in accordance with the cramdown

provisions of Section 1129(b) of the Bankruptcy Code. The Plan Proponents believe that all of the requirements of Section 1129(a) of the Bankruptcy Code (with the exception of Section 1129(a)(8)) will be satisfied, that at least one Class of impaired Claims will accept the Plan (excluding the votes of insiders), and that the Plan does not unfairly discriminate against, and is fair and equitable in relation to, Class 7 (Equity Interests) and each of the Classes of Claims that may vote to reject the Plan.

The Bank Agent and Lenders allege that the Plan does not meet all of the requirements of Section 1129(a) (with the exception of Section 1129(a)(8)) because the Plan, among other asserted defects, is not fair and equitable, discriminates unfairly against the Lenders, attempts to improperly equitably subordinate the Lenders' Claims for the Lenders' exercise of their contractual remedies agreed to by the Debtor in the Forbearance Agreement, and was not proposed in good faith by the Debtor due to PRAG's control of the Debtor and its Board of Directors.

The Bankruptcy Court will determine all disputes in relation to the confirmation standards of Section 1129(a) and (b).

## V.
## HISTORICAL AND BACKGROUND INFORMATION

### A.     Organizational Information

The Debtor is a privately-held corporation which was organized under the laws of Texas on or about May 15, 1980, as Volkart Taylor Cooper, Inc. Pursuant to the Debtor's Articles of Incorporation, among the purposes for which the corporation was organized was to engage in the business of buying and selling cotton, both in export trade and domestic business, including contracting for future delivery thereof. By Articles of Amendment dated June 15, 1989, the Debtor changed its name to Volkart, Inc., effective as of July 1, 1989. Thereafter, by Articles of Amendment dated September 23, 1992, the Debtor again changed its name to Paul Reinhart, Inc., effective as of October 1, 1992.

Pursuant to the Articles, the Debtor has been authorized to issue, and has issued, three classes of shares of stock – designated as Class A Common Stock, Class B Common Stock and Class C Common Stock. The respective classes of shares have identical rights and privileges in every respect, except that the holders of Class A Common Stock have the exclusive right and power to elect a minimum of two (2) of the directors of the corporation and the holders of Class B Common Stock and Class C Common Stock, respectively, each have the exclusive right and power to elect one (1) of the directors of the corporation. As of the date hereof, Paul Reinhart America, Inc. ("PRAI") holds all of the issued and outstanding shares of stock in the Debtor (4,000,000 shares of Class A Common Stock; 750,000 shares of Class B Common Stock; and 250,000 shares of Class C Common Stock). PRAI, in turn, is a wholly-owned subsidiary of Paul Reinhart AG ("PRAG"), a Swiss corporation.

### B.     The Debtor's Business and Operations

The Debtor is headquartered in Richardson, Texas. Since its incorporation, the Debtor has been engaged in the cotton trade business, buying and selling cotton both domestically and abroad. For a period of over twenty-five (25) years the Debtor had successfully expanded its business, and as of early 2008 was generally regarded as the fourth-largest cotton merchant in the United States and the largest seller of organic cotton worldwide.

When fully operational, the Debtor would regularly contract with farmers, farmer groups and other cotton producers primarily located in Texas, the Mississippi Delta area, and Mexico (collectively, the "Growers") to purchase all or a portion of their future crop year cotton production. Separately, the

Debtor would regularly market its existing and projected cotton inventory to customers predominantly located outside of the United States, including customers in China, Mexico, Turkey, Pakistan, Thailand, Indonesia, Hong Kong, Canada, India, Guatemala, Peru, Vietnam, Bangladesh and Singapore. Approximately ninety percent (90%) of the Debtor's sales were to foreign customers as of early 2008.

In 1997, to better serve its customers in the Far East, the Debtor also organized Paul Reinhart (Australia) Pty. Ltd. ("PRAL"), an Australian corporation, as a wholly-owned subsidiary of the Debtor. PRAL purchased and sold cotton grown within Australia. On September 22, 2008, PRAL initiated its own insolvency proceeding in Australia through the appointment of joint administrators under relevant provisions of Australia's Corporation Act of 2001, and PRAL is no longer operating as a going concern.

As explained in greater detail below, the Debtor experienced significant losses as a consequence of the major disruption in the cotton futures market that occurred in March 2008. Since March 2008, the Debtor has not engaged in any new cotton purchase transactions and its business has been focused almost exclusively on the sale of its remaining cotton inventory, the collection of outstanding receivables, and the general wind up of its remaining business affairs.

## C.     Events Leading to Chapter 11 Filing

When fully operational, the Debtor operated as a basis trader within the cotton merchant industry. In very general terms, the Debtor structured most of its purchase contracts with Growers to provide for the price to be set at a discount (basis differential) off of the futures price of cotton as listed on the ICE Futures U.S. exchange at the time of price fixation under the contracts. Once the contract price was fixed, the Debtor would customarily enter into a corresponding number of financial futures contracts (short futures contracts) to hedge against the impact of future price fluctuations in the market pending delivery of the cotton to the Debtor and the Debtor's sale of the cotton to a textile mill or other cotton purchaser. By hedging against price risk in relation to its forward purchase contracts and inventory, the Debtor was able to maintain a substantially "squared book," meaning that any loss in the value of its physical book (*i.e.* the cotton associated with such forward contracts and cotton inventory) caused by a decline in the price of cotton in the market would generally be offset by a corresponding gain in the value of its financial futures contracts, and vice versa.

Beginning in 2005, both the Debtor and PRAG maintained their respective hedging positions within brokerage accounts opened by PRAG at UBS AG ("UBS"). In connection with same, PRAG isolated specific sub-accounts at UBS for exclusive use in connection with commodities futures and options business related to the Debtor (collectively, the "PRI Sub-Accounts"). PRAG executed a Power of Attorney to grant the Debtor authority to execute trades in these PRI Sub-Accounts. On or about January 26, 2007, the Debtor, PRAG, UBS and the then-appointed Bank Agent[8] entered into a Security and Assignment Agreement (the "Sub-Account Security Agreement") pursuant to which, among other things, the parties recited the existence of the PRI Sub-Accounts and PRAG (as the owner of the PRI Sub-Accounts) granted a security interest in the PRI Sub-Accounts to the Bank Agent for the benefit of the Lenders to secure the Debtor's obligations to the Lenders under its credit agreement with the Lenders (referred to as the Intercreditor Agreement). As part of the Sub-Account Security Agreement, the Bank Agent agreed that until it elected to the contrary and delivered written notice of such election to UBS, PRAG could continue to execute transactions in the ordinary course of business in the PRI Sub-Accounts (and, hence, the Debtor as well by virtue of the Power of Attorney).

---

[8] Rabobank Coöperatieve Centrale Raiffeisen-Boerenleenbank B.A., "Rabobank International", New York Branch. Wells Fargo HSBC Trade Bank, National Association was later appointed as the successor Bank Agent in March 2008.

While the Debtor had a long record of strong earnings and profitability heading into 2008, the Debtor suffered a severe liquidity crisis in early March 2008 as a result of the extraordinary run-up in the futures price of cotton in the market and the ever-increasing margin requirements in relation to the Debtor's position in financial short futures contracts in the PRI Sub-Accounts. In this regard, by the commencement of business on March 4, 2008, after having funded roughly $100 million in additional margin, the Debtor no longer had sufficient liquidity to fund any further sizeable margin calls in the event of a continuing run-up in the price of cotton in the market. To exacerbate matters, because of the volatility in the market during this time frame, the Debtor's trading options were limited as it attempted to protect against the possibility of the liquidation of its existing financial positions to satisfy further margin requirements. Ultimately, various options trades were placed in the PRI Sub-Accounts by personnel of PRAG on behalf of the Debtor in an effort to reduce future margin risk and free up a level of liquidity. Because of the nature of the options trades placed, the Debtor's financial book became out of balance with its physical book. Hence, while the Debtor was successful in ultimately avoiding a complete collapse during the run-up in the price of cotton in the market, the Debtor was exposed to loss in the value of its physical book as the market began to cool and the futures price of cotton began to drop back to more normal levels. Because the Debtor continued to lack sufficient liquidity to re-square its book as prices began to moderate, the Debtor incurred a substantial loss to the value of its physical book.

The losses negatively impacted the Debtor's credit lines with its Lenders, resulting in the declaration of various defaults under the Intercreditor Agreement. As a result, in April 2008 the Debtor entered into a forbearance arrangement with its Lenders under the terms of an amendment to the Intercreditor Agreement – specifically, a Sixth Amendment to Agreement, Priority Credit Facility and Forbearance Agreement, dated as of April 11, 2008 (the "<u>Forbearance Agreement</u>"). Pursuant to the Forbearance Agreement, and subject to the conditions and limitations set forth therein, the Lenders, among other things: (i) advanced certain additional funds to the Debtor to enable the Debtor to re-square its book (by entering into additional short futures contracts), (ii) agreed to advance certain additional funds, as necessary, to enable the Debtor to satisfy margin requirements imposed by its broker, and (iii) agreed to forbear from exercising their remedies until the earlier of (A) the end of December 2008, or (B) a default under the terms of the Forbearance Agreement. In exchange, the Debtor, among other things: (i) agreed to make future cash expenditures only in strict compliance with a budget approved by the Lenders, (ii) consented to the Lenders' weekly sweep of cash from its operating and brokerage accounts in excess of certain established levels, and (iii) agreed to not spend any amounts of money on its 2008/2009 crop year purchase obligations without the prior written consent of the Lenders. Additionally, the Debtor agreed to pursue the sale of substantially all of its assets, subject to the Lenders' right to veto any such sale if the sale would not result in the payment in full of all outstanding obligations to the Lenders.

With respect to the last requirement, during the latter part of July 2008 the Debtor successfully obtained a bid from Allenberg Cotton Co. ("<u>Allenberg</u>"), one of its competitors, for Allenberg's purchase of a substantial portion of the Debtor's assets, including the assumption of substantially all of the Debtor's forward cotton purchase obligations. A tentative closing of the Allenberg transaction was scheduled for September 5, 2008. Because the purchase price proposed by Allenberg would not result in the payment in full of the Lenders, however, the closing was subject to the Lenders' written consent under the terms of the Forbearance Agreement. The Lenders did not provide their written consent to the transaction and the transaction did not close on September 5, 2008.

On September 10, 2008, the Bank Agent provided notice to the Debtor of various alleged defaults under the Forbearance Agreement, of the alleged termination of the forbearance period by virtue of such defaults, and of its acceleration of all indebtedness owing by the Debtor to the Lenders. Notwithstanding same, the Debtor and PRAG continued to negotiate with the Agent and Lenders with respect to the Allenberg transaction. The Lenders did not provide their written consent.

On October 1, 2008, without any advanced notice to the Debtor, and as a result of the alleged continuing defaults of the Debtor under the Forbearance Agreement, the Bank Agent, among other things, took control of two of the Debtor's primary bank accounts, took control of the Debtor's brokerage account, and issued instructions to the Debtor's broker to begin immediately liquidating short futures contracts within the brokerage account. As a consequence of the Bank Agent's actions and the Debtor's inability to perform under its 2008/2009 crop year contracts, the Debtor determined to seek relief under Chapter 11 of the Bankruptcy Code in order to preserve and protect the value of its remaining assets for the benefit of all of its creditors. Accordingly, on October 15, 2008, the Debtor filed for relief under Chapter 11 of the Bankruptcy Code.

## D.    Management of the Debtor

Throughout the course of the Bankruptcy Case, the Debtor has been operating as a debtor in possession under the Bankruptcy Code, meaning that the Debtor has continued to operate under the guidance and control of its officers and directors. As of the date hereof, the Debtor's primary remaining officers are R. Dale Grounds, the Debtor's President and Chief Executive Officer, and William W. Wickham II, the Debtor's Vice President of Finance and Treasurer. The Debtor's board of directors, in turn, is comprised of Dr. Thomas P. Reinhart, P. Jürg Reinhart and Rolf Stahel, all of whom also serve as the directors of the Debtor's parent corporation PRAI and PRAI's parent corporation PRAG.

As described in greater detail below, the Plan provides for the termination of all remaining officers and directors of the Debtor on the Plan's Effective Date, whereupon the Trustee of the Creditor Trust will be deemed appointed as the Debtor's President and sole director.

## E.    Description of Assets of the Debtor

As of July 31, 2009, the assets of the Debtor consisted of cash, accounts receivable, cotton inventory, property and equipment, other assets used in the operation of the business and Causes of Action that are, or may be, held by the Estate. Attached hereto as **Exhibit B** is the Debtor's unaudited balance sheet as of July 31, 2009, reflecting the net book or carrying value of the various categories of assets of said date, excluding Causes of Action. A description of such assets is provided as follows:

1.    <u>Cash</u>. As of July 31, 2009, the Debtor had cash and restricted cash on its balance sheet of approximately $4.25 million.

2.    <u>Accounts Receivable</u>. The Debtor's balance sheet as of July 31, 2009, reflects accounts receivable from customers in the amount of approximately $19.19 million, which is net of an allowance for doubtful accounts of approximately $7.35 million.[9]

3.    <u>Inventory</u>. Inventory of the Debtor as of July 31, 2009, was approximately $369,000, which represents cotton inventory held for sale by the Debtor.

4.    <u>Prepaid Expenses</u>. Prepaid expenses of the Debtor as of July 31, 2009 were approximately $44,000, which represents deposits held with others for the provision of goods and services.

5.    <u>Property, Plant & Equipment</u>. The Debtor had property, plant and equipment with a net book value of approximately $173,000 on its balance sheet as of July 31, 2009. This property and equipment consists mainly of office furniture and computer equipment at

---

[9] While the Debtor is continuing its efforts to collect accounts receivable, actual collections may differ materially from the carrying amount of approximately $19.19 million as of July 31, 2009.

the Debtor's corporate offices and an office/warehouse building owned by the Debtor in Harlingen, Texas.

6. <u>Other Assets</u>. The Debtor's balance sheet as of July 31, 2009, reflects other assets with a carrying value of approximately $5.1 million. These other assets include an account receivable from Pacific Pima Gin Company (an affiliate of the Debtor) with a carrying value of approximately $3.3 million,[10] shares in IntercontinentalExchange, Inc. with a carrying value of approximately $0.3 million, and various other assets with a combined carrying value of approximately $1.5 million.

## F. Bank Agent's and Lenders' Assertions

In response to the information set out above about the nature of the Debtor's business operations, the events leading to the Chapter 11 filing, and the Debtor's management, the Bank Agent and the Lenders assert the following:

- With respect to the Debtor's financial and physical book, the Bank Agent and the Lenders allege that the Debtor customarily did not maintain a completely "squared" book. The Bank Agent and the Lenders believe that the Debtor ordinarily and customarily managed the entirety of the hedge book for its benefit based on its own internal policies.

- With respect to the losses suffered by the Debtor in connection with the market disruption in March 2008, the Bank Agent and the Lenders allege that the Debtor incurred a substantial loss to its overall business due to the March Trades.[11] The Bank Agent and Lenders assert, upon information and belief, that the PRAG representatives who placed certain of the March Trades did so without consultation with, or the prior consent or authorization of, the officers of the Debtor, and question whether such trades were placed for the benefit of the Debtor and/or to accomplish the above-stated purposes. The Bank Agent and the Lenders assert that the March Trades resulted in a loss to the Debtor in excess of $60 million and question whether such option trading, which was conducted by personnel of PRAG, gives rise to claims against PRAG and/or those persons or entities involved in such trades.

- With respect to the Forbearance Agreement, the Bank Agent and Lenders assert that the Agreement was negotiated and agreed to between the Debtor and Lenders in an arms' length transaction with the assistance of counsel.

- With respect to the exercise of remedies by the Bank Agent on behalf of the Lenders in October 2008, the Bank Agent and the Lenders assert that the Debtor received numerous letters between May 2008 and October 2008 related to the Debtor's multiple defaults under the Forbearance Agreement, that all of the actions of the Bank Agent and Lenders were undertaken pursuant to their contractual arrangements with the Debtor, and that all of the actions were authorized by the account control agreements and/or other contractual arrangements agreed to by the Debtor.

---

[10] The Debtor has entered into a Debt Settlement and Release Agreement with Pacific Pima Gin Company ("<u>PPGC</u>") and Pacific Ginning Company ("<u>PGC</u>"), as of July 17, 2009, subject to Bankruptcy Court approval. Details regarding the Agreement are set out in Section VI(P)(2) below. If approved by the Bankruptcy Court, the Debtor will recover $660,000 plus certain additional residual recovery rights of nominal value, and the parties will exchange mutual releases.

[11] The "March Trades" are defined in the Plan as "[a]ll trades of cotton futures or options made by or on behalf of the Debtor in March 2008."

- With respect to the Debtor's Chapter 11 bankruptcy filing, the Bank Agent and Lenders assert that the filing did not result from any action of the Bank Agent or Lenders, but rather was a direct result of the March 2008 cotton market volatility and the March Trades.

- With respect to the Debtor's management, the Bank Agent and Lenders assert that the Debtor's board of directors, consisting solely of insiders of PRAG, controls the Debtor's actions.

# VI.
## SIGNIFICANT EVENTS DURING THE BANKRUPTCY CASE

During the course of the Bankruptcy Case, various pleadings have been filed with the Bankruptcy Court and several hearings have been conducted. The following is a description of the more significant events which have transpired during the pendency of the case. For a comprehensive listing of the pleadings which have been filed in the Bankruptcy Case, however, the docket for the Bankruptcy Case should be reviewed, and relevant pleadings referenced therein may be obtained from the Clerk's Office of the Bankruptcy Court or via the on-line PACER system.

## A.      Debtor's Employment of Professionals

### 1.      Bankruptcy Counsel

On the Petition Date, the Debtor filed an *Application for Authority to Employ Munsch Hardt Kopf & Harr, P.C.* to request authority to employ Munsch Hardt Kopf & Harr, P.C. ("Munsch Hardt") as its bankruptcy counsel in connection with the Bankruptcy Case. On October 21, 2008, the Bankruptcy Court entered an *Interim Order Authorizing the Employment of Munsch Hardt Kopf & Harr, P.C.* Following the objection period established under the order, during which time no objections were filed, the order automatically converted into a final order and the Debtor's authorization to employ Munsch Hardt likewise became final.

### 2.      Financial and Restructuring Advisor

On the Petition Date, the Debtor filed an *Application for Order Authorizing Employment of Grant Thornton LLP as Financial and Restructuring Advisor for Debtor* to request authority to employ Grant Thornton LLP ("Grant Thornton") as its financial and restructuring advisor in connection with the Bankruptcy Case. On October 21, 2008, the Bankruptcy Court entered an *Interim Order Authorizing the Employment of Grant Thornton LLP.* Prior to the time that such order became final, the U.S. Trustee filed the *United States Trustee's Objection to Application for Order Authorizing Employment of Grant Thornton LLP as Financial and Restructuring Advisor for Debtor* to object to certain provisions of Grant Thornton's engagement agreement with the Debtor. The objection was thereafter resolved by certain agreed modifications to the engagement agreement, and on January 13, 2009, the Bankruptcy Court entered an *Order Resolving the United States Trustee's Objection to Application for Order Authorizing Employment of Grant Thornton LLP as Financial and Restructuring Advisor for Debtor.*

### 3.      Ordinary Course Mexican Counsel

On May 6, 2009, the Debtor filed a *Motion for Order Authorizing Retention and Compensation of Barrera, Siqueiros Y Torres Landa, S.C., as a Professional Utilized by the Debtor in the Ordinary Course of Business* to request authority to employ and compensate Barrera, Siqueiros Y Torres Landa, S.C. (the

"Barrera Firm") as special counsel on matters involving the Debtor's Mexican receivables. On June 15, 2009, the Bankruptcy Court entered an order granting the motion.

## B.    Committee's Employment of Professionals

On October 28, 2008, the U.S. Trustee appointed an Official Committee of Unsecured Creditors (the "Committee") to serve in the Bankruptcy Case. The Committee is comprised of the following members: Michael D. "Denny" East (Chairman), Bailey Weiner, Alan P. Byrd, Barry L. Richardson, Jr., Larry McClendon, Larry Nelson, William "Storm" Starks, George Hardberger and Charlie Lowrance.

### 1.    Bankruptcy Counsel

On October 31, 2008, the Committee filed an *Application to Employ Rochelle McCullough LLP as Bankruptcy Counsel* to request authority to employ Rochelle McCullough LLP ("RM LLP") as its bankruptcy counsel in connection with the Bankruptcy Case. On November 5, 2008, the Bankruptcy Court entered an *Interim Order Authorizing the Employment of Rochelle McCullough, LLP as Bankruptcy Counsel to the Official Unsecured Creditors Committee*. Following the objection period established under the order, during which time no objections were filed, the order automatically converted into a final order and the Committee's authorization to employ RM LLP likewise became final. Prior to its engagement as bankruptcy counsel for the Committee, RM LLP served as local counsel for the East Plaintiffs.

### 2.    Special Litigation Counsel

On March 27, 2009, the Committee filed an *Application to Employ Special Litigation Counsel* to request authority to employ Randall J. Fishman of Ballin, Ballin & Fishman, P.C. ("Fishman") and C. Barry Ward of Glanker Brown, PLLC ("Ward") as special litigation counsel to represent the Committee's interests with respect to litigation against the Lenders on behalf of the Debtor's estate. Such engagement has been requested in connection with the Bankruptcy Court's authorization of the Committee to pursue certain estate-based claims against the Lenders. *See* Section VI(L) below for a description of such authorization.

In consultation with the U.S. Trustee's Office, the Committee has agreed to provide specific disclosures within this Disclosure Statement with respect to the proposed engagement. First, the Committee selected Fishman and Ward because of their familiarity with the Bankruptcy Case and the subject matter of the litigation for which they are being employed. Specifically, Fishman and Ward had previously been engaged by the East Plaintiffs to represent them in connection with the East Lawsuit pending in the Bankruptcy Court (described in Section VI(N)(1) below). In connection with that engagement, the East Plaintiffs agreed to the following fee arrangement: (a) each client would pay up to $5.00 per bale of cotton that was sold to the Debtor pre-petition, which payment would be made at various intervals during the course of the litigation in the East Lawsuit; (b) if the East Lawsuit is resolved before trial, each client would pay a success fee of $2.50 per bale of cotton sold to the Debtor pre-petition; and (c) if the East Lawsuit is resolved at trial, the overall fee to all of the clients would be equal to 15% of any recovery (after deducting expenses) with a credit for fees previously paid (the "East Plaintiff Fee Arrangement"). Fishman and Ward have proposed to continue their representation of the East Plaintiffs on non-estate-based claims in the East Lawsuit. With respect to estate-based claims, Fishman and Ward have agreed to undertake representation of the Committee on a contingency basis. Specifically, the proposed fee structure is a follows: (a) a fee equal to 30% of any recovery plus reimbursement of expenses if a satisfactory settlement is reached before any summary judgment motions are submitted or argued; (b) a fee equal to 35% of any recovery plus reimbursement of expenses if a settlement is reached after any summary judgment motions have been argued and submitted; and (c) a fee

equal to 40% of any recovery plus reimbursement of expenses in the event the matter goes to trial (the "Committee Fee Arrangement"); *provided, however*, that (i) to the extent claims originally pursued on behalf of the East Plaintiffs constitute estate-based claims and (ii) a particular East Plaintiff satisfied its contractual obligations to Fishman and Ward under the East Plaintiff Fee Arrangement as of the date of the Committee's request for authority to employ Fishman and Ward, then the Committee Fee Arrangement would be modified so as to treat any recovery allocable to such East Plaintiffs as though the East Plaintiff Fee Arrangement were applicable to such allocated recovery.

Objections to the Application were filed by the Bank Agent, on behalf of the Lenders, Cooperative Marketing Alliance, and the U.S. Trustee. On April 22, 2009, the Bankruptcy Court conducted a hearing on the Application, at which time Fishman and Ward clarified on the record that any recoveries obtained on account of individual claims asserted by the East Plaintiffs in the East Litigation would be combined with any recoveries obtained by the Estate on account of claims asserted by the Committee (on behalf of the Estate) in the East Litigation for purposes of distributions to creditors in the Bankruptcy Case. On April 27, 2009, the Bankruptcy Court entered an *Order on Application to Employ* which approved the Application, as modified on the record, except with respect to the Committee's pursuit of avoidance actions on behalf of the Estate. On August 11, 2009, the Bankruptcy Court heard additional arguments with respect to the Committee's request to employ Fishman and Ward on the avoidance actions, at which time the Court took the matter under advisement. As of the date of this Disclosure Statement, such aspect of the Application remains pending with the Bankruptcy Court.

## C. Cash Management System and Maintenance of Accounts

On the Petition Date, the Debtor filed a *Motion for Entry of Order Authorizing Maintenance of Existing Bank and Brokerage Accounts, Continue Use of Existing Cash Management System, Continued Use of Existing Business Forms, and for Related Relief* to request authority to maintain and continue to utilize its existing cash management system and bank and brokerage accounts, and to continue to utilize its existing business forms. On October 21, 2008, the Bankruptcy Court entered an *Order (A) Authorizing Maintenance of Existing Bank and Brokerage Accounts, Continued Use of Existing Cash Management System, and Continued Use of Business Forms, and (B) Providing Related Relief*, thereby granting the motion subject to certain modifications agreed upon among the Debtor, the Lenders and the U.S. Trustee.

