IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| PAUL REINHART, INC., | § | Case No. 08-35283-HDH-11 |
| | § | |
| Debtor. | § | |

**JOINT DISCLOSURE STATEMENT PURSUANT TO 11 U.S.C. § 1125
IN SUPPORT OF DEBTOR'S AND OFFICIAL UNSECURED CREDITORS'
COMMITTEE'S SECOND AMENDED JOINT PLAN OF LIQUIDATION UNDER
CHAPTER 11 OF THE UNITED STATES BANKRUPTCY CODE**

> **NOTICE**
>
> **THE BANKRUPTCY COURT HAS NOT YET APPROVED THIS DISCLOSURE STATEMENT PURSUANT TO 11 U.S.C. § 1125. THEREFORE, IT IS NOT TO BE RELIED UPON OR USED IN CONNECTION WITH THE SOLICITATION OF VOTES FOR OR AGAINST ANY CHAPTER 11 PLAN FILED IN THE BANKRUPTCY CASE.**

E. Lee Morris
Deborah M. Perry
**MUNSCH HARDT KOPF & HARR, P.C.**
3800 Lincoln Plaza
500 N. Akard Street
Dallas, Texas 75201-6659
Telephone: (214) 855-7500
Facsimile: (214) 855-7584

**Attorneys for Paul Reinhart, Inc.,
Debtor and Debtor-in-Possession**

Michael R. Rochelle
Sean J. McCaffity
**ROCHELLE McCULLOUGH LLP**
325 N. St. Paul, Suite 4500
Dallas, Texas 75201
Telephone: (214) 953-0182
Facsimile: (214) 953-0185

**Attorneys for Official Unsecured
Creditors' Committee**

Dated: December 29, 2009

# TABLE OF CONTENTS

INTRODUCTORY DISCLOSURES ................................................................................................... v

I.  INTRODUCTION .................................................................................................................. 1

II. PLAN OVERVIEW ................................................................................................................ 2

III. VOTING PROCEDURES AND REQUIREMENTS ........................................................... 5
    A.  Ballots and Voting Deadline ...................................................................................... 5
    B.  Creditors Solicited to Vote ........................................................................................ 5
    C.  Definition of Impairment ........................................................................................... 5
    D.  Classes Impaired Under the Plan ............................................................................... 6
    E.  Vote Required for Class Acceptance .......................................................................... 6

IV. CONFIRMATION OF THE PLAN ...................................................................................... 7
    A.  Confirmation Hearing ................................................................................................ 7
    B.  Requirements for Confirmation of the Plan .............................................................. 7
    C.  Cramdown ................................................................................................................... 9

V.  HISTORICAL AND BACKGROUND INFORMATION ................................................ 11
    A.  Organizational Information ...................................................................................... 11
    B.  The Debtor's Business and Operations .................................................................... 11
    C.  Events Leading to Chapter 11 Filing ....................................................................... 12
    D.  Management of the Debtor ....................................................................................... 14
    E.  Description of Assets of the Debtor ......................................................................... 14
    F.  Bank Agent's and Lenders' Assertions ................................................................... 15

VI. SIGNIFICANT EVENTS DURING THE BANKRUPTCY CASE ................................. 16
    A.  Debtor's Employment of Professionals ................................................................... 16
        1.  Bankruptcy Counsel ..................................................................................... 16
        2.  Financial and Restructuring Advisor ........................................................... 16
        3.  Ordinary Course Mexican Counsel .............................................................. 16
    B.  Committee's Employment of Professionals ............................................................. 16
        1.  Bankruptcy Counsel ..................................................................................... 17
        2.  Special Litigation Counsel ........................................................................... 17
    C.  Cash Management System and Maintenance of Accounts ....................................... 18
    D.  Financing of Operations and Administration of the Estate ..................................... 18
        1.  PRAI-Texas Gratuitous Contribution .......................................................... 18
        2.  Authorization to Use Cash Collateral .......................................................... 18
    E.  Authorization to Pay Warehouse Charges and Certain Critical Vendor Claims ............ 19
    F.  Adequate Assurance of Utility Payments ................................................................ 20
    G.  Employee Stabilization ............................................................................................ 20
        1.  Authorization to Pay Pre-Petition Wages and Related Amounts;
            Continuation of Standard Employee Benefits ............................................... 20
        2.  Authorization to Maintain Severance Plan ................................................... 20
        3.  Approval of Officer Incentive Program ........................................................ 20
    H.  Executory Contracts and Unexpired Leases ............................................................ 21
        1.  Rejection of Unperformed Cotton Purchase Contracts ................................. 21
        2.  Assumption of Headquarters Lease, As Modified ........................................ 21

|     | 3. | Rejection of Miscellaneous Equipment Leases | 21 |
| I.  |    | Disposition of Disputed Cotton Bales | 21 |
| J.  |    | Automatic Stay Matters | 22 |
|     | 1. | Supplemental Stay Order | 22 |
|     | 2. | CoMark's Motion for Relief from the Automatic Stay | 22 |
| K.  |    | Tax Matters | 22 |
|     | 1. | Payment of Allocated Share of Tax Return Preparation Expenses | 22 |
|     | 2. | California Franchise Tax Board's Request for Payment of Alleged Taxes | 23 |
| L.  |    | Authorization for Committee to Pursue Estate-Based Claims | 23 |
| M.  |    | Extension of Plan Exclusivity Periods | 23 |
| N.  |    | Adversary Proceedings | 24 |
|     | 1. | East Lawsuit (Adversary No. 08-3438) | 24 |
|     | 2. | CoMark Lawsuit (Adversary No. 08-3491) | 26 |
| O.  |    | Sales of Assets of the Estate | 27 |
|     | 1. | Investment in The Seam and ICE | 27 |
|     | 2. | Unnecessary Furniture | 28 |
| P.  |    | Compromises of Disputes | 28 |
|     | 1. | Signia Settlement | 28 |
|     | 2. | PPGC-PGC Settlement | 28 |
|     | 3. | Receivables Restructuring Protocol | 28 |

| VII. | | **THE MEDIATED SETTLEMENT AND ANCILLARY PLAN PROVISIONS FOR IMPLEMENTATION OF THE MEDIATED SETTLEMENT AGREEMENT** | 29 |
| A. | | The Mediated Settlement | 29 |
| B. | | Ancillary Plan Provisions for Implementation of the Mediated Settlement Agreement | 33 |
| | 1. | Incorporation of Mediated Settlement Agreement and Mediation Settlement Order, and Transfer of Rights to Creditor Trust | 33 |
| | 2. | The Supplemental Settlement Release, the Settlement Opt-Out Election, and Restrictions on the Distribution of Lender Settlement Trust Funds | 34 |
| | 3. | Provisions Related to the Subsequent PRAG Payments | 37 |
| | 4. | Provisions Related to the Subsequent Lender Payment and Lender Claim Limitations | 38 |
| | 5. | Remedies in the Event of a Settlement Payment Default | 38 |
| | 6. | Dismissal of East Lawsuit and CoMark Lawsuit | 39 |

| VIII. | | **SUMMARY OF CLAIMS, CLASSIFICATION AND TREATMENT UNDER THE PLAN** | 39 |
| A. | | Introduction | 39 |
| B. | | Classification of Claims and Equity Interests | 39 |
| C. | | Treatment of Unclassified Claims Under the Plan | 40 |
| | 1. | Treatment of Allowed Administrative Claims | 41 |
| | 2. | Treatment of Allowed Priority Tax Claims | 43 |
| D. | | Treatment of Classified Claims and Equity Interests Under the Plan | 43 |
| | 1. | Treatment of Allowed Lender Secured Claims (Class 1) | 43 |
| | 2. | Treatment of Allowed Other Secured Claims (Class 2) | 45 |
| | 3. | Treatment of Allowed Priority Non-Tax Claims (Class 3) | 46 |
| | 4. | Treatment of Allowed General Unsecured Claims (Class 4) | 46 |
| | 5. | Treatment of Equity Interests (Class 5) | 48 |
| E. | | Distributions Only on Account of Allowed Claims | 48 |

IX.     **MEANS FOR IMPLEMENTATION OF THE PLAN** ................................................ 49

     A.     Creation, Funding and Administration of Creditor Trust ................................... 49

     B.     Wind-Up and Termination of Debtor ................................................................ 53

     C.     Incorporation of Mediated Settlement Agreement and Mediated Settlement Order ........ 53

     D.     Cancellation of Notes and Instruments; Release of Liens ................................. 53

     E.     Preservation of Causes of Action ...................................................................... 53

     F.     Termination of Pension Plan .............................................................................. 54

X.     **LEGAL PROCEEDINGS AFFECTING THE DEBTOR AND ESTATE** ............................ 55

     A.     Litigation Pending as of the Petition Date ........................................................ 55

     B.     Post-Petition Litigation ..................................................................................... 56

     C.     Potential Litigation ........................................................................................... 56

          1.     Avoidance Causes of Action ................................................................. 57

          2.     Collection Causes of Action ................................................................. 57

          3.     Lien Dispute Causes of Action ............................................................. 58

          4.     Claims Objections and Offsetting Causes of Action ............................. 58

          5.     Notice of Preservation of Causes of Action .......................................... 58

XI.     **OTHER SIGNIFICANT PLAN PROVISIONS** ............................................................ 58

     A.     Treatment of Executory Contracts and Unexpired Leases ................................. 58

     B.     Distributions Under the Plan ............................................................................. 59

          1.     Distributions Made to Holders as of Distribution Record Date ............. 59

          2.     Interim and Final Distributions of Net Available Funds ....................... 59

          3.     Conditions to Distributions, Warranty of Entitlement, and Withholding ........... 61

          4.     Setoffs ................................................................................................. 61

          5.     Establishment of Reserves Under the Plan ........................................... 61

          6.     Undeliverable and Unclaimed Distributions ........................................ 62

          7.     Disputed Distributions ......................................................................... 63

          8.     De Minimis Distributions ..................................................................... 63

     C.     Means for Resolving Disputed Claims .............................................................. 63

     D.     Conditions to Confirmation and Effectiveness of the Plan ................................ 64

     E.     Effects of Confirmation of the Plan; Injunction and Exculpation ...................... 64

          1.     Binding Effect of Plan .......................................................................... 64

          2.     Vesting of Assets .................................................................................. 65

          3.     Injunction Against Interference with Plan ............................................ 65

          4.     Exculpation .......................................................................................... 65

     F.     Modification of the Plan ................................................................................... 65

     G.     Retention of Jurisdiction ................................................................................... 65

XII.     **COMPARISON OF PLAN TO ALTERNATIVES** ....................................................... 66

     A.     Chapter 7 Liquidation ...................................................................................... 66

     B.     Alternative Plans .............................................................................................. 67

     C.     Dismissal .......................................................................................................... 67

XIII.     **MATERIAL UNCERTAINTIES AND RISKS** ........................................................... 67

XIV.     **CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN** ...................... 68

     A.     Introduction ...................................................................................................... 68

     B.     Federal Income Tax Consequences to the Debtor ............................................. 69

     C.     Federal Income Tax Consequences Associated with Creation of Creditor Trust ............. 69

     D.     Additional Federal Income Tax Consequences to Creditors .............................. 70

|   | E. | Tax Withholding | 70 |
|---|----|-----------------|----|
|   | F. | Disclaimers | 70 |

**XV.**     **CONCLUSION** ............................................................................................................ 71

<u>**EXHIBITS**</u>

| | |
|---|---|
| **Exhibit A**: | Debtor's and Official Unsecured Creditors' Committee's Second Amended Joint Plan of Liquidation Under Chapter 11 of the United States Bankruptcy Code |
| **Exhibit B**: | Unaudited Balance Sheet of the Debtor as of November 30, 2009 |
| **Exhibit C**: | Amended Joint Motion of the Debtor and Committee for Entry of Order Approving Mediated Settlement |

# INTRODUCTORY DISCLOSURES

THIS DISCLOSURE STATEMENT, WHICH HAS BEEN JOINTLY FILED BY PAUL REINHART, INC. (THE "DEBTOR") AND THE OFFICIAL UNSECURED CREDITORS' COMMITTEE (THE "COMMITTEE," AND TOGETHER WITH THE DEBTOR THE "PLAN PROPONENTS"), CONTAINS A SUMMARY OF MATERIAL PROVISIONS OF THE DEBTOR'S AND OFFICIAL UNSECURED CREDITORS' COMMITTEE'S SECOND AMENDED JOINT PLAN OF LIQUIDATION UNDER CHAPTER 11 OF THE UNITED STATES BANKRUPTCY CODE (THE "PLAN"), INCLUDING PROVISIONS RELATING TO THE PLAN'S TREATMENT OF CLAIMS AGAINST AND EQUITY INTERESTS IN THE DEBTOR, RELATING TO IMPLEMENTATION OF THE MEDIATED SETTLEMENT REACHED AMONG THE PLAN PROPONENTS AND CERTAIN OTHER KEY PARTIES TO THE BANKRUPTCY CASE, AND RELATING TO THE MEANS OF IMPLEMENTATION OF THE PLAN. THE DISCLOSURE STATEMENT ALSO SUMMARIZES CERTAIN FINANCIAL INFORMATION CONCERNING THE DEBTOR AND THE CLAIMS ASSERTED AGAINST THE DEBTOR IN ITS BANKRUPTCY CASE. WHILE THE PLAN PROPONENTS BELIEVE THAT THE DISCLOSURE STATEMENT CONTAINS ADEQUATE INFORMATION WITH RESPECT TO THE DOCUMENTS AND INFORMATION SUMMARIZED, CREDITORS AND EQUITY INTEREST HOLDERS SHOULD REVIEW THE ENTIRE PLAN AND EACH OF THE DOCUMENTS REFERENCED HEREIN, AND SHOULD SEEK THE ADVICE OF THEIR OWN COUNSEL AND OTHER ADVISORS BEFORE CASTING THEIR BALLOTS ON THE PLAN.

EXCEPT FOR THE INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT AND THE EXHIBITS ATTACHED HERETO, NO REPRESENTATIONS CONCERNING THE DEBTOR, THE DEBTOR'S ASSETS AND LIABILITIES, THE PAST OR FUTURE OPERATIONS OF THE DEBTOR, THE PLAN AND ITS TERMS, OR ALTERNATIVES TO THE PLAN ARE AUTHORIZED, NOR ARE ANY SUCH REPRESENTATIONS TO BE RELIED UPON IN ARRIVING AT A DECISION WITH RESPECT TO THE PLAN. ANY INFORMATION WITH RESPECT TO SUCH TOPIC AREAS THAT IS PROVIDED TO SECURE ACCEPTANCE OR REJECTION OF THE PLAN AND THAT IS NOT CONTAINED IN THIS DISCLOSURE STATEMENT AND THE EXHIBITS ATTACHED HERETO IS UNAUTHORIZED AND SHOULD BE REPORTED IMMEDIATELY TO THE PLAN PROPONENTS' COUNSEL.

STATEMENTS AND FINANCIAL INFORMATION CONCERNING THE DEBTOR HEREIN, INCLUDING, WITHOUT LIMITATION, HISTORICAL INFORMATION, INFORMATION REGARDING THE DEBTOR'S ASSETS AND LIABILITIES, AND INFORMATION REGARDING CLAIMS AND EQUITY INTEREST ASSERTED OR OTHERWISE EVIDENCED IN THE BANKRUPTCY CASE, HAVE BEEN DERIVED FROM NUMEROUS SOURCES INCLUDING, WITHOUT LIMITATION, THE DEBTOR'S BOOKS AND RECORDS, THE DEBTOR'S SCHEDULES, AND COURT RECORDS. WHILE THE COMMITTEE PARTICIPATED IN THE PREPARATION OF THE DISCLOSURE STATEMENT, HISTORICAL AND FINANCIAL INFORMATION REGARDING THE DEBTOR WAS PREPARED BY THE DEBTOR, AND THE COMMITTEE IS NOT REPONSIBLE FOR THE ACCURACY OR COMPLETENESS OF SUCH HISTORICAL AND FINANCIAL INFORMATION. AND WHILE THE DEBTOR REASONABLY BELIEVES THAT THE HISTORICAL AND FINANCIAL INFORMATION SET FORTH HEREIN IS ACCURATE, COMPLETE AND RELIABLE, THE DEBTOR AND ITS PROFESSIONALS HAVE NOT TAKEN ANY INDEPENDENT ACTION TO VERIFY THE ACCURACY, COMPLETENESS OR RELIABILITY OF SUCH HISTORICAL INFORMATION AND THERE HAS BEEN NO INDEPENDENT AUDIT OF THE FINANCIAL INFORMATION CONTAINED IN THIS

DISCLOSURE STATEMENT. THEREFORE, NEITHER THE PLAN PROPONENTS NOR THEIR RESPECTIVE PROFESSIONALS WARRANT OR REPRESENT THAT THE INFORMATION CONTAINED HEREIN IS COMPLETE, ACCURATE AND RELIABLE. HOWEVER, THE PLAN PROPONENTS HAVE REVIEWED THE INFORMATION SET FORTH HEREIN AND, BASED UPON THE SOURCES OF INFORMATION AVAILABLE TO THEM, GENERALLY BELIEVE SUCH INFORMATION TO BE COMPLETE.

UNLESS INDICATED OTHERWISE, THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE AS OF DECEMBER 22, 2009, AND NEITHER DELIVERY OF THIS DISCLOSURE STATEMENT NOR ANY EXCHANGE OF RIGHTS MADE IN CONNECTION WITH THE PLAN SHALL, UNDER ANY CIRCUMSTANCES, CREATE AN IMPLICATION THAT THERE HAS BEEN NO CHANGE IN THE INFORMATION SET FORTH HEREIN SINCE THE DATE THE DISCLOSURE STATEMENT AND THE MATERIALS RELIED UPON IN THE PREPARATION OF THE DISCLOSURE STATEMENT WERE COMPILED.

THIS DISCLOSURE STATEMENT MAY NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN TO DETERMINE WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN. THIS DISCLOSURE STATEMENT CONTAINS PROJECTED FINANCIAL INFORMATION REGARDING THE DEBTOR, RECOVERIES UNDER THE PLAN, AND CERTAIN OTHER FORWARD-LOOKING STATEMENTS, ALL OF WHICH ARE BASED UPON VARIOUS ASSUMPTIONS AND ESTIMATES AS OF DECEMBER 22, 2009 OR SUCH OTHER TIME AS IS SPECIFIED. SUCH INFORMATION WILL NOT BE UPDATED TO REFLECT EVENTS OCCURRING AFTER SAID DATE(S), AND SUCH INFORMATION IS SUBJECT TO INHERENT UNCERTAINTIES AND TO A WIDE VARIETY OF SIGNIFICANT BUSINESS, ECONOMIC AND COMPETITIVE RISKS. CONSEQUENTLY, ACTUAL EVENTS, CIRCUMSTANCES, EFFECTS AND RESULTS MAY VARY SIGNIFICANTLY FROM THOSE INCLUDED IN OR CONTEMPLATED BY SUCH PROJECTED FINANCIAL INFORMATION AND SUCH OTHER FORWARD-LOOKING STATEMENTS.

THE APPROVAL OF THIS DISCLOSURE STATEMENT BY THE BANKRUPTCY COURT DOES NOT CONSTITUTE AN ENDORSEMENT BY THE BANKRUPTCY COURT OF THE PLAN OR A GUARANTY OF THE ACCURACY AND COMPLETENESS OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT.

ANY INFORMATION PROVIDED IN THE DISCLOSURE STATEMENT BY THE BANK AGENT AND/OR LENDERS SHOULD NOT BE RELIED UPON UNLESS SUCH INFORMATION HAS BEEN INDEPENDENTLY VERIFIED. NOTHING CONTAINED IN THIS DISCLOSURE STATEMENT SHALL HAVE ANY PRECLUSIVE EFFECT AGAINST THE BANK AGENT OR LENDERS (WHETHER BY WAIVER, ADMISSION, ESTOPPEL OR OTHERWISE) IN ANY CAUSE OR PROCEEDING WHICH MAY EXIST OR OCCUR IN THE FUTURE. THIS DISCLOSURE STATEMENT SHALL NOT BE CONSTRUED OR DEEMED TO CONSTITUTE AN ACCEPTANCE OF FACT OR AN ADMISSION BY THE BANK AGENT OR LENDERS IN REGARDS TO ANY OF THE STATEMENTS CONTAINED OR MADE HEREIN, AND ALL RIGHTS AND REMEDIES OF THE BANK AGENT AND LENDERS ARE EXPRESSLY RESERVED IN THIS REGARD.

NOTHING CONTAINED IN THIS DISCLOSURE STATEMENT, EXPRESS OR IMPLIED, IS INTENDED TO GIVE RISE TO ANY COMMITMENT OR OBLIGATION OF THE DEBTOR, THE COMMITTEE, OR ANY OTHER PARTY, NOR SHALL IT BE CONSTRUED AS CONFERRING UPON ANY PERSON ANY RIGHTS, BENEFITS OR REMEDIES OF ANY

**NATURE WHATSOEVER. THE DISCLOSURE STATEMENT IS INFORMATIONAL ONLY. ADDITIONALLY, CREDITORS AND EQUITY INTEREST HOLDERS SHOULD NOT CONSTRUE THE CONTENTS OF THIS DISCLOSURE STATEMENT AS PROVIDING ANY LEGAL, BUSINESS, FINANCIAL OR TAX ADVICE. EACH CREDITOR AND EQUITY INTEREST HOLDER SHOULD CONSULT WITH ITS OWN LEGAL, BUSINESS, FINANCIAL AND TAX ADVISORS AS TO ANY MATTER CONCERNING THE PLAN, THE EFFECTS OF IMPLEMENTATION OF THE PLAN, AND THE VOTING PROCEDURES APPLICABLE TO THE PLAN.**

**JOINT DISCLOSURE STATEMENT PURSUANT TO 11 U.S.C. § 1125 IN SUPPORT OF DEBTOR'S AND OFFICIAL UNSECURED CREDITORS' COMMITTEE'S SECOND AMENDED JOINT PLAN OF LIQUIDATION UNDER CHAPTER 11 OF THE UNITED STATES BANKRUPTCY CODE**

# I.
## INTRODUCTION

On October 15, 2008, Paul Reinhart, Inc. (the "Debtor")[1] filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code, thereby initiating Case No. 08-35283-HDH-11 (the "Bankruptcy Case") with the United States Bankruptcy Court for the Northern District of Texas (the "Bankruptcy Court"). Since the inception of the Bankruptcy Case, the Debtor has been operating and managing its business and properties as a debtor in possession. On October 28, 2008, the Official Unsecured Creditors' Committee (the "Committee"), comprised of nine (9) members, was appointed in the Bankruptcy Case to represent the common interests of all unsecured creditors.

On December 29, 2009, the Debtor and the Committee (together, the "Plan Proponents") filed the Debtor's and Official Unsecured Creditors' Committee's Second Amended Joint Plan of Liquidation Under Chapter 11 of the United States Bankruptcy Code (the "Plan"). The Plan proposes, among other things, the means by which all Claims against and Equity Interests in the Debtor will be finally resolved and treated for distribution purposes, consistent with the provisions and priorities mandated by the Bankruptcy Code. Approval and consummation of the Plan will enable the Bankruptcy Case to be concluded and closed.

The Plan Proponents hereby submit this Joint Disclosure Statement Pursuant to 11 U.S.C. § 1125 in Support of Debtor's and Official Unsecured Creditors' Committee's Second Amended Joint Plan of Liquidation Under Chapter 11 of the United States Bankruptcy Code (the "Disclosure Statement") in connection with the solicitation of votes on the Plan. On _____, 2010, after notice and a hearing, the Bankruptcy Court, The Honorable Harlin D. Hale presiding, signed an order approving the Disclosure Statement as containing information of a kind and in sufficient detail, to enable Creditors and Equity Interest holders whose votes on the Plan are being solicited to make an informed judgment on whether to accept or reject the Plan. The Bankruptcy Court's approval of the Disclosure Statement does not constitute the Court's approval or disapproval of the Plan.

The Disclosure Statement, which includes the Plan as **Exhibit A**, is being mailed to each holder of a Claim against and each holder of an Equity Interest in the Debtor. However, the Plan Proponents are only seeking votes on the Plan from Creditors and Equity Interest holders who are entitled to vote. With respect to voting on the Plan, pursuant to the Bankruptcy Code only those Creditors holding Claims, and those Equity Interest holders holding Equity Interests, within impaired Classes under the Plan are entitled to vote.

The Plan Proponents believe that they have promulgated the Plan consistent with the provisions of the Bankruptcy Code. The Plan Proponents believe that the Plan provides affected Creditors and Equity Interest holders distribution rights on account of their Claims and Equity Interests which are at least equal to, if not greater than, what they would obtain if the Bankruptcy Case were converted to a Chapter 7 liquidation and assets of the Debtor were liquidated within the parameters of Chapter 7 of the Bankruptcy Code. The Plan Proponents believe that the Plan is fair and equitable to all Classes of Claims and Equity Interests under the Plan.

---

[1] Capitalized terms used herein, if not separately defined, have the meanings assigned to them in the Plan, or if not defined in the Plan, then in the Bankruptcy Code or Bankruptcy Rules.

This Disclosure Statement is not intended to replace careful review and analysis of the Plan. Rather, it is submitted as an aid and supplement in your review of the Plan, and attempts to explain the terms and implications of the Plan. Every effort has been made to fully explain the various aspects of the Plan as it may affect Creditors and Equity Interest holders. All Persons receiving this Disclosure Statement are urged to review all of the exhibits to this Disclosure Statement, in addition to reviewing the text of this Disclosure Statement. If you have any questions, you may contact the Debtor's counsel and/or the Committee's counsel, and every effort will be made to assist you.

Creditors and Equity Interest holders should read this Disclosure Statement in its entirety prior to voting on the Plan. No solicitation of votes on the Plan may be made except pursuant to this Disclosure Statement and Section 1125 of the Bankruptcy Code. No other party has been authorized to utilize any information concerning the Debtor, its operations, and its assets and liabilities, other than the information contained in this Disclosure Statement, to solicit votes on the Plan. Creditors and Equity Interest holders should not rely on any information relating to the Debtor, its operations, or its assets and liabilities, other than the information contained in this Disclosure Statement and the exhibits attached hereto.

## II.
## PLAN OVERVIEW

The Plan is designed to accomplish five primary objectives: (a) the liquidation of all remaining assets of the Debtor's Estate; (b) consummation of the Mediated Settlement entered into by the Debtor, PRAI, PRAG, PRAI-Texas, the Committee, the Bank Group, the East Plaintiffs and CoMark; (c) the orderly determination of Disputed Claims in the Bankruptcy Case; and (d) the making of distributions to holders of Allowed Claims consistent with the priorities mandated by the Bankruptcy Code. The Plan specifies the means for accomplishing each of these objectives, and pertinent provisions of the Plan in relation thereto are described in detail in this Disclosure Statement.

Focusing on distributions to be made to Creditors and Equity Interest holders under the Plan, the Plan divides Claims against and Equity Interests in the Debtor into separate Classes of Claims[2] and Equity Interests, and then sets out the treatment to be provided to each such Class under the Plan. Sections 1122 and 1123 of the Bankruptcy Code require such classification, with each Class to contain Claims or Equity Interests that are substantially similar to one another. The Plan Proponents have classified Claims against the Debtor into four (4) Classes for purposes of voting on and distributions under the Plan. There is a single Class of Equity Interests for purposes of voting on and distributions under the Plan. The various Classes of Claims and Equity Interests and the treatment provided under the Plan to each such Class are discussed in greater detail in later sections of the Disclosure Statement.

The following table sets out the Debtor's estimate of the number of Claims and Equity Interests per Class, an estimate of the total liquidated amount of Claims and Equity Interests falling within each Class (as asserted or scheduled), and a summary of the treatment afforded to each Class under the Plan. The information set forth within the table is qualified in its entirety by the more detailed information regarding the Plan set forth in this Disclosure Statement, the exhibits hereto (including the Plan itself), and the additional disclosures which follow the table.

---

[2] There are two exceptions to the classification of Claims. Because Administrative Claims and Priority Tax Claims are subject to mandatory treatment under the Bankruptcy Code, they are not subject to classification.

| SUMMARY OF TREATMENT OF CLASSES UNDER THE PLAN | | |
|---|---|---|
| **Class** | **Estimated Amounts of Claims and Equity Interests per Class** | **Treatment Under Plan** |
| Unclassified – Allowed Administrative Claims | Est. No. of Pending Claims: 7<br>Est. Amt. of Pending Claims: $2,013,887 (see notes)<br>Est. Amt. of Allowable Claims: *See* description of Plan treatment for Allowed Administrative Claims | Paid in full within 15 days of the later of the Effective Date or the date on which Allowed.<br>**Est. recovery: 100%** |
| Unclassified – Allowed Priority Tax Claims | Est. No. of Pending Claims: 11<br>Est. Amt. of Pending Claims: $22,909<br>Est. Amt. of Allowable Claims: $13,284 | Paid in full within 15 days of the later of the Effective Date or the date on which Allowed.<br>**Est. recovery: 100%** |
| 1 – Allowed Lender Secured Claims | Est. No. of Pending Claims: 2<br>Est. Amt. of Pending Claims: $157,633,023<br>Est. Amt. of Allowable Claims: *See* description of Plan treatment for Class 1 | The following distributions will be made to the Bank Agent who will then have the responsibility of making further disbursements in accordance with the terms and conditions of the Loan Documents, the Cash Collateral Order, and any other applicable Final Order of the Bankruptcy Court: (a) all Lender Collateral in the form of Cash within 15 days of the Effective Date; and (b) Net Available Lender Collateral Proceeds, as available for distribution.<br>**Est. recovery: 100%** |
| 2 – Allowed Other Secured Claims | Est. No. of Pending Claims: 1<br>Est. Amt. of Pending Claims: $26,307<br>Est. Amt. of Allowable Claims: $0 | Each Allowed Other Secured Claim will be satisfied, within 15 days of the later of the Effective Date or the date on which Allowed, in one of the following ways (at the option of the Trustee of the Creditor Trust): (i) paid in full; (ii) if not in default, assumed by the Creditor Trust without impairment to the holder's legal, equitable and contractual rights; (iii) if in default, reinstated (subject to cure and compensation for any damages and pecuniary loss required to be paid) and assumed by the Creditor Trust without impairment to the holder's legal, equitable and contractual rights.<br>**Est. recovery: 100%** |
| 3 – Allowed Priority Non-Tax Claims | Est. No. of Pending Claims: 35<br>Est. Amt. of Pending Claims: $42,411<br>Est. Amt. of Allowable Claims: $0 | Paid in full within 15 days of the later of the Effective Date or the date on which Allowed.<br>**Est. recovery: 100%** |
| 4 – Allowed General Unsecured Claims | Est. No. of Pending Claims: 487<br>Est. Amt. of Pending Claims: $146,399,250<br>Est. Amt. of Allowable Claims: *See* description of Plan treatment for Class 4 | The following distributions will be made after satisfaction of (or reserve for) Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Other Secured Claims, and Allowed Priority Non-Tax Claims: (a) a Pro Rata Share of Net Available General Trust Funds, as available for distribution, to each holder of an Allowed General Unsecured Claim; (b) a Pro Rata Share of Net Available Lender Settlement Trust Funds, as available for distribution, to each holder of an Allowed General Unsecured Claim who has executed and delivered a Settlement Release to the Bank Agent or prior to the Settlement Release Deadline; and (c) a Pro Rata Share of Net Available Other Settlement Trust Funds, as available for distribution, to each holder of an Allowed General Unsecured Claim who has not timely made the Settlement Opt-Out Election.<br>**Est. recovery: 16.3%-25.8%** |
| 5 – Equity Interests | Est. No. of Equity Interest holders: 1<br>Est. No. of Equity Interests: 5,000,000<br>Est. Allowable Equity Interests: 5,000,000 | Cancelled, extinguished and otherwise rendered null, void and of no further force or effect<br>**Est. recovery: 0%** |

## Factors and Assumptions Applied in Arriving at Estimates

The estimated numbers and amounts of Claims per Class in the foregoing table have been derived from the Debtor's Schedules and proofs of claim filed by Creditors in the Bankruptcy Case, as reconciled with the Debtor's books and records and certain other records obtained by the Debtor in relation thereto. With respect to Claims asserted in the Bankruptcy Case, at least 469 proofs of claim have been filed asserting Claims in the aggregate amount of approximately $305,841,781.[3] In addition to proofs of claim filed in the Bankruptcy Case, the Debtor's Schedules in the Bankruptcy Case list Claims which the Debtor believed to be validly-existing against it as of the Petition Date. For those Claimants listed on the Schedules who have also filed proofs of claim in the Bankruptcy Case, applicable Bankruptcy Rules provide that the proofs of claim have superseded any amounts reflected in the Schedules. To the extent Claims scheduled by the Debtor have not been superseded by proofs of claim, the estimates in the foregoing table take into account Claims scheduled by the Debtor in a liquidated, non-contingent and undisputed amount. Excluding duplicate proofs of claim, proofs of claim that have been amended, and unliquidated Claims, the total amount of filed and scheduled Claims pending in the Bankruptcy Case, as of the date hereof, is approximately $304,600,052. The following additional information is provided in relation to the estimated numbers and amounts of Administrative Claims and Priority Tax Claims:

- • Allowed Administrative Claims. The estimated number of pending Claims in the table above for Unclassified-Allowed Administrative Claims (7 total) contemplates the assertion of Administrative Claims by each of the 5 court-approved estate professionals in the Bankruptcy Case. However, the estimated amount of pending Administrative Claims in the table does not include any estimate of the amount of unpaid fees and expenses that such professionals are likely to incur through the projected Effective Date of the Plan. Such estimate is discussed below in connection with the description of the Plan treatment provided for Allowed Administrative Claims.