## D. Financing of Operations and Administration of the Estate

### 1. PRAI-Texas Gratuitous Contribution

On October 20, 2008, the Bankruptcy Court conducted a hearing on the Debtor's initial "first day" motions. In connection with such hearing, the Debtor made an oral motion for the approval of certain terms associated with the Debtor's acceptance of a gratuitous transfer of $250,000 from PRAI-Texas. Such transfer was necessary to enable the Debtor to pay for certain critical expenses pending the filing and consideration of a motion to use cash collateral. On October 21, 2008, the Bankruptcy Court entered an *Order with Respect to Gratuitous Contribution from PRAI Texas, Inc.*, thereby authorizing the Debtor's acceptance of the transfer under terms agreed upon among the Debtor, PRAI-Texas and the Lenders.

### 2. Authorization to Use Cash Collateral

On October 21, 2008, the Debtor filed a *Motion for Entry of Order (A) Authorizing Use of Cash Collateral Pursuant to 11 U.S.C. § 363(c) or, Alternatively, Approving Case Administration Funding Agreement with PRAI Texas, Inc., and (B) For Relief Related Thereto* (the "Cash Collateral Motion") to seek authorization to use cash collateral or, alternatively, to obtain financing from PRAI-Texas under the

terms of a proposed agreement with PRAI-Texas which, among other things, provided for a full release of PRAG and its affiliates. On October 24, 2008, the Bank Agent filed an *Objection to Debtor's Motion for Entry of Order (A) Authorizing Use of Cash Collateral Pursuant to 11 U.S.C. § 363(c) or, Alternatively, Approving Case Administration Funding Agreement with PRAI Texas, Inc., and (B) For Relief Related Thereto*. Thereafter, following the Committee's appointment, the Debtor, the Lenders and the Committee reached agreement on the terms of a consensual cash collateral arrangement, and on November 10, 2008, the Bankruptcy Court entered a *Final Agreed Order Authorizing Limited Use of Cash Collateral and Granting Adequate Protection to Existing Lienholders* (as amended and extended from time to time, the "Cash Collateral Order").

Pursuant to the Cash Collateral Order, parties-in-interest were provided a period of time within which to object to the terms of the order. On November 24, 2008, certain taxing authorities filed an objection. Additionally, certain informal objections/comments were presented by the U.S. Trustee and Cooperative Marketing Alliance. All of such objections/comments were resolved under the terms of a *First Amendment to Final Agreed Order Authorizing Limited Use of Cash Collateral and Granting Adequate Protecting to Existing Lienholders* entered by the Bankruptcy Court on November 25, 2008.

The Cash Collateral Order further provided for a release of the Lenders in the absence of the Debtor's initiation of litigation against the Lenders and/or the Committee's filing of a motion to request standing to pursue litigation against the Lenders on behalf of the estate, in each case by a fixed deadline. Pursuant to a *Second Amendment to Final Agreed Order Authorizing Limited Use of Cash Collateral and Granting Adequate Protection to Existing Lienholders* entered by the Bankruptcy Court on January 9, 2009, the deadline for such action was extended to February 16, 2009. As explained separately below, prior to such extended deadline the Committee filed a motion to request standing to pursue litigation against the Lenders on behalf of the Estate and such motion was granted in part.

Under the Cash Collateral Order, the Debtor's authorization to use cash collateral extends only through the earlier of (i) a default under the terms of the Cash Collateral Order, or (ii) the expiration date established under the order. On February 27, 2009, the Debtor, the Bank Agent and the Committee filed a *Notice of Extension of Final Agreed Order Authorizing Limited Use of Cash Collateral and Granting Adequate Protection to Existing Lienholders* to evidence an initial extension of the expiration date. Thereafter, on March 13, 2009, the Debtor, the Bank Agent and the Committed filed a *Notice of Second Extension of Final Agreed Order Authorizing Limited Use of Cash Collateral and Granting Adequate Protection to Existing Lienholders* to evidence an additional extension of the expiration date.

Pursuant to paragraph 59 of the Cash Collateral Order, the filing of a plan of reorganization by the Debtor that is not otherwise acceptable to the Bank Agent in the treatment of the Pre-Petition Claims of the Lenders constitutes an Event of Default pursuant to the Cash Collateral Order. On April 13, 2009, the Debtor and the Committee filed their original *Joint Plan of Liquidation Under Chapter 11 of the United States Bankruptcy Code* which was not otherwise acceptable to the Bank Agent in the treatment of the Pre-Petition Claims of the Lenders. Such action constituted an Event of Default under the Cash Collateral Order (the "CC Order Default"). On April 29, 2009, the Bankruptcy Court entered a *Limited Forbearance and Agreed Order Extending Debtor's Authority to Use Cash Collateral Pursuant to Final Agreed Order Authorizing Limited Use of Cash Collateral and Granting Adequate Protection to Existing Lienholders*, whereby the Lenders agreed to a limited forbearance in relation to the CC Order Default and extension of the Debtor's authority to use cash collateral under the terms of such order. Thereafter, on May 14, 2009, the Debtor and Bank Agent filed a *Notice of Limited Forbearance and Extension of Final Agreed Order Authorizing Limited Use of Cash Collateral and Granting Adequate Protection to Existing Lienholders* to evidence an extension of the limited forbearance and further extension of the Debtor's authority to use cash collateral. On June 4, 2009, the Bankruptcy Court entered a *Second Limited Forbearance and Agreed Order Extending Debtor's Authority to Use Cash Collateral Pursuant to Final*

*Agreed Order Authorizing Limited Use of Cash Collateral and Granting Adequate Protection to Existing Lienholders*, whereby the Lenders agreed to a further limited forbearance in relation to the CC Order Default and extension of the Debtor's authority to use cash collateral under the terms of such order. On June 29, 2009, the Debtor and Bank Agent filed a *Second Notice of Limited Forbearance and Extension of Final Agreed Order Authorizing Limited Use of Cash Collateral and Granting Adequate Protection to Existing Lienholders* to evidence an extension of the further limited forbearance and further extension of the Debtor's authority to use cash collateral. On August 7, 2009, the Bankruptcy Court entered a *Third Limited Forbearance and Agreed Order Extending Debtor's Authority to Use Cash Collateral Pursuant to Final Agreed Order Authorizing Limited Use of Cash Collateral and Granting Adequate Protection to Existing Lienholders*, whereby the Lenders agreed to a further limited forbearance in relation to the CC Order Default and extension of the Debtor's authority to use cash collateral under the terms of such order. As of the date hereof, the Debtor's authorization to use cash collateral under the terms of the Cash Collateral Order expires on August 31, 2009.

**E.      Authorization to Pay Warehouse Charges and Certain Critical Vendor Claims**

On November 10, 2008, the Debtor filed a *Motion for Order Authorizing the Payment of Pre-Petition Warehouse Charges and Certain other Pre-Petition Claims for Critical Shipment, Handling and Related Services* to request authority to pay certain pre-petition charges to warehouses storing the Debtor's cotton inventory and certain outstanding pre-petition shipping and handling charges, as determined to be necessary under established procedures to ensure the timely shipment of cotton to third-party purchasers. On November 18, 2008, the Bankruptcy Court entered an *Order Authorizing the Payment of Pre-Petition Warehouse Charges and Certain Other Pre-Petition Claims for Critical Shipment, Handling and Related Services*, thereby authorizing such payments and requiring the Debtor to periodically file reports detailing the payments that have been made, the recipients of such payments, and certain additional information. In compliance with the order, the Debtor has periodically filed notices with the Bankruptcy Court to disclose such information.

**F.      Adequate Assurance of Utility Payments**

On the Petition Date, the Debtor filed a *Motion for Interim and Final Order Providing Adequate Assurance of Utility Payment* to request approval of the Debtor's proposed means of providing adequate assurance of payment to utilities under Section 366 of the Bankruptcy Code and certain procedures in relation thereto. On October 24, 2008, the Bankruptcy Court entered an *Interim and Proposed Final Order Providing Adequate Assurance of Utility Payments*, thereby approving the Debtor's proposal and procedures subject to an opportunity for objection. Following the objection period, during which time no objections were filed, the order was automatically converted into a final order and the procedures established thereby were likewise deemed finally approved.

**G.      Employee Stabilization**

**1.      Authorization to Pay Pre-Petition Wages and Related Amounts; Continuation of Standard Employee Benefits**

On the Petition Date, the Debtor filed a *Motion for Authority to (A) Pay Accrued Pre-Petition Wages, (B) Reimburse Pre-Petition Business Expenses, (C) Make Accrued Pre-Petition Contributions to Employee Benefit Plans, (D) Honor and Continue Employee Benefits, and (E) Release Pre-Petition Withholdings* to seek authority to pay accrued, unpaid pre-petition wages to employees, to reimburse employees for expenses incurred on behalf of the Debtor pre-petition, to continue standard contributions to employees benefit plans and honor and continue standard employee benefits, and to release pre-petition employee withholdings. On October 21, 2008, the Bankruptcy Court entered an *Order Authorizing (A)*

*Payment of Accrued Pre-Petition Wages, (B) Reimbursement of Pre-Petition Business Expenses, (C) Making of Accrued Pre-Petition Contributions to Employee Benefit Plans, (D) Continuance of Employee Benefits, and (E) Release of Pre-Petition Employee Withholdings*.

### 2. Authorization to Maintain Severance Plan

On November 10, 2008, the Debtor filed a *Motion for Authority to Maintain and Honor Pre-Petition Employee Severance Plan, as Modified* to request authority to continue the Debtor's severance plan for employees, as modified in consultation with the Lenders and Committee. On November 18, 2008, the Bankruptcy Court entered an *Order Authorizing Debtor to Maintain and Honor Pre-Petition Employee Severance Plan, as Modified*.

### 3. Approval of Officer Incentive Program

On November 3, 2008, the Debtor and certain of the Debtor's officers filed a *Motion for Order Authorizing Officer Incentive Program and Payments Pursuant to 11 U.S.C. §§ 105, 363(b) and 503(c)* to request approval a performance-based incentive plan for the Debtor's key officers. Under the incentive plan, such officers are entitled to additional compensation upon satisfying different levels of performance-based targets or benchmarks within a fixed period of time. On December 19, 2008, the Bankruptcy Court entered a *Second Amended Order, Nunc Pro Tunc, Authorizing Officer Incentive Program and Payments*. Since that time, certain, but not all, of the performance targets/benchmarks have been met.

## H. Executory Contracts and Unexpired Leases

### 1. Rejection of Unperformed Cotton Purchase Contracts

On October 17, 2008, a group of cotton growers filed an *Emergency Motion of Cotton Growers to Require Debtor to Accept or Reject Forward Cotton Contracts* to request entry of an order compelling the Debtor to immediately assume or reject its unperformed cotton purchase contracts with such cotton growers. On October 21, 2008, the Debtor filed its own *Expedited Motion for Authority to Reject Cotton Purchase Contracts* to request authority to reject all of its unperformed cotton purchase contracts. The Bankruptcy Court granted the Debtor's Motion and on October 24, 2008, entered an *Order Authorizing Debtor's Rejection of Cotton Purchase Contracts*, thereby deeming such contracts to be rejected as of the Petition Date.

### 2. Assumption of Headquarters Lease, as Modified

On January 28, 2009, the Debtor filed a *Motion to Extend the Period of Assumption or Rejection of Unexpired Nonresidential Real Property Lease with Campbell Creek, Ltd.* to request an extension of the deadline established by Section 365 of the Bankruptcy Code for the assumption or rejection of the Debtor's headquarters lease with Campbell Creek, Ltd. (the "Landlord"). Following negotiation among the Debtor, the Landlord and the Lenders on the terms of such extension, the Bankruptcy Court granted the Motion, and on February 6, 2009, entered an *Order Granting Debtor's Motion to Extend the Period for Assumption or Rejection of Unexpired Nonresidential Real Property Lease with Campbell Creek, Ltd.* Pursuant to the order, the deadline for assumption or rejection was extended to July 12, 2009. On July 6, 2009, the Debtor filed a second *Motion to Extend the Period of Assumption or Rejection of Unexpired Nonresidential Real Property Lease with Campbell Creek, Ltd.* to request a further extension of the assumption/rejection deadline. On July 10, 2009, the Bankruptcy Court entered an *Order Granting Debtor's Motion to Extend the Period for Assumption or Rejection of Unexpired Nonresidential Real Property Lease with Campbell Creek, Ltd.*, thereby extending the deadline to July 31, 2009. On July 17, 2009, the Debtor filed a *Motion to Approve Assumption of Unexpired Nonresidential Real Property Lease*

*with Campbell Creek, Ltd., as Amended by the First Amendment to Lease Agreement.* On July 30, 2009, the Bankruptcy Court entered an *Order Granting Debtor's Motion to Approve Assumption of Unexpired Nonresidential Real Property Lease with Campbell Creek, Ltd., as Amended by the First Amendment to Lease Agreement.*

### 3. Rejection of Miscellaneous Equipment Leases

On April 22, 2009, the Debtor filed a *Motion for Authority to Reject that Certain Equipment Lease with De Lage Landen Financial Services, Inc.* to request authority to reject a lease of certain copiers. On May 20, 2009, the Bankruptcy Court entered an order granting the motion. On June 2, 2009, the Debtor filed a *Motion for Authority to Reject that Certain Equipment Lease with Pitney Bowes Global Financial Services LLC* to request authority to reject a lease of certain postage equipment. On July 1, 2009, the Bankruptcy Court entered an order granting the motion.

## I. Disposition of Disputed Cotton Bales

On December 5, 2008, the Debtor and Cooperative Marketing Alliance ("CoMark") filed a *Joint Expedited Motion for Order Authorizing the Sale of Certain Disputed Bales of Cotton and the Placement of Sales Proceeds in Escrow or in Court's Registry Pending Determination of Rights to Same* to seek approval of the sale of certain cotton bales claimed to be owned by both the Debtor and CoMark and approval for the placement of the net proceeds thereof in escrow or in the registry of the Bankruptcy Court pending resolution of the ownership dispute. On December 10, 2008, the Bank Agent filed a *Limited Objection to Joint Expedited Motion for Order Authorizing the Sale of Certain Disputed Bales of Cotton and the Placement of Sales Proceeds in Escrow or in Court's Registry Pending Determination of Rights to Same*. Following negotiation among the Debtor, CoMark and the Lenders, an agreement was reached in resolution of the Bank Agent's objection. On December 12, 2008, the Bankruptcy Court entered an *Order Approving Joint Expedited Motion for Order Authorizing the Sale of Certain Disputed Bales of Cotton and the Placement of Sales Proceeds in Escrow or in Court's Registry Pending Determination of Rights to Same.* In accordance with the procedures established under the order, all of the disputed bales have been sold and approximately $4.1 million has been deposited into the registry of the Bankruptcy Court pending resolution of the ownership dispute. *See also* Section VI(N)(2) below for a description of pending litigation among the Debtor, CoMark and the Lenders.

## J. Automatic Stay Matters

### 1. Supplemental Stay Order

On the Petition Date, the Debtor filed a *Motion for an Order Enforcing the Protections of Section 362 of the Bankruptcy Code* to request entry of an order embodying and enforcing the automatic stay protections of Section 362 of the Bankruptcy Code. On October 20, 2008, the Bankruptcy Court entered an *Order Pursuant to Section 105 of the Bankruptcy Code Enforcing the Protections of Section 362 of the Bankruptcy Code*.

### 2. CoMark's Motion for Relief from the Automatic Stay

On December 19, 2008, CoMark filed a *Motion for Relief from the Automatic Stay to Effectuate a Right of Setoff* to request relief from the automatic stay imposed by Section 362 of the Bankruptcy Code in order to setoff certain proceeds from the sale of cotton, including proceeds held in the registry of the Bankruptcy Court, against amounts allegedly owing by the Debtor to CoMark. On January 5, 2009, the Debtor filed a *Response in Opposition to CoMark's Motion for Relief from the Automatic Stay to Effectuate a Right of Setoff.* On the same date, the Bank Agent filed an *Objection to Cooperative*

JOINT DISCLOSURE STATEMENT IN SUPPORT OF DEBTOR'S AND OFFICIAL UNSECURED CREDITORS' COMMITTEE'S FIRST AMENDED JOINT PLAN OF LIQUIDATION

Page 23

*Marketing Alliance's Motion for Relief from the Automatic Stay to Effectuate a Right of Setoff.* On January 7, 2009, the Bankruptcy Court conducted a preliminary hearing on the Motion at which time the Court determined to consolidate the Motion with the separately-pending adversary proceeding initiated by the Debtor against CoMark. *See* Section VI(N)(2) below for a description of such adversary proceeding. Accordingly, on January 22, 2009, the Bankruptcy Court entered an *Order Consolidating Final Hearing on Motion for Relief from the Automatic Stay to Effectuate a Right of Setoff with the Trial in Adversary No. 08-3491.*

## K.    Tax Matters

### 1.    Payment of Allocated Share of Tax Return Preparation Expenses

The Debtor is a member of a consolidated tax group for federal income tax purposes. The tax group is comprised of the Debtor, PRAI (the Debtor's parent corporation), and two other wholly-owned subsidiaries of PRAI. Historically, PRAI has filed the consolidated federal tax return on behalf of the tax group. On March 13, 2009, the Debtor filed a *Motion for Authority to Pay Allocated Share of Consolidated Tax Return Preparation Expenses* to request authority to pay for the Debtor's proportionate share of the expenses incurred in preparing the consolidated tax group's federal income tax return for the period ending June 30, 2008 and certain related state tax returns. On April 8, 2009, the Bankruptcy Court entered an *Order Authorizing Debtor's Payment of Allocated Share of Consolidated Tax Return Preparation Expenses.*

### 2.    California Franchise Tax Board's Request for Payment of Alleged Taxes

On March 5, 2009, the California Franchise Tax Board ("FTB") filed a *Request for Payment of Administrative Expense* to request entry of an order directing the Debtor to pay certain taxes for the tax period ending June 30, 2009. On March 25, 2009, the Debtor filed an *Objection to the State of California's Request for Payment of Administrative Expense.* On June 29, 2009, the Bankruptcy Court entered an order denying the FTB's request for want of prosecution.

## L.    Authorization for Committee to Pursue Estate-Based Claims

On February 13, 2009, the Committee filed a *Motion for Leave to Assert Claims that are Property of the Estate* (the "Motion to Assert Claims") to request leave of court to pursue certain alleged claims of the Estate, on behalf of the Estate. The claims identified by the Committee in the motion were largely comprised of various claims asserted in the East Lawsuit (*see* Section VI(N)(1) below), in relation to which the Committee request authority to assert alleged Estate claims against the Lenders, PRAI and the Debtor's officers and directors. On March 9, 2009, the Bank Agent filed an *Objection and Response to Motion for Leave to Assert Claim.* On March 10, 2009, the Debtor filed a *Limited Objection to Motion of Official Unsecured Creditors' Committee for Leave to Assert Claims.* On April 15, 2009, the Bankruptcy Court entered an *Order on Committee's Motion to Assert Claims* pursuant to which the Court granted leave and authority to the Committee to pursue certain types of alleged Estate claims against the Lenders, including avoidance claims, and denied without prejudice the Committee's request to pursue certain types of "omnibus authority" claims and fiduciary duty claims against the Debtor's officers and directors.

## M.    Extension of Plan Exclusivity Periods

On January 28, 2009, the Debtor filed a *Motion for Extension of Exclusivity and Report Pursuant to Local Rule 3016.1* to request an extension of the period during which only the Debtor may file a Chapter 11 plan and the corresponding extended period during which the Debtor may seek confirmation of such a plan before any competing Chapter 11 plan may be filed. On February 4, 2009, the Bank Agent

filed a *Limited Objection to Debtor's Motion for Extension of Exclusivity and Report Pursuant to Local Rule 3016.1*. On February 6, 2009, the Bankruptcy Court entered an *Order Granting Debtor's Motion for Extension of Exclusivity and Report Pursuant to Local Rule 3016.1*. Pursuant to such order, the above-referenced periods of exclusivity were extended to April 13, 2009 (for the Debtor's filing of a plan) and June 12, 2009 (for confirmation of such plan). On June 2, 2009, the Debtor filed a *Motion for Extension of Exclusivity Period to Solicit Acceptance of Plan* to request a further extension of the period of exclusivity. On June 11, 2009, the Bankruptcy Court entered an order granting the motion, thereby extending the period of exclusivity in which to seek acceptance of the plan until December 9, 2009.

**N.    Adversary Proceedings**

**1.    East Lawsuit (Adversary No. 08-3438)**

On the Petition Date, the East Plaintiffs[12] filed an *Original Adversary Complaint* (the "Original Complaint") against Wells Fargo Bank, N.A. ("Wells Fargo"), the Lenders (the Lenders and Wells Fargo collectively referred to in this section as the "Bank Group"), the Debtor and PRAI (collectively, the "East Defendants"), thereby initiating the East Lawsuit (Adversary No. 08-3438) with the Bankruptcy Court. Pursuant to the Original Complaint, the East Plaintiffs asserted that the East Defendants took certain wrongful actions prior to the Petition Date in relation to unperformed cotton purchase contracts which caused harm to the East Plaintiffs. Pursuant to the Original Complaint, the East Plaintiffs asserted the following counts against one or more of the East Defendants: principal and agent relationship; breach of contract; intentional interference and deceit; fraud and deceit to Michael D. East; fraud and deceit to plaintiff growers and East Cotton; violation of Arkansas Deceptive Practice Act; tortious and intentional breach of contract; equitable subordination and cancellation; unjust enrichment; conversion; false misrepresentation; loss of business reputation; breach of fiduciary duty; and aiding and abetting breach of fiduciary duty. Pursuant to the Original Complaint, the East Plaintiffs sought, among other things, actual damages in excess of $70 million and punitive damages of at least $630 million against the East Defendants, jointly and severally, the imposition of an equitable lien against all assets of the Debtor and PRAI, the equitable subordination of the Lenders' liens, and the Lenders' disgorgement of all sums received from the Debtor's hedge accounts since April 11, 2008.

Following initiation of the East Lawsuit, the parties agreed to certain extensions of the period for the East Defendants to answer or otherwise plead in response to the Original Complaint so that the parties could first engage in negotiations and a joint mediation. On December 9-10, 2008, the East Plaintiffs, the East Defendants, the Committee and PRAI-Texas participated in the joint mediation, but a settlement among all of the parties was not successfully negotiated at that time. Nevertheless, negotiations among the parties continued thereafter.

On February 13, 2009, as indicated above, the Committee filed its Motion to Assert Claims to request leave of court to pursue certain alleged causes of action on behalf of the Estate. *See* Section VI(L) above. As a result of the filing of such motion, on February 24, 2009, the parties to the East Lawsuit filed an *Agreed Motion for Order Approving Deadlines* to request entry of an order establishing new deadlines in the case dependent upon the outcome of the Motion to Assert Claims. On February 27, 2009, the Bankruptcy Court entered an *Agreed Order on Agreed Motion for Order Approving Deadlines*, thereby establishing a deadline for the East Plaintiffs and the Committee to file an amended or consolidated complaint in the event of the Bankruptcy Court's entry of an order granting, in whole or in part, the Motion to Assert Claims, and new deadlines for the East Defendants to answer or otherwise plead in

---

[12] The East Plaintiffs are comprised of the East Cotton Company Inc., Michael D. East, and certain cotton growers and gin companies identified on Exhibit 1 to the Original Adversary Complaint.

response to the Original Complaint or such amended/consolidated complaint depending upon the outcome of the Motion to Assert Claims.

On April 30, 2009, following the Court's entry of the *Order on Committee's Motion to Assert Claims* in the Bankruptcy Case (*see* Section VI(L) above), the East Plaintiffs and the Committee filed a joint *First Amended Adversary Complaint* in the East Lawsuit against the Bank Group (the "Amended Complaint").[13] Pursuant to the Amended Complaint:

(a) the East Plaintiff Growers and the Committee have jointly asserted a count for equitable subordination (Count I);

(b) the East Plaintiff Growers have jointly asserted the following counts: (i) principal and agent relationship (Count II); (ii) vicarious liability for breach of contract with Growers (Count III); (iii) tortious interference with the contracts of plaintiff Growers (Count IV); (iv) breach of third party beneficiary contract (Count V); (v) fraud and deceit (Count VI); (vi) unjust enrichment (Count VIII); and (vii) conversion (Count IX);

(c) the East Plaintiffs have jointly asserted a count for loss of business reputation (Count X);

(d) the East Cotton Company has asserted a count for breach of its commission agreement (Count XII); and

(e) the Committee, on behalf of the Estate, has asserted the following counts: (i) tortious interference with contract (Count VII); (ii) aiding and abetting breach of fiduciary duty (Count XI); and (iii) preferential transfers (Count XIII).