- • Allowed Priority Tax Claims. Certain Claims asserted by taxing authorities have been filed as Secured Claims and, only in the alternative, as Priority Tax Claims. Notwithstanding the assertion of such Claims as Secured Claims in the first instance, such Claims have been classified under the Plan for all purposes as Priority Tax Claims. Accordingly, such Claims have been reflected in the table above as Priority Tax Claims and not as Secured Claims.

With respect to the estimated amount of Allowed Claims per Class, the estimates reflected in the table above (or alternatively in the Class descriptions below) constitute the Debtor's best estimate of allowable Claims on a per Class basis as of the projected Effective Date. For Claims asserted by proofs of claim, the amounts reflected take into account the anticipated disallowance of such Claims to the extent they are disputed or the Debtor has been unable to otherwise reconcile them to the Debtor's Schedules, books and records, or otherwise. Any Claim which is a Disputed Claim may be disallowed or reduced in amount if an objection has been, or is timely hereafter, filed and sustained by the Bankruptcy Court. Because the resolution of Disputed Claims involves many factual and legal issues which may or may not be resolved as anticipated by the Debtor, no assurance can be given that the anticipated amount of allowable Claims in each Class will be achieved, and the foregoing estimates shall not be deemed as an admission on the part of the Plan Proponents to the validity of any Claim. Similarly, the projected recovery levels reflected in the table above are estimates only, there is no guaranty that such levels of recovery will be achieved, and such estimates shall not constitute an admission on the part of the Plan Proponents to the validity of any Disputed Claims. Except as otherwise provided in the Plan, all objections and other defenses to Disputed Claims are preserved under the Plan. Additional information with respect to estimated allowable Claims and recoveries per Class is provided below in Section VIII of the Disclosure Statement.

---

[3] Such total includes amounts asserted pursuant to proofs of claim which the Debtor believes to be duplicative, in whole or in part, of other proofs of claim. Additionally, certain proofs of claim have been asserted, in whole or in part, in an unliquidated amount, and the estimate set forth above only includes the liquidated amount of such Claims.

<strong>III.</strong><br/>
<strong><u>VOTING PROCEDURES AND REQUIREMENTS</u></strong>

**A.      Ballots and Voting Deadline**

Each Creditor holding a Claim which entitles the Creditor to vote on the Plan has been provided a Ballot along with this Disclosure Statement.  If a Creditor holds Claims in more than one Class entitled to vote under the Plan, such Creditor has been provided a separate Ballot for each such Class.  The Ballot is to be used by the Creditor to accept or reject the Plan.

To ensure that a Ballot is deemed timely and considered by the Balloting Agent, a Creditor must (a) carefully review the Ballot and the instructions set forth thereon, (b) provide all of the information requested on the Ballot, (c) sign the Ballot, and (d) return the completed and signed Ballot to the Balloting Agent by the Voting Deadline.

By order of the Bankruptcy Court, the Voting Deadline is 5:00 p.m. (prevailing Central Time), on _____, 2010.  Therefore in order for a Ballot to be counted for voting purposes, the completed and signed Ballot must be received at the address specified below by no later than such Voting Deadline:

<strong>DEADLINE</strong>:  Must Be <strong><u>Received</u></strong> By 5:00 p.m. (prevailing Central Time),<br/>
on _____, 2010

<strong><u>Addressed To</u></strong>:<br/>
Grant Thornton LLP<br/>
Attn: John D. Bittner<br/>
1717 Main Street, Suite 1500<br/>
Dallas, Texas 75201<br/>
Fax: (214) 561-2370

**B.      Creditors Solicited to Vote**

Each Creditor holding a Claim in a Class which is impaired under the Plan is being solicited to vote on the Plan.  As to any Claim for which a proof of claim was filed and as to which an objection has been lodged, however, if such objection is still pending as of the Voting Deadline, the Creditor's vote associated with such Claim will not be counted to the extent of the objection to the Claim, unless and to the extent the Bankruptcy Court temporarily allows the Claim upon motion by such Creditor in an amount which the Bankruptcy Court deems proper for the purpose of voting on the Plan.  Such motion must be heard and determined by the Bankruptcy Court prior to the date and time established by the Bankruptcy Court for determination of confirmation of the Plan.  In addition, a Creditor's vote may be disregarded if the Bankruptcy Court determines that the Creditor's acceptance or rejection of the Plan was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.

**C.      Definition of Impairment**

Pursuant to Section 1124 of the Bankruptcy Code, except to the extent that the holder of a particular claim or equity interest within a class agrees to less favorable treatment of the holder's claim or equity interest, a class of claims or equity interests is impaired under a plan unless, with respect to each claim or equity interest of such class, the plan does at least one of the following two (2) things:

1.      The plan leaves unaltered the legal, equitable, and contractual rights to which such claim or equity interest entitles the holder of such claim or equity interest; or

2.  Notwithstanding any contractual provision or applicable law that entitles the holder of such claim or equity interest to demand or receive accelerated payment of such claim or equity interest after the occurrence of a default, the plan:

(a)  cures any such default that occurred before or after the commencement of the case under the Bankruptcy Code, other than a default of a kind specified in Section 365(b)(2) of the Bankruptcy Code or of a kind that Section 365(b)(2) expressly does not require to be cured;

(b)  reinstates the maturity of such claim or equity interest as such maturity existed before such default;

(c)  compensates the holder of such claim or equity interest for any damages incurred as a result of any reasonable reliance by such holder on such contractual provision or such applicable law;

(d)  if such claim or such equity interest arises from any failure to perform a nonmonetary obligation, other than a default arising from failure to operate a nonresidential real property lease subject to Section 365(b)(1)(A) of the Bankruptcy Code, compensates the holder of such claim or equity interest (other then the debtor or an insider) for any actual pecuniary loss incurred by such holder as a result of such failure; and

(e)  does not otherwise alter the legal, equitable, or contractual rights to which such claim or equity interest entitles the holder of such claim or equity interest.

## D.  Classes Impaired Under the Plan

Classes 1 and 4 of the Plan are impaired Classes of Claims under the Plan; therefore, holders of Claims within such Classes are being solicited to vote on the Plan. The remaining Classes of Claims (Classes 2 and 3) are unimpaired under the Plan; therefore, such Classes are deemed to have accepted the Plan pursuant to Section 1126(f) of the Bankruptcy Code and Creditors holding Claims within such Classes are not being solicited to vote on the Plan.

Class 5 of the Plan, the sole Class of Equity Interests under the Plan, is also impaired. Because the Plan does not provide for the holders of Equity Interests in Class 5 to receive or retain any property under the Plan, however, Class 5 is deemed to have rejected the Plan pursuant to Section 1126(g) of the Bankruptcy Code and holders of Equity Interests within such Class are not being solicited to vote on the Plan.

With respect to the foregoing, the Plan Proponents specifically reserve the right to determine and contest, if necessary, (a) the impaired or unimpaired status of a Class under the Plan; and (b) whether any Ballots cast by Creditors holding Claims within such a Class should be counted for purposes of confirmation of the Plan.

## E.  Vote Required for Class Acceptance

Pursuant to Section 1126(c) of the Bankruptcy Code, a Class of Claims under the Plan shall be deemed to have accepted the Plan if the Plan is accepted by Creditors holding at least two-thirds (2/3) in amount and more than one-half (1/2) in number of the Claims within such Class who are entitled to vote and who actually vote using a properly completed and signed Ballot which is returned to the Balloting Agent by no later than the Voting Deadline.

Pursuant to Section 1126(e) of the Bankruptcy Code, on request of a party in interest in the Bankruptcy Case, and after notice and a hearing, the Bankruptcy Court may designate the vote of any Creditor whose acceptance or rejection of the Plan was not in good faith, or was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.

## IV.
## CONFIRMATION OF THE PLAN

### A.    Confirmation Hearing

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a hearing on confirmation of the Plan (the "Confirmation Hearing"). Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to confirmation of the Plan.

By order of the Bankruptcy Court entered on _____, 2010, the Confirmation Hearing has been scheduled for _____, 2010, at _____ ____.m. (prevailing Central Time), in the United States Bankruptcy Court, Courtroom of The Honorable Harlin D. Hale, 1100 Commerce Street, 14th Floor, Dallas, Texas 75242. Any objection to confirmation must be made in writing, and such written objection must be filed with the Bankruptcy Court and served on the following parties by no later than _____, 2010:

Debtor:
Paul Reinhart, Inc.
Attn: R. Dale Grounds
2280 Campbell Creek Blvd., Suite 350
Richardson, Texas 75082
Facsimile: (972) 301-3283

Counsel for the Debtor:
Munsch Hardt Kopf & Harr, P.C.
Attn: E. Lee Morris
500 N. Akard Street, Suite 3800
Dallas, Texas 75201-6659
Facsimile: (214) 855-7584

Committee:
Official Unsecured Creditors' Committee
Attn: Michael D. East, Chairman
35 Alta Vista Cove
Marion, Arkansas 72364
Facsimile: (870) 739-3054

Counsel for Committee:
Rochelle McCullough LLP
Attn: Michael R. Rochelle
325 N. St. Paul, Suite 4500
Dallas, Texas 75201
Facsimile: (214) 953-0185

United States Trustee:
Office of United States Trustee
Attn: George F. McElreath
1100 Commerce Street, Room 976
Dallas, Texas 75242
Facsimile: (214) 767-8971

**UNLESS AN OBJECTION TO CONFIRMATION IS TIMELY FILED AND SERVED, IT WILL NOT BE CONSIDERED BY THE BANKRUPTCY COURT**.

### B.    Requirements for Confirmation of the Plan

At the Confirmation Hearing, the Bankruptcy Court will determine whether the confirmation requirements of Section 1129(a) of the Bankruptcy Code have been satisfied. Only in the event that all of these requirements have been satisfied, and that all other conditions to confirmation set forth in the Plan

have been met, will the Bankruptcy Court enter an order confirming the Plan under Section 1129(a). The requirements of Section 1129(a) applicable to corporate debtors are as follows:

1.  The plan complies with the applicable provisions of the Bankruptcy Code.

2.  The proponent of the plan complies with the applicable provisions of the Bankruptcy Code.

3.  The plan has been proposed in good faith and not by any means forbidden by law.

4.  Any payment made or to be made by the proponent, by the debtor, or by a person issuing securities or acquiring property under the plan, for services or for costs and expenses in or in connection with the case, or in connection with the plan and incident to the case, has been approved by, or is subject to the approval of, the court as reasonable.

5.  The proponent of the plan has disclosed:

    (a) the identity and affiliations of any individual proposed to serve, after confirmation of the plan, as a director, officer, or voting trustee of the debtor, an affiliate of the debtor participating in a joint plan with the debtor, or a successor to the debtor under the plan, and the appointment to, or continuance in, such office of such individual, is consistent with the interests of creditors and equity interest holders and with public policy; and

    (b) the identity of any insider that will be employed or retained by the reorganized debtor, and the nature of any compensation for such insider.

6.  Any governmental regulatory commission with jurisdiction, after confirmation of the plan, over the rates of the debtor has approved any rate change provided for in the plan, or such rate change is expressly conditioned on such approval.

7.  With respect to each impaired class of claims or equity interests:

    (a) each holder of a claim or equity interest of such class has accepted the plan or will receive or retain under the plan on account of such claim or equity interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under Chapter 7 of the Bankruptcy Code on such date; or

    (b) if Section 1111(b)(2) of the Bankruptcy Code applies to the claims of such class, each holder of a claim of such class will receive or retain under the plan on account of such claim property of a value, as of the effective date of the plan, that is not less than the value of such holder's interest in the estate's interest in the property that secures such claims.

8.  With respect to each class of claims or equity interests, such class has accepted the plan or such class is not impaired under the plan.

9.  Except to the extent that the holder of a particular claim has agreed to a different treatment of such claim, the plan provides that:

    (a) with respect to a claim of a kind specified in Section 507(a)(2) or 507(a)(3) of the Bankruptcy Code, on the effective date of the plan, the holder of such claim will receive on account of such claim cash equal to the allowed amount of such claim;

    (b) with respect to a class of claims of a kind specified in Section 507(a)(1), 507(a)(4), 507(a)(5), 507(a)(6), or 507(a)(7) of the Bankruptcy Code, each holder of a claim of such class will receive (i) if such class has accepted the plan, deferred cash payments of a value, as of the effective date of the plan, equal to the allowed amount of such claim, or

(ii) if such class has not accepted the plan, cash on the effective date of the plan equal to the allowed amount of such claim;

(c) with respect to a claim of a kind specified in Section 507(a)(8) of the Bankruptcy Code, the holder of such claim will receive on account of such claim regular installment payments in cash (i) of a total value, as of the effective date of the plan, equal to the allowed amount of such claim, (ii) over a period ending not later than 5 years after the date of the order for relief under Section 301, 302, or 303 of the Bankruptcy Code, and (iii) in a manner not less favorable than the most favored nonpriority unsecured claim provided for by the plan (other than cash payments made to a class of creditors under Section 1122(b) of the Bankruptcy Code); and

(d) with respect to a secured claim which would otherwise meet the description of an unsecured claim of a governmental unit under Section 507(a)(8) of the Bankruptcy Code, but for the secured status of that claim, the holder of that claim will receive on account of that claim, cash payments, in the same manner and over the same period, as prescribed in paragraph 9(c) above.

10.    If a class of claims is impaired under the plan, at least one class of claims that is impaired under the plan has accepted the plan, determined without including any acceptance of the plan by any insider.

11.    Confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan.

12.    All fees payable under Section 1930 of Title 28, as determined by the court at the hearing on confirmation of the plan, have been paid or the plan provides for the payment of all such fees on the effective date of the plan.

13.    The plan provides for the continuation after its effective date of payment of all retiree benefits, as that term is defined in Section 1114 of the Bankruptcy Code, at the level established pursuant to subsection (e)(1)(B) or (g) of Section 1114 of the Bankruptcy Code, at any time prior to confirmation of the plan, for the duration of the period the debtor has obligated itself to provide such benefits.

14.    All transfers of property of the plan shall be made in accordance with any applicable provisions of nonbankruptcy law that govern the transfer of property by a corporation or trust that is not a moneyed, business, or commercial corporation or trust.

If a sufficient number of Creditors and amounts of Claims in impaired Classes under the Plan vote to accept the Plan, the Plan Proponents believe that the Plan will satisfy all of the applicable statutory requirements of Section 1129(a) of the Bankruptcy Code with the exception of the requirement set out in paragraph 8 above on account of the deemed rejection of the Plan by Class 5 (Equity Interests). As discussed below, however, the Plan Proponents nevertheless believe that the Plan may be confirmed under the "cramdown" provisions of Section 1129(b) of the Bankruptcy Code.

## C.    Cramdown

Pursuant to Section 1129(b) of the Bankruptcy Code, the Bankruptcy Court may confirm the Plan at the request of the Plan Proponents if: (a) all of the requirements of Section 1129(a) of the Bankruptcy Code, with the exception of Section 1129(a)(8) (set out in paragraph 8 above), are met with respect to the Plan; (b) at least one Class of Claims that is impaired under the Plan has accepted the Plan (excluding the

votes of insiders); and (c) with respect to each impaired Class that has not accepted the Plan, the Plan does not "discriminate unfairly" and is "fair and equitable."

A plan does not "discriminate unfairly" within the meaning of the Bankruptcy Code if the classification of claims under the plan complies with the Bankruptcy Code and no particular class will receive more than it is legally entitled to receive for its claims or equity interests.

"Fair and equitable," on the other hand, has a different meaning for classes of secured claims, classes of unsecured claims, and classes of equity interests, as described below:

With respect to a class of secured claims that rejects the plan, to be "fair and equitable" the plan must, among other things, provide:

(a) that the holders of such claims retain the liens securing such claims, whether the property subject to such liens is retained by the debtor or transferred to another entity, to the extent of the allowed amount of such claims, and that each holder of a claim of such class receive on account of such claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property;

(b) for the realization of such holders of the indubitable equivalent of such claims; or

(c) for the sale, subject to Section 363(k) of the Bankruptcy Code, of any property that is subject to the liens securing such claims, free and clear of such liens, with such liens to attach to the proceeds of such sale, and the treatment of such liens on proceeds under (a) or (b) above.

With respect to a class of unsecured claims that rejects the plan, to be "fair and equitable" the plan must, among other things, provide:

(a) that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or

(b) that the holder of any claim or equity interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or equity interest any property.

With respect to a class of equity interests that rejects the plan, to be "fair and equitable" the plan must, among other things, provide:

(a) that each holder of an equity interest of such class receive or retain on account of such equity interest property of a value, as of the effective date of the plan, equal to the greatest of the allowed amount of any fixed liquidation preference to which such holder is entitled, any fixed redemption price to which such holder is entitled, or the value of such equity interest; or

(b) that the holder of any equity interest that is junior to the equity interests of such class will not receive or retain under the plan on account of such junior equity interest any property.

In the event that at least one impaired Class of Claims under the Plan accepts the Plan, the Plan Proponents request the Bankruptcy Court to confirm the Plan in accordance with the cramdown provisions of Section 1129(b) of the Bankruptcy Code. The Plan Proponents believe that all of the requirements of Section 1129(a) of the Bankruptcy Code (with the exception of Section 1129(a)(8)) will be satisfied, that at least one Class of impaired Claims will accept the Plan (excluding the votes of insiders), and that the Plan does not unfairly discriminate against, and is fair and equitable in relation to, Class 5 (Equity Interests) and each of the other impaired Classes of Claims that may vote to reject the

Plan. The Bankruptcy Court will determine all disputes in relation to the confirmation standards of Section 1129(a) and (b).

## V.
## HISTORICAL AND BACKGROUND INFORMATION

### A. Organizational Information

The Debtor is a privately-held corporation which was organized under the laws of Texas on or about May 15, 1980, as Volkart Taylor Cooper, Inc. Pursuant to the Debtor's Articles of Incorporation, among the purposes for which the corporation was organized was to engage in the business of buying and selling cotton, both in export trade and domestic business, including contracting for future delivery thereof. By Articles of Amendment dated June 15, 1989, the Debtor changed its name to Volkart, Inc., effective as of July 1, 1989. Thereafter, by Articles of Amendment dated September 23, 1992, the Debtor again changed its name to Paul Reinhart, Inc., effective as of October 1, 1992.

Pursuant to the Articles, the Debtor has been authorized to issue, and has issued, three classes of shares of stock – designated as Class A Common Stock, Class B Common Stock and Class C Common Stock. The respective classes of shares have identical rights and privileges in every respect, except that the holders of Class A Common Stock have the exclusive right and power to elect a minimum of two (2) of the directors of the corporation and the holders of Class B Common Stock and Class C Common Stock, respectively, each have the exclusive right and power to elect one (1) of the directors of the corporation. As of the date hereof, Paul Reinhart America, Inc. ("PRAI") holds all of the issued and outstanding shares of stock in the Debtor (4,000,000 shares of Class A Common Stock; 750,000 shares of Class B Common Stock; and 250,000 shares of Class C Common Stock). PRAI, in turn, is a wholly-owned subsidiary of Paul Reinhart AG ("PRAG"), a Swiss corporation.

### B. The Debtor's Business and Operations

The Debtor is headquartered in Richardson, Texas. Since its incorporation, the Debtor has been engaged in the cotton trade business, buying and selling cotton both domestically and abroad. For a period of over twenty-five (25) years the Debtor had successfully expanded its business, and as of early 2008 was generally regarded as the fourth-largest cotton merchant in the United States and the largest seller of organic cotton worldwide.

When fully operational, the Debtor would regularly contract with farmers, farmer groups and other cotton producers primarily located in Texas, the Mississippi Delta area, and Mexico (collectively, the "Growers") to purchase all or a portion of their future crop year cotton production. Separately, the Debtor would regularly market its existing and projected cotton inventory to customers predominantly located outside of the United States, including customers in China, Mexico, Turkey, Pakistan, Thailand, Indonesia, Hong Kong, Canada, India, Guatemala, Peru, Vietnam, Bangladesh and Singapore. Approximately ninety percent (90%) of the Debtor's sales were to foreign customers as of early 2008.

In 1997, to better serve its customers in the Far East, the Debtor also organized Paul Reinhart (Australia) Pty. Ltd. ("PRAL"), an Australian corporation, as a wholly-owned subsidiary of the Debtor. PRAL purchased and sold cotton grown within Australia. On September 22, 2008, PRAL initiated its own insolvency proceeding in Australia through the appointment of joint administrators under relevant provisions of Australia's Corporation Act of 2001, and PRAL is no longer operating as a going concern.

As explained in greater detail below, the Debtor experienced significant losses as a consequence of the major disruption in the cotton futures market that occurred in March 2008. Since March 2008, the

Debtor has not engaged in any new cotton purchase transactions and its business has been focused almost exclusively on the sale of its remaining cotton inventory, the collection of outstanding receivables, and the general wind up of its remaining business affairs.

## C.     Events Leading to Chapter 11 Filing

When fully operational, the Debtor operated as a basis trader within the cotton merchant industry. In very general terms, the Debtor structured most of its purchase contracts with Growers to provide for the price to be set at a discount (basis differential) off of the futures price of cotton as listed on the ICE Futures U.S. exchange at the time of price fixation under the contracts. Once the contract price was fixed, the Debtor would customarily enter into a corresponding number of financial futures contracts (short futures contracts) to hedge against the impact of future price fluctuations in the market pending delivery of the cotton to the Debtor and the Debtor's sale of the cotton to a textile mill or other cotton purchaser. By hedging against price risk in relation to its forward purchase contracts and inventory, the Debtor was able to maintain a substantially "squared book," meaning that any loss in the value of its physical book (*i.e.* the cotton associated with such forward contracts and cotton inventory) caused by a decline in the price of cotton in the market would generally be offset by a corresponding gain in the value of its financial futures contracts, and vice versa.

Beginning in 2005, both the Debtor and PRAG maintained their respective hedging positions within brokerage accounts opened by PRAG at UBS AG ("UBS"). In connection with same, PRAG isolated specific sub-accounts at UBS for exclusive use in connection with commodities futures and options business related to the Debtor (collectively, the "PRI Sub-Accounts"). PRAG executed a Power of Attorney to grant the Debtor authority to execute trades in these PRI Sub-Accounts. On or about January 26, 2007, the Debtor, PRAG, UBS and the then-appointed Bank Agent[4] entered into a Security and Assignment Agreement (the "Sub-Account Security Agreement") pursuant to which, among other things, the parties recited the existence of the PRI Sub-Accounts and PRAG (as the owner of the PRI Sub-Accounts) granted a security interest in the PRI Sub-Accounts to the Bank Agent for the benefit of the Lenders to secure the Debtor's obligations to the Lenders under its credit agreement with the Lenders (referred to as the Intercreditor Agreement). As part of the Sub-Account Security Agreement, the Bank Agent agreed that until it elected to the contrary and delivered written notice of such election to UBS, PRAG could continue to execute transactions in the ordinary course of business in the PRI Sub-Accounts (and, hence, the Debtor as well by virtue of the Power of Attorney).

While the Debtor had a long record of strong earnings and profitability heading into 2008, the Debtor suffered a severe liquidity crisis in early March 2008 as a result of the extraordinary run-up in the futures price of cotton in the market and the ever-increasing margin requirements in relation to the Debtor's position in financial short futures contracts in the PRI Sub-Accounts. In this regard, by the commencement of business on March 4, 2008, after having funded roughly $100 million in additional margin, the Debtor no longer had sufficient liquidity to fund any further sizeable margin calls in the event of a continuing run-up in the price of cotton in the market. To exacerbate matters, because of the volatility in the market during this time frame, the Debtor's trading options were limited as it attempted to protect against the possibility of the liquidation of its existing financial positions to satisfy further margin requirements. Ultimately, various options trades were placed in the PRI Sub-Accounts by personnel of PRAG on behalf of the Debtor in an effort to reduce future margin risk and free up a level of liquidity. Because of the nature of the options trades placed, the Debtor's financial book became out of balance with its physical book. Hence, while the Debtor was successful in ultimately avoiding a complete collapse during the run-up in the price of cotton in the market, the Debtor was exposed to loss in the value

---

[4] Rabobank Coöperatieve Centrale Raiffeisen-Boerenleenbank B.A., "Rabobank International", New York Branch. Wells Fargo HSBC Trade Bank, National Association was later appointed as the successor Bank Agent in March 2008.

of its physical book as the market began to cool and the futures price of cotton began to drop back to more normal levels. Because the Debtor continued to lack sufficient liquidity to re-square its book as prices began to moderate, the Debtor incurred a substantial loss to the value of its physical book.

The losses negatively impacted the Debtor's credit lines with its Lenders, resulting in the declaration of various defaults under the Intercreditor Agreement. As a result, in April 2008 the Debtor entered into a forbearance arrangement with its Lenders under the terms of an amendment to the Intercreditor Agreement – specifically, a Sixth Amendment to Agreement, Priority Credit Facility and Forbearance Agreement, dated as of April 11, 2008 (the "Forbearance Agreement"). Pursuant to the Forbearance Agreement, and subject to the conditions and limitations set forth therein, the Lenders, among other things: (i) advanced certain additional funds to the Debtor to enable the Debtor to re-square its book (by entering into additional short futures contracts), (ii) agreed to advance certain additional funds, as necessary, to enable the Debtor to satisfy margin requirements imposed by its broker, and (iii) agreed to forbear from exercising their remedies until the earlier of (A) the end of December 2008, or (B) a default under the terms of the Forbearance Agreement. In exchange, the Debtor, among other things: (i) agreed to make future cash expenditures only in strict compliance with a budget approved by the Lenders, (ii) consented to the Lenders' weekly sweep of cash from its operating and brokerage accounts in excess of certain established levels, and (iii) agreed to not spend any amounts of money on its 2008/2009 crop year purchase obligations without the prior written consent of the Lenders. Additionally, the Debtor agreed to pursue the sale of substantially all of its assets, subject to the Lenders' right to veto any such sale if the sale would not result in the payment in full of all outstanding obligations to the Lenders.

With respect to the last requirement, during the latter part of July 2008 the Debtor successfully obtained a bid from Allenberg Cotton Co. ("Allenberg"), one of its competitors, for Allenberg's purchase of a substantial portion of the Debtor's assets, including the assumption of substantially all of the Debtor's forward cotton purchase obligations. A tentative closing of the Allenberg transaction was scheduled for September 5, 2008. Because the purchase price proposed by Allenberg would not result in the payment in full of the Lenders, however, the closing was subject to the Lenders' written consent under the terms of the Forbearance Agreement. The Lenders did not provide their written consent to the transaction and the transaction did not close on September 5, 2008.

On September 10, 2008, the Bank Agent provided notice to the Debtor of various alleged defaults under the Forbearance Agreement, of the alleged termination of the forbearance period by virtue of such defaults, and of its acceleration of all indebtedness owing by the Debtor to the Lenders. Notwithstanding same, the Debtor and PRAG continued to negotiate with the Agent and Lenders with respect to the Allenberg transaction. The Lenders did not provide their written consent.

On October 1, 2008, without any advanced notice to the Debtor, and as a result of the alleged continuing defaults of the Debtor under the Forbearance Agreement, the Bank Agent, among other things, took control of two of the Debtor's primary bank accounts, took control of the Debtor's brokerage account, and issued instructions to the Debtor's broker to begin immediately liquidating short futures contracts within the brokerage account. As a consequence of the Bank Agent's actions and the Debtor's inability to perform under its 2008/2009 crop year contracts, the Debtor determined to seek relief under Chapter 11 of the Bankruptcy Code in order to preserve and protect the value of its remaining assets for the benefit of all of its creditors. Accordingly, on October 15, 2008, the Debtor filed for relief under Chapter 11 of the Bankruptcy Code.

**D.    Management of the Debtor**

Throughout the course of the Bankruptcy Case, the Debtor has been operating as a debtor in possession under the Bankruptcy Code, meaning that the Debtor has continued to operate under the guidance and control of its officers and directors.  As of the date hereof, the Debtor's primary remaining officers are R. Dale Grounds, the Debtor's President and Chief Executive Officer, and William W. Wickham II, the Debtor's Vice President of Finance and Treasurer.  The Debtor's board of directors, in turn, is comprised of Dr. Thomas P. Reinhart, P. Jürg Reinhart and Rolf Stahel, all of whom also serve as the directors of the Debtor's parent corporation PRAI and PRAI's parent corporation PRAG.

As described in greater detail below, the Plan provides for the termination of all remaining officers and directors of the Debtor on the Plan's Effective Date, whereupon the Trustee of the Creditor Trust will be deemed appointed as the Debtor's President and sole director.

**E.    Description of Assets of the Debtor**

As of November 30, 2009, the assets of the Debtor consisted of cash, accounts receivable, cotton inventory, property and equipment, other assets used in the operation of the business and Causes of Action that are, or may be, held by the Estate.  Attached hereto as **Exhibit B** is the Debtor's unaudited balance sheet as of November 30, 2009, reflecting the net book or carrying value of the various categories of assets as of said date, excluding Causes of Action.  A description of such assets is provided as follows:

1.    Cash.  As of November 30, 2009, the Debtor had cash of approximately $2,248,463.

2.    Accounts Receivable.  As of November 30, 2009, the Debtor had accounts receivable from customers in the amount of approximately $17.62 million, which is net of an allowance for doubtful accounts of approximately $7.35 million.[5]

3.    Prepaid Expenses.  Prepaid expenses of the Debtor as of November 30, 2009 were approximately $44,085, which represents deposits held by others for the provision of goods and services.

4.    Property, Plant & Equipment.  As of November 30, 2009, the Debtor had property, plant and equipment with a net book value of approximately $147,859.  Such property and equipment consists mainly of office furniture and computer equipment at the Debtor's corporate offices and an office/warehouse building owned by the Debtor in Harlingen, Texas.

5.    Other Assets.  As of November 30, 2009, the Debtor had various other assets with a combined carrying value of approximately $1.12 million.

---

[5] While the Debtor is continuing its efforts to collect accounts receivable, actual collections may differ materially from the above carrying amount of approximately $17.62 million as of November 30, 2009.

## F.      Bank Agent's and Lenders' Assertions[6]

In response to the information set out above about the nature of the Debtor's business operations, the events leading to the Chapter 11 filing, and the Debtor's management, the Bank Agent and the Lenders assert the following:

- With respect to the Debtor's financial and physical book, the Bank Agent and the Lenders allege that the Debtor customarily did not maintain a completely "squared" book.  The Bank Agent and the Lenders believe that the Debtor ordinarily and customarily managed the entirety of the hedge book for its benefit based on its own internal policies.