Pursuant to the Amended Complaint, the East Plaintiffs and Committee seek, among other things: (a) a money judgment against the Bank Group, jointly and severally, for $180 million; (b) punitive damages against the Bank Group, jointly and severally; (c) pursuant to Section 510(c) of the Bankruptcy Code, judgment for (i) an equitable lien; (ii) the equitable subordination of the Bank Group's Claims in full to all unsecured creditors; (iii) all sums recovered by the Bank Group from the Debtor's hedge account to be disgorged and repaid to the Estate for equitable distribution to all unsecured creditors; (iv) the Bank Group's liens to be transferred to the Estate; and (v) an accounting for and disgorgement of all sums received from the Debtor's hedge accounts since April 11, 2008 for the East Plaintiffs and Committee's benefit; (d) a judgment for all amounts of the Debtor's hedge account taken by the Bank Group to be ordered transferred to the U.S. Marshal for safe keeping pending further order of the Court; (e) Michael D. East's recovery of judgment for loss of business judgment in the sum of $2.5 million; (f) the East Cotton Company's recovery of judgment for the amount of commission income lost in the amount of $1 million; (g) the East Plaintiff Growers' recovery of judgment for loss and impairment of business reputation in an amount of at least $200 million against the Bank Group, jointly and severally; and (h) the East Plaintiff Growers' recovery of judgment against the Bank Group for $103 million.

On June 1, 2009, the Bank Group filed a *Motion to Dismiss for Failure to State a Claim* and *Motion for More Definite Statement*. On July 24, 2009, the Bankruptcy Court entered an *Order Granting in Part and Denying in Part the Bank Group's Motion to Dismiss for Failure to State a Claim*. Pursuant to the order, the Bankruptcy Court: (a) dismissed with prejudice Counts V, VII, VIII, IX and X; (b) dismissed with prejudice Count IV to the extent that any tortious interference claims are based on the Bank Group's refusal to consent to the Allenberg transaction, denying the Motion to Dismiss as to said Count in all other respects; (c) dismissed with prejudice Counts XII and XIII unless the East Cotton Company and the Committee, as applicable, replead such counts by August 10, 2009; (d) denied the Motion to Dismiss as to Counts I, II, III, VI and IX; (e) required any amended complaint to be filed by the East Plaintiffs and Committee to set forth the relevant factual allegations in connection with each cause of

_____

[13] The Amended Complaint does not assert any counts against the Debtor or PRAI.

action or count alleged; and (e) denied the Motion to Dismiss and Motion for More Definite Statement except as granted in the order. By agreement between the Committee and the Lenders, the deadline for the East Cotton Company and Committee to replead Counts XII and XIII has been extended to August 20, 2009. As of the date of this Disclosure Statement, neither the East Cotton Company nor the Committee has filed an amended complaint to replead such counts.

### 2. CoMark Lawsuit (Adversary No. 08-3491)

On December 24, 2008, the Debtor filed an *Original Complaint* against CoMark (the "Debtor's Complaint"), thereby initiating Adversary No. 08-3491 with the Bankruptcy Court (the "CoMark Lawsuit"). Pursuant to the Debtor's Complaint, the Debtor has asserted that CoMark converted to its own use and/or otherwise wrongfully withheld from the Debtor certain bales of cotton redeemed out of the federal loan program (including the proceeds thereof), wrongfully caused the Debtor to make certain bale equity and redemption payments to CoMark, and wrongfully made various representations to the Debtor in connection with the foregoing. The Debtor has asserted the following causes of action against CoMark: turnover; declaratory relief (related to disputed bales sales proceeds deposited in court's registry); violation of the automatic stay; conversion; common law fraud; breach of fiduciary duty; constructive trust; negligent misrepresentation; breach of contract; avoidance and recovery of fraudulent transfers; and avoidance and recovery of preferential payments. The Debtor seeks, among other things, turnover of the withheld cotton and cotton proceeds and, subject thereto, damages in the amount of at least $10.5 million.

On January 22, 2009, as indicated above, the Bankruptcy Court entered an *Order Consolidating Final Hearing on Motion for Relief from the Automatic Stay to Effectuate a Right of Setoff with the Trial in Adversary No. 08-3491* pursuant to which CoMark's motion for relief from the automatic stay has been consolidated with the CoMark Lawsuit for trial. *See* Section VI(J)(2) above. Shortly thereafter, on February 2, 2009, the Bank Agent filed an *Unopposed Motion to Intervene as an Additional Plaintiff and Brief in Support* to request permission to intervene in the CoMark Lawsuit and also assert claims against CoMark. On February 3, 2009, the Bankruptcy Court entered an *Order Granting Unopposed Motion to Intervene as an Additional Plaintiff* and on the same date the Bank Agent filed its *Original Complaint in Intervention* against CoMark (the "Lenders' Complaint"). Pursuant to the Lenders' Complaint, the Bank Agent has adopted many of the assertions set forth within the Debtor's Complaint and further asserted that CoMark's actions resulted in the conversion of the Lenders' collateral. The Bank Agent has asserted a cause of action against CoMark for conversion of collateral. On February 9, 2009, CoMark filed a *Motion to Dismiss Counts 5-10 and Answer to Debtor's Original Complaint*. Thereafter, on March 9, 2009, CoMark filed a *Motion to Dismiss for Failure to State a Claim and Answer to Bank Group's Complaint in Intervention*.

On March 9, 2009, CoMark also filed *CoMark's Counterclaim Against Paul Reinhart, Inc. and the Bank Group* in the CoMark Lawsuit ("CoMark's Counterclaim"). Pursuant to CoMark's Counterclaim, CoMark has asserted that the Debtor breached certain cotton purchase contracts between the Debtor and CoMark, committed certain wrongdoing in connection with the maintenance of hedge positions and hedge accounts, and made certain misrepresentations to CoMark in connection with the foregoing. CoMark has additionally asserted that the Lenders participated in the Debtor's alleged wrongdoing and wrongfully obtained the benefit from same. CoMark has asserted the following alleged counterclaims against the Debtor and/or the Lenders: breach of contract; negligent and/or fraudulent misrepresentation; conversion; breach of the duty of good faith and fair dealing; breach of fiduciary duty; aiding and abetting; conspiracy; domination and control; and constructive trust. On June 5, 2009, the Debtor filed a *Motion to Dismiss CoMark's Counterclaim Against Paul Reinhart, Inc.* and the Bank Agent, on behalf of the Lenders, filed a *Motion to Dismiss CoMark's Counterclaim Against the Bank Group for Failure to State a Claim*.

On July 20, 2009, the Bankruptcy Court conducted a hearing on all of the motions to dismiss referenced above, at the conclusion of which the Court took all of the motions under advisement. As of the date hereof, the Bankruptcy Court has not yet ruled on any of the motions.

## O.    Sales of Assets of the Estate

### 1.    Investment in The Seam and ICE

On April 22, 2009, the Debtor filed a *Motion to Approve Sale of Certain Assets Free and Clear of All Liens, Claims, Encumbrances and Interests, and For Related Relief*, to request authority to sell its equity ownership in The Seam, LLC (50,000 investment units) and IntercontinentalExchange, Inc. (11,067 shares of common stock). On May 28, 2009, the Bankruptcy Court entered an *Order Granting Debtor's Motion to Approve Sale of Certain Assets Free and Clear of All Liens, Claims, Encumbrances and Interests, and For Related Relief*.

### 2.    Unnecessary Furniture

On July 17, 2009, the Debtor filed a *Motion to Approve Sale of Certain Assets of De Minimus Value Free and Clear of All Liens, Claims, Encumbrances and Interests, and For Related Relief*, to request authority to sell certain unnecessary items of furniture in connection with the reduction of the office space leased by the Debtor. On July 21, 2009, Dallas County and the City of Richardson filed a *Limited Objection to Motion to Approve Sale of Certain Assets of De Minimus Value Free and Clear of All Liens, Claims, Encumbrances and Interests, and For Related Relief*. The Debtor and the above-referenced taxing authorities subsequently reached agreement in resolution of the Limited Objection. On July 30, 2009, the Bankruptcy Court entered an *Order Granting Debtor's Motion to Approve Sale of Certain Assets of De Minimus Value Free and Clear of All Liens, Claims, Encumbrances and Interests, and For Related Relief*.

## P.    Compromises of Disputes

### 1.    Signia Settlement

On May 11, 2009, the Debtor filed a *Motion for Approval of Compromise and Settlement with Signia Cotton Cooperative*. Pursuant to the Motion, the Debtor requested approval of the settlement that it had reached with Signia Cotton Cooperative ("Signia") in relation to a Marketing Agreement between the parties and amounts owing by Signia to the Debtor under a promissory note. On June 11, 2009, the Bankruptcy Court entered an *Order Granting Debtor's Motion for Approval of Compromise and Settlement with Signia Cotton Cooperative*.

### 2.    PPGC-PGC Settlement

On August 7, 2009, the Debtor filed a *Motion for Entry of Order Approving Debt Settlement and Release Agreement Among the Debtor, Pacific Pima Gin Company, Inc. and Pacific Ginning Company, LLC*. As explained in the Motion, Pacific Pima Gin Company, Inc. ("PPGC"), an affiliate of the Debtor, owes approximately $3.3 million to the Debtor under various intercompany loans made by the Debtor to PPGC, and Pacific Ginning Company, LLC ("PGC"), in turn, owes approximately $1.4 million to PPGC in connection with a sales transaction that took place between PGC and PPGC in 2007. Each of the parties may hold certain claims and defenses against one another in connection with the foregoing. Pursuant to a Debt Settlement and Release Agreement between the parties, dated as of July 17, 2009, the parties have agreed to compromise and settle their respective financial obligations, claims and defenses,

in a comprehensive manner, subject to the Bankruptcy Court's approval. Upon approval of the Agreement, the Debtor will immediately receive $660,000 with the possibility of recovering certain additional amounts in the future. As of the date of this Disclosure Statement, the Motion remains pending with the Bankruptcy Court.

### 3. Receivables Restructuring Protocol

On August 7, 2009, the Debtor filed a *Motion for Entry of Order Approving Receivables Restructuring Protocol and Authorizing Debtor to Enter Into Restructuring Agreements with Customers in Accordance with Protocol*. Pursuant to the Motion, the Debtor has requested approval of specific restructuring parameters and procedures in relation to its outstanding foreign receivables. As of the date of this Disclosure Statement, the Motion remains pending with the Bankruptcy Court.

## VII.
## PRAG SETTLEMENT

### A. Introduction

The Plan is structured around, and dependent upon, approval of a settlement among the Debtor, PRAI, PRAG, PRAI-Texas, the East Plaintiffs, and the Committee. Because a key component of the settlement relates to the contribution of a portion of the revenues generated from future cotton trading activity in the United States on behalf of PRAG and/or its affiliates, it is described herein as the "PRAG Settlement." The PRAG Settlement, in turn, is dependent upon the equitable subordination of the Lenders' Claims. Therefore, before turning to a description of the Plan's treatment of Claims and Equity Interests in the Bankruptcy Case, it is important to have an understanding of the terms and conditions of the PRAG Settlement and the request for the subordination of the Lenders' Claims. In this section, the PRAG Settlement is discussed. Section VIII of the Disclosure Statement contains a discussion regarding the request for equitable subordination of the Lenders' Claims. This Disclosure Statement shall serve as the Plan Proponents' motion for approval of the PRAG Settlement under the terms and conditions set forth in the Plan and described below pursuant to Sections 105, 363, 1107 and 1123 of the Bankruptcy Code and Bankruptcy Rule 9019.

### B. Nature of Claims Subject to Resolution

As described generally in relation to the East Lawsuit (*see* Section VI(N)(1) above), the East Plaintiffs asserted under their Original Complaint that the Debtor and PRAI breached contractual and fiduciary obligations owed to them. Specifically, the East Plaintiffs alleged that the Debtor entered into forward contracts to purchase cotton from them and failed to perform, resulting in a breach of their contracts. The East Plaintiffs also alleged that PRAI engaged in tortious interference with their contracts, in that PRAI participated and/or controlled the Debtor's actions in failing to perform the contracts before the filing of the bankruptcy. The East Plaintiffs also asserted a claim against the Debtor for breach of fiduciary duties that they assert may have been owed to creditors while the Debtor was in the vicinity of insolvency. The breach of duty allegation was predicated on the Debtor's alleged failure to disclose to the East Plaintiffs its true financial condition in the months preceding the bankruptcy, thus depriving the East Plaintiffs of the opportunity to move their cotton contracts to other merchants or buyers. Except for the East Plaintiffs' claim for breach of contract in relation to the East Plaintiffs' cotton purchase contracts, which breach is deemed to have occurred as a result of the Debtor's rejection of such contracts pursuant to Section 365 of the Bankruptcy Code, both the Debtor and PRAI dispute the East Plaintiffs' contentions and deny any liability to the East Plaintiffs.

In connection with considering the potential for a settlement with the Debtor, PRAI and PRAG, the Committee analyzed, among other things, the nature of the March Trades[14] that ultimately resulted in significant losses to the Debtor to assess the viability of any claims that the Estate may have against PRAG. In connection with the Committee's analysis, certain information and documentation was made available by the Debtor and PRAG to the Committee. Based upon such information and documentation, the Committee currently believes that:[15]

- At the time of the March Trades, all of the Debtor's financial futures contracts and other hedging positions (collectively, the "Hedging Positions") were held in the PRI Sub-Accounts (certain brokerage sub-accounts opened by and held in the name of PRAG at UBS AG ("UBS")).

- While it does not appear that the Debtor had any direct contractual obligation to UBS to fund amounts in relation to the PRI Sub-Accounts, maintenance of the Debtor's Hedging Positions was dependent upon, among other things, the satisfaction of periodic margin calls of UBS in relation to the Hedging Positions in the PRI Sub-Accounts, which the Debtor customarily funded to UBS by and through PRAG.

- At the time of the March Trades, the PRI Sub-Accounts were maintained for the exclusive purpose of hedging activity involving the Debtor's business, and there does not appear to have been any commingling of the Debtor's Hedging Positions with the Hedging Positions of PRAG or any of its other affiliates.

- At the time of the March Trades, personnel of PRAG appear to have had trading authority in relation to the PRI Sub-Accounts, provided that such trades were in the ordinary course of business and on behalf, or in furtherance, of the Debtor's business.

- Between March 4 and 6, 2008, certain of the personnel of PRAG placed and/or directed the placement of various options trades in the PRI Sub-Accounts. Such trades appear to have been undertaken for the benefit of the Debtor in an attempt to minimize the risk of substantial loss to the Debtor's Hedging Positions in the PRI Sub-Accounts – specifically, because of the Debtor's lack of liquidity, the Debtor faced the prospect of having all or a substantial portion of its Hedging Positions liquidated in the event of a continuing run-up in the futures price of cotton which, in turn, would have triggered the requirement to fund additional margin that the Debtor would have been unable to fund.

- Because of both the Debtor's lack of liquidity and the volatility in the market, the trading alternatives that existed between March 4 and 6, 2008 were limited, resulting in the decision to execute trades in options.

- The losses ultimately suffered by the Debtor as the market began to settle also resulted in a complete loss to PRAG of the value of its investment in PRAI (as the 100% shareholder

---

[14] The "March Trades" are defined in the Plan as "[a]ll trades of cotton futures or options made by or on behalf of the Debtor in March 2008."

[15] Committee Disclaimer: The principal terms of the PRAG Settlement were reached early in the Bankruptcy Case as a result of a voluntary informal mediation between the East Plaintiffs, the Committee, the Lenders, the Debtor and PRAG. No suit had yet been filed against PRAG, its affiliates, or any of their respective officers or directors, and no formal discovery had yet commenced at the time of the settlement. See subsection (E) below for the Committee's discussion of the value of the pre-suit settlement with PRAG and the inherent risks and uncertainties such a pre-suit settlement may entail. Nothing contained in this Section VII of the Disclosure Statement shall have any preclusive effect against the Committee (whether by waiver, admission, estoppel or otherwise) in any cause or proceeding which may exist or occur in the future in the event the PRAG Settlement is not approved. This Section VII of the Disclosure Statement shall not be construed or deemed to constitute an acceptance of fact or an admission by the Committee in regards to any of the statements made herein, and all rights and remedies of the Committee are expressly reserved in this regard.

of PRAI) and PRAI's loss in the value of its investment in the Debtor (as the 100% shareholder of the Debtor).

## C.     Terms of the PRAG Settlement

The PRAG Settlement is set out in Article 7 of the Plan.  The material components of the PRAG Settlement are described as follows:[16]

- Confirmation Payment.  First, the Plan provides for the payment of US $10,000,000.00 by PRAI-Texas to the Estate on the Effective Date of the Plan (the "Confirmation Payment").  Mechanically, in connection with seeking the Bankruptcy Court's approval of the Disclosure Statement, the Plan Proponents will request entry of an order pursuant to Bankruptcy Rule 3020(a) that provides that by no later than ten (10) days prior to the Confirmation Hearing, PRAI-Texas shall deliver the Confirmation Payment to the Debtor, which funds shall be deemed placed in trust with the Debtor and shall be deposited by the Debtor into a segregated interest-bearing account established for the exclusive purpose of the Plan.  On the Effective Date of the Plan, the Confirmation Payment, together with all interest earned thereon while held in trust by the Debtor, will be deemed released from trust and paid by PRAI-Texas to the Estate, and then immediately transferred to the Creditor Trust as part of the Trust Assets.

- Subsequent Payments.  Next, the Plan provides for NEWCO, following the Effective Date of the Plan, to pay to the Creditor Trust the sum of US $5.00 per each bale of cotton that it purchases in the United States (collectively, the "Subsequent Payments") for a period of three years (the "Obligation Period").  NEWCO will be the entity designated to conduct any and all cotton trading, purchasing, or selling in the United States by, or on behalf of, PRAG, PRAI-Texas, or any of the other PRAG Affiliates during the Obligation Period.  The identity of NEWCO will be disclosed by PRAI-Texas by no later than thirty (30) days prior to the Confirmation Hearing.  On the Effective Date of the Plan, PRAG will execute an instrument pursuant to which it covenants and agrees to be bound by the above-restriction for any business it chooses to directly or indirectly conduct within the United States during the Obligation Period.

- Mechanics of Subsequent Payments.  Pursuant to the Plan, the Obligation Period will start to run on the later of the first day of the first calendar month following the Effective Date or the first day of the calendar month that NEWCO begins to conduct business in the United States.  The Subsequent Payments will be made with respect to cotton that NEWCO buys directly from growers and merchants in the United States without regard to whether such purchases are at a profit or loss; *provided, however*, that NEWCO will have no obligation to make purchases of cotton that it does not deem to be in its interest and NEWCO will remain entirely free in its trading decisions according to its own commercial judgment.  Each of the Subsequent Payments will be paid to the Creditor Trust, and each of the Subsequent Payments will only become payable by NEWCO following NEWCO's sale and delivery of such purchased U.S. cotton to third parties.  More specifically, NEWCO will be required to provide reporting and payments as follows: (i) first, within fifteen (15) days following the end of each month of the Obligation Period, NEWCO will be required to provide to the Trustee a written report specifying the number of bales of cotton that it purchased in the United States in the preceding month; (ii) second, as NEWCO sells and delivers such cotton to third parties,

---

[16] To following is a summary only.  To the extent of any conflict between the provisions of Article 7 of the Plan and the description of the PRAG Settlement set forth herein, the terms of the Plan control.

NEWCO will be required to provide to the Trustee, within fifteen (15) days following the end of each month in which NEWCO has made delivery of any such cotton, a written report specifying the number of bales so delivered during the preceding month; and (iii) third, within thirty (30) days after the end of each calendar month in which NEWCO has made delivery of any such cotton, NEWCO will be required to pay to the Creditor Trust an amount equal to US $5.00 per bale of cotton so delivered during the preceding month.

- The NEWCO Agreement.  On the Effective Date of the Plan, NEWCO will execute an instrument pursuant to which it covenants and agrees to perform all of the obligations under the Plan and represents and warrants to the Debtor, the Creditor Trust and the Trustee that: (a) NEWCO will handle all cotton trading, purchasing, or selling conducted in the United States during the Obligation Period by, or on behalf of, PRAG, PRAI-Texas, or any of the other PRAG Affiliates; (b) NEWCO is adequately capitalized and will remain adequately capitalized throughout the entire period of time that it owes any obligation to the Creditor Trust; (c) NEWCO's performance of the obligations set forth the Plan has been duly authorized by all requisite corporate action on the part of NEWCO and will not violate any provision of any statute, rule or regulation, any provision of NEWCO's organizational and governing documents, any applicable order of any court, or any rule, regulation or order of any governmental body or agency; and (d) NEWCO has obtained reasonably equivalent value in exchange for its agreement to perform all of the obligations set out in the Plan.

- Release of PRAG Parties.  On the Effective Date of the Plan, the Debtor, on behalf of itself and the Estate, and the East Plaintiffs will execute a release thereby (a) unconditionally and irrevocably waiving, remising, acquitting, and fully and forever releasing and discharging PRAG, PRAI and PRAI-Texas, and each of their respective (i) direct and indirect subsidiaries and (ii) officers, directors, shareholders, managers, employees and agents and those of their direct and indirect subsidiaries (collectively, the "PRAG Parties")[17] from any and all claims which the Debtor, the Estate or the East Plaintiffs have or ever had against the PRAG Parties, and (b) covenanting and agreeing never to voluntarily aid in any way, foment, prosecute or cause to be commenced or prosecuted against any of the PRAG Parties any action or other proceeding based upon any claims which may have arisen at any time on or prior to the Effective Date; *provided, however*, that said release shall not release, nor be deemed to constitute a release or waiver of: (i) any of the obligations imposed upon any of the PRAG Parties pursuant to the Plan; (ii) any of the Debtor's or the Estate's rights with respect to any federal or state tax refunds obtained or claimed by PRAI on account of PRAI's filing of any consolidated tax returns in which the Debtor was or is included as a member of the consolidated tax group; (iii) any of the Debtor's or the Estate's rights with respect to the outstanding inter-company receivable owing by Pacific Pima Gin Company to the Debtor; or (iv) any of the Debtor's or the Estate's rights with respect to the outstanding inter-company receivable owing by Paul Reinhart (Australia) Pty. Ltd. ("PRAL") to the Debtor or any of the Debtor's or the Estate's defenses with respect to the Claim asserted by PRAL in the Bankruptcy Case; *and further provided*, that in the event that less than all of the East Plaintiffs execute the release required by this provision of the Plan, the release requirement shall nevertheless be deemed to have been satisfied provided the East Plaintiffs' counsel and/or designated agents have used their best efforts to obtain execution of the release by all of the East Plaintiffs.

---

[17] The PRAG Parties include, without limitation, PRAG, PRAI, PRAI-Texas, Riverbend Warehouse, LLC, Pacific Pima Gin Company, Richardson LSA, Inc., Paul Reinhart (Australia) Pty Ltd., and each of their respective officers and directors.

- <u>Release of Estate Parties</u>. On the Effective Date of the Plan, PRAG, PRAI and PRAI-Texas will execute a release thereby (a) unconditionally and irrevocably waiving, remising, acquitting, and fully and forever releasing and discharging the Debtor, the Estate, and each of the Debtor's (i) direct and indirect subsidiaries and (ii) officers, directors, managers, employees and agents and those of its direct and indirect subsidiaries (collectively, the "Estate Parties") from any and all claims which PRAG, PRAI or PRAI-Texas have or ever had against the Estate Parties, and (b) covenanting and agreeing never to voluntarily aid in any way, foment, prosecute or cause to be commenced or prosecuted against any of the Estate Parties any action or other proceeding based upon any claims which may have arisen at any time on or prior to the Effective Date; *provided, however*, that said release shall not release, nor be deemed to constitute a release or waiver of, any of the obligations imposed upon any of the Estate Parties pursuant to the Plan.

- <u>Dismissal of Certain Claims in East Lawsuit</u>. On the Effective Date of the Plan, each and every claim and cause of action asserted by the East Plaintiffs or the Committee (if applicable) in the East Lawsuit against the Debtor, PRAI, or any of their respective officers, directors, managers, employees or agents (if applicable) will be deemed dismissed with prejudice; *provided, however*, that such dismissal shall not result in the release or waiver of, or adversely impact in any way, any Claims asserted by the East Plaintiffs against the Debtor by and through proofs of claim filed in the Bankruptcy Case on or before the Bar Date.