- With respect to the losses suffered by the Debtor in connection with the market disruption in March 2008, the Bank Agent and the Lenders allege that the Debtor incurred a substantial loss to its overall business due to the March Trades.[7]  The Bank Agent and Lenders assert, upon information and belief, that the PRAG representatives who placed certain of the March Trades did so without consultation with, or the prior consent or authorization of, the officers of the Debtor, and question whether such trades were placed for the benefit of the Debtor and/or to accomplish the above-stated purposes.  The Bank Agent and the Lenders assert that the March Trades resulted in a loss to the Debtor in excess of $60 million and question whether such option trading, which was conducted by personnel of PRAG, gives rise to claims against PRAG and/or those persons or entities involved in such trades.

- With respect to the Forbearance Agreement, the Bank Agent and Lenders assert that the Agreement was negotiated and agreed to between the Debtor and Lenders in an arms' length transaction with the assistance of counsel.

- With respect to the exercise of remedies by the Bank Agent on behalf of the Lenders in October 2008, the Bank Agent and the Lenders assert that the Debtor received numerous letters between May 2008 and October 2008 related to the Debtor's multiple defaults under the Forbearance Agreement, that all of the actions of the Bank Agent and Lenders were undertaken pursuant to their contractual arrangements with the Debtor, and that all of the actions were authorized by the account control agreements and/or other contractual arrangements agreed to by the Debtor.

- With respect to the Debtor's Chapter 11 bankruptcy filing, the Bank Agent and Lenders assert that the filing did not result from any action of the Bank Agent or Lenders, but rather was a direct result of the March 2008 cotton market volatility and the March Trades.

- With respect to the Debtor's management, the Bank Agent and Lenders assert that the Debtor's board of directors, consisting solely of insiders of PRAG, controls the Debtor's actions.

---

[6] Disclaimer by Bank Agent and Lenders:  Any information provided in the Disclosure Statement by the Bank Agent and/or Lenders should not be relied upon unless such information has been independently verified.  Nothing contained in this Disclosure Statement shall have any preclusive effect against the Bank Agent or Lenders (whether by waiver, admission, estoppel or otherwise) in any cause or proceeding which may exist or occur in the future.  This Disclosure Statement shall not be construed or deemed to constitute an acceptance of fact or an admission by the Bank Agent or Lenders in regards to any of the statements contained or made herein, and all rights and remedies of the Bank Agent and Lenders are expressly reserved in this regard.

[7] The "March Trades" are defined in the Plan as "[a]ll trades of cotton futures or options made by or on behalf of the Debtor in March 2008."

# VI.
## SIGNIFICANT EVENTS DURING THE BANKRUPTCY CASE

During the course of the Bankruptcy Case, various pleadings have been filed with the Bankruptcy Court and several hearings have been conducted. The following is a description of the more significant events which have transpired during the pendency of the case. For a comprehensive listing of the pleadings which have been filed in the Bankruptcy Case, however, the docket for the Bankruptcy Case should be reviewed, and relevant pleadings referenced therein may be obtained from the Clerk's Office of the Bankruptcy Court or via the on-line PACER system.

## A.     Debtor's Employment of Professionals

### 1.      Bankruptcy Counsel

On the Petition Date, the Debtor filed an *Application for Authority to Employ Munsch Hardt Kopf & Harr, P.C.* to request authority to employ Munsch Hardt Kopf & Harr, P.C. ("Munsch Hardt") as its bankruptcy counsel in connection with the Bankruptcy Case. On October 21, 2008, the Bankruptcy Court entered an *Interim Order Authorizing the Employment of Munsch Hardt Kopf & Harr, P.C.* Following the objection period established under the order, during which time no objections were filed, the order automatically converted into a final order and the Debtor's authorization to employ Munsch Hardt likewise became final.

### 2.      Financial and Restructuring Advisor

On the Petition Date, the Debtor filed an *Application for Order Authorizing Employment of Grant Thornton LLP as Financial and Restructuring Advisor for Debtor* to request authority to employ Grant Thornton LLP ("Grant Thornton") as its financial and restructuring advisor in connection with the Bankruptcy Case. On October 21, 2008, the Bankruptcy Court entered an *Interim Order Authorizing the Employment of Grant Thornton LLP*. Prior to the time that such order became final, the U.S. Trustee filed the *United States Trustee's Objection to Application for Order Authorizing Employment of Grant Thornton LLP as Financial and Restructuring Advisor for Debtor* to object to certain provisions of Grant Thornton's engagement agreement with the Debtor. The objection was thereafter resolved by certain agreed modifications to the engagement agreement, and on January 13, 2009, the Bankruptcy Court entered an *Order Resolving the United States Trustee's Objection to Application for Order Authorizing Employment of Grant Thornton LLP as Financial and Restructuring Advisor for Debtor*.

### 3.      Ordinary Course Mexican Counsel

On May 6, 2009, the Debtor filed a *Motion for Order Authorizing Retention and Compensation of Barrera, Siqueiros Y Torres Landa, S.C., as a Professional Utilized by the Debtor in the Ordinary Course of Business* to request authority to employ and compensate Barrera, Siqueiros y Torres Landa, S.C. (the "Barrera Firm") as special counsel on matters involving the Debtor's Mexican receivables. On June 15, 2009, the Bankruptcy Court entered an order granting the motion.

## B.     Committee's Employment of Professionals

On October 28, 2008, the U.S. Trustee appointed an Official Committee of Unsecured Creditors (the "Committee") to serve in the Bankruptcy Case. The Committee is comprised of the following members: Michael D. "Denny" East (Chairman), Bailey Weiner, Alan P. Byrd, Barry L. Richardson, Jr., Larry McClendon, Larry Nelson, William "Storm" Starks, George Hardberger and Charlie Lowrance.

1.     **Bankruptcy Counsel**

On October 31, 2008, the Committee filed an *Application to Employ Rochelle McCullough LLP as Bankruptcy Counsel* to request authority to employ Rochelle McCullough LLP ("RM LLP") as its bankruptcy counsel in connection with the Bankruptcy Case. On November 5, 2008, the Bankruptcy Court entered an *Interim Order Authorizing the Employment of Rochelle McCullough, LLP as Bankruptcy Counsel to the Official Unsecured Creditors Committee*. Following the objection period established under the order, during which time no objections were filed, the order automatically converted into a final order and the Committee's authorization to employ RM LLP likewise became final. Prior to its engagement as bankruptcy counsel for the Committee, RM LLP served as local counsel for the East Plaintiffs.

2.     **Special Litigation Counsel**

On March 27, 2009, the Committee filed an *Application to Employ Special Litigation Counsel* to request authority to employ Randall J. Fishman of Ballin, Ballin & Fishman, P.C. (the "Fishman Firm") and C. Barry Ward of Glanker Brown, PLLC (the "Ward Firm," and together with the Fishman Firm, "Special Counsel") as special litigation counsel to represent the Committee's interests with respect to litigation against the Lenders on behalf of the Debtor's estate. Such engagement was requested in connection with the Bankruptcy Court's authorization of the Committee to pursue certain estate-based claims against the Lenders. *See* Section VI(L) below for a description of such authorization.

In consultation with the U.S. Trustee's Office, the Committee agreed to provide specific disclosures within this Disclosure Statement with respect to the proposed engagement. First, the Committee selected the Special Counsel firms because of Messrs. Fishman's and Ward's familiarity with the Bankruptcy Case and the subject matter of the litigation for which Special Counsel were being employed. Specifically, the Special Counsel firms had previously been engaged by the East Plaintiffs to represent them in connection with the East Lawsuit pending in the Bankruptcy Court (described in Section VI(N)(1) below). In connection with that engagement, the East Plaintiffs agreed to the following fee arrangement: (a) each client would pay up to $5.00 per bale of cotton that was sold to the Debtor pre-petition, which payment would be made at various intervals during the course of the litigation in the East Lawsuit; (b) if the East Lawsuit is resolved before trial, each client would pay a success fee of $2.50 per bale of cotton sold to the Debtor pre-petition; and (c) if the East Lawsuit is resolved at trial, the overall fee to all of the clients would be equal to 15% of any recovery (after deducting expenses) with a credit for fees previously paid (the "East Plaintiff Fee Arrangement"). The Special Counsel firms proposed to continue their representation of the East Plaintiffs on non-estate-based claims in the East Lawsuit. With respect to estate-based claims, Special Counsel agreed to undertake representation of the Committee on a contingency basis. Specifically, the fee structure proposed was as follows: (a) a fee equal to 30% of any recovery plus reimbursement of expenses if a satisfactory settlement is reached before any summary judgment motions are submitted or argued; (b) a fee equal to 35% of any recovery plus reimbursement of expenses if a settlement is reached after any summary judgment motions have been argued and submitted; and (c) a fee equal to 40% of any recovery plus reimbursement of expenses in the event the matter goes to trial (the "Committee Fee Arrangement"); *provided, however,* that (i) to the extent claims originally pursued on behalf of the East Plaintiffs constitute estate-based claims and (ii) a particular East Plaintiff satisfied its contractual obligations to the Special Counsel firms under the East Plaintiff Fee Arrangement as of the date of the Committee's request for authority to employ the Special Counsel firms, then the Committee Fee Arrangement would be modified so as to treat any recovery allocable to such East Plaintiffs as though the East Plaintiff Fee Arrangement were applicable to such allocated recovery.

Objections to the Application were filed by the Bank Agent, on behalf of the Lenders, Cooperative Marketing Alliance, and the U.S. Trustee. On April 22, 2009, the Bankruptcy Court

conducted a hearing on the Application, at which time Special Counsel clarified on the record that any recoveries obtained on account of individual claims asserted by the East Plaintiffs in the East Litigation would be combined with any recoveries obtained by the Estate on account of claims asserted by the Committee (on behalf of the Estate) in the East Litigation for purposes of distributions to creditors in the Bankruptcy Case. On April 27, 2009, the Bankruptcy Court entered an *Order on Application to Employ* which approved the Application, as modified on the record, except with respect to the Committee's pursuit of avoidance actions on behalf of the Estate. On August 11, 2009, the Bankruptcy Court heard additional arguments with respect to the Committee's request to employ the Special Counsel firms on the avoidance actions, at which time the Court took the matter under advisement. On September 4, 2009, the Bankruptcy Court entered a separate *Order on Application to Employ*, whereby the Committee's employment of Special Counsel to pursue avoidance actions was also approved based upon, among other things, Special Counsel's agreement to pursue such claims on a fifteen percent (15%) contingent fee basis.

## C.    Cash Management System and Maintenance of Accounts

On the Petition Date, the Debtor filed a *Motion for Entry of Order Authorizing Maintenance of Existing Bank and Brokerage Accounts, Continue Use of Existing Cash Management System, Continued Use of Existing Business Forms, and for Related Relief* to request authority to maintain and continue to utilize its existing cash management system and bank and brokerage accounts, and to continue to utilize its existing business forms. On October 21, 2008, the Bankruptcy Court entered an *Order (A) Authorizing Maintenance of Existing Bank and Brokerage Accounts, Continued Use of Existing Cash Management System, and Continued Use of Business Forms, and (B) Providing Related Relief*, thereby granting the motion subject to certain modifications agreed upon among the Debtor, the Lenders and the U.S. Trustee.

## D.    Financing of Operations and Administration of the Estate

### 1.    PRAI-Texas Gratuitous Contribution

On October 20, 2008, the Bankruptcy Court conducted a hearing on the Debtor's initial "first day" motions. In connection with such hearing, the Debtor made an oral motion for the approval of certain terms associated with the Debtor's acceptance of a gratuitous transfer of $250,000 from PRAI-Texas. Such transfer was necessary to enable the Debtor to pay for certain critical expenses pending the filing and consideration of a motion to use cash collateral. On October 21, 2008, the Bankruptcy Court entered an *Order with Respect to Gratuitous Contribution from PRAI Texas, Inc.*, thereby authorizing the Debtor's acceptance of the transfer under terms agreed upon among the Debtor, PRAI-Texas and the Lenders.

### 2.    Authorization to Use Cash Collateral

On October 21, 2008, the Debtor filed a *Motion for Entry of Order (A) Authorizing Use of Cash Collateral Pursuant to 11 U.S.C. § 363(c) or, Alternatively, Approving Case Administration Funding Agreement with PRAI Texas, Inc., and (B) For Relief Related Thereto* (the "Cash Collateral Motion") to seek authorization to use cash collateral or, alternatively, to obtain financing from PRAI-Texas under the terms of a proposed agreement with PRAI-Texas which, among other things, provided for a full release of PRAG and its affiliates. On October 24, 2008, the Bank Agent filed an *Objection to Debtor's Motion for Entry of Order (A) Authorizing Use of Cash Collateral Pursuant to 11 U.S.C. § 363(c) or, Alternatively, Approving Case Administration Funding Agreement with PRAI Texas, Inc., and (B) For Relief Related Thereto*. Thereafter, following the Committee's appointment, the Debtor, the Lenders and the Committee reached agreement on the terms of a consensual cash collateral arrangement, and on November 10, 2008, the Bankruptcy Court entered a *Final Agreed Order Authorizing Limited Use of Cash Collateral and*

*Granting Adequate Protection to Existing Lienholders* (as amended and extended from time to time, the "Cash Collateral Order").

Pursuant to the Cash Collateral Order, parties-in-interest were provided a period of time within which to object to the terms of the order. On November 24, 2008, certain taxing authorities filed an objection. Additionally, certain informal objections/comments were presented by the U.S. Trustee and Cooperative Marketing Alliance. All of such objections/comments were resolved under the terms of a *First Amendment to Final Agreed Order Authorizing Limited Use of Cash Collateral and Granting Adequate Protecting to Existing Lienholders* entered by the Bankruptcy Court on November 25, 2008. The Cash Collateral Order further provided for a release of the Lenders in the absence of the Debtor's initiation of litigation against the Lenders and/or the Committee's filing of a motion to request standing to pursue litigation against the Lenders on behalf of the estate, in each case by a fixed deadline. Pursuant to a *Second Amendment to Final Agreed Order Authorizing Limited Use of Cash Collateral and Granting Adequate Protection to Existing Lienholders* entered by the Bankruptcy Court on January 9, 2009, the deadline for such action was extended to February 16, 2009. As explained separately below, prior to such extended deadline the Committee filed a motion to request standing to pursue litigation against the Lenders on behalf of the Estate and such motion was granted in part.

Under the Cash Collateral Order, the Debtor's authorization to use cash collateral extends only through the earlier of (i) a default under the terms of the Cash Collateral Order, or (ii) the expiration date established under the order. On February 27 and March 13, 2009, the Debtor, the Bank Agent and the Committee filed notices to evidence additional extensions of the expiration date. Pursuant to paragraph 59 of the Cash Collateral Order, the filing of a plan of reorganization by the Debtor that is not otherwise acceptable to the Bank Agent in the treatment of the Pre-Petition Claims of the Lenders constitutes an Event of Default pursuant to the Cash Collateral Order.

On April 13, 2009, the Debtor and the Committee filed their original *Joint Plan of Liquidation Under Chapter 11 of the United States Bankruptcy Code* which was not otherwise acceptable to the Bank Agent in the treatment of the Pre-Petition Claims of the Lenders. Such action constituted an Event of Default under the Cash Collateral Order (the "CC Order Default"). On April 29, 2009, the Bankruptcy Court entered an initial *Limited Forbearance and Agreed Order Extending Debtor's Authority to Use Cash Collateral Pursuant to Final Agreed Order Authorizing Limited Use of Cash Collateral and Granting Adequate Protection to Existing Lienholders*, whereby the Lenders agreed to a limited forbearance in relation to the CC Order Default and extension of the Debtor's authority to use cash collateral under the terms of such order. Since that time, additional extension notices have been filed by the Debtor and Bank Agent, and additional limited forbearance-agreed orders have been entered by the Bankruptcy Court, in each case to evidence further extensions of the Debtor's authority to use cash collateral under the terms of the Cash Collateral Order, as modified by each of the limited forbearance-agreed orders. As of the date hereof, the Debtor's authorization to use cash collateral under the terms of the Cash Collateral Order expires on January 4, 2010.

**E.  Authorization to Pay Warehouse Charges and Certain Critical Vendor Claims**

On November 10, 2008, the Debtor filed a *Motion for Order Authorizing the Payment of Pre-Petition Warehouse Charges and Certain other Pre-Petition Claims for Critical Shipment, Handling and Related Services* to request authority to pay certain pre-petition charges to warehouses storing the Debtor's cotton inventory and certain outstanding pre-petition shipping and handling charges, as determined to be necessary under established procedures to ensure the timely shipment of cotton to third-party purchasers. On November 18, 2008, the Bankruptcy Court entered an *Order Authorizing the Payment of Pre-Petition Warehouse Charges and Certain Other Pre-Petition Claims for Critical Shipment, Handling and Related Services*, thereby authorizing such payments and requiring the Debtor to

periodically file reports detailing the payments that have been made, the recipients of such payments, and certain additional information. In compliance with the order, the Debtor has periodically filed notices with the Bankruptcy Court to disclose such information.

## F. Adequate Assurance of Utility Payments

On the Petition Date, the Debtor filed a *Motion for Interim and Final Order Providing Adequate Assurance of Utility Payment* to request approval of the Debtor's proposed means of providing adequate assurance of payment to utilities under Section 366 of the Bankruptcy Code and certain procedures in relation thereto. On October 24, 2008, the Bankruptcy Court entered an *Interim and Proposed Final Order Providing Adequate Assurance of Utility Payments*, thereby approving the Debtor's proposal and procedures subject to an opportunity for objection. Following the objection period, during which time no objections were filed, the order was automatically converted into a final order and the procedures established thereby were likewise deemed finally approved.

## G. Employee Stabilization

### 1. Authorization to Pay Pre-Petition Wages and Related Amounts; Continuation of Standard Employee Benefits

On the Petition Date, the Debtor filed a *Motion for Authority to (A) Pay Accrued Pre-Petition Wages, (B) Reimburse Pre-Petition Business Expenses, (C) Make Accrued Pre-Petition Contributions to Employee Benefit Plans, (D) Honor and Continue Employee Benefits, and (E) Release Pre-Petition Withholdings* to seek authority to pay accrued, unpaid pre-petition wages to employees, to reimburse employees for expenses incurred on behalf of the Debtor pre-petition, to continue standard contributions to employees benefit plans and honor and continue standard employee benefits, and to release pre-petition employee withholdings. On October 21, 2008, the Bankruptcy Court entered an *Order Authorizing (A) Payment of Accrued Pre-Petition Wages, (B) Reimbursement of Pre-Petition Business Expenses, (C) Making of Accrued Pre-Petition Contributions to Employee Benefit Plans, (D) Continuance of Employee Benefits, and (E) Release of Pre-Petition Employee Withholdings*.

### 2. Authorization to Maintain Severance Plan

On November 10, 2008, the Debtor filed a *Motion for Authority to Maintain and Honor Pre-Petition Employee Severance Plan, as Modified* to request authority to continue the Debtor's severance plan for employees, as modified in consultation with the Lenders and Committee. On November 18, 2008, the Bankruptcy Court entered an *Order Authorizing Debtor to Maintain and Honor Pre-Petition Employee Severance Plan, as Modified*.

### 3. Approval of Officer Incentive Program

On November 3, 2008, the Debtor and certain of the Debtor's officers filed a *Motion for Order Authorizing Officer Incentive Program and Payments Pursuant to 11 U.S.C. §§ 105, 363(b) and 503(c)* to request approval a performance-based incentive plan for the Debtor's key officers. Under the incentive plan, such officers are entitled to additional compensation upon satisfying different levels of performance-based targets or benchmarks within a fixed period of time. On December 19, 2008, the Bankruptcy Court entered a *Second Amended Order, Nunc Pro Tunc, Authorizing Officer Incentive Program and Payments*. Subsequent to entry of the order, each of the performance targets/benchmarks was satisfied.

### H. Executory Contracts and Unexpired Leases

#### 1. Rejection of Unperformed Cotton Purchase Contracts

On October 17, 2008, a group of cotton growers filed an *Emergency Motion of Cotton Growers to Require Debtor to Accept or Reject Forward Cotton Contracts* to request entry of an order compelling the Debtor to immediately assume or reject its unperformed cotton purchase contracts with such cotton growers. On October 21, 2008, the Debtor filed its own *Expedited Motion for Authority to Reject Cotton Purchase Contracts* to request authority to reject all of its unperformed cotton purchase contracts. The Bankruptcy Court granted the Debtor's Motion and on October 24, 2008, entered an *Order Authorizing Debtor's Rejection of Cotton Purchase Contracts*, thereby deeming such contracts to be rejected as of the Petition Date.

#### 2. Assumption of Headquarters Lease, as Modified

On January 28, 2009, the Debtor filed a *Motion to Extend the Period of Assumption or Rejection of Unexpired Nonresidential Real Property Lease with Campbell Creek, Ltd.* to request an extension of the deadline established by Section 365 of the Bankruptcy Code for the assumption or rejection of the Debtor's headquarters lease with Campbell Creek, Ltd. (the "Landlord"). Following negotiation among the Debtor, the Landlord and the Lenders on the terms of such extension, the Bankruptcy Court granted the Motion, and on February 6, 2009, entered an *Order Granting Debtor's Motion to Extend the Period for Assumption or Rejection of Unexpired Nonresidential Real Property Lease with Campbell Creek, Ltd.* Pursuant to the order, the deadline for assumption or rejection was extended to July 12, 2009. On July 6, 2009, the Debtor filed a second *Motion to Extend the Period of Assumption or Rejection of Unexpired Nonresidential Real Property Lease with Campbell Creek, Ltd.* to request a further extension of the assumption/rejection deadline. On July 10, 2009, the Bankruptcy Court entered an *Order Granting Debtor's Motion to Extend the Period for Assumption or Rejection of Unexpired Nonresidential Real Property Lease with Campbell Creek, Ltd.*, thereby extending the deadline to July 31, 2009. On July 17, 2009, the Debtor filed a *Motion to Approve Assumption of Unexpired Nonresidential Real Property Lease with Campbell Creek, Ltd., as Amended by the First Amendment to Lease Agreement.* On July 30, 2009, the Bankruptcy Court entered an *Order Granting Debtor's Motion to Approve Assumption of Unexpired Nonresidential Real Property Lease with Campbell Creek, Ltd., as Amended by the First Amendment to Lease Agreement.*

#### 3. Rejection of Miscellaneous Equipment Leases

On April 22, 2009, the Debtor filed a *Motion for Authority to Reject that Certain Equipment Lease with De Lage Landen Financial Services, Inc.* to request authority to reject a lease of certain copiers. On May 20, 2009, the Bankruptcy Court entered an order granting the motion. On June 2, 2009, the Debtor filed a *Motion for Authority to Reject that Certain Equipment Lease with Pitney Bowes Global Financial Services LLC* to request authority to reject a lease of certain postage equipment. On July 1, 2009, the Bankruptcy Court entered an order granting the motion.

### I. Disposition of Disputed Cotton Bales

On December 5, 2008, the Debtor and Cooperative Marketing Alliance ("CoMark") filed a *Joint Expedited Motion for Order Authorizing the Sale of Certain Disputed Bales of Cotton and the Placement of Sales Proceeds in Escrow or in Court's Registry Pending Determination of Rights to Same* to seek approval of the sale of certain cotton bales claimed to be owned by both the Debtor and CoMark and approval for the placement of the net proceeds thereof in escrow or in the registry of the Bankruptcy Court pending resolution of the ownership dispute. On December 10, 2008, the Bank Agent filed a

*Limited Objection to Joint Expedited Motion for Order Authorizing the Sale of Certain Disputed Bales of Cotton and the Placement of Sales Proceeds in Escrow or in Court's Registry Pending Determination of Rights to Same*.  Following negotiation among the Debtor, CoMark and the Lenders, an agreement was reached in resolution of the Bank Agent's objection.  On December 12, 2008, the Bankruptcy Court entered an *Order Approving Joint Expedited Motion for Order Authorizing the Sale of Certain Disputed Bales of Cotton and the Placement of Sales Proceeds in Escrow or in Court's Registry Pending Determination of Rights to Same.*  In accordance with the procedures established under the order, all of the disputed bales have been sold and approximately $4.1 million has been deposited into the registry of the Bankruptcy Court pending resolution of the ownership dispute.  *See also* Section VI(N)(2) below for a description of pending litigation among the Debtor, CoMark and the Lenders, and Section VII below for a description of the settlement that has been reached in resolution of the dispute.

## J.      Automatic Stay Matters

### 1.      Supplemental Stay Order

On the Petition Date, the Debtor filed a *Motion for an Order Enforcing the Protections of Section 362 of the Bankruptcy Code* to request entry of an order embodying and enforcing the automatic stay protections of Section 362 of the Bankruptcy Code.  On October 20, 2008, the Bankruptcy Court entered an *Order Pursuant to Section 105 of the Bankruptcy Code Enforcing the Protections of Section 362 of the Bankruptcy Code*.

### 2.      CoMark's Motion for Relief from the Automatic Stay

On December 19, 2008, CoMark filed a *Motion for Relief from the Automatic Stay to Effectuate a Right of Setoff* to request relief from the automatic stay imposed by Section 362 of the Bankruptcy Code in order to setoff certain proceeds from the sale of cotton, including proceeds held in the registry of the Bankruptcy Court, against amounts allegedly owing by the Debtor to CoMark.  On January 5, 2009, the Debtor filed a *Response in Opposition to CoMark's Motion for Relief from the Automatic Stay to Effectuate a Right of Setoff*.  On the same date, the Bank Agent filed an *Objection to Cooperative Marketing Alliance's Motion for Relief from the Automatic Stay to Effectuate a Right of Setoff*.  On January 7, 2009, the Bankruptcy Court conducted a preliminary hearing on the Motion at which time the Court determined to consolidate the Motion with the separately-pending adversary proceeding initiated by the Debtor against CoMark.  Accordingly, on January 22, 2009, the Bankruptcy Court entered an *Order Consolidating Final Hearing on Motion for Relief from the Automatic Stay to Effectuate a Right of Setoff with the Trial in Adversary No. 08-3491.  See* Section VI(N)(2) below for a description of such adversary proceeding, and Section VII below for a description of the settlement that has been reached in resolution of the dispute.

## K.      Tax Matters

### 1.      Payment of Allocated Share of Tax Return Preparation Expenses

The Debtor is a member of a consolidated tax group for federal income tax purposes.  The tax group is comprised of the Debtor, PRAI (the Debtor's parent corporation), and two other wholly-owned subsidiaries of PRAI.  Historically, PRAI has filed the consolidated federal tax return on behalf of the tax group.  On March 13, 2009, the Debtor filed a *Motion for Authority to Pay Allocated Share of Consolidated Tax Return Preparation Expenses* to request authority to pay for the Debtor's proportionate share of the expenses incurred in preparing the consolidated tax group's federal income tax return for the period ending June 30, 2008 and certain related state tax returns.  On April 8, 2009, the Bankruptcy Court

entered an *Order Authorizing Debtor's Payment of Allocated Share of Consolidated Tax Return Preparation Expenses*.

## 2.  California Franchise Tax Board's Request for Payment of Alleged Taxes

On March 5, 2009, the California Franchise Tax Board ("<u>FTB</u>") filed a *Request for Payment of Administrative Expense* to request entry of an order directing the Debtor to pay certain taxes for the tax period ending June 30, 2009.  On March 25, 2009, the Debtor filed an *Objection to the State of California's Request for Payment of Administrative Expense*.  On June 29, 2009, the Bankruptcy Court entered an order denying the FTB's request for want of prosecution.

## L.  Authorization for Committee to Pursue Estate-Based Claims

On February 13, 2009, the Committee filed a *Motion for Leave to Assert Claims that are Property of the Estate* (the "<u>Motion to Assert Claims</u>") to request leave of court to pursue certain alleged claims of the Estate, on behalf of the Estate.  The claims identified by the Committee in the motion were largely comprised of various claims asserted in the East Lawsuit (*see* Section VI(N)(1) below), in relation to which the Committee request authority to assert alleged Estate claims against the Lenders, PRAI and the Debtor's officers and directors.  On March 9, 2009, the Bank Agent filed an *Objection and Response to Motion for Leave to Assert Claim*.  On March 10, 2009, the Debtor filed a *Limited Objection to Motion of Official Unsecured Creditors' Committee for Leave to Assert Claims*.  On April 15, 2009, the Bankruptcy Court entered an *Order on Committee's Motion to Assert Claims* pursuant to which the Court granted leave and authority to the Committee to pursue certain types of alleged Estate claims against the Lenders, including avoidance claims, and denied without prejudice the Committee's request to pursue certain types of "omnibus authority" claims and fiduciary duty claims against the Debtor's officers and directors.

## M.  Extension of Plan Exclusivity Periods

On January 28, 2009, the Debtor filed a *Motion for Extension of Exclusivity and Report Pursuant to Local Rule 3016.1* to request an extension of the period during which only the Debtor may file a Chapter 11 plan and the corresponding extended period during which the Debtor may seek confirmation of such a plan before any competing Chapter 11 plan may be filed.  On February 4, 2009, the Bank Agent filed a *Limited Objection to Debtor's Motion for Extension of Exclusivity and Report Pursuant to Local Rule 3016.1*.  On February 6, 2009, the Bankruptcy Court entered an *Order Granting Debtor's Motion for Extension of Exclusivity and Report Pursuant to Local Rule 3016.1*.  Pursuant to such order, the above-referenced periods of exclusivity were extended to April 13, 2009 (for the Debtor's filing of a plan) and June 12, 2009 (for confirmation of such a plan).

On April 13, 2009, the Debtor and the Committee filed their originally-proposed joint plan of liquidation.  As a result of certain delays caused by disputes between the Debtor/Committee and the Bank Agent/Lenders in relation to the accompanying proposed disclosure statement, on June 2, 2009, the Debtor filed a *Motion for Extension of Exclusivity Period to Solicit Acceptance of Plan* to request a further extension of the period of exclusivity.  On June 11, 2009, the Bankruptcy Court entered an order granting the motion, thereby extending the period of exclusivity in which to seek acceptance of the plan until December 9, 2009.  Thereafter, on August 17, 2009, the Debtor and the Committee filed their proposed first amended joint plan of liquidation and an amended proposed disclosure statement.  On September 10, 2009, the Bankruptcy Court entered an order approving the proposed disclosure statement and solicitation procedures in relation thereto (the "<u>Initial Disclosure Statement Order</u>").  On September 25, 2009, the Bank Agent and Lenders filed a *Motion for Modification and Limited Objection to Confirmation Hearing Order* whereby the Bank Agent/Lenders requested the Bankruptcy Court to modify certain dates and deadlines within the Initial Disclosure Statement Order.  Prior to consideration

of the motion and the transmittal of the disclosure statement, however, the Debtor, the Committee, the Bank Agent, and the Lenders, along with several other parties, agreed to engage in a multi-party mediation, and a Mediated Settlement Agreement was entered into at the mediation. *See* Section VII below for a description of the mediation and Mediated Settlement Agreement. Consequently, on October 26, 2009, the Bankruptcy Court entered an *Agreed Order Abating Dates and Deadlines Within Order Approving Joint Disclosure Statement* pursuant to which all dates and deadlines within the Initial Disclosure Statement were abated pending further actions in furtherance of the mediated settlement.

Pursuant to the Mediated Settlement Agreement, the Debtor and Committee agreed to file an amended plan and disclosure statement conforming to the mediated settlement (ultimately resulting in the filing of the current Plan and this Disclosure Statement). To provide sufficient time for the amendments and filings, and for the solicitation of acceptance of the amended plan, on December 8, 2009, the Debtor filed an *Expedited, Unopposed Third Motion for Entry of Order Extending Periods of Exclusivity for the Filing and Solicitation of Acceptance of Plan* to request a further extension of the period of exclusivity. On December 22, 2009, the Bankruptcy Court entered an order granting the motion, thereby extending the period of exclusivity through and including January 15, 2010 for the filing of an amended plan and March 15, 2010 for soliciting acceptance of the plan.