- <u>Conditions Precedent to PRAG Settlement</u>. The PRAG Settlement is dependent upon, among other things: (a) the Confirmation Order including findings, or substantially similar findings, (i) that PRAG committed no act or omission that would constitute liability of PRAG to the Debtor in relation to the March Trades and (ii) that there was no evidence presented of any other act or omission that would cause PRAG to have liability to the Debtor; *provided, however*, that such condition shall be deemed satisfied if, and to the extent, waived in writing by PRAI-Texas; and (b) the Confirmation Order providing for the equitable subordination of the Lenders' Claims so as to enable distribution of the Confirmation Payment and the Subsequent Payments (less the amount of said payments required to satisfy or reserve for Allowed Administrative Claims, Allowed Priority Tax Claims, and Allowed Claims within Classes 2 and 3 of the Plan, and less the amount of said payments reserved by the Trustee as part of the Litigation and Administrative Expense Reserve) solely to the holders of Allowed General Unsecured Claims; *provided, however*, that such condition shall be deemed satisfied if, and to the extent, waived in writing by the Committee and the East Plaintiffs.

## D. Legal Standard for Approval of Settlements

The Plan Proponents seek approval of the PRAG Settlement pursuant to Sections 105, 363, 1107 and 1123 of the Bankruptcy Code and Bankruptcy Rule 9019.

Sections 363 and 1107 of the Bankruptcy Code, in combination, provide that a debtor in possession may, after notice and a hearing, "use [or] sell …, other than in the ordinary course of business, property of the estate." 11 U.S.C. §§ 363(b)(1), 1107(a). Section 105 of the Bankruptcy Code compliments such provisions by providing, in pertinence, that "[t]he court may issue any order … that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." *Id*. § 105(a). In applying the foregoing provisions to a request for approval of a settlement, Bankruptcy Rule 9019 provides that "[o]n motion by the trustee [or per the authority granted pursuant to Section 1107 of the Bankruptcy Code, the debtor in possession] and after notice and a hearing, the court may approve a compromise or settlement." Fed. R. Bankr. P. 9019(a). In addition, Section 1123(b) of the Bankruptcy Code provides

that a plan may, among other things, "provide for the settlement or adjustment of any claim or interest belonging to the debtor or to the estate" and "include any other appropriate provision not inconsistent with the applicable provisions of [the Bankruptcy Code]." 11 U.S.C. § 1123(b)(3)(A), (b)(6).

Courts have uniformly held that a debtor's decision to use/sell property of the estate out of the ordinary course is subject to consideration under the business judgment rule. In other words, provided the debtor articulates a business justification for the proposed course of action, generally it is appropriate for the court to defer to the debtor's judgment.[18] Here, because certain key aspects of the PRAG Settlement relate to the Debtor's parent corporation PRAI, to PRAI's parent corporation PRAG, and to PRAI-Texas, and because the members of the Debtor's board of directors are also officers and/or directors of PRAI and PRAG, the business judgment rule may not be applicable to the Debtor's evaluation of the settlement. Consequently, the analysis of the PRAG Settlement set out below is the product of the Committee alone, and the Debtor has abstained from contributing to such discussion due to such connections.

When it comes to the approval of settlements, the Fifth Circuit Court of Appeals has added that a settlement should be approved under Bankruptcy Rule 9019 only if the settlement is "fair and equitable and in the best interest of the estate."[19] To aid courts in their assessment of whether a settlement is fair and equitable and in the best interest of the estate, the Fifth Circuit has directed courts to consider the following three factors:[20]

    (1)    The probability of success in the litigation, with due consideration for the uncertainty in fact and law;

    (2)    The complexity and likely duration of the litigation and any attendant expense, inconvenience and delay; and

    (3)    All other factors bearing on the wisdom of the compromise.

Various courts have elaborated on each of these factors. First, in relation to the probability of success in the litigation, it is unnecessary for the court to conduct a mini-trial on the various claims and defenses to be resolved under the settlement. "The judge need only apprise himself of the relevant facts and law so that he can make an informed and intelligent decision."[21] As explained by another court:[22]

The court's responsibility is "to canvass the issues and see whether the settlement 'fall[s] below the lowest point in the range of reasonableness.'" Indeed, a court may approve a settlement even if it believes that the Trustee [or debtor in possession pursuant to § 1107] ultimately would be successful.

---

[18] *See, e.g., In re Continental Air Lines, Inc.*, 780 F.2d 1223, 1226 (5th Cir. 1986); *see also In re Ionosphere Clubs, Inc.*, 100 B.R. 670, 675 (Bankr. S.D.N.Y. 1989); *Stephens Indus., Inc. v. McClung*, 789 F.2d 383, 391 (6th Cir. 1986); *In re Lionel Corp.*, 722 F.2d 1063 (2nd Cir. 1983).

[19] *Rivercity v. Herpel (In re Jackson Brewing Co.)*, 624 F.2d 599, 602 (5th Cir. 1980); *see also Connecticut General Life Ins. Co. v. United Companies Fin. Corp. (In re Foster Mortgage Corp.)*, 68 F.3d 914, 917 (5th Cir. 1995); *United States v. AWECO (In re AWECO)*, 725 F.2d 293, 298 (5th Cir.), *cert. denied*, 469 U.S. 880 (1984).

[20] *Foster Mortgage*, 68 F.3d at 917 (citing *Jackson Brewing*, 624 F.2d at 609).

[21] *Official Committee of Unsecured Creditors v. Cajun Elec. Power Coop., Inc. (In re Cajun Elec. Power Coop., Inc.)*, 119 F.3d 349, 356 (5th Cir. 1997) (quoting *La Salle Nat'l Bank v. Holland (In re American Reserve Corp.)*, 841 F.2d 159, 163 (7th Cir. 1987)).

[22] *Official Committee of Unsecured Creditors of Int'l Distrib. Ctrs., Inc. v. James Talcott, Inc. (In re International Distrib. Ctrs., Inc.)*, 103 B.R. 420, 423 (S.D.N.Y. 1989) (citations omitted) (quoting *In re W.T. Grant, Co.*, 699 F.2d 599, 608 (2nd Cir.), *cert. denied*, 464 U.S. 822 (1983)); *see also In re Drexel Burnham Lambert Group, Inc.*, 134 B.R. 493, 496-97 (Bankr. S.D.N.Y. 1991).

Next, in relation to the factor focused on the complexity, duration, expense and delay of the litigation, it is important to emphasize that "[a] Trustee [or debtor in possession pursuant to § 1107] has a duty to conserve the assets of the estate to the extent possible where … there are finite assets available to fund the cost of litigation."[23] Indeed, as explained by the Fifth Circuit, "compromises are a normal part of the process of reorganization, oftentimes desirable and wise methods of bringing to a close proceedings otherwise lengthy, complicated and costly."[24]

Finally, as for all other factors bearing on the wisdom of the compromise, the Fifth Circuit has identified at least two such other factors: (a) the best interests of the creditors, with "proper" deference to their "reasonable" views; and (b) the extent to which the settlement is truly the product of arms-length bargaining, and not fraud and collusion.[25]

## E.    Committee's Analysis of PRAG Settlement Under Legal Standard

The Committee believes that the PRAG Settlement provided for in the Plan is supported by each of the above factors.  Pursuant to Federal Rule of Evidence 408, the recitals and comments made in this section of the Disclosure Statement are intended as "statements made in compromise negotiations" and are not admissible in any subsequent proceeding to establish or negate liability.

### The Probability of Success in Litigation

All litigation is inherently uncertain and incapable of precise estimation and prediction, particularly when the litigation being compromised is resolved prior to litigation being formally initiated. There is no precise way to handicap the probability of success of litigation against the Debtor, PRAI or PRAG, but the Committee does believe that any litigation pursued against these entities would be difficult and expensive litigation from both a factual and financial perspective.  With respect to claims against the Debtor for breach of contract, the Committee believes that there would be unquestionable success on such claims.  The Debtor rejected the contracts and success would only be dependent on establishing the appropriate measure of rejection damages as of October 15, 2008.  However, this claim is against the Debtor, which does not have the capacity to pay any judgment or otherwise fund a settlement on its own accord.

The remaining claims asserted or that could be asserted are also difficult to assess and likely more difficult to prove.  Further, given the complexity, duration and expense of the litigation, the Committee believes that a pre-suit settlement with PRAG, PRAI and the Debtor is in the best interests of creditors.

### Complexity, Duration and Expense of Continued Litigation

The Committee further took into account the complexity of the litigation, the likely duration of the litigation and the expense that would be incurred by the Estate in continuing to pursue the litigation. There is no question that litigation against PRAG, PRAI or the Debtor involving the March Trades would be complicated and protracted.  The litigation would involve numerous complicated hedging transactions, historical analysis of cotton prices and the cotton market, and extensive expert testimony to sort through both the liability and damage questions that would arise.

---

[23] *Monus v. Lambros*, 286 B.R. 629, 638 (N.D. Ohio 2002), *aff'd*, 63 Fed. Appx. 215 (6th Cir. 2003) (quoting *In re Lee Way Holding Co.*, 120 B.R. 881, 890 (Bankr. S.D. Ohio 1990)).

[24] *Cajun Elec.*, 119 F.3d at 354 (quoting *Jackson Brewing*, 624 F.2d at 602).

[25] *See Cajun Elec.* 119 F.3d at 356.

In addition, the litigation would be expensive and protracted. PRAG has asserted and continues to maintain that it is not subject to *in personam* jurisdiction in this Court or any other court in the United States. From PRAG's perspective, it has no presence in the United States, owns no assets in the United States, and took no action (tortious or otherwise) in the United States related to the Debtor. PRAG is a Swiss entity and would have to be pursued through international service of process channels. Even if PRAG could be haled into this Court, efforts to collect on any judgment obtained would likely have to be pursued in Switzerland or in other locations overseas. Litigation against PRAG, even if successful, would require extensive and expensive collections efforts in foreign jurisdictions that could literally last several years before any monies are ever recovered on behalf of the Estate.

The fact that a pre-trial compromise was reached that will yield approximately $10 to $15 million to the Estate was a considerable motivating factor in the Committee's analysis. In accepting a pre-suit compromise and avoiding potentially years and millions worth of litigation against PRAG, PRAI and the Debtor, the Committee believes that this settlement and compromise is in the best interests of the creditors.

*Other Factors*

Finally, the Fifth Circuit has recognized at least two other factors to be considered: (a) the best interests of the creditors, with "proper" deference to their "reasonable" views; and (b) the extent to which the settlements are truly the product of arms-length bargaining, and not fraud and collusion. The Committee believes that each of these factors also support approval of the settlement. First, the Committee believes that the settlement is in the best interests of the creditors because it provides immediate value to the Estate and avoids years of delay and potentially millions of dollars in expense. Put simply, the cost and risk of pursuing the complex litigation against PRAG, PRAI and the Debtor for a future speculative recovery is too great to jeopardize a potential $10-$15 million settlement now.

As for the nature of the negotiations between the parties, there is no question about the arms-length nature of such negotiations. Each party was represented by competent and capable counsel. The parties began negotiations in December 2008 when the parties voluntarily went to a multi-day mediation before The Honorable William Jefferson Brown. The parties were unable to reach a final agreement at that time, but did reach a tentative settlement with the assistance of the neutral mediator and the parties' best efforts. The settlement, however, was not final and required an additional four months to fully and finally negotiate an acceptable Memorandum of Understanding ("MOU"). The parties finally agreed on the terms of a final MOU on April 7, 2009, subject to this Court's approval.

The Committee believes that the settlement – which will result in the Estate's recovery of at least $10 million to be transferred to the Creditor Trust and potentially another $5 million in subsequent payments –is fair and equitable and in the best interest of the Estate.

## F. Bank Agent's and Lenders' Assertions

In response to the information set out above about the nature of the claims subject to resolution under the PRAG Settlement, the terms of the Settlement, and the Committee's evaluation of the Settlement, the Bank Agent and the Lenders assert the following:

- The Bank Agent and the Lenders dispute the Committee's beliefs about the background of the March Trades. The Bank Agent and the Lenders assert, upon information and belief, that PRAG, and not the Debtor, was contractually obligated to UBS to fund UBS' margin calls. The Bank Agent and Lenders further assert, upon information and belief, that certain of the March Trades undertaken by personnel of PRAG were not authorized

by, and were made without the prior knowledge and consent of, the Debtor's President and Chief Executive Officer, R. Dale Grounds. The Bank Agent and Lenders assert that the actions taken by personnel of PRAG with respect to the March Trades caused losses to the Debtor in excess of $60 million.

- With respect to negotiation of the PRAG Settlement, the Bank Agent and Lenders assert that the PRAG Settlement was negotiated on behalf of the Debtor by the members of the Debtor's Board of Directors, insiders of PRAG, rather than by the Debtor's officers, and that the Board then directed R. Dale Grounds, the Debtor's President and Chief Executive Officer, to execute a Memorandum of Understanding reflecting the terms of the PRAG Settlement on behalf of the Debtor. As stated in a Written Consent in Lieu of a Special Meeting of the Board of Directors of Paul Reinhart, Inc., dated April 7, 2009, representatives of the Debtor's Board of Directors, not any Debtor officer or employee, negotiated the PRAG Settlement on behalf of the Debtor. The Board of Directors of the Debtor consists entirely of the following PRAG officers or directors: Dr. Thomas P. Reinhart, P. Jurg Reinhart and Rolf Stahel.

- With respect the terms of the PRAG Settlement, the Bank Agent and the Lenders assert that the provision of the Settlement calling for the dismissal of claims against the Debtor and PRAI cannot be considered a material component of the PRAG Settlement because, pursuant to the Amended Complaint jointly filed by the East Plaintiffs and Committee in the East Lawsuit, the Debtor and PRAI have already been dismissed from the East Lawsuit by virtue of their omission from the Amended Complaint. Additionally, with respect to the condition of the PRAG Settlement that the Confirmation Order (i) include findings, or substantially similar findings, that PRAG committed no act or omission that would constitute liability of PRAG to the Debtor in relation to the March Trades, and (ii) provide for the equitable subordination of the Lenders' Claims, the Bank Agent and the Lenders assert that no such finding of fact may be made and that there is no basis for equitable subordination of the Lenders' Claims.

- With respect the Committee's evaluation of the PRAG Settlement, the Bank Agent and Lenders assert that the Settlement should not be approved for, among other reasons, that it is not fair and equitable, it is not in the best interests of the estate, and is not the product of arms' length bargaining. The Bank Agent and Lenders disagree with the Committee's assessment and believe the PRAG Settlement should not be approved on the terms and conditions provided.

## VIII.
## EQUITABLE SUBORDINATION OF
## CLAIMS OF THE LENDERS

### A. Introduction

The Plan is also structured around, and dependent upon, the subordination of Claims of the Lenders. Therefore, it is important to also have an understanding of the nature of equitable subordination and how the doctrine relates to subordination of the Lenders' Claims under the Plan. As indicated above, the Committee has been granted standing, effective April 15, 2009, to assert claims on behalf of the Estate against the Lenders for, among other things, equitable subordination. Accordingly, this Section VIII of the Disclosure Statement (including all sub-parts) is presented solely by the Committee and shall serve as a request by the Committee, individually and on behalf of the Estate and pursuant to Section 510(c) of the Bankruptcy Code and Bankruptcy Rules 3020, 7001 and 9014, for (i) the equitable subordination of the

Lenders' Claims for purposes of distributions under the Plan to all General Unsecured Claims, and (ii) the transfer of all Liens securing the Lenders' Claims to the Estate.

**B.** **Standards for Equitable Subordination**

Section 510(c) of the Bankruptcy Code provides as follows:

> Notwithstanding subsections (a) [relating to inter-creditor subordination agreements] and (b) [relating to certain securities based claims] of this section, after notice and a hearing, the court may –

> (1) under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim….; or

> (2) order that any lien securing such a subordinated claim to be transferred to the estate.

11 U.S.C. § 510(c). Ordinarily, a request for equitable subordination is adjudicated in the context of an adversary proceeding. However, an exception exists "when a chapter 11 … plan provides for subordination." Fed. R. Bankr. P. 7001(8); *see also* Fed. R. Bankr. P. 3020(b)(1) (providing that an objection to confirmation is governed by Bankruptcy Rule 9014).

Substantively, the Bankruptcy Code does not specify the "principles of equitable subordination" applicable to subordination under Section 510(c). Instead, "the reference in § 510(c) to 'principles of equitable subordination' clearly indicates congressional intent at least to start with existing [judicial] doctrine."[26] Based upon such direction, the most widely-recognized[27] summary of applicable "principles of equitable subordination" was provided by the Fifth Circuit in the *Mobile Steel* case:[28]

> [B]ankruptcy courts have traditionally been regarded as courts of equity, and it is settled that they possess the power "to prevent the consummation of a course of conduct by [a] claimant which … would be fraudulent or otherwise inequitable" by subordinating his claim to the ethically superior claims asserted by other creditors.

> . . .

> Three conditions must be satisfied before exercise of the power of equitable subordination is appropriate.

> (i) The claimant must have engaged in some type of inequitable conduct.

> (ii) the misconduct must have resulted in injury to the creditors of the bankrupt or conferred an unfair advantage on the claimant.

> (iii) Equitable subordination of the claim must not be inconsistent with the provisions of the Bankruptcy Act [now Bankruptcy Code].

---

[26] *United States v. Noland*, 517 U.S. 537, 538 (1996); *see also Fabricators*, 926 F.2d at 1464 ("The legislative history indicates that equitable subordination is to be invoked according to case law at the time of codification [of the Bankruptcy Code], with development of the concept being left to the courts"); *Summit Coffee Co. v. Herby's Foods, Inc. (In re Herby's Foods, Inc.)*, 2 F.3d 128, 131 (5th Cir. 1993) (same).

[27] *See, e.g., Noland*, 517 U.S. at 538 (describing the *Mobile Steel* opinion as an "influential opinion" on the principles of equitable subordination); *Merrimac Paper Co., Inc. v. Harrison (In re Merrimac Paper Co., Inc.)*, 420 F.3d 53, 59 (1st Cir. 2005) (citing *Mobile Steel* test with approval); *Sender v. Bronze Group, Ltd. (In re Hedged-Investments Assocs., Inc.)*, 380 F.3d 1292, 1300 (10th Cir. 2004) (recognizing adoption of *Mobile Steel* test).

[28] *Mobile Steel*, 563 F.2d at 698-701 (citations omitted).

Focusing on the first condition, inequitable conduct includes (a) fraud, illegality or breach of fiduciary duties; and (b) a claimant's use of the debtor as a mere instrumentality or alter ego."[29] As for the third condition, the Fifth Circuit merely intended to ensure that subordination decisions are not made on the basis of generalized or categorical equitable considerations. Instead, subordination must be considered and justified on the particular facts of the case.[30]

As reflected by the above principles, a creditor's use of the debtor as a mere instrumentality to achieve an unfair advantage is one form of inequitable conduct that warrants equitable subordination of the creditor's claim. In the context of a lender-borrower relationship, the Fifth Circuit has explained:[31]

> Through its loan agreement, every lender effectively exercises "control" over its borrower to some degree....The purpose of equitable subordination is to distinguish between the unilateral remedies that a creditor may properly enforce pursuant to its agreements with the debtor and other inequitable conduct such as fraud, misrepresentation, or the exercise of such total control over the debtor as to have essentially replaced its decision-making capacity with that of the lender. The crucial distinction between what is inequitable and what a lender can reasonably and legitimately do to protect its interests is the distinction between the existence of "control" and the exercise of that "control" to direct the activities of the debtor. "It is not mere existence of an opportunity to do wrong that brings the rule into play; it is the unconscionable use of the opportunity afforded by the domination to advantage itself at the injury of the subsidiary that deprives the wrongdoer of the fruits of his wrong."

In the Fifth Circuit, "a claim should be subordinated only to the extent necessary to offset the harm which the debtor or its creditors have suffered as a result of the inequitable conduct." *Wooley v. Faulkner (In re SI Restructuring, Inc.)*, 532 F.3d 355, 360-61 (5th Cir. 2008).

## C. Committee's Application of Standards to Lenders' Claims

Early in 2008, the Debtor entered into hundreds of forward crop contracts with cotton growers and other cotton producers (collectively, the "Growers") to purchase roughly 585,000 bales of cotton from the 2008-2009 crop year at an average price per pound of approximately 85 cents, and 13,000 bales of cotton from the 2009-2010 crop year at an average price per pound of approximately 84 cents. The Debtor proposed to finance these purchases through its long-standing credit agreement with the Lenders which had been in place since 2003. As is customary in the cotton business, the Debtor hedged these contracts, thereby protecting both itself and the Growers against subsequent price fluctuations.

After the forward crop contracts had been hedged, cotton prices began a substantial and rapid rise, causing the Debtor to have to fund substantial margin calls in relation to the hedges. During the month of March 2008, the Debtor was informed by the Lenders that they would advance no further funds to cover the margin calls. Accordingly, the Debtor was forced to make trading decisions that resulted in an imbalance between the Debtor's physical and financial book and ultimately resulted in losses approximating $120 million. Ironically, faced with a loss in their collateral base, in April of 2008 the Lenders required as a condition to their agreement to forbear from exercising remedies against the Debtor and its assets that the Debtor re-"square" its book by, among other things, purchasing new hedges for the

---

[29] *Clark Pipe & Supply Co.*, 893 F.2d at 699; *see also Wilson v. Huffman (In re Missionary Baptist Found. of America, Inc.)*, 818 F.2d 1135, 1142 (5th Cir. 1987).

[30] *See Noland*, 517 U.S. at 1527; *Merrimac Paper Co.*, 420 F.3d at 60-62.

[31] *Clark Pipe & Supply Co.*, 893 F.2d at 701 (quoting *Comstock v. Group of Institutional Investors*, 335 U.S. 211, 229 (1948)).

2008-2009/2009-2010 cotton crop contracts. The Debtor did so. At this point, the Lenders had largely fixed their loss, in that any future decreases in the value of the Debtor's physical contracts (i.e. the forward contracts with the Growers) would be correspondingly and equally offset by increases in the value of the Debtor's financial contracts (i.e. the hedges), and any future decreases in the value of the Debtor's financial contracts would be correspondingly and equally offset by increases in the value of the Debtor's physical contracts.

As a result of the Debtor's report to the Growers and/or their representatives that the Debtor once again had a "squared book," the Growers were led to believe that the Debtor's financial condition was stable and adequate for performance of the forward crop contracts. Consequently, the Growers believed the Debtor would perform the forward crop contracts in due course and that they had no reason to pursue any additional adequate assurance from the Debtor.

Unbeknownst to the Growers, however, was the fact that the Lenders precluded the Debtor from using any of its funds to perform on the Growers' forward crop contracts without the Lenders' consent. Such restriction was designed by the Lenders to provide a win-win scenario for them because (a) if the futures price of cotton began to rise after execution of the forbearance agreement, then the Lenders were no worse off because the value of the physical book would offset the loss in the financial book and the physical book would be marketable to a third party to the extent the forward crop contracts were "in the money;" and (b) if the futures price of cotton began to decline after execution of the forbearance agreement, then the Lenders could capture the increase in value of the financial book without experiencing the corresponding loss to the physical book because the Lenders had contractually restricted the Debtor from performing on the 2008-2009 and 2009-2010 forward crop contracts without their consent.

Over the course of the summer of 2008, the price of cotton, in fact, steadily began to decline to below 60 cents per pound. As the price of cotton declined, the value of the hedges correspondingly grew and the Lenders realized on such additional value by periodically sweeping the excess margin released from the Debtor's brokerage account. Hence, although a hedge contract is created in the cotton business to guarantee price protection to both the buyer and the seller, the Lenders' restriction on the Debtor's ability to perform on the Growers' forward purchase contracts enabled the Lenders to benefit from the hedges to the detriment of the Growers. In other words, by consciously deciding to separate the hedges from the forward crop contracts, the Lenders obtained an unfair advantage. According to the Debtor's records, more than $180 million in excess margin tied to the Debtor's hedges was released to the Debtor and then, through the Lenders' inequitable conduct, swept and retained by the Lenders.

By the time the Debtor finally released the Growers from their forward crop contracts by rejecting them in the Bankruptcy Case, the market price of cotton had fallen below 50 cents per pound, more than 35 cents less than the original contract price. Had the Lenders decided to honor the purpose of the hedges by either (a) permitting the Debtor to perform on the forward crop contracts or (b) refunding the amount of the swept excess margin necessary to enable the Allenberg transaction to close, then the Growers would have been kept whole and not suffered any loss. By doing neither of these things and instead separating the hedges from the forward crop contracts to the detriment of the Growers, the Growers have been left to sell their cotton on the market at depressed prices, sustaining a loss of what the Growers believe to be at least $70 million, and the Debtor has been saddled with additional unsecured claims of warehousemen and other unsecured vendors that would have been avoided through consummation of the Allenberg transaction. Moreover, by liquidating substantially all of the Debtor's short futures contracts on or about October 1, 2008, the Lenders left the Debtor "naked" on price risk in relation to its remaining cotton inventory, resulting in additional unnecessary loss to the Debtor that could have been avoided.

Based upon the foregoing, the Committee believes that the Lenders' inequitable conduct coupled with the unfair advantage obtained and the damage caused to creditors and the Debtor thereby justify subordination of the Lenders' Claims to all General Unsecured Claims for purposes of distributions under the Plan and further justify a transfer of the Lenders' Liens to the Estate in connection with such subordination. Accordingly, the Committee urges the Bankruptcy Court to order such subordination, Lien transfers, and other necessary relief to compensate the injured creditors as part of the Court's order confirming the Plan.