## N. Adversary Proceedings

### 1. East Lawsuit (Adversary No. 08-3438)

On the Petition Date, the East Plaintiffs[8] filed an *Original Adversary Complaint* (the "Original Complaint") against Wells Fargo Bank, N.A. ("Wells Fargo"), the Lenders (the Lenders and Wells Fargo collectively referred to in this section as the "Bank Group"), the Debtor and PRAI (collectively, the "East Defendants"), thereby initiating the East Lawsuit (Adversary No. 08-3438) with the Bankruptcy Court. Pursuant to the Original Complaint, the East Plaintiffs asserted that the East Defendants took certain wrongful actions prior to the Petition Date in relation to unperformed cotton purchase contracts which caused harm to the East Plaintiffs. Pursuant to the Original Complaint, the East Plaintiffs asserted the following counts against one or more of the East Defendants: principal and agent relationship; breach of contract; intentional interference and deceit; fraud and deceit to Michael D. East; fraud and deceit to plaintiff growers and East Cotton; violation of Arkansas Deceptive Practice Act; tortious and intentional breach of contract; equitable subordination and cancellation; unjust enrichment; conversion; false misrepresentation; loss of business reputation; breach of fiduciary duty; and aiding and abetting breach of fiduciary duty. Pursuant to the Original Complaint, the East Plaintiffs sought, among other things, actual damages in excess of $70 million and punitive damages of at least $630 million against the East Defendants, jointly and severally, the imposition of an equitable lien against all assets of the Debtor and PRAI, the equitable subordination of the Lenders' liens, and the Lenders' disgorgement of all sums received from the Debtor's hedge accounts since April 11, 2008.

Following initiation of the East Lawsuit, the parties agreed to certain extensions of the period for the East Defendants to answer or otherwise plead in response to the Original Complaint so that the parties could first engage in negotiations and a joint mediation. On December 9-10, 2008, the East Plaintiffs, the East Defendants, the Committee and PRAI-Texas participated in the joint mediation, but a settlement among all of the parties was not successfully negotiated at that time. Nevertheless, negotiations among the parties continued thereafter.

---

[8] The East Plaintiffs are comprised of the East Cotton Company Inc., Michael D. East, and certain cotton growers and gin companies identified on Exhibit 1 to the Original Adversary Complaint.

On February 13, 2009, as indicated above, the Committee filed its Motion to Assert Claims to request leave of court to pursue certain alleged causes of action on behalf of the Estate. *See* Section VI(L) above. As a result of the filing of such motion, on February 24, 2009, the parties to the East Lawsuit filed an *Agreed Motion for Order Approving Deadlines* to request entry of an order establishing new deadlines in the case dependent upon the outcome of the Motion to Assert Claims. On February 27, 2009, the Bankruptcy Court entered an *Agreed Order on Agreed Motion for Order Approving Deadlines*, thereby establishing a deadline for the East Plaintiffs and the Committee to file an amended or consolidated complaint in the event of the Bankruptcy Court's entry of an order granting, in whole or in part, the Motion to Assert Claims, and new deadlines for the East Defendants to answer or otherwise plead in response to the Original Complaint or such amended/consolidated complaint depending upon the outcome of the Motion to Assert Claims.

On April 30, 2009, following the Court's entry of the *Order on Committee's Motion to Assert Claims* in the Bankruptcy Case (*see* Section VI(L) above), the East Plaintiffs and the Committee filed a joint *First Amended Adversary Complaint* in the East Lawsuit against the Bank Group (the "Amended Complaint").[9] Pursuant to the Amended Complaint:

 (a) the East Plaintiff Growers and the Committee jointly asserted a count for equitable subordination (Count I);

 (b) the East Plaintiff Growers jointly asserted the following counts: (i) principal and agent relationship (Count II); (ii) vicarious liability for breach of contract with Growers (Count III); (iii) tortious interference with the contracts of plaintiff Growers (Count IV); (iv) breach of third party beneficiary contract (Count V); (v) fraud and deceit (Count VI); (vi) unjust enrichment (Count VIII); and (vii) conversion (Count IX);

 (c) the East Plaintiffs jointly asserted a count for loss of business reputation (Count X);

 (d) the East Cotton Company asserted a count for breach of its commission agreement (Count XII); and

 (e) the Committee, on behalf of the Estate, asserted the following counts: (i) tortious interference with contract (Count VII); (ii) aiding and abetting breach of fiduciary duty (Count XI); and (iii) preferential transfers (Count XIII).

Pursuant to the Amended Complaint, the East Plaintiffs and Committee sought, among other things: (a) a money judgment against the Bank Group, jointly and severally, for $180 million; (b) punitive damages against the Bank Group, jointly and severally; (c) pursuant to Section 510(c) of the Bankruptcy Code, judgment for (i) an equitable lien; (ii) the equitable subordination of the Bank Group's Claims in full to all unsecured creditors; (iii) all sums recovered by the Bank Group from the Debtor's hedge account to be disgorged and repaid to the Estate for equitable distribution to all unsecured creditors; (iv) the Bank Group's liens to be transferred to the Estate; and (v) an accounting for and disgorgement of all sums received from the Debtor's hedge accounts since April 11, 2008 for the East Plaintiffs and Committee's benefit; (d) a judgment for all amounts of the Debtor's hedge account taken by the Bank Group to be ordered transferred to the U.S. Marshal for safe keeping pending further order of the Court; (e) Michael D. East's recovery of judgment for loss of business judgment in the sum of $2.5 million; (f) the East Cotton Company's recovery of judgment for the amount of commission income lost in the amount of $1 million; (g) the East Plaintiff Growers' recovery of judgment for loss and impairment of business reputation in an amount of at least $200 million against the Bank Group, jointly and severally; and (h) the East Plaintiff Growers' recovery of judgment against the Bank Group for $103 million.

---

[9] The Amended Complaint does not assert any counts against the Debtor or PRAI.

On June 1, 2009, the Bank Group filed a *Motion to Dismiss for Failure to State a Claim* and *Motion for More Definite Statement*. On July 24, 2009, the Bankruptcy Court entered an *Order Granting in Part and Denying in Part the Bank Group's Motion to Dismiss for Failure to State a Claim*. Pursuant to the order, the Bankruptcy Court: (a) dismissed with prejudice Counts V, VII, VIII, IX and X; (b) dismissed with prejudice Count IV to the extent that any tortious interference claims are based on the Bank Group's refusal to consent to the Allenberg transaction, denying the Motion to Dismiss as to said Count in all other respects; (c) dismissed with prejudice Counts XII and XIII unless the East Cotton Company and the Committee, as applicable, replead such counts by August 10, 2009; (d) denied the Motion to Dismiss as to Counts I, II, III, VI and IX; (e) required any amended complaint to be filed by the East Plaintiffs and Committee to set forth the relevant factual allegations in connection with each cause of action or count alleged; and (e) denied the Motion to Dismiss and Motion for More Definite Statement except as granted in the order. By agreement between the Committee and the Lenders, the deadline for the East Cotton Company and Committee to replead Counts XII and XIII was extended to August 20, 2009. On August 20, 2009, the East Plaintiffs and the Committee filed their joint *Second Amended Adversary Complaint* against the Bank Group (the "Second Amended Complaint"). Prior to the deadline for the Bank Group to respond to the Second Amended Complaint, the East Plaintiffs, the Committee, and the Bank Group, along with several other parties, agreed to engage in a multi-party mediation. As a result, deadlines in the case have been extended by order and agreement of the parties pending the Bankruptcy Court's consideration of approval of a Mediated Settlement Agreement entered into at the mediation. *See* Section VII below for a description of the mediation and Mediated Settlement Agreement.

### 2. CoMark Lawsuit (Adversary No. 08-3491)

On December 24, 2008, the Debtor filed an *Original Complaint* against CoMark (the "Debtor's Complaint"), thereby initiating Adversary No. 08-3491 with the Bankruptcy Court (the "CoMark Lawsuit"). Pursuant to the Debtor's Complaint, the Debtor has asserted that CoMark converted to its own use and/or otherwise wrongfully withheld from the Debtor certain bales of cotton redeemed out of the federal loan program (including the proceeds thereof), wrongfully caused the Debtor to make certain bale equity and redemption payments to CoMark, and wrongfully made various representations to the Debtor in connection with the foregoing. The Debtor has asserted the following causes of action against CoMark: turnover; declaratory relief (related to disputed bales sales proceeds deposited in court's registry); violation of the automatic stay; conversion; common law fraud; breach of fiduciary duty; constructive trust; negligent misrepresentation; breach of contract; avoidance and recovery of fraudulent transfers; and avoidance and recovery of preferential payments. The Debtor seeks, among other things, turnover of the withheld cotton and cotton proceeds and, subject thereto, damages in the amount of at least $10.5 million. On January 22, 2009, as indicated above, the Bankruptcy Court entered an *Order Consolidating Final Hearing on Motion for Relief from the Automatic Stay to Effectuate a Right of Setoff with the Trial in Adversary No. 08-3491* pursuant to which CoMark's motion for relief from the automatic stay has been consolidated with the CoMark Lawsuit for trial. *See* Section VI(J)(2) above.

On February 2, 2009, the Bank Agent filed an *Unopposed Motion to Intervene as an Additional Plaintiff and Brief in Support* to request permission to intervene in the CoMark Lawsuit and also assert claims against CoMark. On February 3, 2009, the Bankruptcy Court entered an *Order Granting Unopposed Motion to Intervene as an Additional Plaintiff* and on the same date the Bank Agent filed its *Original Complaint in Intervention* against CoMark (the "Lenders' Complaint"). Pursuant to the Lenders' Complaint, the Bank Agent has adopted many of the assertions set forth within the Debtor's Complaint and further asserted that CoMark's actions resulted in the conversion of the Lenders' collateral. The Bank Agent has asserted a cause of action against CoMark for conversion of collateral.

On March 9, 2009, CoMark filed *CoMark's Counterclaim Against Paul Reinhart, Inc. and the Bank Group* in the CoMark Lawsuit ("CoMark's Counterclaim"). Pursuant to CoMark's Counterclaim,

CoMark has asserted that the Debtor breached certain cotton purchase contracts between the Debtor and CoMark, committed certain wrongdoing in connection with the maintenance of hedge positions and hedge accounts, and made certain misrepresentations to CoMark in connection with the foregoing. CoMark has additionally asserted that the Lenders participated in the Debtor's alleged wrongdoing and wrongfully obtained the benefit from same. CoMark has asserted the following alleged counterclaims against the Debtor and/or the Lenders: breach of contract; negligent and/or fraudulent misrepresentation; conversion; breach of the duty of good faith and fair dealing; breach of fiduciary duty; aiding and abetting; conspiracy; domination and control; and constructive trust.

On February 9, 2009, CoMark filed a *Motion to Dismiss Counts 5-10 and Answer to Debtor's Original Complaint* whereby, among other things, CoMark moved for the dismissal of certain of the Debtor's claims against it. The Debtor responded in opposition to the motion, and on August 17, 2009, the Bankruptcy Court entered an *Order on CoMark's Motion to Dismiss Counts 5-10* denying CoMark's request for dismissal of the Debtor's claims. Similarly, on March 9, 2009, CoMark filed a *Motion to Dismiss for Failure to State a Claim and Answer to Bank Group's Complaint in Intervention* whereby, among other things, CoMark moved for the dismissal of the Bank Agent's claim against it. The Bank Agent responded in opposition to the motion, and on August 24, 2009, the Bankruptcy Court entered an *Order on CoMark's Motion to Dismiss for Failure to State a Claim* denying CoMark's request for dismissal of the Bank Agent's claim.

Separately, on June 5, 2009, the Debtor filed a *Motion to Dismiss CoMark's Counterclaim Against Paul Reinhart, Inc.* whereby the Debtor moved for the dismissal of certain of CoMark's counterclaims against it, and the Bank Agent, on behalf of the Lenders, filed a *Motion to Dismiss CoMark's Counterclaim Against the Bank Group for Failure to State a Claim* whereby the Bank Agent moved for the dismissal of CoMark's counterclaims against the Bank Agent and Lenders. On August 17, 2009, the Bankruptcy Court entered an *Order on Debtor's Motion to Dismiss Counterclaim* and *Order on Bank Group's Motions* pursuant to which all of CoMark's counterclaims against the Debtor, with the exception of breach of contract and conversion, and all of CoMark's counterclaims against the Bank Group, with the exception of conversion, were dismissed. On August 27, 2009, CoMark filed a *Motion and Brief to Reconsider Court's Orders of Dismissal of Counts II, V, VI and VII of CoMark's Counterclaim*. Prior to the deadline for the Debtor and Bank Group to respond to the motion for reconsideration, the Debtor, the Bank Group, and, along with several other parties, agreed to engage in a multi-party mediation. As a result, the deadline has been extended by order and agreement of the parties pending the Bankruptcy Court's consideration of approval of the Mediated Settlement Agreement entered into at the mediation. *See* Section VII below for a description of the mediation and Mediated Settlement Agreement.

## O.    Sales of Assets of the Estate

### 1.    Investment in The Seam and ICE

On April 22, 2009, the Debtor filed a *Motion to Approve Sale of Certain Assets Free and Clear of All Liens, Claims, Encumbrances and Interests, and For Related Relief*, to request authority to sell its equity ownership in The Seam, LLC (50,000 investment units) and IntercontinentalExchange, Inc. (11,067 shares of common stock). On May 28, 2009, the Bankruptcy Court entered an *Order Granting Debtor's Motion to Approve Sale of Certain Assets Free and Clear of All Liens, Claims, Encumbrances and Interests, and For Related Relief*.

## 2. Unnecessary Furniture

On July 17, 2009, the Debtor filed a *Motion to Approve Sale of Certain Assets of De Minimus Value Free and Clear of All Liens, Claims, Encumbrances and Interests, and For Related Relief*, to request authority to sell certain unnecessary items of furniture in connection with the reduction of the office space leased by the Debtor. On July 21, 2009, Dallas County and the City of Richardson filed a *Limited Objection to Motion to Approve Sale of Certain Assets of De Minimus Value Free and Clear of All Liens, Claims, Encumbrances and Interests, and For Related Relief*. The Debtor and the above-referenced taxing authorities subsequently reached agreement in resolution of the Limited Objection. On July 30, 2009, the Bankruptcy Court entered an *Order Granting Debtor's Motion to Approve Sale of Certain Assets of De Minimus Value Free and Clear of All Liens, Claims, Encumbrances and Interests, and For Related Relief.*

## P. Compromises of Disputes

### 1. Signia Settlement

On May 11, 2009, the Debtor filed a *Motion for Approval of Compromise and Settlement with Signia Cotton Cooperative*. Pursuant to the Motion, the Debtor requested approval of the settlement that it had reached with Signia Cotton Cooperative ("Signia") in relation to a Marketing Agreement between the parties and amounts owing by Signia to the Debtor under a promissory note. On June 11, 2009, the Bankruptcy Court entered an *Order Granting Debtor's Motion for Approval of Compromise and Settlement with Signia Cotton Cooperative*, following which the settlement was consummated.

### 2. PPGC-PGC Settlement

On August 7, 2009, the Debtor filed a *Motion for Entry of Order Approving Debt Settlement and Release Agreement Among the Debtor, Pacific Pima Gin Company, Inc. and Pacific Ginning Company, LLC*. As explained in the Motion, Pacific Pima Gin Company, Inc. ("PPGC"), an affiliate of the Debtor, owed approximately $3.3 million to the Debtor under various intercompany loans made by the Debtor to PPGC, and Pacific Ginning Company, LLC ("PGC"), in turn, owed approximately $1.4 million to PPGC in connection with a sales transaction that took place between PGC and PPGC in 2007. Each of the parties ostensibly held certain claims and defenses against one another in connection with the foregoing. Pursuant to a Debt Settlement and Release Agreement between the parties, dated as of July 17, 2009, the parties agreed to compromise and settle their respective financial obligations, claims and defenses, in a comprehensive manner, subject to the Bankruptcy Court's approval. Pursuant to the Agreement, the Debtor was to immediately receive $660,000 with the possibility of recovering certain additional amounts in the future. On August 25, 2009, the Bankruptcy Court entered an *Order Approving Debt Settlement and Release Agreement Among the Debtor, Pacific Pima Gin Company, Inc. and Pacific Ginning Company, LLC*, following which the settlement was consummated.

### 3. Receivables Restructuring Protocol

On August 7, 2009, the Debtor filed a *Motion for Entry of Order Approving Receivables Restructuring Protocol and Authorizing Debtor to Enter Into Restructuring Agreements with Customers in Accordance with Protocol*. Pursuant to the Motion, the Debtor requested approval of specific restructuring parameters and procedures in relation to its outstanding foreign receivables. On August 20, 2009, the Bank Agent filed an objection to the protocol caps proposed under the motion. By agreement between the Debtor and the Bank Agent, the protocol caps were modified, and on August 25, 2009, the Bankruptcy Court entered an *Order Approving Receivables Restructuring Protocol and Authorizing Debtor to Enter Into Restructuring Agreements with Customers in Accordance with Protocol*.

# VII.
## THE MEDIATED SETTLEMENT AND ANCILLARY PLAN PROVISIONS
## FOR IMPLEMENTATION OF THE MEDIATED SETTLEMENT AGREEMENT

### A.    The Mediated Settlement

The Plan is structured around, and dependent upon, the Bankruptcy Court's approval of a mediated settlement entered into by the Debtor (individually and on behalf of the Estate), PRAI, PRAG, PRAI-Texas, the Committee, the Bank Group, the East Plaintiffs and CoMark (collectively, the "Mediation Settling Parties").  In this regard, on December 21, 2009, the Debtor and the Committee filed their *Amended Joint Motion of the Debtor and Committee for Entry of Order Approving Mediated Settlement* (the "Mediated Settlement Motion"), a copy of which is attached hereto as Exhibit C.  Among other things, the Mediated Settlement Motion describes the connections between the Mediation Settling Parties, the nature of the disputes between the parties, and the settlement reached among the parties in resolution of such disputes.  The Plan Proponents encourage Creditors to separately review the entire Mediated Settlement Motion.  Certain aspects of the motion are outlined herein.

First, the disputes that have existed between the Mediation Settling Parties are generally categorized within the Mediated Settlement Motion as the East Lawsuit Disputes (in reference to the East Lawsuit), the CoMark Lawsuit Disputes (in reference to the CoMark Lawsuit), and the Plan Disputes (in reference to the Plan Proponents' previously-filed proposed plan) (collectively, the "Disputes").  In late August 2009, the Mediation Settling Parties agreed to participate in a joint mediation in an effort to resolve the Disputes and reach an agreement in furtherance of a global resolution to the Bankruptcy Case. The Honorable Marvin Isgur, Chief Judge of the U.S. Bankruptcy Court for the Southern District of Texas, agreed to conduct the mediation and serve as the settlement judge for such purpose.  Based upon same, on September 8, 2009, the U.S. Court Appeals for the Fifth Circuit issued an order temporarily assigning Judge Isgur to the Northern District of Texas for purposes of the mediation, and on September 16, 2009, the Bankruptcy Court entered an *Order for Mediation* in the Bankruptcy Case, the East Lawsuit, and the CoMark Lawsuit, directing the Mediation Settling Parties to engage in the mediation and establishing procedures in relation thereto.

The mediation took place on September 30, 2009.  Leading up to the mediation, not only had all of the Mediation Settling Parties engaged in months of informal negotiations, but groupings of them had also engaged in prior mediations related to the East Lawsuit and the CoMark Lawsuit which, in whole or in part, failed to result in a settlement of Disputes involved in those cases.  During the course of the mediation, however, and with the assistance of Judge Isgur, the Mediation Settling Parties successfully negotiated a settlement in resolution of all of the Disputes (the "Mediated Settlement") and entered into a Mediated Settlement Agreement, a copy of which is attached to the Mediated Settlement Motion as Exhibit A.  Following is a summary of the key terms of the Mediated Settlement:[10]

Financial Terms Related to PRAG:

- *PRAG Payments*.  PRAG shall cause $17,000,000 in payments to be made to the Estate (the "PRAG Payments"), as follows:

---

[10] The following is intended to serve only as a summary of the key terms.  To the extent of any conflict between the summary and the actual terms of the Mediated Settlement Agreement, the terms of the Mediated Settlement Agreement shall control; *provided, however*, that to the extent of any conflict between the Mediated Settlement Agreement and the Bankruptcy Court's order approving the Mediated Settlement (referred to herein and in the Plan as the Mediated Settlement Order), the terms of the Mediated Settlement Order shall control.

(a) $14,000,000 (the "Initial PRAG Payment") shall be paid not later than the later of (i) 14 days after approval of the settlement by the Bankruptcy Court, and (ii) 14 days after all of the Termination Rights (described below) have expired and have not been exercised; and

(b) An additional $3,000,000 in payments (collectively, the "Subsequent PRAG Payments") shall be paid at the rate of $5.00 per each bale of cotton bought directly from growers or merchants in the United States without regard to whether such purchases are at a profit or loss, whether such transactions are through PRAG or any of its affiliates, subsidiaries or entities controlled or directed by PRAG, whether such ownership, affiliation or direction is direct or indirect (the "Subsequent Payment Obligation"). Procedures for the payment and accounting in relation to the Subsequent Payment Obligation shall comport with the provisions of Section 7.1 of the Plan.[11] The amount equal to the difference between $3,000,000 and the amount paid under the Subsequent Payment Obligation (the "Residual Lump Sum Payment") shall be paid on or before December 31, 2019.

- *PRAG Guarantee*. PRAG shall unconditionally guarantee payment/performance of the PRAG Payments. After all of the PRAG Payments have been made, including payment of the Residual Lump Sum Payment, PRAG shall have no further payment obligations.

- *No Liens*. The PRAG Payments shall be free and clear of all Liens. No Person (including the Bank Group) shall have any Lien against the $17,000,000.

- *No Claim*. PRAG shall have no Claim against the Estate.

Financial Terms Related to Bank Group:

- *Bank Group Payments*. The Bank Group shall pay $12,750,000 to the Estate (the "Bank Group Payments"), as follows:

(a) $9,000,000 (the "Initial Lender Payment") shall be paid not later than the later of (i) 14 days after approval of the settlement by the Bankruptcy Court, and (ii) 14 days after the requisite Grower Releases (defined below) are delivered to the Bank Group; and

(b) An additional $3,750,000 (the "Subsequent Lender Payment") shall be paid not later than the latest of (i) March 31, 2010, (ii) 14 days after the requisite Grower Releases are delivered to the Bank Group; and (iii) 14 days after all of the Termination Rights have expired and have not been exercised.

- *No Liens*. The Bank Group Payments shall be free and clear of all Liens. No Person (including the Bank Group) shall have any Lien against the $12,750,000.

- *No Unsecured Claims*. Neither the Bank Group nor its members shall have an Unsecured Claim against the Estate.

Financial Terms Related to CoMark:

- *CoMark Registry Funds*. Once all Termination Rights have expired without having been exercised, all of the funds on deposit with the registry of the Bankruptcy Court related to the sale of bales of cotton in dispute between the Debtor and CoMark (the CoMark Registry Funds),[12] totaling approximately $4.1 million, shall become property of the Estate.

---

[11] The Mediated Settlement Agreement refers to specific provisions of the Plan Proponents' previously-proposed plan. Such provisions have been restated in Section 7.1 of the current Plan.

[12] The Plan defines "CoMark Registry Funds" as the "total amount of all funds deposited into the registry of the Bankruptcy Court pursuant to that certain *Order Approving Joint Expedited Motion of Debtor and CoMark for Order Authorizing the Sale of Certain Disputes Bales of Cotton and the Placement of Sales Proceeds in Escrow or in Court's Registry Pending Determination of Rights to Same* entered in the Bankruptcy Case on or about December 12, 2008 [Docket No. 191] (including any interest

- *CoMark Payment*.  CoMark shall pay to the Estate the difference between $4,250,000 and the amount of the CoMark Registry Funds received by the Estate (the "CoMark Payment") by no later than the later of (i) 14 days after approval of the settlement by the Court, and (ii) 14 days after all Termination Rights have expired without being exercised.

- *No Liens*.  The CoMark Registry Funds and CoMark Payment shall be free and clear of all Liens.  No Person (including the Bank Group) shall have any Lien against the CoMark Registry Funds or the CoMark Payment.

- *Allowance of CoMark Claim*.  The Claim asserted by CoMark in the Bankruptcy Case[13] shall be allowed as a general unsecured, unsubordinated claim against the Estate (an Allowed General Unsecured Claim under the Plan) in the amount of $11,800,000.

<u>Releases Among the Mediation Settling Parties</u>

- *Mutual Releases*.  Except as set forth below, upon approval of the settlement and subject to the Termination Rights, each of the Mediation Settling Parties releases each of the other Mediation Settling Parties (and each of their respective officers, directors, managers, owners, members, affiliates, agents and attorneys) from all claims (as defined in Section 101 of the Bankruptcy Code), known or unknown, asserted or unasserted, including without limitation claims for breach of contract, fraud, tortious interference, aiding and abetting breach of fiduciary duty, conversion, lender liability, equitable subordination or any other actual, imaginable, or unimaginable claim that arose from the beginning of the Universe through September 30, 2009.  The exceptions are as follows:

  (a) Each of the Mediation Settling Parties (excluding the Debtor/Estate) retains its Claims against the Estate, with full right to participate in the Bankruptcy Case as a party in interest;

  (b) The Bank Group and/or its members retain Secured Claims and Liens against all of the Bank Group and its members' Collateral, except for any Claims or Liens against the CoMark Registry Funds and against CoMark;

  (c) The members of the Bank Group retain claims against persons arising from transactions that are wholly unrelated to the Debtor (*e.g*., if a member of the Bank Group has an unrelated loan to a person otherwise released under the Mediated Settlement Agreement, the member is not releasing any claim arising out of such an unrelated loan); and

  (d) Each of the Mediation Settling Parties shall have the full right to enforce its rights arising under the Mediated Settlement Agreement.

- *Effect of Exercise of Termination Right*.  If the Mediated Settlement Agreement is terminated pursuant to any of the Termination Rights, then the foregoing releases are void and of no effect.

<u>Other Release Provisions</u>:

- *Grower Release Provisions*.  The Mediated Settlement is dependent upon the inclusion of provisions within the Mediated Settlement Order which provide for the following: (i) the grant of a release to the Bank Group and its members by all Growers[14] who are Creditors of the Estate; (ii) a requirement for each such Grower to execute a complete release of the Bank

---

[13] CoMark has asserted a non-priority, unsecured Claim in the Bankruptcy Case in the amount of $11,821,392.

[14] For purposes of this summary, "Growers" refers to cotton farmers, gin companies, and other cotton producers who entered into forward cotton purchase contracts with the Debtor which remained unperformed by the Debtor as of the Petition Date.

(above footnote continuation at top)
earned on such funds while on deposit) which is received by the Estate pursuant to, but subject to the conditions set forth in, the Mediated Settlement Agreement and Mediated Settlement Order."

Group and its members (a "Grower Release");[15] and (iii) that no distribution shall be made to any Grower who has failed to sign a Grower Release until such time as such Grower has executed a Grower Release. See also discussion on Bank Group Termination Right, below.

- *RCS Release Provisions.* The Mediated Settlement is also dependent upon the inclusion of provisions within the Mediated Settlement Order which provide for the following: (i) the grant of a release to PRAG by Rabo Capital Services, Inc. ("RCS"); (ii) a requirement for RCS to execute a complete release of PRAG (to the same extent as the release provided to PRAG by the other Mediation Settling Parties in the Mediated Settlement Agreement) (the "RCS Release") within 14 days after entry of the Mediated Settlement Order; and (iii) that no distribution shall be made to RCS until RCS has executed the RCS Release. See also discussion on PRAG Termination Right, below.

Amended Plan Provisions:

- *Amended Plan.* The Debtor and the Committee shall jointly propose an amended plan of reorganization (liquidation) providing for the distribution of the Estate's assets in a manner consistent with the Bankruptcy Code (the "Amended Plan").[16] The Amended Plan:

   (a) shall not seek to subordinate any obligation or claim the subject of the Mediated Settlement Agreement or discriminate against any of the other Mediation Settling Parties;

   (b) shall not seek to modify the terms of the Mediated Settlement Agreement; and

   (c) shall contain provisions for early distributions to holders of Unsecured Claims (*i.e.* prior to the resolution of all claims objections), but with appropriate reserves for objectionable Claims.

- *Diligence.* The Debtor and the Committee are required to act with all deliberate speed in filing the Amended Plan and are required to seek approval of a disclosure statement and confirmation of the Amended Plan at the earliest convenient date for the Court.

Termination Rights:[17]

- *Bank Group Termination Right.* If, and only if, (a) the Mediated Settlement Order does not include the Grower Release Provisions set out above, and (b) a sufficient number of Grower Releases satisfactory to the Bank Group are not received by the Bank Agent within 14 days after entry of the Mediated Settlement Order, the Bank Group and its members may (at their sole option and election) withdraw from the Mediated Settlement Agreement, thereby terminating the Agreement and the Mediated Settlement.

- *PRAG Termination Right.* If, and only if, (a) the Mediated Settlement Order does not include the RCS Release Provisions set out above, and (b) RCS does not timely execute and deliver the RCS Release to PRAG, then PRAG may (at its sole option and election) withdraw from the Mediated Settlement Agreement, thereby terminating the Agreement and the Mediated Settlement.

- *Effect of Exercise of Termination Right.* In the event of the timely exercise of any of the above Termination Rights, then thereafter none of the Mediation Settling Parties shall have any further obligation under the Mediated Settlement Agreement and the Mediated Settlement Agreement shall have no further force and effect.

---

[15] The form of the Grower Release agreed upon by the Mediation Settling Parties is identical, in all material respects, to the Settlement Release attached to the Plan as Exhibit 2.

[16] In compliance with this provision, the Plan Proponents have filed the current Plan.

[17] Certain of the Termination Rights within the Mediated Settlement Agreement have already expired without having been exercised. Therefore, they are not summarized herein. Only the outstanding Termination Rights are summarized herein.

<u>General Provisions</u>:

- *Court Approval*.   The Mediated Settlement Agreement is subject to approval of the Bankruptcy Court.

- *Reservation of Rights as to Special Counsel Fees*.  The Mediated Settlement Agreement does not resolve any disputes regarding the application of the Bankruptcy Court's orders with respect to the amount of attorneys' fees to be awarded to the Committee's Special Counsel firms.  All parties reserve all positions with respect to same and the matter will be submitted to the Bankruptcy Court for resolution.

- *Remedies of the Estate in the Event of Breach*.  If any entity with a payment obligation under the Mediated Settlement Agreement fails to timely make the payment, the Estate (or its successor) may elect either of the following remedies and may collect all attorneys' fees and costs related to the exercise of such election option: (i) enforce the payment obligation; or (ii) revive all claims against the defaulting party that are released under the Mediated Settlement Agreement.

The Mediation Settlement Motion will be heard by the Bankruptcy Court at or prior to the Confirmation Hearing.  As indicated above, the Plan is structured around, and dependent upon, the Bankruptcy Court's approval of the Mediated Settlement.

Separately, the Mediated Settlement is dependent upon, among other things, the execution of a Grower Release by each of the Growers who is a Creditor of the Estate.  As of the date hereof, the Plan Proponents believe that nearly all (if not all) of such Growers have executed a Grower Release.  Not only is this critical to approval of the Mediated Settlement, but it is also relevant to each such Grower's recovery in the Bankruptcy Case because, under the terms of the Mediated Settlement Agreement, no distribution of any amount of the PRAG Payments, Bank Group Payments, CoMark Registry Funds, or CoMark Payment (collectively referred to as the Settlement Payments in the Plan) shall be made to a Grower until the Grower has executed and delivered a Grower Release to the Bank Group.