**D.      Bank Agent's and Lenders' Assertions**

In response to the information set out above about the nature of equitable subordination and the Committee's assertions in support of its request for equitable subordination of the Lenders' Claims and the transfer of the Lenders' liens to the Estate, the Bank Agent and the Lenders assert the following:

- With respect to the Committee's assertions regarding the Debtor's entry into forward crop contracts with the Growers and, specifically, the assertion that the Debtor hedged the contracts to protect both itself and the Growers against subsequent price fluctuations, the Bank Agent and Lenders allege that the Debtor ordinarily and customarily maintained a hedge account for the benefit of the Debtor and only the Debtor. The Bank Agent and Lenders assert that the Growers did not pay any of the costs, including margin calls, associated with the hedge positions and the Debtor could and did change hedge positions on a daily basis as part of its hedging strategy. The Bank Agent and Lenders assert that, to the extent the Growers sought to have their positions hedged, the Growers were responsible for hedging their own contracts with the Debtor and maintaining such positions at their own cost.

- With respect to the Committee's assertion in the second paragraph of Section VIII(C) above that the Lenders would not advance any further funds in March 2008, the Bank Agent and Lenders assert that the reason they did not advance additional funds was because the Debtor had exhausted its credit line with the Lenders.

- With respect to the Committee's assertion that the Debtor was forced to make trading decisions based upon the lack of additional financing, the Bank Agent and Lenders assert that PRAG, not the Debtor, made certain of these "trading decisions" without the Debtor's prior authorization, knowledge, or consent.

- With respect to the Committee's assertions regarding the Lenders' agreement to forbear from exercising remedies against the Debtor and its assets, the Bank Agent and Lenders assert that they were told that the Debtor was seeking additional financing or considering a sale of its assets to a third party in order to pay back its loans to the Lenders. The Bank Agent and Lenders assert that the Debtor was in a similar position prior to the substantial losses suffered as a result of the PRAG trades and the March 2008 market volatility. The Bank Agent and Lenders allege that one purpose of the Forbearance Agreement was to provide funds to the Debtor to square its book, which became out-of-balance due to the March Trades made by PRAG. The Bank Agent and the Lenders assert that in squaring its book, the Debtor did not match the forward crop contracts to a particular hedging transaction.

- With respect to the Committee's assertion that the Debtor reported to the Growers and/or their representatives that the Debtor once again had a "squared book," the Bank Agent and Lenders assert that they were unaware of any such statement being made by the Debtor or any evidence that such a statement was made. The Bank Agent and Lenders

assert that the Committee fails to provide any facts to support that this statement was made to the Growers or why such a statement is the Lenders' responsibility.

- With respect to the Committee's assertion that the Debtor's alleged report to the Growers of its "squared book" led Growers to believe that the Debtor's financial condition was stable and adequate for performance of the forward crop contracts, the Bank Agent and Lenders assert that having a "squared book" does not suggest that the Debtor had the funds to perform the forward crop contracts with the Growers.

- With respect to the Committee's assertion that the Growers had no reason to pursue any additional adequate assurance from the Debtor, the Bank Agent and Lenders assert that the Growers did in fact ask for adequate assurance from the Debtor on more than one occasion and never received such assurance from the Debtor. The Bank Agent and Lenders allege that the Growers should have exercised their remedies at that time under applicable law.

- With respect to the Committee's assertion that, under the Forbearance Agreement, the Lenders precluded the Debtor from using funds to perform on the Growers' contracts without the Lenders' consent, and the alleged reasons for the restriction, the Bank Agent and Lenders dispute the Committee's statements and allege that one purpose of the Forbearance Agreement was to allow the Debtor time to find additional financing from a new source, to get additional funding from PRAG, or to provide more time to find a purchaser of its assets.

- With respect to the Committee's assertions relating to the periodic sweeping of excess margin released from the Debtor's brokerage account, the nature of the hedge contracts, the alleged unfair advantage obtained by the Lenders, and the alleged inequitable conduct of the Lenders, the Bank Agent and Lenders assert that such periodic sweeping of excess margin was expressly agreed to by the Debtor in the Forbearance Agreement in order to pay down the hundreds of millions of dollars owed to the Lenders. The Bank Agent and Lenders dispute that the hedge contracts were entered into for protection of the Growers and allege that the Debtor ordinarily and customarily maintained a hedge account for the benefit of the Debtor and only the Debtor. The Bank Agent and Lenders deny that they obtained an unfair advantage and assert that the Debtor's hedging transactions were not tied to any particular physical contract and the Debtor routinely changed and managed positions because the hedge account was ordinarily and customarily maintained solely for the Debtor's benefit. The Bank Agent and Lenders assert that they did not engage in any inequitable conduct by simply exercising their contractual remedies as agreed to in an arms length negotiation by the Debtor.

- With respect to the Committee's assertion that the Lenders did not honor the purpose of the hedges by permitting the Debtor to perform on the forward crop contracts or by refunding the amount of the swept excess margin to allegedly enable the Allenberg transaction to close, and with respect to the Committee's assertion that the Lenders separated the hedges from the forward crop contracts to the detriment of the Growers, the Bank Agent and Lenders allege that the Committee's assertion is that the first priority and perfected secured Lenders should have chosen to subordinate themselves to the Debtor's unsecured creditors and since the Lenders did not voluntarily subordinate themselves, the Lenders should now be ordered subordinated to the unsecured creditors. The Bank Agent and Lenders assert that such an argument is unsupported by the facts and law, and without merit. The Bank Agent and Lenders assert that the Debtor's hedges are not matched with forward crop contracts and that any loss suffered by Growers was a direct

result of the March 2008 market volatility and the March Trades and not a result of any action by the Bank Agent or Lenders.

- With respect to the Committee's assertion that the Lenders' liquidation of the short futures contracts on or about October 1, 2008 resulted in additional loss to the Debtor, the Bank Agent and Lenders assert that on or about October 1, 2008, the Bank Agent and Lenders began to exercise their contractual remedies as agreed to by the Debtor in the Forbearance Agreement and the account control agreements in order to protect their collateral.

- With respect to the Committee's assertion that the Lenders' actions justify subordination of the Lenders' Claims to all General Unsecured Claims, a transfer of the Lenders' Liens to the Estate, and other relief, the Bank Agent and Lenders vehemently disagree that equitable subordination is warranted because at all relevant times the Bank Agent and Lenders have acted as a lender in a lender-borrower relationship exercising their contractual remedies. The Bank Agent and Lenders assert that the Disclosure Statement fails to, and the Committee and Growers cannot, establish any fraud, breach of fiduciary duty, or control of the Debtor committed by the Bank Agent or Lenders, which forecloses any equitable subordination claim.

**IX.**
**SUMMARY OF THE CLAIMS, CLASSIFICATION**
**AND TREATMENT UNDER THE PLAN**

**A.      Introduction**

A summary of the principal provisions of the Plan relating to the treatment of Classes of Claims and Equity Interests is set out herein. The summary is qualified in its entirety by the Plan, itself, which is controlling in the event of any conflict. Additionally, the estimated amount of allowable Claims in the various Classes are estimates only and are not intended to be exact determinations. While the Debtor has made every effort to reasonably estimate such amounts, there is no guarantee that such estimates are accurate. Moreover, none of the descriptions herein below in relation to such estimates shall constitute an admission on the part of the Plan Proponents to the validity of any Disputed Claims. Any Claim which is not Allowed by an order of the Bankruptcy Court or pursuant to a settlement approved by an order of the Bankruptcy Court may be disallowed or reduced in amount if an objection has been, or is timely hereafter, filed and sustained by the Bankruptcy Court.

**B.      Classification of Claims and Equity Interests**

The Plan provides for the division of Claims against and Equity Interest in the Debtor into Classes. All Claims (except Administrative Claims and Priority Tax Claims) and all Equity Interests are placed in Classes under the Plan. A Claim is classified within a particular Class only to the extent that the Claim qualifies under the description of that Class. A proof of claim asserting a Claim which is properly includable in more than one Class is only entitled to inclusion within a particular Class to the extent that it qualifies under the description of such Class, and shall be included within a different Class(es) to the extent that it qualifies under the description of such different Class(es). The Plan classifies Claims and Equity Interests as follows:

Unclassified Claims
Allowed Administrative Claims
Allowed Priority Tax Claims

Classified Claims and Equity Interests
Class 1: Secured Claims of Lenders
Class 2: Allowed Secured Claims of Non-Lender Claimants
Class 3: Allowed Priority Non-Tax Claims
Class 4: Allowed General Unsecured Claims
Class 5: Allowed Unsecured Lender Claims
Class 6: Allowed Subordinated Claims
Class 7: Equity Interests

## C.    Treatment of Unclassified Claims Under the Plan

### 1.    Treatment of Allowed Administrative Claims

Pursuant to the Plan, in full and final satisfaction of Allowed Administrative Claims, each Allowed Administrative Claim will, unless otherwise agreed, be paid in full in Cash by no later than the later of (a) fifteen (15) days after the Effective Date of the Plan, or (b) fifteen (15) days after becoming an Allowed Administrative Claim; *provided, however*, that (x) Allowed Administrative Claims that represent liabilities incurred on or after the Petition Date, but prior to the Effective Date, in the ordinary course of the Debtor's business which may be paid in the ordinary course of the Debtor's business without order of the Bankruptcy Court will be paid in accordance with the agreements related thereto; and (y) from and after the Effective Date, any fees and charges which are assessed under Chapter 123, Title 28, United States Code, in relation to the Bankruptcy Case will be paid by the Trustee from the Creditor Trust as they become due.

Holders of Administrative Claims, other than Allowed Administrative Claims, must by no later than the Administrative Claims Bar Date[32] (a) file an application with the Bankruptcy Court for allowance of the Administrative Claim, (b) serve a copy of such application on the Debtor, the Committee, the Trustee, and the United States Trustee, and (c) file and serve a notice of the filing of the application on all other parties entitled to notice in the Bankruptcy Case. Failure to file and serve such application and notice by the Administrative Claims Bar Date will result in the Administrative Claim being forever barred and discharged.

The Pension Benefit Guaranty Corporation ("PBGC") has filed three proofs of claim in the Bankruptcy Case to assert Claims related to the Paul Reinhart, Inc. Employees Defined Benefit Pension Plan (as amended and restated from time to time, the "Pension Plan"). Background information regarding the Pension Plan, the PBGC, and pension plan termination issues are set out in Section IX(C)(1) below. The PBGC has estimated the underfunding of benefit liabilities under the Pension Plan on a termination basis, as of an assumed termination date of October 15, 2008, to be $2,011,950. The PBGC has asserted the following Claims, contingent upon a distressed or involuntary termination of the Pension Plan:

- A Claim for unfunded benefit liabilities in the amount of $2,011,950;

- A Claim for unpaid minimum funding contributions in an unliquidated amount; and

- A claim for unpaid Title IV insurance premiums in an unliquidated amount.

Pursuant to 29 U.S.C. §§ 1362 and 1368, the PBGC asserts that its Claims for unfunded benefit liabilities constitute a tax owed to the PBGC as a governmental agency, and that such Claims are entitled to priority as Administrative Claims under Section 507(a)(2) of the Bankruptcy Code or, alternatively, as Priority

---

[32] The thirtieth (30th) day after the Effective Date of the Plan, unless not a Business Day, in which case the Administrative Claims Bar Date will be the first Business Day thereafter.

Tax Claims under Section 507(a)(8) of the Bankruptcy Code, in each case limited to 30% of the collective net worth of the Debtor and the members of its controlled group. The amount of unfunded benefit liabilities that exceeds 30% of the collective net worth of the Debtor and the members of its controlled group is a General Unsecured Claim. The Plan provides for a standard termination of the Pension Plan if the Pension Plan has not previously been terminated prior to the Effective Date of the Plan. In the event of a standard termination (requiring, among other things, the cure of any underfunding of the Pension Plan), the PBGC Claims will be rendered moot and be subject to withdrawal or disallowance. In the event of a prior distressed or involuntary termination of the Pension Plan, on the other hand, the PBGC Claims will become non-contingent and be subject to treatment under the Plan. In either situation, the underfunding of the Pension Plan will have to be addressed (*i.e.* whether through cure of the underfunding in connection with standard termination or allowance of Claims of the PBGC in connection with distressed or involuntary termination). While the Debtor reasonably believes that the estimated level of underfunding has decreased to an amount less than $2,000,000, for purposes of estimating Claims and recoveries in this Disclosure Statement the Debtor has estimated the allowable amount of the PBGC's Administrative Claims to be $2,000,000.

Separately, Administrative Claims have been and will continue to be incurred by the Estate on account of fees and expenses charged by professionals employed by the Debtor and the Committee. During the course of the Bankruptcy Case, certain of such fees and expenses have been paid on an interim basis subject to final approval by the Bankruptcy Court at the end of the case. As a result of certain restrictions set out in the Cash Collateral Order, certain fees and expenses have not been, and will likely not in the future be, paid on an interim basis. To the extent there exists an unpaid balance of professional fees and expenses as of the Effective Date of the Plan, and such fees and expenses are allowed by the Bankruptcy Court, such fees and expenses will be subject to payment as Allowed Administrative Claims. Outstanding unpaid professional fees and expenses, plus fees and expenses budgeted through March 15, 2010 (the projected month of the Effective Date of the Plan), total approximately $856,369.

> 2.  **Treatment of Allowed Priority Tax Claims**

Pursuant to the Plan, in full and final satisfaction of Allowed Priority Tax Claims, each Allowed Priority Tax Claim will, unless otherwise agreed, be paid in full in Cash by no later than the later of (a) fifteen (15) days after the Effective Date, or (b) fifteen (15) days after becoming an Allowed Priority Tax Claim.

The estimated amount of all Allowed Priority Tax Claims is approximately $16,074.

**D.     Treatment of Classified Claims and Equity Interests Under the Plan**

> 1.  **Treatment of Secured Claims of Lenders (Class 1)**

The Plan provides for all Secured Claims held by, or asserted on behalf of, the Lenders to be equitably subordinated for purposes of distributions under the Plan to all General Unsecured Claims, and for all Liens securing such Secured Claims to be transferred to the Estate, in each case except to the extent ordered otherwise by the Bankruptcy Court. If, and to the extent, the Bankruptcy Court orders, as part of the Confirmation Order, that such Secured Claims be so subordinated, then such subordinated Secured Claims, to the extent Allowed, will constitute Allowed Subordinated Secured Claims under the Plan. If, and only to the extent, the Bankruptcy Court does not order, as part of the Confirmation Order, that such Secured Claims be so subordinated, then such non-subordinated Secured Claims, to the extent Allowed, will be treated as Allowed Secured Claims of the Lenders.

*Treatment of Allowed Subordinated Secured Claims*

Pursuant to the Plan, in full and final satisfaction of Allowed Subordinated Secured Claims, each Allowed Subordinated Secured Claim will be satisfied as follows: If and when (a) all Allowed Claims in Class 4 (Allowed General Unsecured Claims) have been fully satisfied in accordance with the provisions of the Plan (or in the case of Disputed Claims in Class 4, have been reserved for in accordance with the Plan), and (b) there remain Net Available Funds in the Creditor Trust for distribution to Creditors, then as soon as practicable thereafter, each holder of an Allowed Subordinated Secured Claim, unless otherwise agreed, shall be paid on account of such Allowed Subordinated Secured Claim a Pro Rata Share of the Net Available Funds in the Creditor Trust, calculated in relation to all other Allowed Subordinated Secured Claims, all Allowed Unsecured Lender Claims, and all Allowed Subordinated Claims.

"Net Available Funds" is defined under the Plan as "[a]t any given time, the Cash on hand in the Creditor Trust, excluding funds on deposit in the Disputed Claims Reserve Account and the Litigation and Administrative Expense Reserve." The "Disputed Claims Reserve Account" is defined under the Plan as "[a]n interest-bearing account of the Creditor Trust which is established and maintained by the Trustee pursuant to Section 9.9[33] of the Plan." The "Litigation and Administrative Expense Reserve" is defined under the Plan as "[t]he reserve to be established and maintained by the Trustee pursuant to the provisions of Section 9.10[34] of the Plan." "Pro Rata Share" is defined under the Plan as "[w]ith respect to distributions to holders of Allowed Claims and reserves established on account of Disputed Claims, a proportionate share, such that a distribution of a Pro Rata Share with respect to an Allowed Claim of a particular Class shall bear the same ratio to all distributions and reserves on account of such Class as the dollar amount that such Allowed Claim bears to the dollar amount of all Allowed Claims and Disputed Claims in such Class, and that the reserve of a Pro Rata Share with respect to a Disputed Claim of a particular Class shall bear the same ratio to all distributions and reserves on account such Class as the dollar amount of such Disputed Claim bears to the dollar amount of all Allowed Claims and Disputed Claims in such Class."

*Treatment of Allowed Secured Claims of Lenders*

Only in the event the Lenders' Secured Claims are not subordinated, then pursuant to the Plan, in full and final satisfaction of Allowed Secured Claims of the Lenders, each such Allowed Secured Claim will, unless otherwise agreed, be satisfied by no later than the later of (a) fifteen (15) days after the Effective Date, or (b) fifteen (15) days after becoming an Allowed Secured Claim, in one of the following ways at the option of the Trustee:

(a)     the Allowed Secured Claim will be paid in full in Cash; or

(b)     the Trustee will transfer the Collateral securing the Allowed Secured Claim to the Bank Agent for disposition in accordance with the Intercreditor Agreement and any applicable Orders of the Bankruptcy Court.

Additionally, holders of non-subordinated Allowed Secured Claims of the Lenders will retain their Liens in any Collateral securing such Allowed Secured Claims; *provided, however*, that if any such Allowed Secured Claim is paid in full in Cash, then upon such payment the holder of such Allowed Secured Claim will be required to execute any and all documents deemed necessary by the Trustee to evidence the release and extinguishment of such holder's Liens.

---

[33] For a description of Section 9.9's reserve provisions for Disputed Claims, see Section XII(B)(5) of the Disclosure Statement.

[34] For a description of Section 9.10's litigation and administrative expense reserve provisions, see Section XII(B)(5) of the Disclosure Statement.

*Estimate of Allowed Amount of Secured Claims of Lenders*

Two Claims have been filed by parties defined as "Lenders" under the Plan: one by the Bank Agent, in the approximate amount of $147,848,221 (the "<u>Bank Agent Claim</u>"), on behalf of itself and the Debtor's pre-petition lenders; and one by Rabo Capital Services, Inc. ("<u>RCS</u>"), in the approximate amount of $9,784,801 (the "<u>RCS Claim</u>"), which RCS alleges is entitled to Secured Claim status by virtue RCS' alleged status as an affiliate of one of the Debtor's pre-petition lenders and certain definitions under the Intercreditor Agreement and related agreements.

With respect to the Bank Agent Claim, during the course of the Bankruptcy Case certain periodic payments have been made to the Bank Agent under the terms of the Cash Collateral Order entered in the case. As of July 31, 2009, a total of at least $97.6 million has been paid to the Bank Agent, thereby reducing the amount of the Bank Agent Claim to approximately $49.8 million. Through the Effective Date of the Plan, the Debtor projects that additional payments of approximately $3.17 million will be made, leaving a projected balance as of such date of approximately $46.6 million. In relation to this balance, and subject to Section 1111(b) of the Bankruptcy Code, Section 506 of the Bankruptcy Code provides that a claim is only entitled to secured status to the extent of the value of the claimholder's interest in the estate's interest in the collateral securing such claim (with the balance treated as an unsecured claim). Based upon Section 506 of the Bankruptcy Code, the Debtor believes that the Bank Agent Claim, as reduced by the payments that have been, and are projected to be, made through the Effective Date, is partially unsecured, resulting in an allowable Secured Claim of approximately $9.14 million (before subordination). As explained in Section XI(C)(1) of the Disclosure Statement, the Committee believes that the Estate holds certain claims against the Lenders. Therefore, the Bank Agent Claim may be subject to further reduction or outright elimination to the extent the Lenders are found to be liable to the Estate on such claims.

With respect to the RCS Claim, the Debtor both disputes RCS' contentions as to the basis for the assertion of the Claim as a Secured Claim and also the amount of the Claim. The Debtor does not believe that any portion of the RCS Claim is allowable as a Secured Claim. However, given RCS' assertion that it is affiliated with the lender group and entitled to the benefits of the lenders' agreements, RCS has been included in the definition of "Lenders" for purposes of the Plan.

## 2. Treatment of Allowed Secured Claims of Non-Lender Claimants (Class 2)

The Plan defines "Non-Lender Claimants" as "Claimants other than the Lenders." Additionally, certain Claims asserted by taxing authorities have been filed as Secured Claims and, only in the alternative, as Priority Tax Claims. Notwithstanding the assertion of such Claims as Secured Claims in the first instance, such Claims have been classified under the Plan for all purposes as Priority Tax Claims.

Pursuant to the Plan, in full and final satisfaction of Allowed Secured Claims held by Non-Lender Claimants, each such Allowed Secured Claim shall, unless otherwise agreed, be satisfied by no later than the later of (a) fifteen (15) days after the Effective Date, or (b) fifteen (15) days after becoming an Allowed Secured Claim, in one of the following ways at the option of the Trustee:

(a)    the Allowed Secured Claim will be paid in full in Cash; or

(b)    the Trustee will execute a written acknowledgment on behalf of the Creditor Trust pursuant to which the Creditor Trust assumes the Allowed Secured Claim and leaves unaltered the legal, equitable and contractual rights to which such Allowed Secured Claim entitles the holder of such Allowed Secured Claim; or

(c)     notwithstanding any contractual provision or applicable law that entitles the holder of the Allowed Secured Claim to demand or receive accelerated payment of such Allowed Secured Claim after the occurrence of a default, (i) the Trustee, on behalf of the Creditor Trust, will cure any such default that occurred before or after the Petition Date, other than a default of a kind specified in Section 365(b)(2) of the Bankruptcy Code or of a kind that Section 365(b)(2) of the Bankruptcy Code expressly does not require to be cured, (ii) the maturity of such Allowed Secured Claim, as such maturity existed before such default, will be reinstated, (iii) the holder of such Allowed Secured Claim will be compensated from the Creditor Trust for any damages incurred as a result of any reasonable reliance by such holder on such contractual provision or such applicable law, (iv) if such Allowed Secured Claim arises from any failure to perform a nonmonetary obligation, other than a default arising from failure to operate a nonresidential real property lease subject to Section 365(b)(1)(A) of the Bankruptcy Code, the holder such Allowed Secured Claim will be compensated from the Creditor Trust for any actual pecuniary loss incurred by such holder as a result of such failure, and (v) the legal, equitable and contractual rights to which such Allowed Secured Claim entitles the holder of such Allowed Secured Claim will not otherwise be altered; or

(d)     the Trustee will transfer to the holder of the Allowed Secured Claim the Collateral securing the Allowed Secured Claim.

Additionally, holders of Allowed Secured Claims within Class 2 of the Plan will retain their Liens in any Collateral securing such Allowed Secured Claims; *provided, however*, that if any such Allowed Secured Claim is satisfied in accordance with one of the options described in (a)-(c) above, then upon the payment in full of such Allowed Secured Claim, the holder of such Allowed Secured Claim will be required to execute any and all documents deemed necessary by the Trustee to evidence the release and extinguishment of such holder's Liens.

The Debtor does not believe that there are any allowable Claims within Class 2 of the Plan.

**3.     Treatment of Allowed Priority Non-Tax Claims (Class 3)**

Pursuant to the Plan, in full and final satisfaction of Allowed Priority Non-Tax Claims, each Allowed Priority Non-Tax Claim will, unless otherwise agreed, be paid in full in Cash by no later than the later of (a) fifteen (15) days after the Effective Date, or (b) fifteen (15) days after becoming an Allowed Priority Non-Tax Claim.

The Debtor does not believe that there are any allowable Claims within Class 3 of the Plan.