With this in mind, the Mediated Settlement Agreement also requires the Plan Proponents to file an Amended Plan, a plan that shall not discriminate against any of the Mediation Settling Parties.  Among the Mediation Settling Parties are the East Plaintiff Growers and CoMark, each of whom holds a General Unsecured Claim in the Bankruptcy Case.  Hence, to address the non-discriminatory requirement, the Plan Proponents, in consultation with each of the other Mediation Settling Parties, formulated the current Plan in a manner designed to treat all General Unsecured Claims in an identical fashion.  Accordingly, the Plan incorporates release and Settlement Payment distribution provisions that are equally applicable to all holders of General Unsecured Claims to ensure the equality of treatment in relation to the Grower Release requirement and Settlement Payment limitations of the Mediated Settlement Agreement.  Such provisions are detailed below in connection with a description of the Plan's ancillary settlement provisions.

**B.      Ancillary Plan Provisions for Implementation
Of the Mediated Settlement Agreement**

**1.      Incorporation of Mediated Settlement Agreement and Mediation
Settlement Order, and Transfer of Rights to the Creditor Trust**

Pursuant to Section 6.3 of the Plan, on the Effective Date of the Plan, the Mediated Settlement Agreement and Mediated Settlement Order will be deemed incorporated into the Plan by reference, and all of the terms and conditions of the Mediated Settlement Agreement and Mediated Settlement Order (including, without limitation, the releases provided thereby) will be binding on all Creditors, all Equity

Interest holders, and both the Creditor Trust (described below) and the Trustee of the Creditor Trust. Additionally, all of the Estate's rights under and in relation to the Mediated Settlement Agreement and the Mediated Settlement Order, including, without limitation, the Estate's right to receive the Subsequent Lender Payment and the Subsequent PRAG Payments, will constitute Trust Assets which, on the Effective Date of the Plan, will be transferred and assigned to the Creditor Trust. In furtherance of such provisions of the Plan, and to facilitate consummation of the Mediated Settlement, the Plan also incorporates several ancillary implementation provisions outlined below.

### 2. The Supplemental Settlement Release, the Settlement Opt-Out Election, And Restrictions on the Distribution of Lender Settlement Trust Funds

**IMPORTANT: THE FOLLOWING IS A DESCRIPTION OF PLAN PROVISIONS WHICH MATERIALLY IMPACT THE RIGHTS AND RECOVERIES OF HOLDERS OF GENERAL UNSECURED CLAIMS. EACH HOLDER OF A GENERAL UNSECURED CLAIM IS ENCOURAGED TO CAREFULLY REVIEW THE FOLLOWING DESCRIPTION AND ALL PROVISIONS OF THE PLAN REFERENCED THEREIN.**

Before turning to specific release and settlement election provisions of the Plan, it is first important to have an understanding of the following defined terms of the Plan:

*Settlement Trust Assets*. The Settlement Payments (including all proceeds and product of such assets). The Settlement Payments are collectively comprised of the CoMark Payment, the CoMark Registry Funds, the Initial Lender Payment, the Initial PRAG Payment, the Subsequent Lender Payment, and the Subsequent PRAG Payments.

    *Lender Settlement Trust Funds*. Collectively, the Initial Lender Payment and the Subsequent Lender Payment (including all proceeds and product of such payments).

        *Net Available Lender Settlement Trust Funds*. At any given time, the Cash on hand in the Creditor Trust constituting Lender Settlement Trust Funds, excluding Lender Settlement Trust Funds on deposit in the Disputed Claims Reserve Account[18] and the Unrestricted Administrative Expense Reserve.[19]

    *Other Settlement Trust Funds*. Collectively, all Settlement Trust Assets other than the Lender Settlement Trust Funds.

        *Net Available Other Settlement Trust Funds*. At any given time, the Cash on hand in the Creditor Trust constituting Other Settlement Trust Funds, excluding Other Settlement Trust Funds on deposit in the Disputed Claims Reserve Account and the Unrestricted Administrative Expense Reserve.

    *Net Available Settlement Trust Funds*. In connection with distributions under the Plan, any amount of the Net Available Lender Settlement Trust Funds and/or Net Available Other Settlement Trust Funds.

*Settlement Release*. A written Unconditional Release in the form of Exhibit 2 to the Plan. *See* Exhibit A (the Plan), Exh. 2.

    *Settlement Release Deadline*. The date that is 90 days after the Effective Date of the Plan.

---

[18] See Section XI(B)(5) below for a discussion regarding the purpose of the Disputed Claims Reserve Account.

[19] See Section XI(B)(5) below for a discussion regarding the purpose of the Unrestricted Administrative Expense Reserve.

Utilizing the above Plan definitions, Section 7.4.1 of the Plan sets out the following Supplemental Settlement Release applicable to all holders of General Unsecured Claims:

**EFFECTIVE AS OF THE EFFECTIVE DATE, AND IN CONSIDERATION OF THE RIGHT OF HOLDERS OF ALLOWED GENERAL UNSECURED CLAIMS TO RECEIVE DISTRIBUTIONS OF NET AVAILABLE SETTLEMENT TRUST FUNDS UNDER THE PLAN, EACH HOLDER OF A GENERAL UNSECURED CLAIM (WHETHER ALLOWED OR DISALLOWED), IN SUCH HOLDER'S OWN RIGHT, ON BEHALF OF ANY PERSON OR ENTITY THAT SUCH HOLDER CONTROLS, AND ON BEHALF OF SUCH HOLDER'S OFFICERS, DIRECTORS, EMPLOYEES, INDEPENDENT CONTRACTORS, ATTORNEYS, AGENTS, HEIRS, EXECUTORS, ADMINISTRATORS, SUCCESSORS AND ASSIGNS, IS DEEMED TO HAVE UNCONDITIONALLY AND IRREVOCABLY WAIVED, REMISED, ACQUITTED, AND FULLY AND FOREVER RELEASED AND DISCHARGED THE LENDER-RELATED PARTIES[20] AND THE PRAG-RELATED PARTIES,[21] AND EACH OF THEM, FROM ANY AND ALL CLAIMS WHICH SUCH HOLDER HAS OR EVER HAD AGAINST ANY OF THEM ARISING UNDER OR RELATED TO THE HOLDER'S GENERAL UNSECURED CLAIM, THE BANKRUPTCY CASE, THE EAST LAWSUIT, THE COMARK LAWSUIT, THE MARCH TRADES, THE INTERCREDITOR AGREEMENT, OR ANY OF THE EVENTS LEADING UP TO THE FILING OF THE BANKRUPTCY CASE, WHETHER SUCH CLAIMS ARE LIQUIDATED OR UNLIQUIDATED, MATURED OR CONTINGENT, KNOWN OR UNKNOWN, AND ASSERTED OR UNASSERTED, IT BEING THE INTENTION THAT SUCH RELEASE BE AS BROAD AS THE LAW ALLOWS AND COVERING ALL SUCH CLAIMS FROM THE BEGINNING OF TIME THROUGH THE EFFECTIVE DATE, INCLUDING, WITHOUT LIMITATION, ANY CLAIMS OR CAUSES OF ACTION ARISING UNDER STATE LAW OR THE BANKRUPTCY CODE; _PROVIDED, HOWEVER_, THAT SUCH RELEASE SHALL NOT CONSTITUTE A RELEASE OF: (i) SUCH HOLDER'S GENERAL UNSECURED CLAIM AGAINST THE ESTATE; (ii) ANY OF THE RIGHTS OBTAINED BY, OR ANY OF THE OBLIGATIONS IMPOSED UPON, ANY PERSON UNDER THE PLAN; OR (iii) ANY OF THE RIGHTS OBTAINED BY, OR ANY THE OBLIGATIONS IMPOSED UPON, ANY OF THE MEDIATION SETTLING PARTIES UNDER THE MEDIATED SETTLEMENT AGREEMENT AND MEDIATED SETTLEMENT ORDER; _AND FURTHER PROVIDED_, THAT SUCH RELEASE SHALL NEITHER APPLY TO, NOR BE BINDING UPON, ANY HOLDER OF A GENERAL UNSECURED CLAIM THAT TIMELY MAKES THE SETTLEMENT OPT-OUT ELECTION PURSUANT TO SECTION 7.4.2 OF THE PLAN.**

As indicated by the above-provision, while the Supplemental Settlement Release provides for an expansive release of both the Lender-Related Parties and the PRAG-Related Parties, the Supplemental

---

[20] The Plan defines Lender-Related Parties as follows: "Collectively, all of the individual members of the Bank Group and all of their respective predecessors, affiliates, officers, directors, managers, owners, members, employees, agents, attorneys (including Vinson & Elkins LLP and its individual attorneys), representatives (including FTI Consulting and its individual consultants), successors and assigns."

[21] The Plan defines PRAG-Related Parties as follows: "Collectively, PRAG, PRAI, PRAI-Texas, Paul Reinhart (Australia) Pty Ltd., the Debtor, and the Estate and all of their respective predecessors, affiliates, officers, directors, managers, owners, members, employees, agents, attorneys, representatives, successors and assigns."

Settlement Release will <u>not</u> constitute a release of a holder's General Unsecured Claim against the Estate and will <u>not</u> constitute a release of any of the rights obtained by any Person (including holders of General Unsecured Claims) under the Plan.

Additionally, the Supplemental Settlement Release shall neither apply to, nor be binding upon, any holder of a General Unsecured Claims that timely makes the Settlement Opt-Out Election pursuant to Section 7.4.2 of the Plan. Section 7.4.2 of the Plan sets out the means by which the election may be made and implications of both making, and failing to make, the election. Specifically, Section 7.4.2 provides as follows:

> Each holder of a General Unsecured Claim shall have the right to opt out of the Supplemental Settlement Release of Section 7.4.1 of the Plan and the benefits conferred under the Plan in relation to the Mediated Settlement Agreement (a) by making such election on the holder's Ballot <u>and</u> timely returning the completed and signed Ballot to the Balloting Agent on or before the Voting Deadline, or (b) only in the case of holders of General Unsecured Claims constituting Effective Date Rejection Damage Claims, by making such election pursuant to the provisions of Section 8.3 of the Plan[22] (the "<u>Settlement Opt-Out Election</u>"). By timely making the Settlement Opt-Out Election, such holder: (a) waives the right to receive, and shall not receive, any distribution of Net Available Settlement Trust Funds on account of the holder's General Unsecured Claim; and (b) shall not be bound by the Supplemental Settlement Release set forth in Section 7.4.1 of the Plan; *provided, however,* that the holder's making of the Settlement Opt-Out Election shall not nullify, eliminate, terminate, amend or otherwise modify, in any respect whatsoever, any release that the holder may have separately given or granted to any of the Lender-Related Parties or PRAG-Related Parties. **THE SETTLEMENT OPT-OUT ELECTION MAY ONLY BE MADE IN ACCORDANCE WITH THE FOREGOING PROCEDURES. EACH AND EVERY HOLDER OF A GENERAL UNSECURED CLAIM WHO DOES NOT TIMELY MAKE THE ELECTION IN ACCORDANCE WITH SUCH PROCEDURES, AND EACH AND EVERY HOLDER OF A GENERAL UNSECURED CLAIM WHO RECEIVES AND ACCEPTS A DISTRIBUTION OF NET AVAILABLE SETTLEMENT TRUST FUNDS UNDER THE PLAN, SHALL BE BOUND BY THE SUPPLEMENTAL SETTLEMENT RELEASE SET FORTH IN SECTION 7.4.1 OF THE PLAN**.

Finally, the Plan expressly restricts the distribution of Lender Settlement Trust Funds to only those holders of Allowed General Unsecured Claims who have delivered an originally-executed Settlement Release to the Bank Agent by no later than the Settlement Release Deadline, subject to the Bank Agent's right to waive the requirement, in its sole discretion, under certain circumstances. *See* Plan, § 4.4.1(b) and Section VIII(D)(4) below (describing the treatment of Allowed General Unsecured Claims). Section 7.2.2 of the Plan sets out specifics with respect to the delivery of executed Settlement Releases and with respect to the Bank Agent's waiver of the requirement (if applicable), as well as the implications of failing to deliver a Settlement Release to the Bank Agent by the Settlement Release Deadline (in the absence of the Bank Agent's waiver of such requirement):

> No Lender Settlement Trust Funds shall be distributed to the holder of an Allowed General Unsecured Claim unless (a) on or prior to the Settlement Release Deadline, the holder has delivered an originally-executed Settlement Release to the Bank Agent, c/o Vinson & Elkins LLP, Attn: Clayton T. Hufft, Esq., 2001 Ross Avenue, Suite 3700,

---

[22] See the discussion in Section XI(A) below with respect to the Plan's provisions on executory contracts and Effective Date Rejection Damage Claims.

Dallas, Texas 75201-2975, or (b) the holder has not timely made the Settlement Opt-Out Election in accordance with Section 7.4.2 of the Plan and the Bank Agent, in relation to such holder, has waived the Settlement Release requirement of Section 4.4.1(b) of the Plan by providing written notice of such waiver to the Trustee. In the event that neither of the above conditions is satisfied as to a particular holder of an Allowed General Unsecured Claim, then all distributions of Net Available Lender Settlement Trust Funds that would otherwise be payable to such holder on account of such Allowed General Unsecured Claim shall instead be returned and refunded by the Trustee to the Bank Agent for the benefit of the Bank Group.

### 3. Provisions Related to the Subsequent PRAG Payments

Confirmation of the Plan is dependent upon the Bankruptcy Court's approval of the Mediated Settlement and entry of the Mediated Settlement Order. Accordingly, the Plan's supplemental settlement provisions in relation to the Subsequent PRAG Payments are predicated upon the Mediated Settlement Order having already been entered. With that in mind, Section 7.1 of the Plan restates the payment obligation associated with the Subsequent PRAG Payments and specifies the means by which such payments must be made. First, Section 7.1.1 of the Plan restates the payment obligation as follows:

> Pursuant to the Mediated Settlement Agreement and Mediated Settlement Order, PRAG is obligated to cause payments totaling $3,000,000.00 (collectively, the "Subsequent PRAG Payments") to be made to the Estate as follows: (a) payment of $5.00 per each bale of cotton bought directly from growers or merchants in the United States (collectively, the "Domestic Bales") by or through PRAG or any of the PRAG Affiliates, without regard to whether such purchases are at a profit or loss (collectively, all such payments referred to as the "Cotton Purchase Payments"); and (b) payment, on or before December 31, 2019, of the difference between $3,000,000.00 and the total amount of all Cotton Purchase Payments made to the Estate (the "Residual Lump Sum Payment"). Pursuant to the Mediated Settlement Agreement and Mediated Settlement Order, PRAG has unconditionally guaranteed the performance of the foregoing payment obligations (the "PRAG Guarantee"). In accordance with Section 6.3 of the Plan, on the Effective Date the Estate's right to receive the Subsequent PRAG Payments and its rights under the PRAG Guarantee shall be transferred and assigned to the Creditor Trust as part of the Trust Assets.

Next, Section 7.1.2 of the Plan provides for the identification of the PRAG-designated entity to make the Subsequent PRAG Payments. Specifically, by no later than 30 days prior to the Confirmation Hearing, PRAG is required to disclose the name of the entity (referred to as "NEWCO" herein and in the Plan) that has been organized (a) to handle all purchases of Domestic Bales under the terms of the Mediated Settlement Agreement and Mediated Settlement Order, and (b) to be responsible for the making all Cotton Purchase Payments and the Residual Lump Sum Payment to the Creditor Trust. From and after the Effective Date of the Plan and until the amount of the Subsequent PRAG Payments has been paid in full to the Creditor Trust (the "Obligation Period"), all purchases of Domestic Bales by or through PRAG or any of the PRAG Affiliates, and all sales of such purchased Domestic Bales to third parties, is required to be undertaken solely by NEWCO. On the Effective Date of the Plan, PRAG is required to execute an instrument pursuant to which it covenants and agrees to be bound by this restriction.

Finally, Sections 7.1.3 and 7.1.4 of the Plan set out the following mechanics and timing requirements applicable to the Cotton Purchase Payments. First, each of the Cotton Purchase Payments shall only become payable by NEWCO to the Creditor Trust following NEWCO's sale and delivery of the purchased Domestic Bales to third parties. With this in mind, the Plan requires NEWCO to provide

reporting and payments as follows during the Obligation Period: (i) first, within 15 days following the end of each month of the Obligation Period, NEWCO shall provide to the Trustee a written report specifying the number of Domestic Bales that it purchased in the preceding month; (ii) second, as NEWCO sells and delivers such Domestic Bales to third parties, NEWCO shall provide to the Trustee, within 15 days following the end of each month in which NEWCO has made delivery of any such Domestic Bales, a written report specifying the number of Domestic Bales so delivered during the preceding month; and (iii) third, within 30 days after the end of each calendar month in which NEWCO has made delivery of any such Domestic Bales, NEWCO shall pay to the Creditor Trust an amount equal to $5.00 per each Domestic Bale so delivered during the preceding month. To evidence the obligation, on the Effective Date of the Plan, NEWCO shall execute an instrument pursuant to which it covenants and agrees to perform all of the obligations set out in Sections 7.1.2 and 7.1.3 of the Plan and represents and warrants to the Debtor, the Creditor Trust and the Trustee that (a) NEWCO will handle all cotton trading, purchasing, or selling conducted in the United States during the Obligation Period by, or on behalf of, PRAG or any of the other PRAG Affiliates, (b) NEWCO is adequately capitalized, and (c) NEWCO's performance of the obligations set forth in Sections 7.1.2 and 7.1.3 of the Plan has been duly authorized by all requisite corporate action on the part of NEWCO and will not violate any provision of any statute, rule or regulation, any provision of NEWCO's organizational and governing documents, any applicable order of any court, or any rule, regulation or order of any governmental body or agency.

Pursuant to the Plan, the Trustee shall be solely responsible for the distribution of Subsequent PRAG Payments pursuant to the Plan. None of PRAG, NEWCO, or any of the other PRAG Affiliates shall have any responsibility for the making of any such distributions, nor shall any them have any liability on account of any distributions that are made, or not made, by the Trustee from the Subsequent PRAG Payments.

4.      **Provisions Related to the Subsequent Lender Payment and Lender Claim Limitations**

Similar to the provisions related to the Subsequent PRAG Payments, Sections 7.2 and 7.3 of the Plan sets out supplemental provisions in relation to the Bank Group's rights, limitation of rights, and obligations under the Mediated Settlement Agreement and Mediation Settlement Order. First, Section 7.2.1 of the Plan restates the Bank Group's Subsequent Lender Payment obligation, reiterating that pursuant to the Mediated Settlement Agreement and Mediated Settlement Order, the Bank Group is obligated to pay $3,750,000.00 (the "Subsequent Lender Payment") to the Estate not later than the latest of (a) March 31, 2010, (b) 14 days after releases from cotton sellers holding Claims against the Estate are delivered to the Bank Group in accordance with paragraph 17 of the Mediated Settlement Agreement, and (c) 14 days after all termination rights set forth in the Mediated Settlement Agreement have expired and not been exercised. In accordance with Section 6.3 of the Plan, on the Effective Date the Estate's right to receive the Subsequent Lender Payment shall be transferred and assigned to the Creditor Trust as part of the Trust Assets. Next, Section 7.2.2 of the Plan sets out the restrictions on distribution of Lender Settlement Trust Funds (set out in detail above). Finally, Section 7.3 of the Plan reiterates that, in accordance with the Mediated Settlement Agreement and Mediated Settlement Order, there shall be no Allowed Unsecured Lender Claims (with all Unsecured Lender Claims deemed Disallowed as of the Effective Date of the Plan), and no distributions shall be made under the Plan on account of any Unsecured Lender Claim.

5.      **Remedies in the Event of a Settlement Payment Default**

Section 7.6 of the Plan specifies the remedies available to the Creditor Trust in the event of settlement payment default. First, pursuant to Section 7.6.1 of the Plan, should any Person having an obligation to pay any portion of the Subsequent Lender Payment fail to timely make such required

payment, the Trustee, on behalf of the Creditor Trust, shall have the right to enforce the payment obligation and shall also be entitled to recover all attorneys' fees and costs related to the exercise of such remedy. Similarly, pursuant to Section 7.6.2 of the Plan, should any Person having an obligation to pay any portion of the Subsequent PRAG Payments fail to timely make such required payment, the Trustee, on behalf of the Creditor Trust, shall have the right to enforce the payment obligation and shall also be entitled to recover all attorneys' fees and costs related to the exercise of such remedy.

### 6.     Dismissal of East Lawsuit and CoMark Lawsuit

Finally, Section 7.5 of the Plan provides for the dismissal of the East Lawsuit and CoMark Lawsuit. First, Section 7.5.1 of the Plan provides that, on the Effective Date of the Plan, and subject to the remedies provisions of the Plan outlined above, the East Lawsuit shall be deemed dismissed with prejudice, with each of the parties to said case to bear their own fees and expenses. Section, Section 7.5.2 of the Plan provides that, on the Effective Date of the Plan, the CoMark Lawsuit shall be deemed dismissed with prejudice, with each of the parties to said case to bear their own fees and expenses; *provided, however*, that such dismissal with prejudice shall have no impact upon, and CoMark shall retain, CoMark's Allowed General Unsecured Claim in the amount of $11,800,000.00 pursuant to the Mediated Settlement Agreement and Mediated Settlement Order.

## VIII.
## SUMMARY OF CLAIMS, CLASSIFICATION
## AND TREATMENT UNDER THE PLAN

### A.     Introduction

A summary of the principal provisions of the Plan relating to the treatment of Classes of Claims and Equity Interests is set out herein. The summary is qualified in its entirety by the Plan, itself, which is controlling in the event of any conflict. Additionally, the estimated amount of allowable Claims in the various Classes are estimates only and are not intended to be exact determinations. While the Debtor has made every effort to reasonably estimate such amounts, there is no guarantee that such estimates are accurate. Moreover, none of the descriptions herein below in relation to such estimates shall constitute an admission on the part of the Plan Proponents to the validity of any Disputed Claims. Any Claim which is not Allowed by an order of the Bankruptcy Court or pursuant to a settlement approved by an order of the Bankruptcy Court may be disallowed or reduced in amount if an objection has been, or is timely hereafter, filed and sustained by the Bankruptcy Court.

### B.     Classification of Claims and Equity Interests

The Plan provides for the division of Claims against and Equity Interest in the Debtor into Classes. All Claims (except Administrative Claims and Priority Tax Claims) and all Equity Interests are placed in Classes under the Plan. A Claim is classified within a particular Class only to the extent that the Claim qualifies under the description of that Class. A proof of claim asserting a Claim which is properly includable in more than one Class is only entitled to inclusion within a particular Class to the extent that it qualifies under the description of such Class, and shall be included within a different Class(es) to the extent that it qualifies under the description of such different Class(es). The Plan classifies Claims and Equity Interests as follows:

> Unclassified Claims
> Allowed Administrative Claims
> Allowed Priority Tax Claims

Classified Claims and Equity Interests
Class 1:  Allowed Lender Secured Claims
Class 2:  Allowed Other Secured Claims
Class 3:  Allowed Priority Non-Tax Claims
Class 4:  Allowed General Unsecured Claims
Class 5:  Equity Interests

## C.  Treatment of Unclassified Claims Under the Plan

In relation to the treatment afforded to Allowed Claims under the Plan, the Plan provides for the establishment of a Creditor Trust and for all payments on account of Allowed Claims to be made from the Creditor Trust.  Details with respect to the Creditor Trust are set out in Section IX(A) below.  For purposes of the descriptions below, however, it is helpful to have an understanding of the various categories of Trust Assets that are available for distribution to Creditors.  In this regard, the Plan segregates the Trust Assets based upon their character as Collateral for Lender Secured Claims, settlement payments under the Mediated Settlement, or residual unencumbered assets of the Estate. Specifically, the Plan includes the following defined terms:

Broad Categories of Trust Assets

*General Trust Assets*.  Excluding the Lender Collateral, the Lender Collateral Proceeds, and the Settlement Payments, all of the Trust Assets (including the proceeds and product of such assets).

*Net Available General Trust Funds*.  At any given time, the Cash on hand in the Creditor Trust constituting General Trust Assets, excluding General Trust Asset funds on deposit in the Disputed Claims Reserve Account[23] and the Unrestricted Administrative Expense Reserve.[24]

*Lender Collateral*.  All Assets which are subject to valid and enforceable Liens securing the payment of Lender Secured Claims including, without limitation, the following Assets as defined in the Cash Collateral Order: Pre-Petition Collateral, Cash Collateral, and Replacement Lien Collateral.  The Lender Collateral shall expressly exclude the Settlement Payments.

*Lender Collateral Proceeds*: Any and all Cash and non-Cash proceeds generated from the administration, sale, or other disposition of Lender Collateral.

*Net Available Lender Collateral Proceeds*.  At any given time, the Cash on hand in the Creditor Trust constituting Lender Collateral Proceeds, excluding Lender Collateral Proceeds on deposit in the Restricted Administrative Expense Reserve.[25]

*Settlement Trust Assets*.  The Settlement Payments[26] (including all proceeds and product of such assets).

*Unrestricted Trust Funds*.  At any given time, funds in the Creditor Trust constituting General Trust Assets and Settlement Trust Assets, but expressly excluding funds on deposit in the Disputed Claims Reserve Account and the Unrestricted Administrative Expense Reserve; *provided, however*, that in the case of any distribution or payment to be made from Unrestricted Trust Funds, such distribution or payment shall be funded first from available General Trust Asset funds and then from Settlement Trust

---

[23] See Section XI(B)(5) below for a discussion regarding the purpose of the Disputed Claims Reserve Account.

[24] See Section XI(B)(5) below for a discussion regarding the purpose of the Unrestricted Administrative Expense Reserve.

[25] See Section XI(B)(5) below for a discussion regarding the purpose of the Restricted Administrative Expense Reserve.

[26] The Settlement Payments are comprised of the CoMark Payment, the CoMark Registry Funds, the Initial Lender Payment, the Initial PRAG Payment, the Subsequent Lender Payment, and the Subsequent PRAG Payments.

Asset funds. The Unrestricted Trust Funds shall expressly exclude the Lender Collateral, the Lender Collateral Proceeds, and funds on deposit in the Restricted Administrative Expense Reserve.

Categories of Settlement Trust Assets

*Lender Settlement Trust Funds.* Assets of the Creditor Trust comprised of the Initial Lender Payment and the Subsequent Lender Payment (including all proceeds and product of such payments).

> *Net Available Lender Settlement Trust Funds.* At any given time, the Cash on hand in the Creditor Trust constituting Lender Settlement Trust Funds, excluding Lender Settlement Trust Funds on deposit in the Disputed Claims Reserve Account and the Unrestricted Administrative Expense Reserve.

*Other Settlement Trust Funds.* Collectively, all Settlement Trust Assets other than the Lender Settlement Trust Funds.

> *Net Available Other Settlement Trust Funds.* At any given time, the Cash on hand in the Creditor Trust constituting Other Settlement Trust Funds, excluding Other Settlement Trust Funds on deposit in the Disputed Claims Reserve Account and the Unrestricted Administrative Expense Reserve.

**1.      Treatment of Allowed Administrative Claims**

Pursuant to the Plan, in full and final satisfaction of Allowed Administrative Claims, each Allowed Administrative Claim shall, unless otherwise agreed, be paid in full in Cash by no later than the later of (a) fifteen (15) days after the Effective Date of the Plan, or (b) fifteen (15) days after becoming an Allowed Administrative Claim; *provided, however*, that (x) Allowed Administrative Claims that represent liabilities incurred on or after the Petition Date, but prior to the Effective Date, in the ordinary course of the Debtor's business which may be paid in the ordinary course of the Debtor's business without order of the Bankruptcy Court shall be paid in accordance with the agreements related thereto; and (y) from and after the Effective Date, any fees and charges which are assessed under Chapter 123, Title 28, United States Code, in relation to the Bankruptcy Case shall be paid by the Trustee from the Creditor Trust as they become due. All payments on account of Allowed Administrative Claims shall be made from Unrestricted Trust Funds of the Creditor Trust.

Holders of Administrative Claims, other than Allowed Administrative Claims, <u>must by no later than the Administrative Claims Bar Date</u>[27] (a) file an application with the Bankruptcy Court for allowance of the Administrative Claim, (b) serve a copy of such application on the Post-Confirmation Debtor, the Committee, the Trustee, and the United States Trustee, and (c) file and serve a notice of the filing of the application on all other parties entitled to notice in the Bankruptcy Case. <u>Failure to file and serve such application and notice by the Administrative Claims Bar Date shall result in the Administrative Claim being forever barred and discharged.</u>

With respect to the estimated amount of allowable Administrative Claims in the Bankruptcy Case, three categories of Administrative Claims have been or are expected to be asserted in the Bankruptcy Case: certain Administrative Claims asserted by the Pension Benefit Guaranty Corporation ("<u>PBGC</u>"); an Administrative Claim asserted by a lessor of rejected office equipment; and Administrative Claims anticipated to be requested for allowance by court-approved professionals in the Bankruptcy Case.

---

[27] The thirtieth (30th) day after the Effective Date of the Plan, unless not a Business Day, in which case the Administrative Claims Bar Date will be the first Business Day thereafter.

First, the PBGC has filed three proofs of claim in the Bankruptcy Case to assert Claims related to the Paul Reinhart, Inc. Employees Defined Benefit Pension Plan (as amended and restated from time to time, the "Pension Plan"). Background information regarding the Pension Plan, the PBGC, and pension plan termination issues are set out in Section IX(F) below. The PBGC has estimated the underfunding of benefit liabilities under the Pension Plan on a termination basis, as of an assumed termination date of October 15, 2008, to be $2,011,950. The PBGC has asserted the following Claims, contingent upon a distressed or involuntary termination of the Pension Plan:

- A Claim for unfunded benefit liabilities in the amount of $2,011,950;

- A Claim for unpaid minimum funding contributions in an unliquidated amount; and

- A claim for unpaid Title IV insurance premiums in an unliquidated amount.

Pursuant to 29 U.S.C. §§ 1362 and 1368, the PBGC asserts that its Claims for unfunded benefit liabilities constitute a tax owed to the PBGC as a governmental agency, and that such Claims are entitled to priority as Administrative Claims under Section 507(a)(2) of the Bankruptcy Code or, alternatively, as Priority Tax Claims under Section 507(a)(8) of the Bankruptcy Code, in each case limited to 30% of the collective net worth of the Debtor and the members of its controlled group. The amount of unfunded benefit liabilities that exceeds 30% of the collective net worth of the Debtor and the members of its controlled group is a General Unsecured Claim. The Plan provides for a standard termination of the Pension Plan if the Pension Plan has not previously been terminated prior to the Effective Date of the Plan. In the event of a standard termination (requiring, among other things, the cure of any underfunding of the Pension Plan), the PBGC Claims will be rendered moot and be subject to withdrawal or disallowance. In the event of a prior distressed or involuntary termination of the Pension Plan, on the other hand, the PBGC Claims will become non-contingent and be subject to treatment under the Plan. In either situation, the underfunding of the Pension Plan will have to be addressed (*i.e.* whether through cure of the underfunding in connection with standard termination or allowance of Claims of the PBGC in connection with distressed or involuntary termination). The Debtor reasonably believes that the estimated level of underfunding has decreased to an amount less than $2,000,000. For purposes of estimating Claims and recoveries in this Disclosure Statement, the Debtor has estimated the allowable amount of the PBGC's Administrative Claims to range between $1,500,000 and $2,000,000.

Second, Pitney Bowes Global Financial Services has asserted an Administrative Claim in the amount of $1,937.37 in relation to its lease of certain office equipment to the Debtor. Because the underlying lease was rejected by the Debtor, the Debtor believes that the Claim is likely not allowable in any amount.