**4.     Treatment of Allowed General Unsecured Claims (Class 4)**

Pursuant to the Plan, in full and final satisfaction of Allowed General Unsecured Claims, each Allowed General Unsecured Claim will be satisfied as follows:   If and when (a) all Allowed Administrative Claims, all Allowed Priority Tax Claims, and all Allowed Claims in Classes 2 and 3 have been fully satisfied in accordance with the terms of the Plan (or in the case of Disputed Administrative Claims, Disputed Priority Tax Claims and Disputed Claims in Classes 2 and 3, have been reserved for in accordance with the Plan), and (b) there remain Net Available Funds in the Creditor Trust for distribution to Creditors, then as soon as practicable thereafter each holder of an Allowed General Unsecured Claim, unless otherwise agreed, will be paid on account of such Allowed General Unsecured Claim a Pro Rata

Share of the Net Available Funds in the Creditor Trust, calculated in relation to all other Allowed General Unsecured Claims; *provided, however*, that the maximum aggregate amount of distributions to be made in relation to an Allowed General Unsecured Claim pursuant to this section will be the Allowed amount of the General Unsecured Claim, without interest.[35]

The vast majority of the Claims falling within Class 4 may be broken into the following seven primary categories: (i) Claims of the Growers, totaling approximately $130,860,373 (collectively, the "Grower Claims"); (ii) Claims of warehouses, shippers and other related vendors, totaling approximately $122,848 (collectively, the "Warehouse/Shipper Claims"); (iii) Claims of ordinary trade vendors, totaling approximately $1,684,847 (collectively, the "Trade Claims"); (iv) a guaranty Claim by Wells Fargo Bank, N.A. in relation to indebtedness owed by an affiliate of the Debtor, totaling approximately $5,928,496 (the "Wells Guaranty Claim"); (v) a Claim by the Debtor's subsidiary Paul Reinhart (Australia) Pty. Ltd., totaling approximately $4,990,938 (the "PRAL Claim"); (vi) Claims of customers, totaling approximately $151,780 (the "Customer Claims"); and Claims of employees, totaling approximately $1,876,339 (the "Employee Claims").   The following additional information is provided in relation to each of these categories of Claims:

- Grower Claims.   Most of the Growers have asserted Claims which calculate their contractual loss based upon a difference between contract price and the futures price of cotton as of the Petition Date.  The Debtor believes that following the rejection, however, many of the Growers successfully placed their cotton into the federal loan program which, on information and belief, provided the means to obtain a greater recovery on the cotton than the prevailing futures price of cotton as of the Petition Date.  Therefore, the Debtor believes that the Grower Claims may be overstated by an aggregate amount of at least $20,000,000.

- Warehouse/Shipper Claims.   As explained in Section VI(E) of the Disclosure Statement, the Debtor obtained authority to pay pre-petition warehouse charges and the pre-petition claims of certain critical shippers and related vendors.  Consequently, the Debtor believes that some of the Warehouse/Shipper Claims may have already been paid in accordance with such order.

- Trade Claims.  These Claims are associated with costs incurred by the Debtor in buying and selling cotton that are not included in Grower Claims or Warehouse/Shipper Claims. Such Claims include asserted commissions payable to agents for Growers and customers of the Debtor and Claims associated with other overhead or administrative expenses incurred in the Debtor's business operations.

- Wells Guaranty Claim.  The primary obligation related to the Wells Guaranty Claim was secured by a lien on a warehouse that was owned by Riverbend Warehouse, LLC ("RBW").  During the course of the Bankruptcy Case, RBW sold the warehouse and the underlying obligation owed by RBW to Wells Fargo Bank, N.A. was paid in full. Therefore, the Debtor believes that the Wells Guaranty Claim is disallowable in full.

- PRAL Claim.  The Debtor has not yet received sufficient detail from the administrators of PRAL to evaluate the PRAL Claim; however, the Debtor believes that the PRAL Claim is significantly overstated.  To the extent allowable, such Claim is subject to offset by the amount that PRAL is obligated to the Debtor on an inter-company receivable.

---

[35] See Section IX(D)(1) of the Disclosure Statement, above, for additional information regarding the terms "Net Available Funds," "Disputed Claims Reserve Account," "Litigation and Administrative Expense Reserve," and "Pro Rata Share."

- <u>Customer Claims</u>. These Claims are for weight differences and price adjustments due to quality claims on the pre-petition sale of cotton by the Debtor to certain of its customers.

- <u>Employee Claims</u>. These Claims have been asserted by certain current and former employees for deferred compensation and retention and other bonus amounts claimed. The Committee believes that the Employee Claims may be overstated by a significant amount.

## 5. Treatment of Allowed Unsecured Lender Claims (Class 5)

The Plan provides for all Unsecured Lender Claims to be equitably subordinated for purposes of distributions under the Plan to all General Unsecured Claims. Accordingly, pursuant to the Plan, in full and final satisfaction of Allowed Unsecured Lender Claims, each Allowed Unsecured Lender Claim will be satisfied as follows: If and when (a) all Allowed Claims in Class 4 (Allowed General Unsecured Claims) have been fully satisfied in accordance with the Plan (or in the case of Disputed Claims in Class 4, have been reserved for in accordance with the Plan), and (b) there remain Net Available Funds in the Creditor Trust for distribution to Creditors, then as soon as practicable thereafter, each holder of an Allowed Unsecured Lender Claim, unless otherwise agreed, will be paid on account of such Allowed Unsecured Lender Claim a Pro Rata Share of the Net Available Funds in the Creditor Trust, calculated in relation to all other Allowed Unsecured Lender Claims, all Allowed Subordinated Secured Claims, and all Allowed Subordinated Claims.[36]

With respect to the estimated allowable amount of Unsecured Lender Claims, see discussion in Section IX(D)(1) of the Disclosure Statement, above.

## 6. Treatment of Allowed Subordinated Claims (Class 6)

Class 6 is established for Allowed Subordinated Claims. The Plan defines a "Subordinated Claim" as "[a]ll or any portion of a Claim, other than a Claim held by or asserted on behalf of a Lender, which is ordered by the Bankruptcy Court to be subordinated in payment to General Unsecured Claims pursuant to, or in accordance with, Section 510 of the Bankruptcy Code." Pursuant to the Plan, in full and final satisfaction of Allowed Subordinated Claims, each Allowed Subordinated Claim will be satisfied as follows: If and when (a) all Allowed Claims in Class 4 (Allowed General Unsecured Claims) have been fully satisfied in accordance with the Plan (or in the case of Disputed Claims in Class 4, have been reserved for in accordance with the Plan), and (b) there remain Net Available Funds in the Creditor Trust for distribution to Creditors, then as soon as practicable thereafter, each holder of an Allowed Subordinated Claim, unless otherwise agreed, will be paid on account of such Allowed Subordinated Claim a Pro Rata Share of the Net Available Funds in the Creditor Trust, calculated in relation to all other Allowed Subordinated Claims, all Allowed Subordinated Secured Claims, and all Allowed Unsecured Lender Claims.[37]

Currently, there are no Allowed Subordinated Claims. However, among other things, in the event that the CoMark Lawsuit is not resolved in a manner that eliminates any Claim asserted by CoMark in the Bankruptcy Case, then the Estate may hold a claim against CoMark for the equitable subordination of such Claim.

---

[36] See Section IX(D)(1) of the Disclosure Statement, above, for additional information regarding the terms "Net Available Funds," "Disputed Claims Reserve Account," "Litigation and Administrative Expense Reserve," and "Pro Rata Share."

[37] See Section IX(D)(1) of the Disclosure Statement, above, for additional information regarding the terms "Net Available Funds," "Disputed Claims Reserve Account," "Litigation and Administrative Expense Reserve," and "Pro Rata Share."

### 7.  Treatment of Equity Interests (Class 7)

Finally, Class 7 of the Plan is established for all Equity Interests.  Pursuant to the Plan, all Equity Interests will be cancelled, extinguished and otherwise rendered null, void and of no further force or effect, whatsoever, except for the sole purpose of effectuating the wind-up and termination of the Post-Confirmation Debtor.  No distributions will be made under the Plan on account of Equity Interests.

### E.  Distributions Only on Account of Allowed Claims

Distributions under the Plan will only be made to Creditors holding Allowed Claims.  A Claim is "Allowed" under the Plan: (a) to the extent that it is listed in the Schedules in a liquidated, non-contingent, and undisputed amount, but only if no proof of claim is filed with the Bankruptcy Court to evidence such Claim on or before the Bar Date;[38] or (b) as evidenced by a proof of claim filed on or before the Bar Date, but only to the extent asserted in a liquidated amount, and only if no objection to the allowance of the Claim, and no motion to expunge the proof of claim, is filed on or before the Claims Objection Deadline;[39] or (c) to the extent allowed by a Final Order of the Bankruptcy Court.

<div align="center">

**X.**
**MEANS FOR IMPLEMENTATION OF THE PLAN**

</div>

### A.  Creation, Funding and Administration of Creditor Trust

The Plan provides for the establishment of the PRI Creditors Trust (the "Creditor Trust") on the Effective Date of the Plan.  Distributions under the Plan will be made from the Creditor Trust, and the Debtor, the Trustee, members of the Creditor Trust Oversight Committee, and all Creditors will be deemed to have adopted and approved the Creditor Trust Documentation establishing the Creditor Trust as of the Effective Date of the Plan.

*Assets of Creditor Trust; Transfer of Claims to Creditor Trust*

On the Effective Date of the Plan, all of the Trust Assets will be transferred to the Creditor Trust and, except as expressly provided otherwise in the Plan, such transfer will be free and clear of all Liens, Claims and encumbrances.  "Trust Assets" is defined in the Plan as "[a]ll Assets of the Debtor and the Estate as of the Effective Date, including, without limitation, the Confirmation Payment, but excluding the Retained Assets."  "Retained Assets" is defined in the Plan as "[a]ll Books and Records of the Debtor" and "Books and Records" is defined as "[a]ll books and records of the Debtor, whether in paper or electronic format, which the Post-Confirmation Debtor, in its sole and absolute discretion, determines it must retain in order to wind-up its remaining affairs and formally terminate its existence."  The Retained Assets will be only Assets of the Debtor and the Estate that will be retained by the Post-Confirmation Debtor.

Correspondingly, on the Effective Date of the Plan, all Claims against the Debtor and the Estate, and all distribution rights conferred by the Plan on account thereof, will also be transferred to the Creditor Trust, and all objections, counterclaims, rights of setoff, rights of recoupment, and any and all other defenses held by the Debtor or the Estate in relation to such Claims, in relation to such distribution rights,

---

[38] The "Bar Date" is defined in the Plan as February 18, 2009 for non-governmental Claimants or April 13, 2009 for governmental Claimants, or such other date as may apply to a particular Claimant or Claim pursuant to a duly-entered Final Order of the Bankruptcy Court.

[39] The "Claim Objection Deadline" is defined in the Plan as 180 days after the Effective Date of the Plan, unless extended by the Bankruptcy Court, for cause shown, upon motion filed with the Bankruptcy Court on or prior to such date.

and in relation to the holders of such Claims and distribution rights, will be preserved and transferred to the Creditor Trust as well. From and after the Effective Date, the Trustee will have standing to assert, prosecute and settle any and all of such objections, counterclaims, rights of setoff, rights of recoupment, and other defenses, subject only to any limitations set forth in the Plan or the Creditor Trust Documentation establishing the Creditor Trust. Claims which are or become Allowed Claims will be satisfied solely and exclusively from the Creditor Trust in accordance with the provisions of the Plan, and the Post-Confirmation Debtor will have no liability on any Claims.

### *Appointment of Trustee and Members of Creditor Trust Oversight Committee*

The Creditor Trust will be administered by the Trustee, who is a Person selected by the Committee and who does not hold or represent an interest adverse to the Estate or to the Creditor Trust and is a "disinterested person" as defined in Section 101(14) of the Bankruptcy Code. Pursuant to the Plan, the Committee is required by no later than 10 days prior to the Disclosure Statement Hearing to file a notice with the Bankruptcy Court identifying the Person selected by the Committee to serve as the Trustee. A copy of such notice is attached hereto as **Exhibit C**. On the Effective Date of the Plan, and pursuant to the Confirmation Order, the Person identified by the Committee to serve as the Trustee will be appointed as the Trustee of the Creditor Trust. The Trustee will be responsible for administering the Creditor Trust consistent with the terms of the Plan, Confirmation Order, and Creditor Trust Documentation establishing the Creditor Trust, and the Trustee will have all of the rights, obligations, powers and duties as set forth in the Plan and Creditor Trust Documentation. The Plan also provides procedures for the appointment of a successor Trustee in the event of the death, resignation or discharge of the Trustee.

The Plan also provides for the appointment of a Creditor Trust Oversight Committee consisting of no fewer than three and no more than five individuals, each of whom holds, or is the designated representative of an entity that holds, a General Unsecured Claim. Per the Plan, the Committee is given the right to select the members of the Creditor Trust Oversight Committee and is required by no later than 10 days prior to the Disclosure Statement Hearing to file a notice with the Bankruptcy Court identifying the individuals selected. A copy of such notice is attached hereto as **Exhibit D**. On the Effective Date of the Plan, and pursuant to the Confirmation Order, the individuals identified by the Committee to serve as the members of the Creditor Trust Oversight Committee will be appointed as the members of the Creditor Trust Oversight Committee. From and after the Effective Date, the Creditor Trust Oversight Committee will primarily serve as an advisory committee to the Trustee and will provide input to the Trustee on matters affecting administration of the Creditor Trust. Additionally, the Creditor Trust Oversight Committee will have the express authority to take the following actions:

(a)   Appoint a successor Trustee in the event of the death, resignation or discharge of the Trustee;

(b)   Review the books and records of the Creditor Trust; and

(c)   File a motion with the Bankruptcy Court, on behalf of the Creditor Trust, requesting discharge of the Trustee in the event that the Creditor Trust Oversight Committee determines, after reasonable investigation, that the Trustee has taken certain actions, or failed to take certain actions, constituting malfeasance or gross negligence in the administration of the Creditor Trust.

Any action of the Creditor Trust Oversight Committee will only be deemed authorized if a majority of the members of the Creditor Trust Oversight Committee vote in favor of such action. The Plan also provides procedures for the appointment of a successor member to the Creditor Trust Oversight Committee in the event of the death or resignation of a member.

*Compensation of Trustee and Creditor Trust Professionals*

For services rendered by the Trustee in administering the Creditor Trust, the Plan provides that the Trustee will be compensated on an hourly basis, based upon the hourly rate which the Trustee customarily charges to his other clients. The Trustee will also be reimbursed for all reasonable out-of-pocket expenses incurred in the performance of his duties and obligations in administering the Creditor Trust. Compensation and reimbursement of the Trustee will be made solely and exclusively from assets of the Creditor Trust. Under the Plan, the Trustee will also have the authority to employ such Persons as the Trustee deems necessary to assist him in the administration of the Creditor Trust, and to compensate such Persons and reimburse such Persons for out-of-pocket expenses incurred by them on reasonable terms agreed to by the Trustee without the necessity of Bankruptcy Court approval. Compensation and reimbursement of such Persons will be made solely and exclusively from assets of the Creditor Trust. Finally, the Plan provides that the members of the Creditor Trust Oversight Committee will receive no compensation for their services, but will be entitled to reimbursement for any reasonable out-of-pocket expenses (excluding attorneys' fees) incurred in connection with their services, which will be paid solely and exclusively from the assets of the Creditor Trust.

*Limitation of Liability*

Under the Plan, no recourse shall ever be had, directly or indirectly, against the Trustee, in his individual capacity, by legal or equitable proceedings or otherwise, by virtue of any contract, agreement, promise, undertaking, covenant, instrument or other writing executed by the Trustee on behalf of the Creditor Trust for any authorized purpose in the administration of the Creditor Trust, it being expressly understood and agreed that all such liabilities will be enforceable, to the extent valid, only against, and will be satisfied only from, the Creditor Trust. Additionally, provided the Trustee acts in good faith, the Trustee will not personally be liable for any action or omission in the administration of the Creditor Trust, and will be indemnified by the Creditor Trust against any and all claims, causes of action and liability, including all expenses and defense costs, associated with, and will be held harmless by the Creditor Trust against, each such action and omission, except to the extent that such action or omission constitutes gross negligence or willful misconduct on the part of the Trustee. As to all legal matters, the Trustee will be entitled to rely upon the advice and opinions of his counsel.

Similarly, the Plan provides that neither the Creditor Trust Oversight Committee nor any member of the Creditor Trust Oversight Committee shall be personally liable to the Creditor Trust, the Trustee, any of the beneficiaries of the Creditor Trust or any other Person for any actions or omissions taken by the Creditor Trust Oversight Committee, and each of the members of the Creditor Trust Oversight Committee will be indemnified by the Creditor Trust against any and all claims, causes of action and liability, including all expenses and defense costs, associated with, and will be held harmless by the Creditor Trust against, each such action and omission, except to the extent that such action or omission constitutes gross negligence or willful misconduct on the part of such Creditor Trust Oversight Committee member.

*Other Material Terms Applicable to the Creditor Trust*

Pursuant to the Plan and the Creditor Trust Documentation establishing the Creditor Trust, the Creditor Trust will be considered a "grantor" trust for federal income tax purposes and, therefore, will not have any separate liability for federal income taxes relating to, or arising from, the conveyance, maintenance, investment or liquidation of assets of the Creditor Trust. If and to the extent required by law, however, the Trustee will be required to file all tax returns that the Debtor or the Post-Confirmation Debtor would have been required to file if the Trust Assets had not been conveyed to the Creditor Trust. Additionally, to the extent that the liquidation of assets of the Creditor Trust creates any tax liability,

whatsoever, for the Post-Confirmation Debtor, the Creditor Trust will be responsible for and shall promptly pay such tax liability from the assets of the Creditor Trust, and any such payments will be considered costs and expenses of operation of the Creditor Trust.  The Trustee will be required to reserve a sum sufficient, from the assets of the Creditor Trust, to pay any accrued or potential tax liability arising out of the operation of the Creditor Trust, and such reserved sum will constitute part of the Litigation and Administrative Expense Reserve under the Plan.

Finally, the Trustee will be required to keep or cause to be kept books and records detailing all receipts, disbursements and reserves in the administration of the Creditor Trust, and such books and records will be open to inspection at all reasonable times upon reasonable request of any Creditor beneficiary of the Creditor Trust.

## B.      Wind-Up and Termination of Debtor

On the Effective Date of the Plan, all Equity Interests will be deemed cancelled, extinguished and otherwise rendered null, void and of no further force or effect, whatsoever, except for the sole purpose of effectuating the wind-up and termination of the Post-Confirmation Debtor.  Additionally, on the Effective Date, all remaining officers and directors of the Debtor will be deemed terminated and the Trustee will be deemed appointed as the President and sole member of the board of directors of the Post-Confirmation Debtor.

The Plan requires the Post-Confirmation Debtor to promptly wind up all remaining affairs and thereafter formally terminate its existence.  In connection therewith, PRAI will be required to execute any and all shareholder consents and/or resolutions deemed necessary by the Trustee to cause such formal termination.  All reasonable expenses incurred by the Post-Confirmation Debtor in winding up and terminating its existence will be paid from the Creditor Trust and will be deemed to constitute expenses of administration of the Creditor Trust.  The Trustee is required by the Plan to reserve a sum sufficient, from the assets of the Creditor Trust, to pay for such expenses, and such reserved sum will constitute part of the Litigation and Administrative Expense Reserve under the Plan.

## C.      Approval and Consummation of PRAG Settlement

Confirmation of the Plan will constitute the Bankruptcy Court's approval of the PRAG Settlement and its determination that the settlement is fair and equitable and in the best interest of the Estate.  On the Effective Date of the Plan, the PRAG Settlement will be deemed binding on the Plan Proponents, the Creditor Trust, the Trustee, all Creditors and all Equity Interest holders.

## D.      Cancellation of Notes and Instruments; Release of Liens

Except as expressly otherwise provided in the Plan, on the Effective Date of the Plan, all notes, instruments, certificates and other documents evidencing Claims against the Debtor or the Estate will be canceled and deemed terminated, and all Liens in or against the Assets of the Debtor and the Estate will be automatically, and without any further action required by any party or the Bankruptcy Court, deemed released and extinguished.

## E.      Preservation of Causes of Action

Pursuant to the Plan, among the Assets that will be transferred to the Creditor Trust on the Effective Date are Causes of Action.  "Causes of Action" is defined under the Plan as "[a]ny and all causes of action, claims, rights of action, suits or proceedings, whether in law or equity, whether known or unknown, which have been or could be asserted by the Debtor or the Estate as of the Effective Date."

Specifically, the Plan provides that, except as expressly otherwise provided in the Plan, all Causes of Action, including, without limitation, all of the Causes of Action referenced in Section XI of the Disclosure Statement, below, will be preserved and will be transferred to the Creditor Trust on the Effective Date as part of the Trust Assets, and on and after the Effective Date, the Trustee will have standing to pursue such Causes of Action and will be deemed appointed as the representative of the Estate in accordance with Section 1123(b)(3) of the Bankruptcy Code for the purpose of enforcing, prosecuting and settling such Causes of Action.

## F.     Termination of Pension Plan

On or about July 1, 1990, the Debtor established the Paul Reinhart, Inc. Employees Defined Benefit Pension Plan (as amended and restated from time to time, the "Pension Plan"), a single-employer defined benefit pension plan covered by Title IV of the Employee Retirement Income Security Act of 1974 ("ERISA"), as amended, 29 U.S.C. §§ 1301-1461. The Debtor is the contributing sponsor of the Pension Plan within the meaning of ERISA and is responsible for the Pension Plan. As of the date hereof, the Pension Plan has not been legally terminated.

Under ERISA, the Debtor and each member of its "controlled group" are jointly and severally liable for the Pension Plan's unfunded benefit liabilities, due and unpaid employer contributions, and insurance premiums. As defined in ERISA, a "controlled group" includes a parent-subsidiary and/or brother-sister group of corporations, trades or businesses connected through common ownership and control as defined by Sections 414(b) and (c) of the Internal Revenue Code and regulations promulgated thereunder. Paul Reinhart America, Inc., the Debtor's parent corporation, is within the Debtor's controlled group. Based upon common ownership and/or control, the Debtor believes that Pacific Pima Gin Company, Richardson LSA, Inc. and Riverbend Warehouse, LLC are also likely within the Debtor's controlled group. Paul Reinhart AG, the parent corporation of Paul Reinhart America, Inc., may also be within the Debtor's controlled group; however, in the Debtor's view, this is less certain given that Paul Reinhart AG is not a U.S. corporation.

The Pension Benefit Guaranty Corporation ("PBGC") is a wholly-owned United States governmental agency created by ERISA to administer the mandatory pension plan termination insurance program established under Title IV of ERISA. The PBGC guarantees the payment of certain pension benefits only after a pension plan covered by Title IV of ERISA has been lawfully terminated. *See* 29 U.S.C. §§ 1322, 1361.

Given the proposed liquidation of the Debtor under the Plan, the Pension Plan needs to be terminated. The Pension Plan may be terminated lawfully only if the Debtor, as administrator of the plan, initiates termination proceedings under 29 U.S.C. § 1341, or the PBGC initiates termination proceedings under 29 U.S.C. § 1342. The filing of a petition under the Bankruptcy Code does not automatically result in termination of a pension plan. In order to obtain voluntary termination of the Pension Plan, either (a) all of the statutory requirements for a standard termination of the plan must be satisfied, including, without limitation, the cure of any underfunding of the plan upon termination, or (b) all of the requirements for a distressed termination of the plan must be satisfied, which includes specific conditions in relation to both the Debtor and each of its controlled group members. The Debtor does not believe that the Pension Plan qualifies for a distressed termination and, as of the date hereof, the PBGC has not taken action to involuntarily terminate the plan. Unless the Pension Plan has been terminated prior to the Effective Date of the Plan, the liabilities owed to the Pension Plan or to the PBGC with respect to the Pension Plan under ERISA will not be affected in any way by the Bankruptcy Case, including by discharge.

If the Pension Plan terminates in a distress termination pursuant to 29 U.S.C. §§ 1341(c)(2)(b)(ii) or (iii), or in an involuntary termination under 29 U.S.C. § 1342, the Debtor may owe Termination Premiums at the rate of $1,250 per plan participant per year for three years. *See* 29 U.S.C. § 1306(a)(7), as amended by § 8101(b) of the Deficit Reduction Act of 2005 (Pub. L. 109-280). The PBGC estimates this amount to be $311,250. If the Pension Plan terminates in a distress termination pursuant to 29 U.S.C. §§ 1341(c)(2)(b)(ii) or (iii), or in an involuntary termination under 29 U.S.C. § 1342, while the Debtor is attempting to reorganize in Chapter 11, and the Debtor ultimately obtains confirmation of a Chapter 11 plan of reorganization, the Debtor's obligation to the PBGC for Termination Premiums does not exist until after the Chapter 11 plan is confirmed and the Debtor obtains a discharge. *See* 29 U.S.C. § 1306(a)(7)(B). In that case, Termination Premiums are not a dischargeable claim or debt within the meaning of 11 U.S.C. §§ 101(5) and 1141.

Based upon a March 2009 pro forma valuation of the Pension Plan assets upon termination, the Pension Plan is underfunded for benefit liabilities on a termination basis. The estimated amount of such underfunding, as of such valuation, is in excess of $2,000,000. Based upon improved market conditions since March 2009 (which have positively impacted the value of the Pension Plan assets), the Debtor reasonably believes that the estimated level of underfunding has decreased to an amount less than $2,000,000; however, the Debtor has not obtained an updated pro forma valuation.

The PBGC has estimated the underfunding of benefit liabilities under the Pension Plan on a termination basis, as of an assumed termination date of October 15, 2008, to be $2,011,950. The PBGC has filed the following contingent Claims for the Pension Plan's underfunded benefit liabilities, funding contributions, and insurance premiums:

- A Claim for unfunded benefit liabilities in the amount of $2,011,950;

- A Claim for unpaid minimum funding contributions in an unliquidated amount; and

- A claim for unpaid Title IV insurance premiums in an unliquidated amount.