Finally, professionals employed by the Debtor and the Committee are likely to seek the allowance of Administrative Claims in the Bankruptcy Case on account of fees and expenses that are incurred but remain unpaid as of the Effective Date of the Plan. In this regard, during the course of the Bankruptcy Case, certain of the professionals' fees and expenses have been paid on an interim basis subject to their final approval by the Bankruptcy Court at the end of the case. Separately, as a result of certain restrictions set out in the Cash Collateral Order, certain of the professionals' fees and expenses have not been, and will likely not in the future be, paid on an interim basis. Among other things, the Debtor does not anticipate that any of the fees and expenses incurred by Special Counsel of the Committee (engaged on a contingent fee basis) will be paid until after approval and consummation of the Mediated Settlement. To the extent there exists an unpaid balance of professional fees and expenses as of the Effective Date of the Plan and such fees and expenses are allowed by the Bankruptcy Court, such fees and expenses will be subject to payment as Allowed Administrative Claims under the Plan. Based upon the level of currently outstanding and unpaid professional fees, the amount of professional fees and expenses that the Debtor has budgeted through March 15, 2010 (the projected Effective Date of the Plan), and the estimated

amount of contingency fees and expenses of the Committee's Special Counsel through March 15, 2010,[28] the Debtor anticipates that the allowable amount of professional-based Administrative Claims as of the Effective Date may total approximately $7.75 million.

### 2. Treatment of Allowed Priority Tax Claims

Pursuant to the Plan, in full and final satisfaction of Allowed Priority Tax Claims, each Allowed Priority Tax Claim shall, unless otherwise agreed, be paid in full in Cash by no later than the later of (a) fifteen (15) days after the Effective Date, or (b) fifteen (15) days after becoming an Allowed Priority Tax Claim. All payments on account of Allowed Priority Tax Claims shall be made from Unrestricted Trust Funds of the Creditor Trust.

The estimated amount of allowable Priority Tax Claims in the Bankruptcy Case is approximately $13,284.

## D. Treatment of Classified Claims and Equity Interests Under the Plan

### 1. Treatment of Allowed Lender Secured Claims (Class 1)

The Plan defines "Lender Secured Claim" as a Secured Claim asserted by, or on behalf of, a Lender[29] or Lender Affiliate.[30] Pursuant to the Plan, in full and final satisfaction of Allowed Lender Secured Claims, such Allowed Lender Secured Claims shall, unless otherwise agreed, be satisfied as follows: (a) by no later than fifteen (15) days after the Effective Date, the Trustee shall distribute all Lender Collateral in the form of Cash to the Bank Agent, which the Bank Agent shall then further disburse in accordance with the terms and conditions of the Loan Documents,[31] the Cash Collateral Order, and any other applicable Final Order of the Bankruptcy Court; and (b) if and when Net Available Lender Collateral Proceeds in the Creditor Trust become available for distribution, then subject to the provisions of Section 9.2.1 of the Plan,[32] the Trustee shall distribute such Net Available Lender Collateral Proceeds to the Bank Agent, which the Bank Agent shall then further disburse in accordance with the terms and

---

[28] During the course of the mediation among the Mediation Settling Parties, a dispute arose with respect to calculation of the Special Counsel firms' contingency fee under orders authorizing the Committee's employment of such firms. The Special Counsel firms have estimated their contingency fee to total approximately $6,998,496 in the event of approval of the Mediated Settlement Agreement. Certain of the Mediation Settling Parties have asserted that such estimation is overstated under the terms of the authorization orders. Ultimately, and pursuant to the terms of the Mediated Settlement Agreement, the dispute will be subject to resolution by the Bankruptcy Court. For purposes of the above estimation only, the Debtor has utilized the estimation provided by the Special Counsel firms.

[29] The Lenders are comprised of each of the Debtor's pre-petition lenders and the Bank Agent with respect to any Claims that it has asserted in the Bankruptcy Case, individually and/or on behalf of any Lenders. *See* Plan, § 1.69.

[30] The definition of "Lender Affiliate" under the Plan is designed to mirror the definition of "Affiliate" under the Intercreditor Agreement in relation to the Lenders. Accordingly, Section 1.65 of the Plan defines "Lender Affiliate" as follows: "With respect to a Lender, another Person that directly or indirectly through one or more intermediaries, Controls, or is Controlled by or is under common Control with, such Lender. For purposes of this definition, 'Control' means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise, and without limiting the generality of the foregoing, a Person shall be deemed to be Controlled by another Person for purposes of this definition if such other Person possesses, directly or indirectly, power to vote 10% or more of the securities having ordinary voting power for the election of directors, managing general partners or equivalent governing bodies of such Person."

[31] The Loan Documents are comprised of the Intercreditor Agreement, the Security Agreement, the Lender Loan Documents (as defined in the Intercreditor Agreement), and any and all other Loan Documents (as defined in the Intercreditor Agreement), agreements and instruments executed in connection with the foregoing. *See* Plan, § 1.74.

[32] Section 9.2.1 of the Plan sets out procedures applicable to interim and final distributions of Net Available Lender Collateral Proceeds. Such procedures are described in Section XI(B)(2) below.

---

conditions of the Loan Documents, the Cash Collateral Order, and any other applicable Final Orders of the Bankruptcy Court.[33]   Additionally, holders of Allowed Lender Secured Claims shall retain their respective Liens in the Lender Collateral and Lender Collateral Proceeds.

Two Lender Secured Claims have been asserted in the Bankruptcy Case: one in the approximate amount of $147,848,221 (the "Bank Agent Claim") filed by the Bank Agent on behalf of itself and the Lenders; and one in the approximate amount of $9,784,801 (the "RCS Claim") by Rabo Capital Services, Inc. ("RCS").  With respect to the Bank Agent Claim, during the course of the Bankruptcy Case periodic payments, aggregating in excess of $98.4 million, have been made to the Bank Agent under the terms of the Cash Collateral Order.  The Bank Agent has also recovered certain amounts from third-party guarantors.  Hence, as of November 30, 2009, the Debtor's books and records reflected an outstanding balance of approximately $46.11 million owing under the Bank Agent Claim.  Through the Effective Date of the Plan, the Debtor projects that additional payments will be made to the Bank Agent, leaving a projected balance as of the Effective Date of approximately $44.46 million.  On the Effective Date, and as contemplated by the Mediated Settlement, the Lender Secured Claims of the Lenders (which, by definition, includes the Bank Agent Claim) shall be deemed Allowed for all purposes.[34]

With respect to the RCS Claim, in early 2008 the Debtor and RCS entered into a Forward Contract Commodity Repurchase Agreement ("FCCRA") pursuant to which the parties established terms for the Debtor's sale of cotton to, and future repurchase of such cotton from, RCS from time to time.  Following the Debtor's default under the FCCRA, RCS exercised its right to sell the cotton the subject of transactions entered into under the FCCRA, and RCS has filed the RCS Claim to assert a Claim against the Debtor for the remainder of those amounts that RCS alleges the Debtor is obligated to pay to RCS under the terms of the FCCRA.  Moreover, RCS has asserted the Claim as a Secured Claim based upon the following: (a) RCS' assertion that it is an "Affiliate" of Coöperatieve Centrale Raiffeisen-Boerenleenbank B.A., "Rabobank International", New York Branch, one of the Lenders, under the terms of the Intercreditor Agreement; and (b) RCS' assertion that the Liens granted by the Debtor to the Bank Agent under the Security Agreement are held by the Bank Agent for the benefit of RCS, as a Lender Affiliate, in addition to the Lenders.  In relation to the foregoing, the Debtor first believes that the amount of the RCS Claim is overstated by several million dollars.  More significantly, both the Bank Agent and the Debtor – the only parties to the Security Agreement – dispute RCS' contention that the Liens granted to the Bank Agent under the Security Agreement were intended to serve as security for the RCS Claim.[35] For these reasons, the Debtor estimates that no amount of the RCS Claim will be allowed as an Allowed Lender Secured Claim.

In relation to all of the Lender Secured Claims asserted in the case, and subject to the provisions of Section 1111(b) of the Bankruptcy Code, Section 506 of the Bankruptcy Code provides that a Claim secured by a Lien on property in which the Estate has an interest is only entitled to treatment as a Secured Claim to the extent of the value of the claimholder's interest in the Estate's interest in such property (with the balance treated as an Unsecured Claim).  Therefore, pursuant to Section 506 of the Bankruptcy Code, the maximum allowable amount of all Lender Secured Claims for purposes of Class 1 under the Plan is

---

[33]  As indicated above, the Bank Agent shall be solely responsible for the further disbursement of all distributions made to it under the Plan.  All consents and approvals by the Bank Agent under the Plan shall be made in accordance with the terms of the Intercreditor Agreement.

[34]  Such allowance, however, is limited to the Lender Secured Claims of the Lenders.  Pursuant to Section 7.3 of the Plan, and as provided in the Mediated Settlement Agreement, there shall be no Allowed Unsecured Lender Claims (with all Unsecured Lender Claims deemed Disallowed as of the Effective Date of the Plan), and no distributions shall be made under the Plan on account of any Unsecured Lender Claim.

[35]  In the absence of resolution of the dispute prior to the Effective Date, all objections to the RCS Claim and all claims and Causes of Action against RCS in relation to the RCS Claim shall be preserved and transferred to the Creditor Trust, with the RCS Claim remaining a Disputed Claim until resolved or otherwise finally determined.

the value of the Lender Collateral and Lender Collateral Proceeds as of the Effective Date of the Plan. Based upon actual and projected collections and settlement adjustments to accounts receivable from December 1, 2009 through the projected Effective Date of the Plan, the projected level of cash on hand as of the Effective Date, and anticipated other remaining assets constituting Lender Collateral as of the Effective Date, the Debtor estimates that the Lender Collateral and Lender Collateral Proceeds will have a projected net book value, as of the Effective Date of the Plan, of approximately $14.9 million.

## 2. Treatment of Allowed Other Secured Claims (Class 2)

The Plan defines an "Other Secured Claim" as a Secured Claim which is not a Lender Secured Claim. Pursuant to the Plan, in full and final satisfaction of Allowed Other Secured Claims, each such Allowed Other Secured Claim shall, unless otherwise agreed, be satisfied by no later than the later of (a) fifteen (15) days after the Effective Date, or (b) fifteen (15) days after becoming an Allowed Other Secured Claim, in one of the following ways at the option of the Trustee:

(a) the Allowed Other Secured Claim shall be paid in full in Cash; or

(b) the Trustee shall execute a written acknowledgment on behalf of the Creditor Trust pursuant to which the Creditor Trust assumes the Allowed Other Secured Claim and leaves unaltered the legal, equitable and contractual rights to which such Allowed Other Secured Claim entitles the holder of such Allowed Other Secured Claim; or

(c) notwithstanding any contractual provision or applicable law that entitles the holder of the Allowed Other Secured Claim to demand or receive accelerated payment of such Allowed Other Secured Claim after the occurrence of a default, (i) the Trustee, on behalf of the Creditor Trust, shall cure any such default that occurred before or after the Petition Date, other than a default of a kind specified in Section 365(b)(2) of the Bankruptcy Code or of a kind that Section 365(b)(2) of the Bankruptcy Code expressly does not require to be cured, (ii) the maturity of such Allowed Other Secured Claim, as such maturity existed before such default, shall be reinstated, (iii) the holder of such Allowed Other Secured Claim shall be compensated from the Creditor Trust for any damages incurred as a result of any reasonable reliance by such holder on such contractual provision or such applicable law, (iv) if such Allowed Other Secured Claim arises from any failure to perform a nonmonetary obligation, other than a default arising from failure to operate a nonresidential real property lease subject to Section 365(b)(1)(A) of the Bankruptcy Code, the holder such Allowed Other Secured Claim shall be compensated from the Creditor Trust for any actual pecuniary loss incurred by such holder as a result of such failure, and (v) the legal, equitable and contractual rights to which such Allowed Other Secured Claim entitles the holder of such Allowed Other Secured Claim shall not otherwise be altered; or

(d) the Trustee shall transfer to the holder of the Allowed Other Secured Claim the Collateral securing the Allowed Other Secured Claim.

Additionally, holders of Allowed Other Secured Claims shall retain their Liens in any Collateral securing such Allowed Other Secured Claims; *provided, however*, that if any such Allowed Other Secured Claim is satisfied in accordance with one of the options described in (a)-(c) above, then upon the payment in full of such Allowed Other Secured Claim, the holder of such Allowed Other Secured Claim shall execute any and all documents deemed necessary by the Trustee to evidence the release and extinguishment of such

holder's Liens.  Finally, all payments on account of Allowed Other Secured Claims shall be made from Unrestricted Trust Funds of the Creditor Trust.

The Debtor does not believe that there are any allowable Other Secured Claims in the Bankruptcy Case.  In this regard, certain taxing authority Claims have been filed in the case as Secured Claims, with their assertion as Priority Tax Claims only in the alternative.  Notwithstanding the assertion of such Claims as Secured Claims in the first instance, such Claims have been classified under the Plan as Priority Tax Claims for all purposes.

### 3. Treatment of Allowed Priority Non-Tax Claims (Class 3)

Pursuant to the Plan, in full and final satisfaction of Allowed Priority Non-Tax Claims, each Allowed Priority Non-Tax Claim shall, unless otherwise agreed, be paid in full in Cash by no later than the later of (a) fifteen (15) days after the Effective Date, or (b) fifteen (15) days after becoming an Allowed Priority Non-Tax Claim.  All payments on account of Allowed Priority Non-Tax Claims shall be made from Unrestricted Trust Funds of the Creditor Trust.

The Debtor does not believe that there are any allowable Priority Non-Tax Claims in the Bankruptcy Case.

### 4. Treatment of Allowed General Unsecured Claims (Class 4)

Pursuant to the Plan, in full and final satisfaction of Allowed General Unsecured Claims, each Allowed General Unsecured Claim shall, unless otherwise agreed, be satisfied as follows: once all Allowed Administrative Claims, all Allowed Priority Tax Claims, all Allowed Other Secured Claims, and all Allowed Priority Non-Tax Claims have been fully satisfied in accordance with the terms of the Plan (or in the case of Disputed Administrative Claims, Disputed Priority Tax Claims, Disputed Other Secured Claims, and Disputed Priority Non-Tax Claims, have been reserved for in accordance with the provisions of Section 9.9 of the Plan),[36] then:

(a) if and when Net Available General Trust Funds in the Creditor Trust become available for distribution, then as soon as practicable thereafter each holder of an Allowed General Unsecured Claim shall be paid on account of such Allowed General Unsecured Claim a Pro Rata Share[37] of such Net Available General Trust Funds, calculated in relation to all other Allowed General Unsecured Claims; and

(b) if and when Net Available Lender Settlement Trust Funds in the Creditor Trust become available for distribution, then as soon as practicable thereafter each holder of an Allowed General Unsecured Claim who has executed and delivered a Settlement Release to the Bank Agent on or prior to the Settlement Release Deadline in accordance with Section 7.2.2 of the Plan[38] shall be paid on account of such Allowed General Unsecured Claim a Pro Rata Share of

---

[36] See Section XI(B)(5) below for a discussion regarding the purpose of the Disputed Claims Reserve Account.

[37] The Plan defines "Pro Rata Share" as follows: "With respect to distributions to holders of Allowed Claims and reserves established on account of Disputed Claims, a proportionate share, such that a distribution of a Pro Rata Share with respect to an Allowed Claim of a particular Class shall bear the same ratio to all distributions and reserves on account of such Class as the dollar amount that such Allowed Claim bears to the dollar amount of all Allowed Claims and Disputed Claims in such Class, and that the reserve of a Pro Rata Share with respect to a Disputed Claim of a particular Class shall bear the same ratio to all distributions and reserves on account of such Class as the dollar amount of such Disputed Claim bears to the dollar amount of all Allowed Claims and Disputed Claims in such Class."

[38] See Section VII(B)(2) above for a discussion relating to the Settlement Release, Settlement Release Deadline, and delivery of Settlement Releases to the Bank Agent.

such Net Available Lender Settlement Trust Funds, calculated in relation to all other Allowed General Unsecured Claims; *provided, however*, that the Bank Agent, in its sole and absolute discretion, may waive the Settlement Release requirement for any particular holder in accordance with Section 7.2.2 of the Plan;[39] and

(c) if and when Net Available Other Settlement Trust Funds in the Creditor Trust become available for distribution, then as soon as practicable thereafter each holder of an Allowed General Unsecured Claim who has not timely made the Settlement Opt-Out Election in accordance with Section 7.4.2 of the Plan[40] shall be paid on account of such Allowed General Unsecured Claim a Pro Rata Share of such Net Available Other Settlement Trust Funds, calculated in relation to all other Allowed General Unsecured Claims held by Creditors who have not timely made the Settlement Opt-Out Election.

Distributions of Net Available General Trust Funds, Net Available Lender Settlement Trust Funds, and Net Available Other Settlement Trust Funds shall be made in accordance with Sections 9.2.2, 9.2.3 and 9.2.4 of the Plan, respectively – distribution provisions which are described in Section XI(B)(2) below.

General Unsecured Claims asserted in the Bankruptcy Case may be broken down into the following 8 categories of Claims: (i) Claims totaling approximately $131.95 million by farmers and other cotton producers ("Growers") who entered into contracts with the Debtor for the Debtor's purchase of their cotton (the "Grower Claims"); (ii) Claims totaling approximately $196,000 by customers of the Debtor who entered into contracts for the purchase of cotton from the Debtor (the "Customer Claims"); (iii) Claims totaling approximately $348,000 by warehouses, shippers and other related vendors (the "Warehouse/Shipper Claims"); (iv) Claims totaling approximately $1.19 million by ordinary trade vendors, including Persons serving as brokers in cotton purchase or sales transactions (the "Trade Claims"); (v) a guaranty Claim totaling approximately $5.93 million by Wells Fargo Bank in relation to indebtedness owed by an affiliate of the Debtor (the "Wells Guaranty Claim"); (vi) a Claim totaling approximately $4.99 million by the Debtor's subsidiary Paul Reinhart (Australia) Pty. Ltd. ("PRAL") (the "PRAL Claim"); (vii) Claims totaling approximately $1.75 million by current and former employees of the Debtor (the "Employee Claims"); and (viii) a Claim totaling approximately $33,000 by the California State Compensation Insurance Fund in relation to a workers' compensation policy issued by the Fund (the "State Comp Fund Claim").   With respect to the estimated amount of allowable General Unsecured Claims, the following additional information is provided:

- Grower Claims.  The Debtor believes that a material amount of the Grower Claims may be disallowable, in whole or in part, or otherwise subject to reduction.  For example, over $1.5 million of the Grower Claims have been asserted pursuant to proofs of claim that appear to be identical/duplicative of previously-filed proofs of claim by the same Growers, and numerous other proofs of claim reference the fact that they may be duplicative, in whole or in part, of proofs of claim filed by other Growers.  Additionally, proofs of claim totaling over $900,000 were filed in the case after expiration of Bar Date established by the Court.  Finally, the Debtor believes that many of the Grower Claims may be overstated in amount.  In this regard, whereas most of the Growers have explained that they calculated their contractual loss based upon a difference between contract price and the futures price of cotton as of the date of the Debtor's rejection of the contracts, many of such Growers utilized the futures price of cotton on a date subsequent to the court-determined date of the rejection (a date on which the futures price of cotton was lower, thus increasing the amount of the Claim).  Moreover, following the

---

[39] See Section VII(B)(2) above for a discussion relating the conditions under which, and the means by which, the Bank Agent may waive the requirement of a Settlement Release.

[40] See Section VII(B)(2) above for a discussion relating to the Settlement Opt-Out Election.

rejection, the Debtor believes that many of the Growers successfully placed their cotton into the federal loan program, thereby mitigating in part, the losses suffered. Based upon the foregoing, the Debtor believes that the Grower Claims may be overstated by an aggregate amount of at least $25 million.

- <u>Warehouse/Shipper Claims</u>. As explained in Section VI(E) above, the Debtor obtained authority to pay pre-petition warehouse charges and claims of certain critical shippers and related vendors. Pursuant to such authorization, most of the warehouse charges and certain of the shipping and related charges have been paid during the course of the Bankruptcy Case, thereby significantly reducing the allowable amount of the Warehouse/Shipper Claims filed in the case.

- <u>Wells Guaranty Claim</u>. With respect to the Wells Guaranty Claim, the primary obligor was Riverbend Warehouse, LLC ("<u>RBW</u>"), an affiliate of the Debtor, who, among other things, had granted a Lien in its warehouse to Wells Fargo Bank to secure payment of the obligation. During the course of the Bankruptcy Case, RBW sold the warehouse and the underlying obligation to Wells Fargo Bank was paid in full. Therefore, the Debtor believes that the Wells Guaranty Claim is disallowable in full.

- <u>PRAL Claim</u>. With respect to the PRAL Claim, the Debtor has not yet received sufficient detail from the administrators of PRAL to evaluate the Claim; however, the Debtor believes that the PRAL Claim is significantly overstated. At a minimum, the Debtor believes that the PRAL Claim is subject to offset by the amount that PRAL is obligated to the Debtor on an inter-company receivable.

- <u>Employee Claims</u>. The Employee Claims have been asserted by certain current and former employees for deferred compensation and retention and other bonus amounts claimed to be owing by the Debtor. The Committee believes that the Employee Claims may be overstated by a significant amount.

- <u>Remaining Claims</u>. With respect to the remaining categories of General Unsecured Claims (Commission Claims, Customer Claims, Trade Claims, and the State Comp Fund Claim), the Debtor has not yet extensively analyzed such Claims.

Based upon the foregoing, the Debtor estimates that the total amount of allowable General Unsecured Claims likely ranges from approximately $90.9 to $117.0 million.

### 5. Treatment of Equity Interests (Class 5)

Finally, Class 7 of the Plan is established for all Equity Interests. Pursuant to the Plan, on the Effective Date of the Plan all Equity Interests shall be cancelled, extinguished and otherwise rendered null, void and of no further force or effect, whatsoever, except for the sole purpose of effectuating the wind-up and termination of the Post-Confirmation Debtor pursuant to the provisions of Section 6.2 of the Plan. No distributions shall be made under the Plan on account of Equity Interests.

### E. Distributions Only on Account of Allowed Claims

Distributions under the Plan will only be made to Creditors holding Allowed Claims. A Claim is "Allowed" under the Plan: (a) to the extent that it is listed in the Schedules in a liquidated, non-contingent, and undisputed amount, but only if no proof of claim is filed with the Bankruptcy Court to

evidence such Claim on or before the Bar Date;[41] or (b) as evidenced by a proof of claim filed on or before the Bar Date, but only to the extent asserted in a liquidated amount, and only if no objection to the allowance of the Claim, and no motion to expunge the proof of claim, is filed on or before the Claim Objection Deadline;[42] or (c) to the extent allowed by a Final Order of the Bankruptcy Court.

## IX.
## MEANS FOR IMPLEMENTATION OF THE PLAN

### A.     Creation, Funding and Administration of Creditor Trust

The Plan provides for the establishment of the PRI Creditors Trust (the "Creditor Trust") on the Effective Date of the Plan.  Distributions under the Plan will be made from the Creditor Trust, and the Debtor, the Trustee, members of the Creditor Trust Oversight Committee, the Bank Agent, and all Creditors will be deemed to have adopted and approved the Creditor Trust Documentation establishing the Creditor Trust as of the Effective Date of the Plan.

*Assets of Creditor Trust; Transfer of Claims to Creditor Trust*

On the Effective Date of the Plan, all of the Trust Assets will be transferred to the Creditor Trust and, except as expressly provided otherwise in the Plan, such transfer will be free and clear of all Liens, Claims and encumbrances.  "Trust Assets" is defined in the Plan as "[a]ll Assets of the Debtor and the Estate as of the Effective Date, excluding the Retained Assets."  "Retained Assets" is defined in the Plan as "[a]ll Books and Records of the Debtor" and "Books and Records" is defined as "[a]ll books and records of the Debtor, whether in paper or electronic format, which the Post-Confirmation Debtor, in its sole and absolute discretion, determines it must retain in order to wind-up its remaining affairs and formally terminate its existence."  The Retained Assets will be the only Assets of the Debtor and the Estate retained by the Post-Confirmation Debtor.

Correspondingly, on the Effective Date of the Plan, all Claims against the Debtor and the Estate, and all distribution rights conferred by the Plan on account thereof, will also be transferred to the Creditor Trust, and all objections, counterclaims, rights of setoff, rights of recoupment, and any and all other defenses held by the Debtor or the Estate in relation to such Claims, in relation to such distribution rights, and in relation to the holders of such Claims and distribution rights, will be preserved and transferred to the Creditor Trust as well.  From and after the Effective Date, the Trustee will have standing to assert, prosecute and settle any and all of such objections, counterclaims, rights of setoff, rights of recoupment, and other defenses, subject only to any limitations set forth in the Plan, the Confirmation Order, or the Creditor Trust Documentation establishing the Creditor Trust.  Claims which are or become Allowed Claims will be satisfied solely and exclusively from the Creditor Trust in accordance with the provisions of the Plan, and the Post-Confirmation Debtor will have no liability on any Claims.

*Appointment of Trustee of the Creditor Trust*

The Creditor Trust will be administered by the Trustee, who shall administer the Creditor Trust consistent with the terms of the Plan, Confirmation Order, and Creditor Trust Documentation establishing the Creditor Trust and who shall have all of the rights, obligations, powers and duties as set forth in the

---

[41] The "Bar Date" is defined in the Plan as February 18, 2009 for non-governmental Claimants or April 13, 2009 for governmental Claimants, or such other date as may apply to a particular Claimant or Claim pursuant to a duly-entered Final Order of the Bankruptcy Court.

[42] The "Claim Objection Deadline" is defined in the Plan as 180 days after the Effective Date of the Plan, unless extended by the Bankruptcy Court, for cause shown, upon motion filed with the Bankruptcy Court on or prior to such date.

Plan and Creditor Trust Documentation. Following the appointment of the Trustee, the Plan and Creditor Trust Documentation include procedures for the appointment of a successor Trustee in the event of the death, resignation or discharge of the Trustee.

Under the Plan, the initial Trustee will be Steven S. Turoff, who on the Effective Date of the Plan, and pursuant to the Confirmation Order, shall be appointed as the Trustee of the Creditor Trust. Mr. Turoff, who was identified and selected by the Committee to serve as the Trustee, is the President of a turnaround management firm called The Renaissance Consulting Group, Inc. ("Renaissance"), which maintains offices in Dallas, Texas. Mr. Turoff founded Renaissance in 1988 and has been involved in a number of bankruptcy-related or restructuring engagements, including several liquidating creditor trust-type engagements in the Northern District of Texas. He has also served as the trustee in a number of business reorganizations and liquidations. Mr. Turoff obtained a Bachelor of Business Administration degree in Accounting from Hofstra University in 1970. He has 11 years of public accounting experience, having worked for Arthur Young & Company (now Ernst & Young), and has continued to maintain his certified public accountant license in the State of Texas. His regular hourly billing rate is $450.00.

### Compensation of Trustee and Creditor Trust Professionals

For services rendered by the Trustee in administering the Creditor Trust, the Plan provides that the Trustee shall be compensated on an hourly basis, based upon the hourly rate which the Trustee customarily charges to his other clients. The Plan further provides that the Trustee shall be reimbursed for all reasonable out-of-pocket expenses incurred in the performance of his duties and obligations in administering the Creditor Trust. Compensation and reimbursement of the Trustee will be made solely and exclusively (a) from the Lender Collateral Proceeds, with respect to all fees and expenses incurred in administering, selling or otherwise disposing of the Lender Collateral; *provided, however*, that any fees and expenses paid from the Lender Collateral Proceeds shall only be made in accordance with a budget approved by the Bank Agent; and (b) from Unrestricted Trust Funds of the Creditor Trust, with respect to all other fees and expenses. The Trustee will be required to maintain time and expense records which accurately segregate the Trustee's time, fees and expenses as between the categories of services and expenses set out in (a) and (b) above.

Under the Plan, the Trustee will also have the authority to employ such Persons as the Trustee deems necessary to assist him in the administration of the Creditor Trust, and to compensate such Persons and reimburse such Persons for out-of-pocket expenses incurred by them on reasonable terms agreed to by the Trustee without the necessity of Bankruptcy Court approval. Compensation and reimbursement of such Persons will be made solely and exclusively (x) from the Lender Collateral Proceeds, with respect to all fees and expenses incurred in representing, advising or otherwise assisting the Trustee in administering, selling or otherwise disposing of the Lender Collateral; *provided, however*, that any fees and expenses paid from the Lender Collateral Proceeds shall only be made in accordance with a budget approved by the Bank Agent; and (y) from Unrestricted Trust Funds of the Creditor Trust, with respect to all other fees and expenses. Each Person employed by the Trustee will be required to maintain time and expense records which accurately segregate such Person's time, fees and expenses as between the categories of services and expenses set out in (x) and (y) above.

### Appointment of Creditor Trust Oversight Committee

The Plan also provides for the appointment of a Creditor Trust Oversight Committee consisting of no fewer than three and no more than five individuals, each of whom holds, or is the designated representative of an entity that holds, a General Unsecured Claim in the Bankruptcy Case. The Plan also provides procedures for the appointment of a successor member to the Creditor Trust Oversight Committee in the event of the death or resignation of a member. From and after the Effective Date of the

Plan, the Creditor Trust Oversight Committee will primarily serve as an advisory committee to the Trustee and shall provide input to the Trustee on matters affecting administration of the Creditor Trust, with the sole exception of matters affecting the administration, sale or other disposition of the Lender Collateral. Additionally, the Creditor Trust Oversight Committee will have the express authority to take the following actions:

(a) Appoint a successor Trustee in the event of the death, resignation or discharge of the Trustee;

(b) Review the books and records of the Creditor Trust; and

(c) File a motion with the Bankruptcy Court, on behalf of the Creditor Trust, requesting discharge of the Trustee in the event that the Creditor Trust Oversight Committee determines, after reasonable investigation, that the Trustee has taken certain actions, or failed to take certain actions, constituting malfeasance or gross negligence in the administration of the Creditor Trust.

Any action of the Creditor Trust Oversight Committee will only be deemed authorized if a majority of the members of the Creditor Trust Oversight Committee vote in favor of such action. The members of the Creditor Trust Oversight Committee will receive no compensation for their services, but will be entitled to reimbursement for any reasonable out-of-pocket expenses (excluding attorneys' fees) incurred in connection with their services, which will be paid solely and exclusively from Unrestricted Trust Funds of the Creditor Trust.

Under the Plan, the initial members of the Creditor Trust Oversight Committee will be Barry Richardson, Larry Nelson, and Michael D. East, who on the Effective Date of the Plan, and pursuant to the Confirmation Order, shall be appointed as the members of the Creditor Trust Oversight Committee. The following information is provided in relation to such individuals:

Barry Richardson is the owner of Richardson Gin, Inc., which is located in Marston, Missouri. Richardson Gin, Inc. has asserted a General Unsecured Claim in excess of $7 million in the Bankruptcy Case. Mr. Richardson is currently serving as a member of the Committee.

Larry Nelson is the owner and President of Larry Nelson Farms, which is located in Tulia, Texas. Larry Nelson Farms has asserted a General Unsecured Claim in excess of $148,000 in the Bankruptcy Case. Mr. Nelson is currently serving as a member of the Committee.

Michael D. East is the owner of East Cotton Company, which is located in Marion, Arkansas. East Cotton Company has asserted a General Unsecured Claim in excess of $1 million in the Bankruptcy Case. Mr. East is currently serving as a member of the Committee.

*Limitation of Liability*

Under the Plan, no recourse shall ever be had, directly or indirectly, against the Trustee, in his individual capacity, by legal or equitable proceedings or otherwise, by virtue of any contract, agreement, promise, undertaking, covenant, instrument or other writing executed by the Trustee on behalf of the Creditor Trust for any authorized purpose in the administration of the Creditor Trust, it being expressly understood and agreed that all such liabilities will be enforceable, to the extent valid, only against, and will be satisfied only from, the Creditor Trust. Additionally, provided the Trustee acts in good faith, the Trustee shall not personally be liable for any action or omission in the administration of the Creditor

Trust, and shall be indemnified by the Creditor Trust against any and all claims, causes of action and liability, including all expenses and defense costs, associated with, and shall be held harmless by the Creditor Trust against, each such action and omission, except to the extent that such action or omission constitutes gross negligence or willful misconduct on the part of the Trustee. As to all legal matters, the Trustee will be entitled to rely upon the advice and opinions of his counsel.