A further discussion of such Claims is set out in Section IX(C)(1) above.

Under the Plan, unless the Pension Plan has previously been lawfully terminated prior to the Effective Date, then following the Effective Date the Post-Confirmation Debtor, in coordination with the Trustee, shall expeditiously take all reasonable and necessary actions to effectuate a standard termination of the Pension Plan under applicable provisions of Title IV of ERISA and any associated regulations. In connection therewith, if and to the extent the Pension Plan is underfunded on a termination basis, the Trustee shall transfer to the Pension Plan, on behalf of the Post-Confirmation Debtor, that amount of Cash from the Creditor Trust as is required to obtain all requisite governmental, regulatory, and PBGC approvals for such standard termination. The Trustee shall reserve a sum sufficient from the assets of the Creditor Trust to make such transfer, and such reserved sum shall constitute part of the Litigation and Administrative Expense Reserve.

## XI.
## LEGAL PROCEEDINGS AFFECTING THE DEBTOR AND ESTATE

### A. Litigation Pending as of the Petition Date

As of the Petition Date, the Debtor was party to the following actions. The status of each of the actions is also noted below:

*In the Matter of the Companies' Creditors Arrangement Act, R.S.C. 1985, C.c-36, as Amended and In the Matter of the Atlantic Yarns Inc., a body corporate and Atlantic Fine Yarns Inc., a body corporate,* Cause No. S/M/92/07, Court of Queen's Bench of New Brunswick, Trial Division, Judicial District of Saint John, Canada.

> Status: The Debtor has an unpaid receivable from Atlantic Fine Yarns Inc. ("Fine Yarns") in the approximate amount of $1,819,844. Fine Yarns is currently involved in the above-referenced insolvency proceeding in Canada. The amount ultimately collected by the Debtor on the receivable will depend upon the outcome of the insolvency proceeding.

*Paul Reinhart, Inc. v. Anhui Shinho Textile Co., Ltd.*, Huainan Intermediate People's Court, Anhui Province, China.

> Status: The Debtor has an unpaid receivable from Anhui Shinho Textile Co., Ltd. ("AST") in the approximate amount of $500,000. After obtaining an arbitration award against AST, the Debtor initiated the above-referenced litigation against AST to collect on the award. Unfortunately, insolvency proceedings were later initiated against AST and the Debtor's collection efforts were further hampered by a corruption investigation and then case against one of AST's principals and the local Mayor. As a result of the outstanding indebtedness owed by AST to its secured creditors, unsecured creditors (including the Debtor) are unlikely to recover anything and the Debtor has abandoned its collection efforts. On information and belief, the Mayor was recently sentenced to death.

*Paul Reinhart, Inc. v. Huzhou Lian Feng Textiles Co., Ltd.*, Huzhou Intermediate People's Court, Zhejiang Province, China.

> Status: The Debtor has an unpaid receivable from Huzhou Lian Feng Textile Co., Ltd. ("HLFT"). In mid-2008, the Debtor filed an application for enforcement of the obligation under the above-referenced case. Following initial proceedings in which the Debtor was unable to produce certain evidence required by the court, the court imposed an enforcement application fee in order to pursue the matter further. Such fee was not paid and the court later delivered a ruling finding that the case had been withdrawn for non-prosecution.

## B.    Post-Petition Litigation

During the course of the Bankruptcy Case, certain litigation has been initiated both against the Debtor and by the Debtor. Details regarding each of these post-petition proceedings are set forth in Section VI(N) of the Disclosure Statement, above.

## C.    Potential Litigation

As noted above, the Plan preserves all Causes of Action, unless expressly provided otherwise, and provides for them to be transferred to the Creditor Trust on the Effective Date of the Plan. In accordance with Section 1123(b)(3) of the Bankruptcy Code, the Plan further provides that the Trustee of the Creditor Trust will have standing, on and after the Effective Date of the Plan, to pursue the Causes of Action and will be deemed appointed as the representative of the Estate for the purpose of enforcing, prosecuting and settling them. In addition to the Causes of Action which have already been asserted by the Debtor (discussed in prior sections of the Disclosure Statement), the Estate does or may hold, among

other possible Causes of Action, the following Causes of Action which are not released as part of the PRAG Settlement:

### 1.  Claims Against the Lenders

As indicated previously, the Committee has been granted leave to assert various claims against the Lenders on behalf of the Estate.  In addition to claims for equitable subordination and aiding and abetting breach of fiduciary duty against the Lenders, which are described in greater detail above and have not been dismissed in the East Lawsuit, the Committee believes that the Estate holds preferential transfer claims against the Lenders that the Committee intends to replead in the East Lawsuit.  Moreover, additional claims may exist and may be discovered by the Committee during the course of the East Lawsuit, including, without limitation, certain other avoidance claims under Chapter 5 of the Bankruptcy Code.  Should such claims exist, the Committee believes it has the requisite standing to also assert such discovered claims and intends to pursue such claims.

### 2.  Avoidance Causes of Action

Pursuant to Sections 547 and 550 of the Bankruptcy Code, a trustee (or debtor in possession pursuant to Section 1107 of the Bankruptcy Code) may avoid and recover any transfer of an interest of the debtor in property to or for the benefit of a creditor if such transfer (i) was for or on account of an antecedent debt owed by the debtor before the transfer was made, (ii) was made while the debtor was insolvent, (iii) was made within ninety (90) days of the bankruptcy filing, and (iv) resulted in the creditor receiving more on account of the debt than if the transfer had not been made, the debtor were liquidated under Chapter 7 of the Bankruptcy Code, and the creditor were limited to recovery on the debt through the Chapter 7 process.  Causes of Action pursuant to Sections 547 and 550 of the Bankruptcy Code are referred to herein as "<u>Preference Causes of Action</u>."

The Estate does or may hold Preference Causes of Action against each of the recipients of payments reflected on Exhibit S-3B (the "<u>90-Day Payment Listing</u>") to the Debtor's Statement of Financial Affairs filed in the Bankruptcy Case on November 14, 2008 [Docket No. 153-3] (the "<u>SOFA</u>").  The 90-Day Payment Listing is incorporated herein, by reference, for all intents and purposes.

### 3.  Subordination Causes of Action

Pursuant to Section 510(c) of the Bankruptcy Code, after notice and a hearing, a bankruptcy court may, under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim.  Causes of Action under Section 510(c) of the Bankruptcy Code are referred to herein as "<u>Subordination Causes of Action</u>."  The Estate does or may hold Subordination Causes of Action against Cooperative Marketing Alliance a/k/a CoMark ("<u>CoMark</u>") on accounts of actions taken by CoMark prior to the Petition Date.  Such actions are detailed in the Debtor's Original Complaint against CoMark filed in the CoMark Lawsuit.  *See* Section VI(N)(2) of the Disclosure Statement, above.

### 4.  Collection Causes of Action

As of the date hereof, numerous parties owe amounts to the Debtor on account of the Debtor's sale of cotton to them.  To the extent that amounts owing to the Debtor are currently past due or may hereafter become past due, the Estate may hold various claims against such parties for collection of the amounts owing.  Any claims arising from such obligations shall constitute part of the Causes of Action preserved and transferred to the Creditor Trust.

## 5. Bank Agent's and Lenders' Assertions

The Bank Agent and the Lenders believe that neither the Committee nor the Debtor have any viable claims against the Bank Agent or Lenders.

With respect to the PRAG Settlement, under the Settlement any avoidance causes of action that may exist against some or all of the Debtor's insiders will be released. Exhibit S-3C to the SOFA identifies payments made to insiders of the Debtor within one year of the Petition Date, including approximately $347 million in payments made by the Debtor to PRAG within one year of the Petition Date.[40]

The Bank Agent and Lenders believe that the Estate may hold significant Preference Causes of Action against PRAG which the Committee proposes to release pursuant to the PRAG Settlement. While the Debtor and PRAG assert that the approximately $347 million in payments made by the Debtor to PRAG within one year of the Petition Date were made to satisfy margin requirements of UBS in relation to the Hedging Positions held in the PRI Sub-Accounts, the Bank Agent and Lenders believe that the Debtor had no contractual obligation to UBS to make such margin payments.

The Bank Agent and Lenders also believe that the Debtor/Estate may hold the following claims and causes of action:

- <u>Causes of Action Against Brokers or Other Persons or Entities Related to Trading Activity</u>. The Bank Agent and the Lenders believe that the Debtor may have claims against various persons or entities (including brokers) relating to the facts underlying the March Trades made by personnel of PRAG. The Bank Agent and Lenders allege, upon information and belief, that the March Trades were a primary cause of the Debtor's bankruptcy filing and that the March Trades may not have been made by authorized personnel.

- <u>Causes of Action Against Denny East and East Cotton Company</u>. The Bank Agent and the Lenders believe that the Debtor may have a number of claims against Denny East and/or East Cotton Company. These claims include, among other things, claims related to Denny East's and East Cotton Company's alleged actions underlying CoMark's counterclaims against the Debtor in the CoMark Lawsuit. *See* Section VI(N)(2) above. CoMark, in connection with its counterclaims, has indicated that it may ultimately attempt to prove that Denny East, as an alleged agent of the Debtor, committed fraud while representing the Debtor in discussions with CoMark.

## 6. Notice of Preservation of Causes of Action

**PLEASE TAKE NOTICE: WITH THE EXCEPTION OF THOSE CAUSES OF ACTION THAT ARE EXPRESSLY RELEASED OR WAIVED UNDER THE TERMS OF THE PLAN, ALL CAUSES OF ACTION OF THE DEBTOR AND THE ESTATE, WHETHER OR NOT SPECIFIED HEREIN, WILL BE PRESERVED AND TRANSFERRED TO THE CREDITOR TRUST PURSUANT TO THE PLAN. THE LACK OF DISCLOSURE OF ANY PARTICULAR**

---

[40] The Debtor and PRAG assert that a vast majority of such payments were made by the Debtor for the segregated purpose of funding margin requirements in relation to the Debtor's Hedging Positions in the PRI Sub-Accounts, with the remaining amounts paid in the ordinary course of the Debtor's business for organic cotton purchases, weight and quality differential reconciliation payments, and overhead cost-sharing expenses. PRAG asserts that, during the same one year period, the Debtor received more from the Sub-Accounts on account of the Debtor's Hedging Positions than the amount of the payments made by the Debtor to PRAG.

**CAUSE OF ACTION SHALL NOT CONSTITUTE, NOR BE DEEMED TO CONSTITUTE, A RELEASE OR WAIVER OF SUCH CAUSE OF ACTION, IT BEING THE INTENTION OF THE PLAN PROPONENTS FOR THE PLAN TO PRESERVE AND TRANSFER TO THE CREDITOR TRUST ANY AND ALL CAUSES OF ACTION HELD BY THE DEBTOR OR THE ESTATE AS OF THE EFFECTIVE DATE OF THE PLAN.**

## XII.
## OTHER SIGNIFICANT PLAN PROVISIONS

### A.    Treatment of Executory Contracts and Unexpired Leases

Section 365 of the Bankruptcy Code sets out various provisions regarding executory contracts and unexpired leases.  Pursuant to the Plan, all contracts and leases constituting executory contracts or unexpired leases under the provisions of Section 365 of the Bankruptcy Code as of the Effective Date of the Plan which (a) have not been assumed or rejected by the Effective Date, or (b) have not been made the subject of a motion to assume which is pending as of the first date set for the hearing on confirmation of the Plan, will be deemed rejected as of the Effective Date in accordance with the provisions of Section 365 of the Bankruptcy Code.

The Plan further provides that any Claim arising from the rejection of an executory contract or unexpired lease under the terms of the Plan must be evidenced by a proof of claim filed with the Bankruptcy Court and served on the Trustee by no later than 20 days following the Effective Date of the Plan.  Any holder of such a rejection damages Claim that fails to file and serve such a proof of claim on or before said deadline shall be deemed to have waived such Claim in full, and such Claim shall be deemed Disallowed and discharged.

### B.    Distributions Under the Plan

Pursuant to the Plan, distributions will be made to the holders of Allowed Claims under the following parameters.

#### 1.    Distributions Made to Holders as of Distribution Record Date

Pursuant to the Plan, all distributions under the Plan on account of Allowed Claims will be made to (or in the case of Disputed Claims, reserved on behalf of) the holders of such Claims as determined as of the Distribution Record Date.  The "Distribution Record Date" is defined under the Plan as the "date established by the Bankruptcy Court as the record date for the making of distributions or the reserving of distributions, as the case may be, which shall be no earlier than the Effective Date [of the Plan]."

#### 2.    Interim and Final Distributions of Net Available Funds

Section 9.2 of the Plan sets out the mechanics and timing for distributions of Net Available Funds under the Plan.  Pursuant to Section 9.2, as soon as practicable after the Effective Date of the Plan, the Trustee will make an initial distribution of Net Available Funds from the Creditor Trust to the holders of Allowed General Unsecured Claims.  Thereafter, the Trustee will, from time to time as he deems warranted in his reasonable discretion, make additional distributions of Net Available Funds to the holders of Allowed General Unsecured Claims as Disputed Claims within Class 4 are finally determined and/or as Net Available Funds are made available for further distributions.  If and when all Allowed General Unsecured Claims have been paid in full in accordance with the Plan, then the Trustee will commence making distributions to the holders of Allowed Subordinated Secured Claims, Allowed Unsecured Lender Claims and Allowed Subordinated Claims in the same manner.  In the case of each of

the above-referenced categories of Allowed Claims, prior to making each additional or the final distribution to the holders of Allowed Claims within the particular Class at issue, the Trustee will recalculate each holder's Pro Rata Share to ensure that each holder of an Allowed Claim within the particular Class will have received, in the aggregate, a Pro Rata Share of the distributions consistent with the treatment provisions of the Plan.

### 3. Conditions to Distributions, Warranty of Entitlement, and Withholding

Pursuant to the Plan, no holder of an Allowed Claim will be entitled to a distribution under the Plan unless and until such holder provides the Trustee such holder's taxpayer identification number. Additionally, each and every Creditor who receives and accepts a distribution under the Plan on account of an Allowed Claim will be deemed to have warranted to the Trustee and the Creditor Trust that such Creditor is the lawful holder of the Allowed Claim, /Allowed Equity Interest, such Creditor is authorized to receive the distribution, and that there are no outstanding commitments, agreements or understandings, express or implied, that may or can, in any way, defeat or modify the right of the Creditor to receive the distribution.

Pursuant to the Plan, any federal, state or local withholding taxes or other amounts required to be withheld under applicable law in relation to a distribution under the Plan will be deducted from the distribution and remitted by the Trustee to the applicable taxing authority(ies). To the extent that such provision of the Plan affects the holder of a particular Allowed Claim, such holder will be required to provide to the Trustee all such information as the Trustee requires in order to comply with such law(s), and no distribution will be made to such holder unless and until such information is provided.

### 4. Setoffs

Pursuant to the Plan, except as otherwise provided in the Plan, the Trustee may, pursuant to Section 502(d) or 553 of the Bankruptcy Code or any applicable non-bankruptcy law, upon application and approval by the Bankruptcy Court, setoff against any distribution to be made pursuant to the Plan on account of an Allowed Claim any claims, rights or Causes of Action held by the Creditor Trust/Trustee against the holder of the Allowed Claim or in relation to the Allowed Claim; *provided, however*, that neither the failure to effect such a setoff nor the allowance of any Claim will constitute a waiver or release by the Creditor Trust or Trustee of any such claims, rights or Causes of Action.

### 5. Establishment of Reserves Under the Plan

Pursuant to the Plan, except to the extent that the Bankruptcy Court enters an order determining that a lesser amount is adequate as to a particular Disputed Claim, the Trustee will be required to deposit into a Disputed Claims Reserve Account an amount of Cash equal to the distribution that would have been made to the holder of such Disputed Claim if such Disputed Claim were an Allowed Claim. At such time as all or any portion of a Disputed Claim becomes an Allowed Claim, the distribution(s) reserved for such Disputed Claim will be released from the Disputed Claims Reserve Account and, subject to all other applicable provisions of Article 9 of the Plan, the Trustee will pay to the holder of such Claim that amount of the distribution(s) to which the holder is entitled under the terms of the Plan. Any interest earned on the funds deposited in the Disputed Claims Reserve Account will constitute property of the Creditor Trust and not the holder of the Claim(s) for which such funds have been reserved.

Additionally, in determining the amount of Net Available Funds which are available for distribution to the holders of Allowed Claims at any particular time, the Trustee will reserve a sufficient amount of funds, determined by the Trustee in his sole discretion, to enable the Trustee to fund the litigation of any Causes of Action and any objections to Claims that the Trustee is pursuing, or may

pursue, and to fund the costs of administering the Creditor Trust until it is terminated, said reserve being the Litigation and Administrative Expense Reserve.

### 6. Undeliverable and Unclaimed Distributions

Pursuant to the Plan, any Cash payment to be made pursuant to the Plan may be made by check or wire transfer, at the option of the Trustee in his sole discretion. If made by check, the distribution will be delivered to the holder of the Allowed Claim by U.S. first class mail, postage prepaid, using (a) the mailing address identified on the Ballot for such Allowed Claim which is timely submitted by the holder of the Allowed Claim to the Balloting Agent, if applicable, or (b) if no such Ballot is submitted to the Balloting Agent, then the mailing address for the provision of notices stated on the proof of claim filed with the Bankruptcy Court in relation to such Allowed Claim, if applicable, or (c) if no proof of claim was filed with the Bankruptcy Court, the mailing address set forth in the Schedules in relation to such Allowed Claim; *provided, however*, that if an Allowed Claim is transferred to another Person on or before the Distribution Record Date, and such transfer is properly evidenced and effectuated by the filing of a claim transfer notice with the Bankruptcy Court pursuant to Bankruptcy Rule 3001(e) on or before the Distribution Record Date which is not contested, then such distribution shall be delivered to the transferee of the Allowed Claim by U.S. first class mail, postage prepaid, using the mailing address noted on the claim transfer notice.

Any distribution which is returned to the Creditor Trust/Trustee and identified by the U.S. Postal Service as undeliverable without any indication of a forwarding address will be retained by the Creditor Trust for a period of ninety (90) days from the date of its original mailing unless otherwise ordered by the Bankruptcy Court. Failure of the holder of the Allowed Claim to come forward and validly make claim to the undelivered distribution by the end of such retention period will constitute the holder's unconditional and irrevocable waiver of any right to receive the distribution and any further distributions under the Plan on account of such Allowed Claim, and will constitute the holder's forfeiture to the Creditor Trust of the distribution and any and all future distributions to which the holder would be entitled in relation to such Allowed Claim. Similarly, unless otherwise ordered by the Bankruptcy Court, failure of the holder of an Allowed Claim to present for payment a distribution check issued by the Creditor Trust (which is not returned to the Creditor Trust/Trustee as undeliverable) within ninety (90) days of the mailing of such distribution will constitute the holder's unconditional and irrevocable waiver of any right to receive the distribution and any further distributions under the Plan on account of such Allowed Claim, and will constitute the holder's forfeiture to the Creditor Trust of the distribution and any and all further distributions to which the holder would be entitled in relation to such Allowed Claim. Forfeited distributions will be available to fund costs of administration of the Creditor Trust or for the distribution to Creditors consistent with the provisions of the Plan. Neither the Post-Confirmation Debtor nor the Trustee will have any obligation to independently undertake any investigation to determine the whereabouts of any holder of an Allowed Claim.

### 7. Disputed Distributions

Pursuant to the Plan, in the event that a dispute arises as to the rightful owner of an Allowed Claim, thereby calling into question the rightful recipient of a distribution under the Plan, the Creditor Trust/Trustee may, in lieu of making the distribution, either (a) deposit the distribution, if Cash, into a segregated account until a determination is made as to the rightful owner of the distribution by the Bankruptcy Court or by written agreement between each of the Persons making claim to the distribution, or (b) interplead the distribution into the registry of the Bankruptcy Court or such other court having jurisdiction over the disputed distribution and the Persons making claim to such distribution, reserving the right to assert any and all claims that the Creditor Trust/Trustee may have in relation to such interpleader action.

### 8.      De Minimis Distributions

Pursuant to the Plan, notwithstanding any provision of the Plan to the contrary, no distribution of less than two dollars ($2.00) shall be made from the Creditor Trust on account of an Allowed Claim.

## C.      Means for Resolving Disputed Claims

Pursuant to the Plan, all objections to Claims must be filed on or before the Claim Objection Deadline.  "Claim Objection Deadline" is defined under the Plan as 180 days after the Effective Date of the Plan, unless extended by the Bankruptcy Court, for cause shown, upon motion filed with the Bankruptcy Court on or prior to such date.  Any Disputed Claim as to which an objection is not filed on or before the Claim Objection Deadline will be deemed to constitute an Allowed Claim under the Plan following the Claim Objection Deadline.

To facilitate the timely and effective administration of Claims, the Plan further provides that, except as otherwise expressly contemplated by the Plan, following the later of the Effective Date of the Plan or the applicable Bar Date, no original or amended proof of claim may be filed in the Bankruptcy Case to assert a Claim against the Debtor without prior authorization of the Bankruptcy Court, and any such proof of claim which is filed without such authorization will be deemed null, void and of no force or effect; *provided, however*, that the holder of a Claim that has been evidenced in the Bankruptcy Case by the filing of a proof of claim on or before the Bar Date shall be permitted to file an amended proof of claim in relation to such Claim at any time if the sole purpose of the amendment is to reduce the amount of the Claim asserted.

Finally, the Plan provides that following the Effective Date, and without the necessity of notice and Bankruptcy Court approval, the Trustee will have the authority to resolve any Disputed Claim which is the subject of a timely-filed objection if the resolution will result in the Claim being Allowed in an amount of no greater than $20,000.00 more than the liquidated, non-disputed and non-contingent amount of the Claim as listed in the Debtor's Schedules.  All other settlements involving Disputed Claims to which timely-filed objections have been lodged will be subject to notice and Bankruptcy Court approval, unless ordered otherwise by the Bankruptcy Court upon separate motion and notice in the Bankruptcy Case.

## D.      Conditions to Confirmation and Effectiveness of the Plan

In addition to meeting the requirements of Section 1129 of the Bankruptcy Code, the following conditions precedent must be met in order for the Plan to be confirmed:

(a)      The Confirmation Payment has been delivered by PRAI-Texas to the Debtor, in trust, by no later than 10 days prior to the Confirmation Hearing;

(b)      The Confirmation Order includes findings, or substantially similar findings, (i) that PRAG committed no act or omission that would constitute liability of PRAG to the Debtor in relation to the March Trades and (ii) that there was no evidence presented of any other act or omission that would cause PRAG to have liability to the Debtor;[41] *provided, however*, that such condition shall be deemed satisfied if, and to the extent, waived in writing by PRAI-Texas;

---

[41] See Section VII of the Disclosure Statement for a discussion of background information relevant to this condition.

(c)      The Confirmation Order approves the release of the PRAG Parties provided for as part of the PRAG Settlement;[42] and

(d)      The Confirmation Order provides for the equitable subordination of the Lenders' Claims so as to enable distribution of the Confirmation Payment and the Subsequent Payments[43] (less the amount of said payments required to satisfy or reserve for Allowed Administrative Claims, Allowed Priority Tax Claims, and Allowed Claims within Classes 2 and 3 of the Plan, and less the amount of said payments reserved by the Trustee as part of the Litigation and Administrative Expense Reserve) solely to the holders of Allowed General Unsecured Claims; *provided, however*, that such condition shall be deemed satisfied if, and to the extent, waived in writing by the Committee and the East Plaintiffs.

Following confirmation of the Plan, the following conditions precedent must be met before the Plan will become effective:

(a)      The Confirmation Order has become a Final Order; *provided, however,* that such condition shall be deemed satisfied if waived in writing by the Plan Proponents and PRAI-Texas;

(b)      The Creditor Trust Documentation, creating the Creditor Trust, has been executed by the Debtor, the Trustee and the members of the Creditor Trust Oversight Committee;

(c)      PRAG has executed and delivered to the Debtor the instrument referenced in Section 7.3.1 of the Plan;

(d)      NEWCO has executed and delivered to the Debtor the instrument referenced in Section 7.3.3 of the Plan;

(e)      The Confirmation Payment has been released to the Estate;

(f)      The Debtor and the East Plaintiffs have executed and delivered to PRAG, PRAI and PRAI-Texas the release referenced in Section 7.5 of the Plan;

(g)      PRAG, PRAI and PRAI-Texas have executed and delivered to the Debtor the release referenced in Section 7.6 of the Plan; and

(h)      The East Plaintiffs, by and through their counsel and/or designated agents, have used their best efforts to secure and deliver to PRAG a release(s) pursuant to which each of the Other Growers,[44] effective as of the Effective Date, unconditionally and irrevocably waives, remises, acquits, and fully and forever releases and discharges PRAG and each of its (i) direct and indirect subsidiaries and (ii) officers, directors, shareholders, managers, employees and agents and those of its direct and indirect subsidiaries (collectively, the "Released Parties") from any and all claims which the Other Growers have or ever had against the Released Parties (except that said release(s) shall not release, nor be deemed to constitute a release or waiver of, any of the obligations imposed upon any of the

---

[42] See Section VII of the Disclosure Statement for a discussion of the releases provided under the PRAG Settlement.