Similarly, the Plan provides that neither the Creditor Trust Oversight Committee nor any member of the Creditor Trust Oversight Committee shall be personally liable to the Creditor Trust, the Trustee, any of the beneficiaries of the Creditor Trust or any other Person for any actions or omissions taken by the Creditor Trust Oversight Committee, and each of the members of the Creditor Trust Oversight Committee shall be indemnified by the Creditor Trust against any and all claims, causes of action and liability, including all expenses and defense costs, associated with, and shall be held harmless by the Creditor Trust against, each such action and omission, except to the extent that such action or omission constitutes gross negligence or willful misconduct on the part of such Creditor Trust Oversight Committee member.

### Rights and Powers of Bank Agent

From and after the Effective Date of the Plan, the Trustee will be required to regularly consult with the Bank Agent on matters affecting the administration, sale or other disposition of the Lender Collateral. Additionally, the Bank Agent will have the express authority to take the following actions:

(a) Review the books and records of the Creditor Trust;

(b) Obtain turnover of Lender Collateral from the Creditor Trust upon reasonable written notice from the Bank Agent; and

(c) File a motion with the Bankruptcy Court, on behalf of the Creditor Trust, requesting discharge of the Trustee in the event that the Bank Agent determines, after reasonable investigation, that the Trustee has taken certain actions, or failed to take certain actions, constituting malfeasance or gross negligence in the administration, sale or other disposition of the Lender Collateral.

All consents and approvals by the Bank Agent under the Plan shall be made in accordance with the terms of the Intercreditor Agreement.

### Other Material Terms Applicable to the Creditor Trust

Pursuant to the Plan and the Creditor Trust Documentation establishing the Creditor Trust, the Trustee will be required to keep or cause to be kept books and records detailing all receipts, disbursements and reserves in the administration of the Creditor Trust, and such books and records will be open to inspection at all reasonable times upon reasonable request of any Creditor beneficiary of the Creditor Trust.

Pursuant to the Plan and the Creditor Trust Documentation establishing the Creditor Trust, the Creditor Trust shall be considered a "grantor" trust for federal income tax purposes and, therefore, shall not have any separate liability for federal income taxes relating to, or arising from, the conveyance, maintenance, investment or liquidation of assets of the Creditor Trust. If and to the extent required by law, however, the Trustee will be required to file all tax returns that the Debtor or the Post-Confirmation Debtor would have been required to file if the Trust Assets had not been conveyed to the Creditor Trust. Additionally, to the extent that the liquidation of assets of the Creditor Trust creates any tax liability, whatsoever, for the Post-Confirmation Debtor, the Creditor Trust will be responsible for and shall

promptly pay such tax liability from Unrestricted Trust Funds of the Creditor Trust, and any such payments will be considered costs and expenses of administration of the Creditor Trust. The Trustee will be required to reserve a sum sufficient, from the General Trust Assets and Settlement Trust Assets of the Creditor Trust, to pay any accrued or potential tax liability arising out of the administration of the Creditor Trust, and such reserved sum will constitute part of the Unrestricted Administrative Expense Reserve of the Creditor Trust.

## B. Wind-Up and Termination of Debtor

On the Effective Date of the Plan, all Equity Interests will be deemed cancelled, extinguished and otherwise rendered null, void and of no further force or effect, whatsoever, except for the sole purpose of effectuating the wind-up and termination of the Post-Confirmation Debtor. Additionally, on the Effective Date, all remaining officers and directors of the Debtor will be deemed terminated. The Trustee will be deemed appointed as the President and sole member of the board of directors of the Post-Confirmation Debtor.

The Plan requires the Post-Confirmation Debtor to promptly wind up all remaining affairs and thereafter formally terminate its existence. In connection therewith, PRAI will be required to execute any and all shareholder consents and/or resolutions deemed necessary by the Trustee to cause such formal termination. All reasonable expenses incurred by the Post-Confirmation Debtor in winding up and terminating its existence will be deemed to constitute expenses of administration of the Creditor Trust and will be paid from Unrestricted Trust Funds of the Creditor Trust. The Trustee is required by the Plan to reserve a sum sufficient from the General Trust Assets and Settlement Trust Assets of the Creditor Trust to pay for such expenses, and such reserved sum will constitute part of the Unrestricted Administrative Expense Reserve of the Creditor Trust.

## C. Incorporation of Mediated Settlement Agreement and Mediated Settlement Order

Pursuant to the Plan, the Mediated Settlement Agreement and the Mediated Settlement Order will be deemed incorporated into the Plan by reference on the Effective Date of the Plan, and all of the terms and conditions of the Mediated Settlement Agreement and Mediated Settlement Order (including, without limitation, the releases provided thereby) shall be binding on the Creditor Trust, the Trustee, all Creditors and all Equity Interest holders. Additionally, all of the Estate's rights under and in relation to the Mediated Settlement Agreement and the Mediated Settlement Order, including, without limitation, the Estate's right to receive the Subsequent Lender Payment and the Subsequent PRAG Payments, shall constitute Trust Assets which, on the Effective Date of the Plan, shall be transferred and assigned to the Creditor Trust.

## D. Cancellation of Notes and Instruments; Release of Liens

Except as expressly otherwise provided in the Plan, on the Effective Date of the Plan, all notes, instruments, certificates and other documents evidencing Claims against the Debtor or the Estate will be canceled and deemed terminated, and all Liens in or against the Assets of the Debtor and the Estate will be automatically, and without any further action required by any party or the Bankruptcy Court, deemed released and extinguished.

## E. Preservation of Causes of Action

Pursuant to the Plan, among the Assets that will be transferred to the Creditor Trust on the Effective Date are Causes of Action. "Causes of Action" is defined under the Plan as "[a]ny and all causes of action, claims, rights of action, suits or proceedings, whether in law or equity, whether known

or unknown, which have been or could be asserted by the Debtor or the Estate as of the Effective Date." Specifically, the Plan provides that, except as expressly otherwise provided in the Plan, all Causes of Action, including, without limitation, all of the Causes of Action referenced in Section X of the Disclosure Statement, below, shall be preserved and shall be transferred to the Creditor Trust on the Effective Date as part of the Trust Assets, and on and after the Effective Date, the Trustee will have standing to pursue such Causes of Action and will be deemed appointed as the representative of the Estate in accordance with Section 1123(b)(3) of the Bankruptcy Code for the purpose of enforcing, prosecuting and settling such Causes of Action.

## F.    Termination of Pension Plan

On or about July 1, 1990, the Debtor established the Paul Reinhart, Inc. Employees Defined Benefit Pension Plan (as amended and restated from time to time, the "Pension Plan"), a single-employer defined benefit pension plan covered by Title IV of the Employee Retirement Income Security Act of 1974 ("ERISA"), as amended, 29 U.S.C. §§ 1301-1461.  The Debtor is the contributing sponsor of the Pension Plan within the meaning of ERISA and is responsible for the Pension Plan.  As of the date hereof, the Pension Plan has not been legally terminated.

Under ERISA, the Debtor and each member of its "controlled group" are jointly and severally liable for the Pension Plan's unfunded benefit liabilities, due and unpaid employer contributions, and insurance premiums.  As defined in ERISA, a "controlled group" includes a parent-subsidiary and/or brother-sister group of corporations, trades or businesses connected through common ownership and control as defined by Sections 414(b) and (c) of the Internal Revenue Code and regulations promulgated thereunder.  Paul Reinhart America, Inc., the Debtor's parent corporation, is within the Debtor's controlled group.  Based upon common ownership and/or control, the Debtor believes that Pacific Pima Gin Company, Richardson LSA, Inc. and Riverbend Warehouse, LLC are also likely within the Debtor's controlled group.  Paul Reinhart AG, the parent corporation of Paul Reinhart America, Inc., may also be within the Debtor's controlled group.

The Pension Benefit Guaranty Corporation ("PBGC") is a wholly-owned United States governmental agency created by ERISA to administer the mandatory pension plan termination insurance program established under Title IV of ERISA.  The PBGC guarantees the payment of certain pension benefits only after a pension plan covered by Title IV of ERISA has been lawfully terminated.  *See* 29 U.S.C. §§ 1322, 1361.

Given the proposed liquidation of the Debtor under the Plan, the Pension Plan needs to be terminated.  The Pension Plan may be terminated lawfully only if the Debtor, as administrator of the plan, initiates termination proceedings under 29 U.S.C. § 1341, or the PBGC initiates termination proceedings under 29 U.S.C. § 1342.  The filing of a petition under the Bankruptcy Code does not automatically result in termination of a pension plan.  In order to obtain voluntary termination of the Pension Plan, either (a) all of the statutory requirements for a standard termination of the plan must be satisfied, including, without limitation, the cure of any underfunding of the plan upon termination, or (b) all of the requirements for a distressed termination of the plan must be satisfied, which includes specific conditions in relation to both the Debtor and each of its controlled group members.  The Debtor does not believe that the Pension Plan qualifies for a distressed termination and, as of the date hereof, the PBGC has not taken action to involuntarily terminate the plan.  Unless the Pension Plan has been terminated prior to the Effective Date of the Plan, the liabilities owed to the Pension Plan or to the PBGC with respect to the Pension Plan under ERISA will not be affected in any way by the Bankruptcy Case, including by discharge.

If the Pension Plan terminates in a distress termination pursuant to 29 U.S.C. §§ 1341(c)(2)(b)(ii) or (iii), or in an involuntary termination under 29 U.S.C. § 1342, the Debtor may owe Termination Premiums at the rate of $1,250 per plan participant per year for three years. *See* 29 U.S.C. § 1306(a)(7), as amended by § 8101(b) of the Deficit Reduction Act of 2005 (Pub. L. 109-280). The PBGC estimates this amount to be $311,250. If the Pension Plan terminates in a distress termination pursuant to 29 U.S.C. §§ 1341(c)(2)(b)(ii) or (iii), or in an involuntary termination under 29 U.S.C. § 1342, while the Debtor is attempting to reorganize in Chapter 11, and the Debtor ultimately obtains confirmation of a Chapter 11 plan of reorganization, the Debtor's obligation to the PBGC for Termination Premiums does not exist until after the Chapter 11 plan is confirmed and the Debtor obtains a discharge. *See* 29 U.S.C. § 1306(a)(7)(B). In that case, Termination Premiums are not a dischargeable claim or debt within the meaning of 11 U.S.C. §§ 101(5) and 1141.

Based upon a March 2009 pro forma valuation of the Pension Plan assets upon termination, the Pension Plan is underfunded for benefit liabilities on a termination basis. The estimated amount of such underfunding, as of such valuation, is in excess of $2,000,000. Based upon improved market conditions since March 2009 (which have positively impacted the value of the Pension Plan assets), the Debtor reasonably believes that the estimated level of underfunding has decreased to an amount less than $2,000,000; however, the Debtor has not obtained an updated pro forma valuation.

The PBGC has estimated the underfunding of benefit liabilities under the Pension Plan on a termination basis, as of an assumed termination date of October 15, 2008, to be $2,011,950. The PBGC has filed the following contingent Claims for the Pension Plan's underfunded benefit liabilities, funding contributions, and insurance premiums:

- A Claim for unfunded benefit liabilities in the amount of $2,011,950;

- A Claim for unpaid minimum funding contributions in an unliquidated amount; and

- A claim for unpaid Title IV insurance premiums in an unliquidated amount.

A further discussion of such Claims is set out in Section VIII(C)(1) above.

Under the Plan, unless the Pension Plan has previously been lawfully terminated prior to the Effective Date of the Plan, then following the Effective Date the Post-Confirmation Debtor, in coordination with the Trustee, shall expeditiously take all reasonable and necessary actions to effectuate a standard termination of the Pension Plan under applicable provisions of Title IV of ERISA and any associated regulations. In connection therewith, if and to the extent the Pension Plan is underfunded on a termination basis, the Trustee shall transfer to the Pension Plan, on behalf of the Post-Confirmation Debtor, that amount of Cash from the Unrestricted Trust Funds of the Creditor Trust as is required to obtain all requisite governmental, regulatory, and PBGC approvals for such standard termination. The Trustee shall reserve a sum sufficient from the General Trust Assets and Settlement Trust Assets of the Creditor Trust to make such transfer, and such reserved sum shall constitute part of the Unrestricted Administrative Expense Reserve.

# X.
# LEGAL PROCEEDINGS AFFECTING THE DEBTOR AND ESTATE

## A. Litigation Pending as of the Petition Date

As of the Petition Date, the Debtor was party to the following actions. The status of each of the actions is also noted below:

*In the Matter of the Companies' Creditors Arrangement Act, R.S.C. 1985, C.c-36, as Amended and In the Matter of the Atlantic Yarns Inc., a body corporate and Atlantic Fine Yarns Inc., a body corporate*, Cause No. S/M/92/07, Court of Queen's Bench of New Brunswick, Trial Division, Judicial District of Saint John, Canada.

> Status: The Debtor has an unpaid receivable from Atlantic Fine Yarns Inc. ("Fine Yarns") in the approximate amount of $1,819,844. Fine Yarns is currently involved in the above-referenced insolvency proceeding in Canada. The amount ultimately collected by the Debtor on the receivable will depend upon the outcome of the insolvency proceeding.

*Paul Reinhart, Inc. v. Anhui Shinho Textile Co., Ltd.*, Huainan Intermediate People's Court, Anhui Province, China.

> Status: The Debtor has an unpaid receivable from Anhui Shinho Textile Co., Ltd. ("AST") in the approximate amount of $500,000. After obtaining an arbitration award against AST, the Debtor initiated the above-referenced litigation against AST to collect on the award. Unfortunately, insolvency proceedings were later initiated against AST and the Debtor's collection efforts were further hampered by a corruption investigation and then case against one of AST's principals and the local Mayor. As a result of the outstanding indebtedness owed by AST to its secured creditors, unsecured creditors (including the Debtor) are unlikely to recover anything and the Debtor has abandoned its collection efforts. On information and belief, the Mayor was recently sentenced to death.

*Paul Reinhart, Inc. v. Huzhou Lian Feng Textiles Co., Ltd.*, Huzhou Intermediate People's Court, Zhejiang Province, China.

> Status: The Debtor has an unpaid receivable from Huzhou Lian Feng Textile Co., Ltd. ("HLFT"). In mid-2008, the Debtor filed an application for enforcement of the obligation under the above-referenced case. Following initial proceedings in which the Debtor was unable to produce certain evidence required by the court, the court imposed an enforcement application fee in order to pursue the matter further. Such fee was not paid and the court later delivered a ruling finding that the case had been withdrawn for non-prosecution.

## B. Post-Petition Litigation

During the course of the Bankruptcy Case, certain litigation has been initiated both against the Debtor and by the Debtor. Details regarding each of these post-petition proceedings are set forth in Section VI(N) of the Disclosure Statement, above.

## C. Potential Litigation

As noted above, the Plan preserves all Causes of Action, unless expressly provided otherwise, and provides for them to be transferred to the Creditor Trust on the Effective Date of the Plan. In accordance with Section 1123(b)(3) of the Bankruptcy Code, the Plan further provides that the Trustee of the Creditor Trust will have standing, on and after the Effective Date of the Plan, to pursue the Causes of Action and will be deemed appointed as the representative of the Estate for the purpose of enforcing, prosecuting and settling them. In addition to the Causes of Action which have already been asserted by

the Debtor (discussed in prior sections of the Disclosure Statement), the Estate does or may hold, among other possible Causes of Action, the following Causes of Action:[43]

### 1. Avoidance Causes of Action

Pursuant to Sections 547 and 550 of the Bankruptcy Code, a trustee (or debtor in possession pursuant to Section 1107 of the Bankruptcy Code) may avoid and recover any transfer of an interest of the debtor in property to or for the benefit of a creditor if such transfer (i) was for or on account of an antecedent debt owed by the debtor before the transfer was made, (ii) was made while the debtor was insolvent, (iii) was made within 90 days of the bankruptcy filing, and (iv) resulted in the creditor receiving more on account of the debt than if the transfer had not been made, the debtor were liquidated under Chapter 7 of the Bankruptcy Code, and the creditor were limited to recovery on the debt through the Chapter 7 process. Causes of Action pursuant to Sections 547 and 550 of the Bankruptcy Code are referred to herein as "Preference Causes of Action."

The Estate does or may hold Preference Causes of Action against each of the recipients of payments reflected on Exhibit S-3B (the "90-Day Payment Listing") to the Debtor's Statement of Financial Affairs filed in the Bankruptcy Case on November 14, 2008 [Docket No. 153-3] (the "SOFA"). The 90-Day Payment Listing is incorporated herein, by reference, for all intents and purposes. Any and all Preference Causes of Action held by the Estate against the recipients of payments reflected on the 90-Day Payment Listing, and their immediate or mediate transferees, as of the Effective Date of the Plan shall constitute part of the Causes of Action preserved and transferred to the Creditor Trust.

### 2. Collection Causes of Action

As of the date hereof, numerous parties owe amounts to the Debtor on account of the Debtor's sale of cotton to them, including, without limitation: Distribuidora Moyel S.A. de C.V.; Hilaturas Textiles S.A. de C.V. a/k/a Vivatex S.A. de C.V.; Pecaltex S.A. de C.V.; Tauro Textil S.A. de C.V.; Textiles El Fresno, S.A. de C.V.; Textiles La Libertad S.A. de C.V.; Corporacion Textil Bonanza, S.A. de C.V.; GFM Telas Parras, S.A. de C.V.; Grupo Textil Vivacolor, S.A. de C.V.; Hilados y Tejidos San Jorge S.A. de C.V.; Maquiladora de Puebla S.A. de C.V.; Preferencia en Deportes S.A. de C.V.; Telas Especiales de Mexico S.A. de C.V.; Textiles La Alsaciana S.A. de C.V.; Texturizados y Tejidos Windsor, S.A. de C.V.; and Triton Industrial S.A. de C.V. To the extent that amounts owing to the Debtor are currently past due or may hereafter become past due, the Estate may hold various claims against such parties for collection of the amounts owing. Any and all claims of the Debtor or the Estate arising from such obligations as of the Effective Date of the Plan shall constitute part of the Causes of Action preserved and transferred to the Creditor Trust. Additionally, the Debtor is the insured under a Comprehensive Export Credit Insurance Policy, Policy No. 948-4609 (the "Policy"), issued by National Union Fire Insurance Company of Pittsburgh, PA ("NUFIC"). The Debtor and the Estate may hold various claims against NUFIC and its agents, including, without limitation, Chartis International, under or in relation to the Policy, including, without limitation, claims for wrongful refusal to honor the coverage provided by the Policy, claims for wrongful refusal to make payments under the Policy, and bad faith in connection with the processing of claims and coverage determinations under the Policy. Any and all of such claims held by the Debtor or the Estate as of the Effective Date of the Plan shall constitute part of the Causes of Action preserved and transferred to the Creditor Trust.

---

[43] Of note, confirmation of the Plan is dependent and contingent upon approval of the Mediated Settlement, and the Mediated Settlement Agreement provides for certain releases by and among the Mediation Settling Parties. Accordingly, excluded from the discussion below is a description of any Causes of Action that the Estate does or may hold against any of the other Mediation Settling Parties or their affiliates given that all of such Causes of Action will be released under the terms of the Mediation Settlement Agreement.

### 3. Lien Dispute Causes of Action

As explained in Section VIII(D)(1) above, RCS has asserted that it is the beneficiary of certain Lien rights under the Security Agreement and Intercreditor Agreement. Such rights are disputed by the Bank Agent and the Debtor. Any claims and causes of action associated with pursuing a determination of such Lien rights and/or disputing such Lien rights that are held by the Debtor or the Estate as of the Effective Date of the Plan shall constitute part of the Causes of Action preserved and transferred to the Creditor Trust. Similarly, the Debtor does not believe that any of the holders of Other Secured Claims hold valid and enforceable Liens against any of the Assets of the Debtor or the Estate. Any claims and causes of action associated with pursuing a determination of such Lien rights and/or disputing such Lien rights that are held by the Debtor or the Estate as of the Effective Date of the Plan shall constitute part of the Causes of Action preserved and transferred to the Creditor Trust.

### 4. Claims Objections and Offsetting Causes of Action

With respect to all Claims constituting Disputed Claims under the Plan as of the Effective Date of the Plan, any and all objections, counterclaims, rights of setoff, rights of recoupment, and any and all other defenses held by the Debtor or the Estate in relation to such Claims, in relation to distribution rights conferred by the Plan on account of such Claims, and in relation to the holders of such Claims and distribution rights, shall constitute part of the Causes of Action preserved and transferred to the Creditor Trust.

### 5. Notice of Preservation of Causes of Action

**PLEASE TAKE NOTICE: WITH THE EXCEPTION OF THOSE CAUSES OF ACTION THAT ARE EXPRESSLY RELEASED OR WAIVED UNDER THE TERMS OF THE PLAN, ALL CAUSES OF ACTION OF THE DEBTOR AND THE ESTATE, WHETHER OR NOT SPECIFIED HEREIN, WILL BE PRESERVED AND TRANSFERRED TO THE CREDITOR TRUST PURSUANT TO THE PLAN. THE LACK OF DISCLOSURE OF ANY PARTICULAR CAUSE OF ACTION SHALL NOT CONSTITUTE, NOR BE DEEMED TO CONSTITUTE, A RELEASE OR WAIVER OF SUCH CAUSE OF ACTION, IT BEING THE INTENTION OF THE PLAN PROPONENTS FOR THE PLAN TO PRESERVE AND TRANSFER TO THE CREDITOR TRUST ANY AND ALL CAUSES OF ACTION HELD BY THE DEBTOR OR THE ESTATE AS OF THE EFFECTIVE DATE OF THE PLAN.**

## XI.
## OTHER SIGNIFICANT PLAN PROVISIONS

### A. Treatment of Executory Contracts and Unexpired Leases

Section 365 of the Bankruptcy Code sets out various provisions regarding executory contracts and unexpired leases. Pursuant to Section 8.1 of the Plan, all contracts and leases constituting executory contracts or unexpired leases under the provisions of Section 365 of the Bankruptcy Code as of the Effective Date of the Plan which (a) have not been assumed or rejected by the Effective Date, or (b) have not been made the subject of a motion to assume which is pending as of the first date set for the hearing on confirmation of the Plan, will be deemed rejected as of the Effective Date in accordance with the provisions of Section 365 of the Bankruptcy Code.

The Plan further provides that any Claim arising from the rejection of an executory contract or unexpired lease under the terms of Section 8.1 of the Plan (an "Effective Date Rejection Damage Claim")

must be evidenced by a proof of claim filed with the Bankruptcy Court and served on the Trustee by no later than 20 days following the Effective Date of the Plan. Any holder of such an Effective Date Rejection Damage Claim who fails to file and serve such a proof of claim on or before said deadline shall be deemed to have waived such Claim in full, and such Claim shall be deemed Disallowed and discharged.

Additionally, with respect to the Settlement Opt-Out Election provisions of the Plan (*see* Section VII(B)(2) above), the holder of an Effective Date Rejection Damage Claim shall have the right to make the Settlement Opt-Out Election by serving a Notice of Settlement Opt-Out Election on the Trustee by no later than 20 days after the Effective Date of the Plan. As provided by Section 7.4.2 of the Plan: **EACH AND EVERY HOLDER OF AN EFFECTIVE DATE REJECTION DAMAGE CLAIM WHO DOES NOT TIMELY MAKE THE ELECTION IN ACCORDANCE WITH THE FOREGOING PROCEDURES, AND EACH AND EVERY HOLDER OF AN EFFECTIVE DATE REJECTION DAMAGE CLAIM WHO RECEIVES AND ACCEPTS A DISTRIBUTION OF NET AVAILABLE SETTLEMENT TRUST FUNDS UNDER THE PLAN, SHALL BE BOUND BY THE SUPPLEMENTAL SETTLEMENT RELEASE SET FORTH IN SECTION 7.4.1 OF THE PLAN**.

## B.    Distributions Under the Plan

Pursuant to the Plan, distributions will be made to the holders of Allowed Claims under the following parameters:

### 1.    Distributions Made to Holders as of Distribution Record Date

Pursuant to the Plan, all distributions under the Plan on account of Allowed Claims will be made to (or in the case of Disputed Claims, reserved on behalf of) the holders of such Claims as determined as of the Distribution Record Date. The "Distribution Record Date" is defined under the Plan as the "date established by the Bankruptcy Court as the record date for the making of distributions or the reserving of distributions, as the case may be, which shall be no earlier than the Effective Date [of the Plan]."

### 2.    Interim and Final Distributions of Net Available Funds

Among other things, Section 9.2 of the Plan provides parameters for the periodic distribution of Net Available Lender Collateral Proceeds, Net Available General Trust Funds, Net Available Lender Settlement Trust Funds, and Net Available Other Settlement Trust Funds. The parameters applicable to each of the foregoing types of net available funds are set out below.

*Distributions of Net Available Lender Collateral Proceeds*

Pursuant to the Plan, the Trustee, in consultation with the Bank Agent, is required to administer, sell or otherwise dispose of all of the Lender Collateral. Subject to the provisions of Section 9.10.1 of the Plan (regarding the Restricted Administrative Expense Reserve discussed separately below), the Trustee shall deposit all Lender Collateral Proceeds realized from such efforts into the Segregated Lender Collateral Proceeds Account of the Creditor Trust, and shall regularly report to the Bank Agent on the amount of Lender Collateral Proceeds held within said account. Following the Effective Date of the Plan, the Trustee shall, from time to time, make distributions of Net Available Lender Collateral Proceeds to the Bank Agent for further disbursement by the Bank Agent in accordance with the provisions of Section 4.1.1 of the Plan. Each such distribution to the Bank Agent shall be made upon the earlier of (a) a written request from the Bank Agent for the Trustee to make a distribution, or (b) the Trustee's determination, in the exercise of reasonable discretion, that such a distribution is warranted. Notwithstanding any of the foregoing, the Bank Agent, at any time, may request turnover of any or all of the Lender Collateral from

the Creditor Trust upon reasonable written notice to the Trustee, and upon receipt of such a written request the Trustee shall promptly execute all such documentation and take all such other actions as reasonably required to effectuate the transfer of such Lender Collateral to the Bank Agent.

### Distributions of Net Available General Trust Funds

Pursuant to the Plan, as soon as practicable after the Effective Date of the Plan, the Trustee shall make an initial distribution of Net Available General Trust Funds to the holders of Allowed General Unsecured Claims in accordance with the provisions of Section 4.4.1(a) of the Plan. Thereafter, the Trustee shall, from time to time as he deems warranted in his reasonable discretion, make additional distributions of Net Available General Trust Funds to the holders of Allowed General Unsecured Claims as Disputed Claims within Class 4 of the Plan are finally determined and/or as Net Available General Trust Funds are made available for further distributions. Prior to making each additional or the final distribution, the Trustee shall recalculate each holder's Pro Rata Share to ensure that each such holder will have received, in the aggregate, a Pro Rata Share of the distributions consistent with the treatment provisions of Section 4.4.1(a) of the Plan.

### Distributions of Net Available Lender Settlement Trust Funds

Pursuant to the Plan, as soon as practicable after the Effective Date of the Plan, the Trustee shall make an initial distribution of Net Available Lender Settlement Trust Funds to the holders of Allowed General Unsecured Claims entitled to receive such a distribution in accordance with the provisions of Section 4.4.1(b) of the Plan. Thereafter, the Trustee shall, from time to time as he deems warranted in his reasonable discretion, make additional distributions of Net Available Lender Settlement Trust Funds to the holders of Allowed General Unsecured Claims entitled to receive such distributions as Disputed Claims within Class 4 of the Plan are finally determined and/or as Net Available Lender Settlement Trust Funds are made available for further distributions. Prior to making each additional or the final distribution, the Trustee shall recalculate each holder's Pro Rata Share to ensure that each such holder will have received, in the aggregate, a Pro Rata Share of the distributions consistent with the treatment provisions of Section 4.4.1(b) of the Plan. For each distribution of Net Available Lender Settlement Trust Funds that is required to be returned and refunded by the Trustee to the Bank Agent pursuant to Section 7.2.2 of the Plan, the Trustee shall return/refund such distribution to the Bank Agent contemporaneous with the making of corresponding distributions of Net Available Lender Settlement Trust Funds to the holders of Allowed General Unsecured Claims eligible to receive such distributions.

### Distributions of Net Available Other Settlement Trust Funds

Pursuant to the Plan, as soon as practicable after the Effective Date of the Plan, the Trustee shall make an initial distribution of Net Available Other Settlement Trust Funds to the holders of Allowed General Unsecured Claims entitled to receive such a distribution in accordance with the provisions of Section 4.4.1(c) of the Plan. Thereafter, the Trustee shall, from time to time as he deems warranted in his reasonable discretion, make additional distributions of Net Available Other Settlement Trust Funds to the holders of Allowed General Unsecured Claims entitled to receive such distributions as Disputed Claims within Class 4 of the Plan are finally determined and/or as Net Available Other Settlement Trust Funds are made available for further distributions. Prior to making each additional or the final distribution, the Trustee shall recalculate each holder's Pro Rata Share to ensure that each such holder will have received, in the aggregate, a Pro Rata Share of the distributions consistent with the treatment provisions of Section 4.4.1(c) of the Plan.

3. **Conditions to Distributions, Warranty of Entitlement, and Withholding**

Pursuant to the Plan, no holder of an Allowed Claim shall be entitled to a distribution under the Plan unless and until such holder provides the Trustee such holder's taxpayer identification number. Each and every Creditor who receives and accepts a distribution under the Plan on account of an Allowed Claim will be deemed to have warranted to the Trustee and the Creditor Trust that such Creditor is the lawful holder of the Allowed Claim, such Creditor is authorized to receive the distribution, and that there are no outstanding commitments, agreements or understandings, express or implied, that may or can, in any way, defeat or modify the right of the Creditor to receive the distribution.

Pursuant to the Plan, any federal, state or local withholding taxes or other amounts required to be withheld under applicable law in relation to a distribution under the Plan shall be deducted from the distribution and remitted by the Trustee to the applicable taxing authority(ies). To the extent that such provision of the Plan affects the holder of a particular Allowed Claim, such holder will be required to provide to the Trustee all such information as the Trustee requires in order to comply with such law(s), and no distribution will be made to such holder unless and until such information is provided.

4. **Setoffs**

Pursuant to the Plan, except as otherwise provided in the Plan, the Trustee may, pursuant to Section 502(d) or 553 of the Bankruptcy Code or any applicable non-bankruptcy law, upon application and approval by the Bankruptcy Court, setoff against any distribution to be made pursuant to the Plan on account of an Allowed Claim any claims, rights or Causes of Action held by the Creditor Trust/Trustee against the holder of the Allowed Claim or in relation to the Allowed Claim; *provided, however,* that neither the failure to effect such a setoff nor the allowance of any Claim will constitute a waiver or release by the Creditor Trust or Trustee of any such claims, rights or Causes of Action.

5. **Establishment of Reserves Under the Plan**

The Plan provides for the establishment of specific types of reserves for both distributional and administrative purposes. Each of these types of reserves is described below.

*Disputed Claims Reserve Account*

The Disputed Claims Reserve Account will be an account maintained by the Trustee for the purposes of holding distributions on account of Disputed Claims pending the Allowance or Disallowance, in whole or in part, of such Claims. Pursuant to the Plan, except to the extent that the Bankruptcy Court enters an order determining that a lesser amount is adequate as to a particular Disputed Claim, the Trustee shall deposit into the Disputed Claims Reserve Account an amount of Cash equal to the distribution that would have been made to the holder of such Disputed Claim if such Disputed Claim were an Allowed Claim. At such time as all or any portion of a Disputed Claim becomes an Allowed Claim, the distribution(s) reserved for such Disputed Claim shall be released from such Disputed Claims Reserve Account and, subject to all other applicable provisions of Article 9 of the Plan, the Trustee shall pay to the holder of such Claim that amount of the distribution(s) to which the holder is entitled under the terms of Article 3 or 4 of the Plan, as applicable. Any interest earned on funds deposited in such Disputed Claims Reserve Account shall constitute property of the Creditor Trust and not of the holder of the Claim(s) for which such funds have been reserved.