[43] See Section VIII of the Disclosure Statement for a discussion regarding equitable subordination of the Lenders' Claims, and Section VII of the Disclosure Statement for a description of the Confirmation Payment and Subsequent Payments.

[44] "Other Growers" is defined under the Plan as "[a]ny and all producers or suppliers of cotton, other than the East Plaintiffs, who have filed a proof of claim in the Bankruptcy Case to assert a Claim against the Debtor on account of the Debtor's failure to perform under a cotton purchase contract."

Released Parties pursuant to the Plan); *provided, however,* that such condition shall be deemed satisfied if, and to the extent, waived in writing by PRAI-Texas.

The "Effective Date" of the Plan will be the date on which the Plan becomes effective by virtue of the satisfaction or waiver (as applicable) of each of the above conditions precedent.

### E. Effects of Confirmation of the Plan; Injunction and Exculpation

#### 1. Binding Effect of Plan

Upon the Effective Date of the Plan, the Plan and each of its provisions will be binding on the Plan Proponents, the Post-Confirmation Debtor, the Creditor Trust, the Trustee, all Creditors, all Equity Interest holders, and all Persons acquiring property under the Plan, whether or not they voted to accept the Plan, whether or not they had a right to vote on the Plan, whether or not any Claim or Equity Interest held by any of them is impaired under the Plan, whether or not any Claim or Equity Interest held by any of them is Allowed in full, only in part, or Disallowed in full, and whether or not a distribution is made to any of them under the Plan.

#### 2. Vesting of Assets

Except as expressly otherwise provided in the Plan, on the Effective Date of the Plan (a) all of the Retained Assets will re-vest in the Post-Confirmation Debtor free and clear of all Claims, Liens and encumbrances, of any nature whatsoever, and (b) all of the Trust Assets will be transferred to the Creditor Trust free and clear of all Claims, Liens and encumbrances, of any nature whatsoever.

#### 3. Injunction Against Interference with Plan

Upon the Effective Date of the Plan, all holders of Claims, all holders of Equity Interests, and all other parties in interest in the Bankruptcy Case, along with their respective current and former officers, directors, principals, employees and agents, will be enjoined from taking any action to interfere with the implementation or consummation of the Plan.

#### 4. Exculpation

Pursuant to the Plan, the Exculpated Parties will neither have nor incur any liability to any Person for any action taken or omitted in soliciting acceptances of the Plan, except to the extent expressly provided otherwise by Section 1125(e) of the Bankruptcy Code. "Exculpated Parties" is defined under the Plan as "[c]ollectively, the Plan Proponents and their respective officers, directors, employees, attorneys, accountants, financial advisors and other agents, professionals and representatives."

### F. Modification of the Plan

Subject to the provisions of Section 1127 of the Bankruptcy Code, the Plan Proponents reserve the right to amend or modify the Plan (a) at any time prior to the Confirmation Date without Bankruptcy Court approval, or (b) at any time after the Confirmation Date, but prior to the Effective Date of the Plan, with Bankruptcy Court approval. In the event that the Plan Proponents are required to provide the holders of Claims (or certain of them) the opportunity to re-vote on the Plan, as amended or modified, then each such holder that previously voted to accept or reject the Plan will be deemed to have cast the same vote for acceptance or rejection, as the case may be, of the Plan, as amended or modified, unless, within the time fixed by the Bankruptcy Court, such holder changes its previously cast vote for acceptance or rejection of the Plan.

**G. Retention of Jurisdiction**

Pursuant to the Plan, from and after the Effective Date of the Plan, the Bankruptcy Court will retain jurisdiction, to the fullest extent legally permitted, over the Bankruptcy Case, all proceedings arising under, arising in or related to the Bankruptcy Case, the Confirmation Order, the Plan and administration of the Creditor Trust. The specific types of disputes and proceedings that the Bankruptcy Court will retain jurisdiction over are identified in Section 14.1 of the Plan.

**XIII.**
**COMPARISON OF PLAN TO ALTERNATIVES**

**A. Chapter 7 Liquidation**

The most realistic alternative to the Plan is conversion of the Bankruptcy Case from a proceeding under Chapter 11 of the Bankruptcy Code to a proceeding under Chapter 7 of the Bankruptcy Code. A Chapter 7 case, sometimes referred to as a "straight liquidation," requires the liquidation of all of the debtor's assets by a Chapter 7 trustee. The cash realized from liquidation is subject to distribution to creditors in accordance with Section 726 of the Bankruptcy Code. Whether a bankruptcy case is one under Chapter 7 or Chapter 11, allowed secured claims, allowed administrative claims and allowed priority claims, unless subordinated pursuant to Section 510 of the Bankruptcy Code, are entitled to be paid in cash, in full, before unsecured creditors and equity interest holders receive anything. Thus, in a Chapter 7 case, the recovery, if any, to creditors holding non-priority unsecured claims will depend upon the net proceeds left in the estate after all of the debtor's assets have been reduced to cash and all claims of higher priority have been satisfied in full.

Chapter 7 liquidation theoretically adds an additional layer of expense. As referenced above, conversion of a bankruptcy case to Chapter 7 will trigger the appointment of a Chapter 7 trustee having the responsibility of liquidating the debtor's assets. Pursuant to Sections 326 and 330 of the Bankruptcy Code, the Chapter 7 trustee will be entitled to reasonable compensation in relation to the level of disbursements made to creditors, as follows: (a) up to 25% of the first $5,000 disbursed; (b) up to 10% of the amount disbursed in excess of $5,000 but not in excess of $50,000; (c) up to 5% of any amount disbursed in excess of $50,000 but not in excess of $1,000,000; and (d) up to 3% of any amount disbursed in excess of $1,000,000. Additionally, the Chapter 7 trustee will be entitled to retain his or her own professionals to assist in the liquidation and administration of the estate. The fees and expenses of such professionals, to the extent allowed, are also entitled to priority in payment as administrative claims. Chapter 7 administrative costs are entitled to priority in payment over Chapter 11 administrative costs. Nevertheless, Chapter 11 administrative costs continue to have priority over all other non-administrative priority claims and non-priority unsecured claims in the bankruptcy case.

Conversion to Chapter 7 could result in the appointment of a trustee having no experience or knowledge of the prior proceedings in the bankruptcy case or of the debtor's business, its books and records and its assets. In the Debtor's case, a substantial amount of time would most definitely be required in order for the new Chapter 7 trustee to become familiar with the Debtor, its prior business operations, its assets, and pending litigation in order to wind the case up effectively.

The Plan Proponents are opposed to conversion of the Bankruptcy Case to Chapter 7 for several reasons. First, the Plan Proponents believe that conversion of the Bankruptcy Case could lead to additional layers of expense for the reasons stated above. Second, conversion of the Bankruptcy Case will re-open the Bar Date and enable additional, otherwise barred Claims, to be asserted. By maintaining the Bankruptcy Case in Chapter 11 and confirming the Plan, the assertion of additional claims can be

prevented. Third, conversion of the Bankruptcy Case to Chapter 7 may eliminate the PRAG Settlement proposed under the Plan, thereby eliminating the recovery of at least $10 million by the Estate. Absent confirmation of the Plan, there is no guarantee that the same settlement may be achieved in a Chapter 7 proceeding. Finally, conversion of the Bankruptcy Case to Chapter 7 will not materially alter the path of the Debtor. In this regard, often creditors will seek conversion of a Chapter 11 case in order to force a liquidation of the debtor's assets instead of the reorganization of the debtor's business. Here, the Plan provides for the liquidation of the Debtor's assets; therefore, conversion will not lead to a different result.

With respect to the "best interest of creditors" test of Section 1129(a)(7) of the Bankruptcy Code, the Plan Proponents do not believe that Creditors will achieve a greater recovery under Chapter 7 than under the Plan. Inasmuch as the Plan is a plan of liquidation, the comparison of likely distributions to holders of Allowed Claims under the Plan to likely distributions to holders of Allowed Claims in a Chapter 7 proceeding is similar, except that in a Chapter 7 proceeding the potential for additional administrative expense and additional Claims demonstrates that distributions under the Plan are likely to exceed, or at least be equal to, the distributions that would be made under Chapter 7. Moreover, as indicated above, conversion to Chapter 7 may eliminate the recovery of at least $10 million under the PRAG Settlement proposed under the Plan. Consequently, the Plan Proponents believe that the Plan is in the best interest of Creditors.

## B.     Alternative Plans

To date, no other proposed Chapter 11 plans have been filed in the Bankruptcy Case, and it is not anticipated that any other proposed Chapter 11 plan will be filed.

## C.     Dismissal

The most remote alternative possibility is dismissal of the Bankruptcy Case. If dismissal were to occur, the Debtor would no longer have the protection of the automatic stay and other applicable provisions of the Bankruptcy Code. Dismissal would force a race among Creditors to take control and dispose of the Debtor's available assets, and unsecured creditors, on an aggregate basis, would very likely fail to realize any recovery on their Claims.

## XIV.
## MATERIAL UNCERTAINTIES AND RISKS

In considering whether to vote to accept or reject the Plan, Creditors entitled to vote should consider the following risks associated with the Plan: (a) that all of the conditions to confirmation of the Plan are not satisfied or waived (as applicable); (b) that all of the conditions to the effectiveness of the Plan are not satisfied or waived (as applicable) or that such conditions are delayed by a significant period of time; (c) that the Bankruptcy Court does not order the subordination of the Lenders' Secured Claims; (d) that the level of business conducted in the U.S. by NEWCO does not generate a significant amount of Subsequent Payments for the Creditor Trust; and (e) that the Trustee's prosecution of Causes of Action against the Lenders and other parties does not result in significant recoveries for the Creditor Trust.

The subordination of the Lenders' Claims is a prerequisite to confirmation of the Plan, except to the extent such condition is waived by the Committee and the East Plaintiffs. In the absence of both approval of the PRAG Settlement and subordination of the Lenders' Claims, it is highly unlikely that any recovery will be realized by the holders of General Unsecured Claims. Additionally, and unless waived by PRAI-Texas, confirmation of the Plan is dependent upon (i) the inclusion of findings, or substantially similar findings, in the Confirmation Order that PRAG committed no act or omission that would constitute liability of PRAG to the Debtor in relation to the March Trades and (ii) no evidence having

been presented of any other act or omission that would cause PRAG to have liability to the Debtor. In the event these conditions are not satisfied or waived, the Plan will not be confirmed.

The Bank Agent and Lenders additionally allege that PRAI-Texas is a shell corporation lacking the financial wherewithal to make the $10 million Confirmation Payment and that, as a result, there is risk that the Confirmation Payment will not be paid. To protect against this risk, and in accordance with Section 7.1 of the Plan, the Plan Proponents will seek entry of an order providing for the deposit of the Confirmation Payment with the Debtor, in trust, by no later than ten (10) days prior to the Confirmation Hearing. This will ensure that the funds are on hand by the time of the Confirmation Hearing and remain on hand until the Effective Date of the Plan, at which time they will be released to the Creditor Trust.

The Bank Agent and Lenders further assert that there are risks associated with the Subsequent Payment obligations of NEWCO. In this regard, they assert that there is no obligation on the part of PRAG, PRAI or PRAI-Texas to adequately capitalize or to cause NEWCO to engage in business, and there is no obligation on the part of PRAG, PRAI or PRAI-Texas to fund NEWCO or make any of the Subsequent Payments. While such risks are present, (a) pursuant to Section 7.3.1 of the Plan, the name of the entity organized to serve as NEWCO must be disclosed by no later than 30 days prior to the Confirmation Hearing, (b) pursuant to Section 7.3.3(b) of the Plan, NEWCO will be required to execute an instrument pursuant to which it covenants that it will remain adequately capitalized throughout the entire period of time that it owes any obligation to the Creditor Trust, and (c) pursuant to Sections 7.3.1 and 11.2(c) of the Plan, PRAG will be required to execute an instrument as a condition to the effectiveness of the Plan by which PRAG covenants and agrees to be bound by the following restriction for any business that it chooses to directly or indirectly conduct within the U.S. during the Obligation Period:[45] that any and all cotton trading, purchasing, or selling conducted in the United States during the Obligation Period by, or on behalf of, PRAG, PRAI-Texas, or any of the other PRAG Affiliates shall be conducted through NEWCO.

Cooperative Marketing Alliance asserts that there are risks associated with the length of time that may transpire before a trial on subordination of the Lenders' Claims, there is a risk of delay in the event of an appeal of the Confirmation Order, and there is a risk of additional costs and expenses associated with such potential delays. Such risks do exist and there is both the possibility of a significant delay before the Plan becomes effective and the possibility of additional expenses which could materially impact the ultimate recovery by Creditors.

Finally, there can be no assurance that the Plan will not be modified up to and through the Confirmation Date, and the Plan Proponents reserve the right to modify the Plan, subject to compliance with the Bankruptcy Code, in the event the modification becomes warranted or necessary in furtherance of confirmation.

## XV.
## CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

### A.    Introduction

Implementation of the Plan may have federal, state and local tax consequences to the Debtor and its Estate, as well as to Creditors and Equity Interest holders of the Debtor. No tax opinion has been

---

[45] Pursuant to Section 7.3.2 of the Plan, the "Obligation Period" is described as the three (3) year period commencing on the later of the first day of the first calendar month following the Effective Date or the Plan or the first day of the calendar month that NEWCO begins to conduct business in the United States.

sought or will be obtained with respect to any tax consequences of the Plan, and the following disclosure does not constitute and is not intended to constitute either a tax opinion or tax advice to any Person.

This disclosure is provided for informational purposes only. Moreover, this disclosure summarizes only certain of the federal income tax consequences associated with the Plan's confirmation and implementation and does not attempt to comment on all such aspects. Similarly, this disclosure does not attempt to consider any facts or limitations applicable to any particular Creditor or Equity Interest holder that may modify or alter the consequences described below. This disclosure does not address state, local or foreign tax consequences or the consequences of any federal tax other than the federal income tax.

This disclosure is based upon the provisions of the Internal Revenue Code of 1986, as amended, the regulations promulgated thereunder, existing judicial decisions, and administrative rulings. In light of the expansiveness of such authorities, no assurance can be given that legislative, judicial or administrative changes will not be forthcoming that would affect the accuracy of the discussion below. Any such changes could be material and could be retroactive with respect to the transactions entered into or completed prior to the enactment or promulgation thereof. Finally, the tax consequences of certain aspects of the Plan are uncertain due to a lack of applicable legal authority and may be subject to judicial or administrative interpretations that differ from the discussion below.

**CREDITORS AND EQUITY INTEREST HOLDERS, THEREFORE, ARE ADVISED TO CONSULT WITH THEIR OWN TAX ADVISORS REGARDING THE TAX CONSEQUENCES TO THEM AND TO THE DEBTOR OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN, INCLUDING FEDERAL, STATE, LOCAL AND FOREIGN TAX CONSEQUENCES.**

## B.     Federal Income Tax Consequences to the Debtor

Under the terms of the Plan, all Assets of the Debtor and the Estate and all Claims against the Debtor will be transferred to the Creditor Trust. The Debtor will have no continuing liability on such Claims. To the extent the Debtor realizes income as a result of the debt forgiveness associated with such transfers, such income will not constitute taxable income to the Debtor because the debt forgiveness arises in connection with a bankruptcy case under Title 11 of the United States Code.

Additionally, for the fiscal year ending June 30, 2008, the Debtor had a net operating loss carry forward of approximately $146 million. The Debtor has experienced additional operating losses during the current fiscal year. Because the Plan provides for the wind-up and termination of the Debtor, the Debtor will lose the benefit of any net operating loss carry forward tax attributes.

## C.     Federal Income Tax Consequences Associated with Creation of Creditor Trust

The Plan provides for the establishment of the Creditor Trust and the transfer of all of the Debtor's assets, including causes of action, to the Creditor Trust on the Effective Date of the Plan. The Plan Proponents intend that the Creditor Trust qualify as a grantor trust of the Debtor for federal income tax purposes. If the IRS does not challenge this treatment, the Creditor Trust will have no separate liability for federal income taxes relating to, or arising from, the conveyance, operation, or liquidation of assets of the Creditor Trust. The Trustee will be required to file the tax returns that the Debtor would have filed if its assets had not been conveyed to the Creditor Trust.

Notwithstanding the Plan Proponents' intent that the Creditor Trust qualify as a grantor trust of the Debtor for federal income tax purposes, the IRS has announced in Rev. Proc. 94-45 that if certain conditions are met, it will issue a ruling that a liquidating trust created pursuant to a bankruptcy plan

under Chapter 11 of the Bankruptcy Code will be treated as a grantor trust of which the <u>Creditors</u> are the grantors. If the IRS were to successfully assert that the Creditor Trust should be characterized as such a liquidating trust, the Creditor Trust would be treated as a "liquidating trust" within the meaning of Section 301.7701-4(d) of the Tax Regulations (a "Liquidating Trust") and the transfer of the assets of the Debtor to the Creditor Trust would be treated as a transfer from the Debtor to the beneficiaries of the Creditor Trust for all purposes of the Internal Revenue Code (*e.g.*, Sections 61(a)(12), 483, 1001, 1012 and 1274) followed by a deemed transfer by such beneficiaries to the Creditor Trust. Any gain the Debtor recognizes related to the transfer of the assets to the Creditors plus any related cancellation of indebtedness income from the satisfaction of the indebtedness will not constitute taxable income to the Debtor because the debt forgiveness arises in connection with a bankruptcy case under Title 11 of the United States Code.

Finally, the valuation of assets transferred to the Creditor Trust (especially unliquidated causes of action) is uncertain. Notwithstanding the difficulty in valuing certain assets, the valuation of the transferred property to the Creditor Trust and the Creditors must be consistent, and under this scenario those valuations would have to be used for all applicable reporting purposes by the Debtor and Creditors.

## D.    Additional Federal Income Tax Consequences to Creditors

Although the Plan Proponents do not believe that the conveyance of the Debtor's assets to the Creditor Trust will be considered a taxable event, the Creditors may, at some point in time, be required to recognize income or be allowed a deduction as a result of the implementation of the Plan. The exact tax treatment depends on each Creditor's method of accounting, the basis of the amount of distributions received, and whether and to what extent such Creditor has taken a bad debt reduction in prior taxable years with respect to a particular debt owed to it by the Debtor. In the event that the Creditor Trust is treated as a grantor trust for the benefit of Creditors, any income, gain or loss attributable to the ownership, operation or disposition of the assets of the Creditor Trust would be taxable to the Creditors, in accordance with their interests in such assets, <u>whether or not the Creditors had received any cash distributions from the Creditor Trust</u>. Gain or loss on the subsequent disposition of Creditor Trust assets would be equal to the difference between the amount realized on the disposition of those assets and their tax bases in the hands of the Creditor Trust (initially, the fair market value of the Creditor Trust assets at the time of the transfer to the Creditor Trust). **EACH CREDITOR IS URGED TO CONSULT WITH ITS OWN TAX ADVISOR REGARDING THE PARTICULAR TAX CONSEQUENCES OF ITS CLAIM UNDER THE PLAN.**

## E.    Tax Withholding

Pursuant to the Plan, the Trustee will withhold from payments made to Creditors pursuant to the Plan any amounts required by law to be withheld. In order to assist that withholding process, Creditors may be required to provide general tax information to the Trustee prior to receiving their distributions under the Plan.

## F.    Disclaimers

**PERSONS CONCERNED WITH THE TAX CONSEQUENCES OF THE PLAN SHOULD CONSULT THEIR OWN ACCOUNTANTS, ATTORNEYS AND/OR ADVISORS. THE PLAN PROPONENTS MAKE THE ABOVE-NOTED DISCLOSURE OF POSSIBLE TAX CONSEQUENCES FOR THE SOLE PURPOSE OF ALERTING READERS TO TAX ISSUES THAT THEY MAY WISH TO CONSIDER. THE PLAN PROPONENTS CANNOT, AND DO NOT, REPRESENT THAT THE TAX CONSEQUENCES MENTIONED ABOVE ARE COMPLETELY ACCURATE BECAUSE, AMONG OTHER THINGS, THE TAX LAW**

**EMBODIES MANY COMPLICATED RULES THAT MAKE IT DIFFICULT TO STATE ACCURATELY WHAT THE TAX IMPLICATIONS OF ANY ACTION MIGHT BE.**

**IRS CIRCULAR 230 NOTICE:  TO ENSURE COMPLIANCE WITH REQUIREMENTS IMPOSED BY THE INTERNAL REVENUE SERVICE, THE PLAN PROPONENTS INFORM ALL RECIPIENTS OF THIS DISCLOSURE STATEMENT THAT ANY U.S. TAX INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT (INCLUDING THE EXHIBITS HERETO) IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, FOR THE PURPOSE OF (A) AVOIDING PENALTIES UNDER THE INTERNAL REVENUE CODE, OR (B) PROMOTING, MARKETING OR RECOMMENDING TO ANOTHER PARTY ANY TRANSACTION OR MATTER ADDRESSED HEREIN.**

## XVI.
### CONCLUSION

The Plan Proponents believe that the Plan complies with Section 1129 of the Bankruptcy Code and is fair and equitable and in the best interests of the Debtor, the Estate and Creditors.  Accordingly, the Plan Proponents urge Creditors receiving Ballots to vote to accept the Plan.


[Remainder of Page Intentionally Left Blank]

DATED: August 17, 2009

**MUNSCH HARDT KOPF & HARR, P.C.**
3800 Lincoln Plaza
500 N. Akard Street
Dallas, Texas 75201-6659
Telephone: (214) 855-7500
Facsimile: (214) 855-7584

By: /s/ E. Lee Morris
    E. Lee Morris
    Texas Bar No. 00788079
    Deborah M. Perry
    Texas Bar No. 24002755

**ATTORNEYS FOR PAUL REINHART, INC.,
DEBTOR AND DEBTOR-IN-POSSESSION**


**ROCHELLE McCULLOUGH LLP**
325 N. St. Paul, Suite 4500
Dallas, Texas 75201
Telephone: (214) 953-0182
Facsimile: (214) 953-0185

By: /s/ Sean J. McCaffity
    Michael R. Rochelle
    Texas Bar No. 17126700
    Sean J. McCaffity
    Texas Bar No. 24013122

**ATTORNEYS FOR OFFICIAL UNSECURED
CREDITORS' COMMITTEE**

# EXHIBIT A

[Debtor's and Official Unsecured Creditors' Committee's First Amended Joint
Plan of Liquidation Under Chapter 11 of the United States Bankruptcy Code]

[See Docket No. 455]
[Actual copy to be attached to approved Disclosure Statement]

# EXHIBIT B

[Unaudited Balance Sheet of Debtor as of July 31, 2009]

### Paul Reinhart, Inc
#### Financial Statements
**Year to Date**

| | July 31<br>2009 |
|---|---|

## BALANCE SHEET

### ASSETS
--------------

**CURRENT ASSETS:**

| | |
|---|---|
| Cash | 4,254,210 |
| Trade Receivalbes net of Allowance for Bad Debts | 19,186,907 |
| Inventory | 369,362 |
| Prepaid Expenses | 44,085 |
| | ------------------------------- |
| Total Current Assets | 23,854,564 |
| | |
| Property and Equipment - Cost | 1,688,805 |
| Accumulated Depreciation | (1,516,172) |
| | ------------------------------- |
| Property and Equipment - Net | 172,633 |
| | |
| Other Assets | 5,093,382 |
| | ------------------------------- |
| **TOTAL ASSETS** | **29,120,579** |
| | ================= |

## LIABILITIES & STOCKHOLDER'S EQUITY
---------------------------------------

**CURRENT LIABILITIES:**

| | |
|---|---|
| Secured Debt | 49,760,580 |
| Trade, Agents, & Suppliers | 561,364 |
| Professional Fees | 454,919 |
| Unsecured Debt | 75,949,812 |
| | ------------------------------- |
| Total Current Liabilities | 126,726,675 |

**STOCKHOLDER'S EQUITY:**

| | |
|---|---|
| Prepetition Owner's Equity | (103,477,884) |
| Earnings (Loss) Since Petition Date | 5,924,305 |
| Other Comprehensive Income | (52,517) |
| | ------------------------------- |
| Total Stockholder's Equity | (97,606,096) |
| | ------------------------------- |
| | |
| **TOTAL LIABILITIES AND STOCKHOLDER'S EQUITY** | **29,120,579** |
| | ================= |

# EXHIBIT C

[Notice of Designation of Trustee]

[See Docket No. 420]
[Actual copy to be attached to approved Disclosure Statement]

# EXHIBIT D

[Notice of Designation of Members of Creditor Trust Oversight Committee]

[See Docket No. 419]
[Actual copy to be attached to approved Disclosure Statement]