Pursuant to the Plan, in determining the amount of Net Available Lender Collateral Proceeds which are available for distribution to the Bank Agent at any particular time in accordance with Sections 4.1.1 and 9.2.1 of the Plan, the Trustee shall reserve a sufficient amount of Lender Collateral Proceeds, determined by the Trustee in his sole discretion, to enable the Trustee to fund the costs of administering, selling or otherwise disposing of the Lender Collateral. Such reserve is the Restricted Administrative Expense Reserve.

*Unrestricted Administrative Expense Reserve*

Pursuant to the Plan, in determining the amount of Net Available General Trust Funds, Net Available Lender Settlement Trust Funds and/or Net Available Other Settlement Trust Funds which are available for distribution to the holders of Allowed General Unsecured Claims at any particular time in accordance with Sections 4.4.1, 9.2.2, 9.2.3 and 9.2.4 of the Plan (as applicable), the Trustee shall reserve a sufficient amount of funds constituting General Trust Assets and Settlement Trust Assets, determined by the Trustee in his sole discretion, to enable the Trustee (a) to fund the litigation of any Causes of Action and any objections to Claims that the Trustee is pursuing, or may pursue, (b) to fund the costs of administering assets of the Creditor Trust (other than the Lender Collateral and Lender Collateral Proceeds), and (c) to fund the costs of administering the Creditor Trust until it is terminated. Such reserve is the Unrestricted Administrative Expense Reserve.

### 6. Undeliverable and Unclaimed Distributions

Pursuant to the Plan, any Cash distribution to be made pursuant to the Plan may be made by check or wire transfer, at the option of the Trustee in his sole discretion. If made by check, the Plan provides that the distribution shall be delivered to the holder of the Allowed Claim by U.S. first class mail, postage prepaid, using (in the following order of priority): (a) the mailing address identified on the Ballot for such Allowed Claim which is timely submitted by the holder of the Allowed Claim to the Balloting Agent, or (b) if no such Ballot is submitted to the Balloting Agent, then the mailing address for the provision of notices or payments (as applicable) stated on the proof of claim filed with the Bankruptcy Court in relation to such Allowed Claim, or (c) if no proof of claim was filed with the Bankruptcy Court, the mailing address set forth in the Schedules in relation to such Allowed Claim; *provided, however*, that if an Allowed Claim is transferred to another Person on or before the Distribution Record Date, and such transfer is properly evidenced and effectuated by the filing of a claim transfer notice with the Bankruptcy Court pursuant to Bankruptcy Rule 3001(e) on or before the Distribution Record Date which is not contested, then such distribution shall be delivered to the transferee of the Allowed Claim by U.S. first class mail, postage prepaid, using the mailing address noted on the claim transfer notice.

Any distribution which is returned to the Creditor Trust/Trustee and identified by the U.S. Postal Service as undeliverable without any indication of a forwarding address shall be retained by the Creditor Trust for a period of 90 days from the date of its original mailing unless otherwise ordered by the Bankruptcy Court. Failure of the holder of the Allowed Claim to come forward and validly make claim to the undelivered distribution by the end of such retention period shall constitute the holder's unconditional and irrevocable waiver of any right to receive the distribution and any further distributions under the Plan on account of such Allowed Claim, and shall constitute the holder's forfeiture to the Creditor Trust of the distribution and any and all future distributions to which the holder would be entitled in relation to such Allowed Claim. Similarly, unless otherwise ordered by the Bankruptcy Court, failure of the holder of an Allowed Claim to present for payment a distribution check issued by the Creditor Trust (which is not returned to the Creditor Trust/Trustee as undeliverable) within 90 days of the mailing of such distribution shall constitute the holder's unconditional and irrevocable waiver of any right to

receive the distribution, and shall constitute the holder's forfeiture to the Creditor Trust of the distribution. Forfeited distributions shall be available to fund costs of administration of the Creditor Trust or for the distribution to Creditors consistent with the provisions of Articles 3 and 4 of the Plan. Neither the Post-Confirmation Debtor nor the Trustee will have any obligation to independently undertake any investigation to determine the whereabouts of any holder of an Allowed Claim.

## 7. Disputed Distributions

Pursuant to the Plan, in the event that a dispute arises as to the rightful owner of an Allowed Claim, thereby calling into question the rightful recipient of a distribution under the Plan, the Creditor Trust/Trustee may, in lieu of making the distribution, either (a) deposit the distribution, if Cash, into a segregated account until a determination is made as to the rightful owner of the distribution by the Bankruptcy Court or by written agreement between each of the Persons making claim to the distribution, or (b) interplead the distribution into the registry of the Bankruptcy Court or such other court having jurisdiction over the disputed distribution and the Persons making claim to such distribution, reserving the right to assert any and all claims that the Creditor Trust/Trustee may have in relation to such interpleader action.

## 8. De Minimis Distributions

Pursuant to the Plan, notwithstanding any provision of the Plan to the contrary, no distribution of less than two dollars ($2.00) shall be made from the Creditor Trust on account of an Allowed Claim.

## C. Means for Resolving Disputed Claims

Pursuant to the Plan, all objections to Claims must be filed on or before the Claim Objection Deadline. "Claim Objection Deadline" is defined under the Plan as 180 days after the Effective Date of the Plan, unless extended by the Bankruptcy Court, for cause shown, upon motion filed with the Bankruptcy Court on or prior to such date. Any Disputed Claim as to which an objection is not filed on or before the Claim Objection Deadline will be deemed to constitute an Allowed Claim under the Plan following the Claim Objection Deadline.

To facilitate the timely and effective administration of Claims, the Plan further provides that, except as otherwise expressly contemplated by the Plan, following the Effective Date of the Plan no original or amended proof of claim may be filed in the Bankruptcy Case to assert a Claim against the Debtor without prior authorization of the Bankruptcy Court, and any such proof of claim which is filed without such authorization shall be deemed null, void and of no force or effect; *provided, however*, that the holder of a Claim that has been evidenced in the Bankruptcy Case by the filing of a proof of claim on or before the Bar Date shall be permitted to file an amended proof of claim in relation to such Claim at any time if the sole purpose of the amendment is to reduce the amount of the Claim asserted.

Finally, the Plan provides that following the Effective Date of the Plan, and without the necessity of notice and Bankruptcy Court approval, the Trustee shall have the authority to resolve any Disputed Claim which is the subject of a timely-filed objection if the resolution will result in the Claim being Allowed in an amount of no greater than $20,000.00 more than the liquidated, non-disputed and non-contingent amount of the Claim as listed in the Debtor's Schedules. All other settlements involving Disputed Claims to which timely-filed objections have been lodged will be subject to notice and Bankruptcy Court approval, unless ordered otherwise by the Bankruptcy Court upon separate motion and notice in the Bankruptcy Case.

**D.** **Conditions to Confirmation and Effectiveness of the Plan**

In addition to meeting the requirements of Section 1129 of the Bankruptcy Code, the following conditions precedent must be met in order for the Plan to be confirmed:

(a) The Bank Agent and PRAG have approved the form and substance of the Plan;

(b) Each of the Bank Agent, the initial Trustee as proposed under the Plan, and the initial members of the Creditor Trust Oversight Committee as proposed under the Plan have approved the form and substance of the Creditor Trust Documentation;

(c) Each of the Plan Proponents, the Bank Agent, and PRAG have approved the form and substance of the Confirmation Order, which approval shall not be unreasonably withheld; and

(d) The Bankruptcy Court has entered the Mediated Settlement Order.

Following confirmation of the Plan, the following conditions precedent must be met before the Plan will become effective:

(a) The Confirmation Order has become a Final Order; *provided, however,* that such condition shall be deemed satisfied if waived in writing by the Plan Proponents;

(b) The Creditor Trust Documentation, creating the Creditor Trust, has been executed by the Debtor, the Trustee, the members of the Creditor Trust Oversight Committee, and the Bank Agent;

(c) PRAG has executed and delivered to the Debtor the instrument referenced in Section 7.1.2 of the Plan;

(d) NEWCO has executed and delivered to the Debtor the instrument referenced in Section 7.1.4 of the Plan;

(e) The Estate has received the Initial Lender Payment;

(f) The Estate has received the Initial PRAG Payment;

(g) The Estate has received the CoMark Registry Funds; and

(h) The Estate has received the CoMark Payment.

The "Effective Date" of the Plan will be the date on which the Plan becomes effective by virtue of the satisfaction or waiver (as applicable) of each of the above conditions precedent.

**E.** **Effects of Confirmation of the Plan; Injunction and Exculpation**

**1.** **Binding Effect of Plan**

Pursuant to the Plan, upon the Effective Date of the Plan, the Plan and each of its provisions shall be binding on the Plan Proponents, the Post-Confirmation Debtor, the Creditor Trust, the Trustee, all Creditors, all Equity Interest holders, and all Persons acquiring property under the Plan, whether or not they voted to accept the Plan, whether or not they had a right to vote on the Plan, whether or not any Claim or Equity Interest held by any of them is impaired under the Plan, whether or not any Claim or Equity Interest held by any of them is Allowed in full, only in part, or Disallowed in full, and whether or not a distribution is made to any of them under the Plan.

## 2. Vesting of Assets

Pursuant to the Plan, except as expressly otherwise provided in the Plan, on the Effective Date of the Plan (a) all of the Retained Assets shall re-vest in the Post-Confirmation Debtor free and clear of all Claims, Liens and encumbrances, of any nature whatsoever, and (b) all of the Trust Assets shall be transferred to the Creditor Trust free and clear of all Claims, Liens and encumbrances, of any nature whatsoever.

## 3. Injunction Against Interference with Plan

The Plan also provides for an injunction against interference with the Plan. Specifically, Section 12.3 of the Plan provides as follows:

**UPON THE EFFECTIVE DATE, ALL HOLDERS OF CLAIMS, ALL HOLDERS OF EQUITY INTERESTS, AND ALL OTHER PARTIES IN INTEREST IN THE BANKRUPTCY CASE, ALONG WITH THEIR RESPECTIVE CURRENT AND FORMER OFFICERS, DIRECTORS, PRINCIPALS, EMPLOYEES, AGENTS, SUCCESSORS AND ASSIGNS, SHALL BE AND ARE HEREBY ENJOINED FROM TAKING ANY ACTION TO INTERFERE WITH THE IMPLEMENTATION OR CONSUMMATION OF THE PLAN.**

## 4. Exculpation

Pursuant to the Plan, the Exculpated Parties shall neither have nor incur any liability to any Person for any action taken or omitted in soliciting acceptances of the Plan, except to the extent expressly provided otherwise by Section 1125(e) of the Bankruptcy Code. "Exculpated Parties" is defined under the Plan as "[c]ollectively, the Plan Proponents and their respective officers, directors, employees, attorneys, accountants, financial advisors and other agents, professionals and representatives."

## F. Modification of the Plan

Subject to the provisions of Section 1127 of the Bankruptcy Code, the Plan Proponents reserve the right to amend or modify the Plan (a) at any time prior to the Confirmation Date without Bankruptcy Court approval, or (b) at any time after the Confirmation Date, but prior to the Effective Date of the Plan, with Bankruptcy Court approval. In the event that the Plan Proponents are required to provide the holders of Claims (or certain of them) the opportunity to re-vote on the Plan, as amended or modified, then each such holder that previously voted to accept or reject the Plan will be deemed to have cast the same vote for acceptance or rejection, as the case may be, of the Plan, as amended or modified, unless, within the time fixed by the Bankruptcy Court, such holder changes its previously cast vote for acceptance or rejection of the Plan.

## G. Retention of Jurisdiction

Pursuant to the Plan, from and after the Effective Date of the Plan, the Bankruptcy Court shall retain jurisdiction, to the fullest extent legally permitted, over the Bankruptcy Case, all proceedings arising under, arising in or related to the Bankruptcy Case, the Confirmation Order, the Plan and administration of the Creditor Trust. The specific types of disputes and proceedings that the Bankruptcy Court will retain jurisdiction over are identified in Section 14.1 of the Plan.

**XII.**
**COMPARISON OF PLAN TO ALTERNATIVES**

**A.     Chapter 7 Liquidation**

The most realistic alternative to the Plan is conversion of the Bankruptcy Case from a proceeding under Chapter 11 of the Bankruptcy Code to a proceeding under Chapter 7 of the Bankruptcy Code. A Chapter 7 case, sometimes referred to as a "straight liquidation," requires the liquidation of all of the debtor's assets by a Chapter 7 trustee. The cash realized from liquidation is subject to distribution to creditors in accordance with Section 726 of the Bankruptcy Code. Whether a bankruptcy case is one under Chapter 7 or Chapter 11, allowed secured claims, allowed administrative claims and allowed priority claims, unless subordinated pursuant to Section 510 of the Bankruptcy Code, are entitled to be paid in cash, in full, before unsecured creditors and equity interest holders receive anything. Thus, in a Chapter 7 case, the recovery, if any, to creditors holding non-priority unsecured claims will depend upon the net proceeds left in the estate after all of the debtor's assets have been reduced to cash and all claims of higher priority have been satisfied in full.

Chapter 7 liquidation theoretically adds an additional layer of expense. As referenced above, conversion of a bankruptcy case to Chapter 7 will trigger the appointment of a Chapter 7 trustee having the responsibility of liquidating the debtor's assets. Pursuant to Sections 326 and 330 of the Bankruptcy Code, the Chapter 7 trustee will be entitled to reasonable compensation in relation to the level of disbursements made to creditors, as follows: (a) up to 25% of the first $5,000 disbursed; (b) up to 10% of the amount disbursed in excess of $5,000 but not in excess of $50,000; (c) up to 5% of any amount disbursed in excess of $50,000 but not in excess of $1,000,000; and (d) up to 3% of any amount disbursed in excess of $1,000,000. Additionally, the Chapter 7 trustee will be entitled to retain his or her own professionals to assist in the liquidation and administration of the estate. The fees and expenses of such professionals, to the extent allowed, are also entitled to priority in payment as administrative claims. Chapter 7 administrative costs are entitled to priority in payment over Chapter 11 administrative costs. Nevertheless, Chapter 11 administrative costs continue to have priority over all other non-administrative priority claims and non-priority unsecured claims in the bankruptcy case.

Conversion to Chapter 7 could result in the appointment of a trustee having no experience or knowledge of the prior proceedings in the Bankruptcy Case or of the Debtor's business, its books and records and its assets. Hence, a substantial amount of time would most definitely be required in order for the Chapter 7 trustee to become familiar with the Debtor, its prior business operations, its assets, and pending litigation in order to wind the case up effectively.

The Plan Proponents are opposed to conversion of the Bankruptcy Case to Chapter 7 for several reasons. First, the Plan Proponents believe that conversion of the Bankruptcy Case could lead to additional layers of expense for the reasons stated above. Second, conversion of the Bankruptcy Case will re-open the Bar Date and enable additional, otherwise barred Claims, to be asserted. By maintaining the Bankruptcy Case in Chapter 11 and confirming the Plan, the assertion of additional claims can be prevented. Finally, conversion of the Bankruptcy Case to Chapter 7 will not materially alter the path of the Debtor. In this regard, often creditors will seek conversion of a Chapter 11 case in order to force a liquidation of the debtor's assets instead of the reorganization of the debtor's business. Here, the Plan provides for the liquidation of the Debtor's assets; therefore, conversion will not lead to a different result.

With respect to the "best interest of creditors" test of Section 1129(a)(7) of the Bankruptcy Code, the Plan Proponents do not believe that Creditors will achieve a greater recovery under Chapter 7 than under the Plan. Inasmuch as the Plan is a plan of liquidation, the comparison of likely distributions to holders of Allowed Claims under the Plan to likely distributions to holders of Allowed Claims in a

Chapter 7 proceeding is similar, except that in a Chapter 7 proceeding the potential for additional administrative expense and additional Claims demonstrates that distributions under the Plan are likely to exceed the distributions that would be made under Chapter 7. Consequently, the Plan Proponents believe that the Plan is in the best interest of Creditors.

**B.      Alternative Plans**

To date, no other proposed Chapter 11 plans have been filed in the Bankruptcy Case, and it is not anticipated that any other proposed Chapter 11 plan will be filed.

**C.      Dismissal**

The most remote alternative possibility is dismissal of the Bankruptcy Case. If dismissal were to occur, the Debtor would no longer have the protection of the automatic stay and other applicable provisions of the Bankruptcy Code. Dismissal would force a race among Creditors to take control and dispose of the Debtor's available assets, and unsecured creditors, on an aggregate basis, would very likely fail to realize any recovery on their Claims.

**XIII.**
**MATERIAL UNCERTAINTIES AND RISKS**

In considering whether to vote to accept or reject the Plan, Creditors entitled to vote should consider the following risks associated with the Plan:

First, there is risk that all of the conditions to confirmation of the Plan are not satisfied or waived (as applicable). In this regard, the Plan is expressly conditioned upon the Bankruptcy Court's approval of the Mediated Settlement and entry of the Mediation Settlement Order. In the absence of such approval and order, the Plan is not feasible and therefore will not be confirmed. The Plan Proponents believe that all of the conditions to confirmation will be satisfied at or prior to the Confirmation Hearing.

Second, there is risk that all of the conditions to the effectiveness of the Plan are not satisfied or waived (as applicable). Among other things, the effectiveness of the Plan is conditioned upon the Estate's receipt of the Initial Lender Payment, the Initial PRAG Payment, the CoMark Registry Funds, and the CoMark Payment. This is to ensure that the Mediated Settlement Agreement has been partially consummated prior to the Plan's effectiveness, thereby ensuring the feasibility of the Plan and also that the Mediation Settling Parties are performing in accordance with the settlement reached at mediation. Additionally, effectiveness of the Plan is dependent upon the execution of various instruments in furtherance of the post-Effective Date performance of settlement obligations related to the Subsequent PRAG Payments. This condition is designed to ensure that both PRAG and NEWCO are bound to the domestic cotton sales and payment procedures set forth in the Plan. The Plan Proponents believe that all of the conditions to the effectiveness of the Plan will be satisfied shortly after entry of the Confirmation Order.

Third, there is risk that the conditions to payment of the Subsequent Lender Payment are not satisfied. Pursuant to the Mediated Settlement Agreement, the Bank Group is obligated to make the Subsequent Lender Payment by no later than the latest of (i) March 31, 2010, (ii) 14 days after Grower Releases from Growers holding Claims against the Estate are delivered to the Bank Group in accordance with paragraph 17 of the Mediated Settlement Agreement, and (iii) 14 days after all termination rights set forth in the Mediated Settlement Agreement have expired and been not exercised. With respect to condition (iii) above, because the effectiveness of the Plan is conditioned on partial consummation of the Plan, the Plan Proponents do not believe that this condition will be applicable. With respect to condition

(ii) above, the Committee reasonably believes that it has already obtained all, or substantially all, of the requisite Grower Releases to satisfy such condition. Moreover, the Plan's release provisions applicable to General Unsecured Claims in Class 4 of the Plan are designed to supplement the Grower Release requirements of the Mediated Settlement Agreement. For these reasons, the Plan Proponents reasonably believe that all conditions to payment of the Subsequent Lender Payment will be satisfied by, or within a reasonable period of time after, March 31, 2010.

Fourth, there is risk that payment of the Subsequent PRAG Payments may take place over an extended period of time. As reflected above, NEWCO's payments to the Creditor Trust are tied to the sale and delivery of Domestic Bales to third parties. Hence, the payment stream to the Creditor Trust will necessarily be dependent upon the level of business conducted by NEWCO in the United States. Pursuant to the Mediated Settlement Agreement and the Plan's ancillary provisions for implementation of the agreement, the deadline for making the full amount of the Subsequent PRAG Payments is December 31, 2019, and there is no obligation for NEWCO to conduct any fixed level of business at any time. To the extent that any portion of the Subsequent PRAG Payments has not been paid by such date, however, PRAG has unconditionally guaranteed payment of the Residual Lump Sum Payment, thereby minimizing the risk of non-payment altogether.

Fifth, there is risk that the Debtor's projected recovery by holders of Allowed General Unsecured Claims within Class 4 of the Plan is not achieved. In this regard, the Debtor's projections are premised upon a number of assumed subsequent events that may or may not occur as anticipated – among them, that Disputed Claims within Class 4 are timely and properly objected to or otherwise administered to ensure that such Claims are only Allowed in amounts that are supportable in fact and in law.

Finally, there can be no assurance that the Plan will not be modified up to and through the Confirmation Date, and the Plan Proponents reserve the right to modify the Plan, subject to compliance with the Bankruptcy Code, in the event the modification becomes warranted or necessary in furtherance of confirmation.

## XIV.
## CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

### A.     Introduction

Implementation of the Plan may have federal, state and local tax consequences to the Debtor and its Estate, as well as to Creditors and Equity Interest holders of the Debtor. No tax opinion has been sought or will be obtained with respect to any tax consequences of the Plan, and the following disclosure does not constitute and is not intended to constitute either a tax opinion or tax advice to any Person. This disclosure is provided for informational purposes only. Moreover, this disclosure summarizes only certain of the federal income tax consequences associated with the Plan's confirmation and implementation and does not attempt to comment on all such aspects. Similarly, this disclosure does not attempt to consider any facts or limitations applicable to any particular Creditor or Equity Interest holder that may modify or alter the consequences described below. This disclosure does not address state, local or foreign tax consequences or the consequences of any federal tax other than the federal income tax.

This disclosure is based upon the provisions of the Internal Revenue Code of 1986, as amended, the regulations promulgated thereunder, existing judicial decisions, and administrative rulings. In light of the expansiveness of such authorities, no assurance can be given that legislative, judicial or administrative changes will not be forthcoming that would affect the accuracy of the discussion below. Any such changes could be material and could be retroactive with respect to the transactions entered into or completed prior to the enactment or promulgation thereof. Finally, the tax consequences of certain

aspects of the Plan are uncertain due to a lack of applicable legal authority and may be subject to judicial or administrative interpretations that differ from the discussion below.

**CREDITORS AND EQUITY INTEREST HOLDERS, THEREFORE, ARE ADVISED TO CONSULT WITH THEIR OWN TAX ADVISORS REGARDING THE TAX CONSEQUENCES TO THEM AND TO THE DEBTOR OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN, INCLUDING FEDERAL, STATE, LOCAL AND FOREIGN TAX CONSEQUENCES.**

**B.      Federal Income Tax Consequences to the Debtor**

Under the terms of the Plan, all Assets of the Debtor and the Estate (with the sole exception of the Retained Assets, being Books and Records of the Debtor required to enable the wind-up and termination of the Debtor's existence) and all Claims against the Debtor will be transferred to the Creditor Trust. The Debtor will have no continuing liability on Claims. To the extent the Debtor realizes income as a result of the debt forgiveness associated with such transfers, such income will not constitute taxable income to the Debtor because the debt forgiveness arises in connection with a bankruptcy case under Title 11 of the United States Code.

Additionally, for the fiscal year ending June 30, 2008, the Debtor had a net operating loss carry forward of approximately $146 million. The Debtor experienced additional operating losses during the fiscal year ending June 30, 2009. Because the Plan provides for the wind-up and termination of the Debtor, the Debtor will lose the benefit of any net operating loss carry forward tax attributes.

**C.      Federal Income Tax Consequences Associated with Creation of Creditor Trust**

The Plan provides for the establishment of the Creditor Trust and the transfer of all of the Debtor's and Estate's assets, including Causes of Action, to the Creditor Trust on the Effective Date of the Plan (the sole exception being the Retained Assets, as discussed above). The Plan Proponents intend that the Creditor Trust qualify as a "grantor" trust of the Debtor for federal income tax purposes. If the IRS does not challenge this treatment, the Creditor Trust will have no separate liability for federal income taxes relating to, or arising from, the conveyance, administration, or liquidation of assets of the Creditor Trust. The Trustee will be required to file the tax returns that the Debtor would have filed if its assets had not been conveyed to the Creditor Trust.

Notwithstanding the Plan Proponents' intent that the Creditor Trust qualify as a grantor trust of the Debtor for federal income tax purposes, the IRS has announced in Rev. Proc. 94-45 that if certain conditions are met, it will issue a ruling that a liquidating trust created pursuant to a bankruptcy plan under Chapter 11 of the Bankruptcy Code will be treated as a grantor trust of which the Creditors are the grantors. If the IRS were to successfully assert that the Creditor Trust should be characterized as such a liquidating trust, the Creditor Trust would be treated as a "liquidating trust" within the meaning of Section 301.7701-4(d) of the Tax Regulations (a "Liquidating Trust") and the transfer of the assets of the Debtor to the Creditor Trust would be treated as a transfer from the Debtor to the beneficiaries of the Creditor Trust for all purposes of the Internal Revenue Code (*e.g.*, Sections 61(a)(12), 483, 1001, 1012 and 1274) followed by a deemed transfer by such beneficiaries to the Creditor Trust. Any gain the Debtor recognizes related to the transfer of the assets to the Creditors plus any related cancellation of indebtedness income from the satisfaction of the indebtedness will not constitute taxable income to the Debtor because the debt forgiveness arises in connection with a bankruptcy case under Title 11 of the United States Code.

Finally, the valuation of assets transferred to the Creditor Trust (especially unliquidated Causes of Action) is uncertain. Notwithstanding the difficulty in valuing certain assets, the valuation of the

transferred property to the Creditor Trust and the Creditors must be consistent, and under this scenario those valuations would have to be used for all applicable reporting purposes by the Debtor and Creditors.

## D.     Additional Federal Income Tax Consequences to Creditors

Although the Plan Proponents do not believe that the conveyance of the Debtor's assets to the Creditor Trust will be considered a taxable event, the Creditors may, at some point in time, be required to recognize income or be allowed a deduction as a result of the implementation of the Plan. The exact tax treatment depends on each Creditor's method of accounting, the basis of the amount of distributions received, and whether and to what extent such Creditor has taken a bad debt reduction in prior taxable years with respect to a particular debt owed to it by the Debtor. In the event that the Creditor Trust is treated as a grantor trust for the benefit of Creditors, any income, gain or loss attributable to the ownership, administration or disposition of the assets of the Creditor Trust would be taxable to the Creditors, in accordance with their interests in such assets, whether or not the Creditors had received any cash distributions from the Creditor Trust. Gain or loss on the subsequent disposition of Creditor Trust assets would be equal to the difference between the amount realized on the disposition of those assets and their tax bases in the hands of the Creditor Trust (initially, the fair market value of the Creditor Trust assets at the time of the transfer to the Creditor Trust). **EACH CREDITOR IS URGED TO CONSULT WITH ITS OWN TAX ADVISOR REGARDING THE PARTICULAR TAX CONSEQUENCES OF ITS CLAIM UNDER THE PLAN.**

## E.     Tax Withholding

Pursuant to the Plan, the Trustee will withhold from payments made to Creditors pursuant to the Plan any amounts required by law to be withheld. In order to assist that withholding process, Creditors may be required by the Trustee to provide general tax information to him prior to receiving their distributions under the Plan.

## F.     Disclaimers

**PERSONS CONCERNED WITH THE TAX CONSEQUENCES OF THE PLAN SHOULD CONSULT THEIR OWN ACCOUNTANTS, ATTORNEYS AND/OR ADVISORS. THE PLAN PROPONENTS MAKE THE ABOVE-NOTED DISCLOSURE OF POSSIBLE TAX CONSEQUENCES FOR THE SOLE PURPOSE OF ALERTING READERS TO TAX ISSUES THAT THEY MAY WISH TO CONSIDER. THE PLAN PROPONENTS CANNOT, AND DO NOT, REPRESENT THAT THE TAX CONSEQUENCES MENTIONED ABOVE ARE COMPLETELY ACCURATE BECAUSE, AMONG OTHER THINGS, THE TAX LAW EMBODIES MANY COMPLICATED RULES THAT MAKE IT DIFFICULT TO STATE ACCURATELY WHAT THE TAX IMPLICATIONS OF ANY ACTION MIGHT BE.**

**IRS CIRCULAR 230 NOTICE:   TO ENSURE COMPLIANCE WITH REQUIREMENTS IMPOSED BY THE INTERNAL REVENUE SERVICE, THE PLAN PROPONENTS INFORM ALL RECIPIENTS OF THIS DISCLOSURE STATEMENT THAT ANY U.S. TAX INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT (INCLUDING THE EXHIBITS HERETO) IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, FOR THE PURPOSE OF (A) AVOIDING PENALTIES UNDER THE INTERNAL REVENUE CODE, OR (B) PROMOTING, MARKETING OR RECOMMENDING TO ANOTHER PARTY ANY TRANSACTION OR MATTER ADDRESSED HEREIN.**

# XV.
# CONCLUSION

The Plan Proponents believe that the Plan complies with Section 1129 of the Bankruptcy Code and is fair and equitable and in the best interests of the Debtor, the Estate and Creditors. Accordingly, the Plan Proponents urge Creditors receiving Ballots to vote to accept the Plan.


DATED: December 29, 2009

**MUNSCH HARDT KOPF & HARR, P.C.**
3800 Lincoln Plaza
500 N. Akard Street
Dallas, Texas 75201-6659
Telephone: (214) 855-7500
Facsimile: (214) 855-7584

By: /s/ E. Lee Morris
    E. Lee Morris
    Texas Bar No. 00788079
    Deborah M. Perry
    Texas Bar No. 24002755

**ATTORNEYS FOR PAUL REINHART, INC.,
DEBTOR AND DEBTOR-IN-POSSESSION**


**ROCHELLE McCULLOUGH LLP**
325 N. St. Paul, Suite 4500
Dallas, Texas 75201
Telephone: (214) 953-0182
Facsimile: (214) 953-0185

By: /s/ Sean J. McCaffity
    Michael R. Rochelle
    Texas Bar No. 17126700
    Sean J. McCaffity
    Texas Bar No. 24013122

**ATTORNEYS FOR OFFICIAL UNSECURED
CREDITORS' COMMITTEE**

# EXHIBIT A

[Debtor's and Official Unsecured Creditors' Committee's Second Amended Joint
Plan of Liquidation Under Chapter 11 of the United States Bankruptcy Code]

[See Docket No. 533]
[Actual copy to be attached to approved Disclosure Statement]

# EXHIBIT B

[Unaudited Balance Sheet of Debtor as of November 30, 2009]

# Paul Reinhart, Inc
## Financial Statements

|  | November 30 |
|---|---|
|  | 2009 |

## BALANCE SHEET

### ASSETS
--------------

**CURRENT ASSETS:**

| | |
|---|---:|
| Cash | 2,248,463 |
| Trade Receivalbes net of Allowance for Bad Debts | 17,623,542 |
| Prepaid Expenses | 44,085 |
| | ------------------------------- |
| Total Current Assets | 19,916,090 |
| | |
| Property and Equipment - Cost | 1,688,805 |
| Accumulated Depreciation | (1,540,946) |
| | ------------------------------- |
| Property and Equipment - Net | 147,859 |
| | |
| Other Assets | 1,123,902 |
| | ------------------------------- |
| **TOTAL ASSETS** | **21,187,851** |
| | ================= |

## LIABILITIES & STOCKHOLDER'S EQUITY
----------------------------------------

**CURRENT LIABILITIES:**

| | |
|---|---:|
| Secured Debt | 46,111,860 |
| Trade, Agents, & Suppliers | 496 |
| Professional Fees | 495,670 |
| Unsecured Debt | 85,232,873 |
| | ------------------------------- |
| Total Current Liabilities | 131,840,899 |

**STOCKHOLDER'S EQUITY:**

| | |
|---|---:|
| Prepetition Owner's Equity | (103,477,884) |
| Earnings (Loss) Since Petition Date | (7,175,164) |
| | ------------------------------- |
| Total Stockholder's Equity | (110,653,048) |
| | ------------------------------- |
| | |
| **TOTAL LIABILITIES AND STOCKHOLDER'S EQUITY** | **21,187,851** |
| | ================= |

# EXHIBIT C

[Amended Joint Motion of the Debtor and Committee
for Entry of Order Approving Mediated Settlement]

[See Docket No. 527]
[Actual copy to be attached to approved Disclosure Statement]